Erich P. Wise/State Bar No. 63219
Nicholas S. Politis/State Bar No. 92978
Aleksandrs E. Drumalds/State Bar No. 237101
FLYNN, DELICH & WISE LLP
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
Telephone: (562) 435-2626
Facsimile: (562) 437-7555

James B. Nebel/State Bar No. 69626
Conte C. Cicala/State Bar No. 173554
FLYNN, DELICH & WISE LLP
One California Street, Suite 350
San Francisco, California
Telephone: (415) 693-5566
Facsimile: (415) 693-0410

Attorneys for Plaintiff
PACIFIC MERCHANT SHIPPING ASSOCIATION,
a California Mutual Benefit Corporation

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO

| | |
|---|---|
| PACIFIC MERCHANT SHIPPING ASSOCIATION, a California Mutual Benefit Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CATHERINE E. WITHERSPOON, in her official capacity as Executive Officer of the California Air Resources Board,<br><br>Defendant,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC., COALITION FOR CLEAN AIR, INC., SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, and CITY OF LONG BEACH,<br><br>Defendants-Intervenors. | CASE NO.: 2:06-CV-02791-WBS-KJM<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT BY PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION<br><br>Date:        July 9, 2007<br>Time:        2:00 p.m.<br>Courtroom: 5<br>Judge:      Hon. William B. Shubb |

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.............................................................. 1

II.   STATEMENT OF THE CASE.......................................... 4

    A.    The Parties..................................................... 5

    B.    The Regulations.............................................. 6

III.  ARGUMENT.................................................................. 8

    A.    Summary Judgment Is Appropriate In This Case Because
The Material Facts Are Undisputed And PMSA Is Entitled To
Judgment As A Matter of Law........................................ 8

    B.    Plaintiff Is Entitled To An Injunction Against Enforcement
Of The CARB Regulations Because These Regulations Impose
Standards Relating To Emissions From Nonroad Engines And
CARB Did Not Obtain EPA Authorization For The Regulations
As Required By § 209(e)(2)(A) Of The Clean Air Act............ 10

        1.    State Standards Relating to Emissions from Vessel
Auxiliary Diesel Engines Are Preempted by
§209(e)(2)(A) of the Clean Air Act........................ 10

        2.    The CARB Regulations Impose Standards Relating
to Emissions from Vessel Auxiliary Diesel Engines...... 14

        3.    The CARB Regulations Are Standards, Not
"In-Use" Requirements...................................... 16

        4.    Section 209(e)(2)(A) of the Clean Air Act Prohibits
CARB's  Enforcement of the Regulations Because
CARB Did Not Obtain EPA Authorization for those
Regulations................................................... 21

**FLYNN, DELICH & WISE LLP**
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

i

# TABLE OF CONTENTS

**Page**

    5.    Injunctive and Declaratory Relief Is Appropriate to Preclude Enforcement Pending EPA Authorization of the Regulations......................................... 24

  C.  CARB's Regulations Contravene The Territorial Limits Placed On California's Authority By The Submerged Lands Act, 43 U.S.C. §§1301, et seq................................. 25

    1.    The Submerged Lands Act Establishes California's Boundary at Three Miles Seaward of the California Coastline................................................. 26

    2.    The Police Power of States Does Not Extend to Maritime Conduct Beyond the State's Boundaries...... 29

    3.    Presidential Proclamations 5928 and 7219, EPA Regulations and Policy Exempting Foreign Flag Ships from Clean Air Act Regulations, and the United States' Ratification of MARPOL Annex VI Preclude State Regulation of Vessel Emissions Beyond the Three-Mile Limit............................ 48

IV.    CONCLUSION............................................................. 58

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT BY PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

Anderson v. Liberty Lobby, Inc.
   477 U.S. 242 (1986)...................................................... 8, 9

Askew v. American Waterways Operators, Inc.
   411 U.S. 325 (1973)...........................................25, 30, 32, 33

Bayside Fish Co. v. Gentry
   297 U.S. 422 (1936)...................................................... 46

Bluewater Network v. Environ. Prot. Agcy.
   372 F.3d 404 (D.C. Cir. 2004)...........................................12, 24

Bud Antle, Inc. v. Barbosa
   45 F.3d 1261 (9th Cir. 1994)............................................ 24

Celotex Corp. v. Catrett
   477 U.S. 317 (1986)...................................................... 9

Chevron v. Hammond
   726 F.2d 483 (9th Cir. 1984)...........................................25, 30, 36

Chevron U.S.A. v. Sheffield
   471 U.S. 1140 (1985)...................................................25, 30, 36

Cooley v. Board of Wardens
   53 U.S. 299 (1851)...................................................... 40, 44

Eisenberg v. Ins. Co. of N. Am.
   815 F.2d 1285 (9th Cir. 1987)............................................ 9

Eng. Mfrs. Ass'n v. U.S. EPA
   88 F.3d 1075 (D.C. Cir. 1996)..........................................11-14, 16, 21

Eng. Mfrs. Ass'n v. South Coast Air Quality Management District
   541 U.S. 246 (2004)...................................................14-21, 23

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

Gillis v. Louisiana
   294 F.3d 755 (5th Cir. 2002)...................................................................39, 42-44

Hanon v. Dataproducts Corp.
   976 F.2d 497 (9th Cir. 1992)......................................................................... 9

Hjelle v. Brooks
   377 F.Supp. 430 (D. Ak. 1974).................................................................. 45-47

Horton v. Smith
   6 Ben. 264................................................................................................. 41

Huron Portland Cement Co. v. City of Detroit
   362 U.S. 440 (1960)...............................................................................25, 30-32

Just v. Chambers
   312 U.S. 383 (1941)...................................................................................... 33

Lea v. Ship Alexander
   2 Paine, 468.............................................................................................. 41

Ray v. Atlantic Richfield Co.
435 U.S. 151 (1978)............................................................................25, 30, 34, 36, 47

Shaw v. Delta Air Lines, Inc.
   463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)........................... 24

Skiriotes v. Florida
   313 U.S. 69 (1941)...............................................................................37-39, 45

Silz v. Esterberg
   211 U.S. 31 (1908)...................................................................................... 46

State of Alaska v. Bundrant
   546 P.2d 530 (Ak. Sup. Ct. 1976)........................................................... 44-47

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
PARTIAL SUMMARY JUDGMENT BY PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page**

State of Alaska v. Sieminski
   556 P.2d (Ak. Sup. Ct. 1976)...................................................................44, 45

Summers v. Teichert & Son, Inc.
   127 F.3d 1150 (9th Cir. 1997)..................................................................9

TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n
   809 F.2d 626  (9th Cir. 1987)...................................................................9

The Whistler
   13 F. 295 (D.Ore. 1882)......................................................................39-43

Warner v. Dunlap
   532 F.2d 767 (1st Cir. 1976)..................................................................43, 44

Wilson v. McNamee
   102 U.S. 572 (1880)..........................................................................39, 40, 43

U.S. v. Locke
   529 U.S. 89 (2000)...........................................25, 30, 34-36, 40, 44, 47

U.S. v. State of Alaska
   521 U.S. 1 (1997)............................................................................28

United States v. California
   332 U.S. 804 (1947).........................................................................25, 27

United States v. Louisiana
   339 U.S. 699 (1950).........................................................................27

United States v. California
   381 U.S. 139 (1965).........................................................................25, 27, 29

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
PARTIAL SUMMARY JUDGMENT BY PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION

# TABLE OF AUTHORITIES

## Federal Statutes and Regulations                                    Page

40 C.F.R. §89.1(b)(4)(ii)............................................... 19

40 C.F.R. Part 89, subpart A, Appendix A..................................19

40 C.F.R. §94.1........................................................ 53

40 C.F.R. §94.1(b)(2)..................................................19, 53

68 Fed. Reg. 9746......................................................23, 53

68 Fed. Reg. 9759......................................................24, 53

62 Fed. Reg. 67735..................................................... 22

28 U.S.C. §1331........................................................24, 56

28 U.S.C. §1651........................................................ 24

42 U.S.C. §7543............................................1, 10, 12, 14, 16, 23, 56

42 U.S.C. §7550........................................................ 12

42 U.S.C. §7583........................................................ 55

42 U.S.C. §7627........................................................ 56

43 U.S.C. §1301..............................................1, 2, 25, 26, 28

43 U.S.C. §1311........................................................ 26, 28

43 U.S.C. §1312........................................................ 26

Clean Air Act §209...........................1, 2, 10-19, 21-24, 55-58

Federal Rule of Civil Procedure 56..................................... 8, 9

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

# TABLE OF AUTHORITIES

## State Statutes and Regulations                                    Page

California Health & Safety Code §39515................................................ 5

California Health & Safety Code §39516................................................ 5


## Louisiana State Statutes

Revised Statutes, 34:1073.............................................................. 43

Revised Statutes, 34:1076.............................................................. 43


## Other Authorities

13 CCR §2299.1..............................................4-6, 10, 14, 20, 21, 25, 26, 30

17 CCR §93118..............................................4-6, 10, 14, 20, 21, 24-26, 30

MARPOL Annex VI........................................................................ 48, 54

Presidential Proclamation No. 5928................................25, 26, 48, 49, 50, 53

Presidential Proclamation No. 7219.....................................25, 26, 48, 50-53

Senate Executive Session, p. S3400, April 7, 2006............................... 49

United Nations Convention of the Sea of Law, 1833 U.N.T.S. 397............... 52


## Secondary Sources

Moordian, *Protecting "Sovereign Rights":  The Case to Increase Coastal State Jurisdiction Over Vessel-Source Pollution In The Exclusive Economic Zone*, 82 B.U.L. Rev. 67 (2002)................................................... 52

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
PARTIAL SUMMARY JUDGMENT BY PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

# I.

# **INTRODUCTION**

This case presents issues of national and international importance concerning the power of California and other states to regulate air emissions from vessels engaged in foreign and interstate maritime trade.  On January 1, 2007, the California Air Resources Board ("CARB") began enforcement of two regulations that impose emissions standards and other requirements on diesel electric and auxiliary diesel engines used onboard U.S. and foreign-flagged vessels that call at California ports.  In doing so, CARB has ignored the federal statutory imperative set forth in §209(e)(2)(A) of the Clean Air Act, 42 U.S.C. §7543(e)(2)(A). That statute requires California to obtain authorization for its emissions standards from the federal Environmental Protection Agency ("EPA"), but CARB has neither sought nor obtained such authorization for its auxiliary diesel engine regulations.  By adopting its regulations, CARB has also undertaken to regulate the conduct of ocean-going vessels in navigation on a vast expanse of more than 10,000 square miles of Pacific Ocean outside of the three-mile limit placed on state territorial jurisdiction by the federal Submerged Lands Act, 43 U.S.C. §1301 et seq.  This extension of state territorial jurisdiction is contrary to the limitations on state authority under the Submerged Lands Act and the Constitution.

/ / /

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Plaintiff Pacific Merchant Shipping Association ("PMSA"), an organization whose members own and operate U.S. and foreign-flagged ocean-going vessels subject to the CARB regulations, moves for summary judgment on its First Claim for Relief and on that portion of its Second Claim for Relief which seeks relief against application of the regulations to conduct occurring more than three nautical miles seaward from the California coast. The motion asks the Court to declare the regulations preempted by federal law and to enjoin their enforcement.

As alleged in Plaintiff's First Claim for Relief, the challenged regulations directly conflict with §209(e)(2)(A) of the Clean Air Act. The statute requires the State of California to obtain EPA authorization for any emissions standards that it seeks to enforce against any "nonroad" engines. Since the regulations impose such standards and the auxiliary diesel engines on the ocean-going vessels regulated by the new CARB rules are "nonroad" engines, the regulations are subject to the authorization requirements of §209(e)(2)(A). CARB's failure to obtain EPA approval of the regulations, therefore, contravenes the Clean Air Act and CARB's enforcement of the regulations should be enjoined pending EPA authorization.

The territorial scope of the CARB regulations is also preempted by the geographic limits placed on California's jurisdiction by the Submerged Lands Act, 43 U.S.C. §§1301 et seq. As alleged in the PMSA's Second Claim For Relief, the reach of the regulations to 24 nautical miles seaward of the California coast is

- 2 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1  contrary to the historical, constitutional, and statutory division of state and federal

2  territorial power in matters of interstate and international maritime commerce and

3  the country's relations with foreign nations.

4  

5      There are no issues of material fact that preclude summary judgment.  There

6  is no dispute that CARB has adopted the regulations at issue effective December 6,

7  2006, with enforcement commencing on January 1, 2007, and that it did so without

8  seeking or obtaining authorization from the EPA.   It is also undisputed that the

9  

10 regulations apply to the ship owner and operator members of the PMSA and their

11 vessels and regulate the conduct of these vessels out to 24 nautical miles from the

12 California coastline.   Thus, the claims are ripe, the PMSA is a proper plaintiff with

13 

14 standing to assert them, and the claims otherwise present only legal issues of

15 statutory interpretation and application of the Supremacy Clause of the United States

16 

17 Constitution.   For the reasons set forth below, the undisputed facts, the Clean Air

18 Act, the Submerged Lands Act, and the Supremacy Clause entitle the PMSA to

19 summary judgment as a matter of law on its First Claim for Relief and on that

20 

21 portion of its Second Claim which alleges that CARB cannot enforce its regulations

22 outside of the three-mile limit.

23 

24 ///

25 ///

26 

27 

28

- 3 -

## II.

## STATEMENT OF THE CASE[1]

This is an action to enjoin the enforcement of §2299.1 of Title 13 and §93118 of Title 17 of the California Code of Regulations ("CCR") by CARB and to declare the regulations unconstitutional and contrary to federal law.    CARB has adopted the challenged regulations effective December 6, 2006, and began enforcing them on January 1, 2007.    The regulations require all ocean-going vessels calling at California ports to meet CARB's air emissions standards for auxiliary and diesel electric engines while operating within 24 nautical miles of the California coast. They require ship owners and operators to maintain detailed records regarding both the internal operations of their vessels within 24 nautical miles of the California coast and the purchase and quality of fuel oil used by those vessels.[2]   They impose substantial fines and penalties and allow for unspecified injunctive relief against the vessels and their owners in the event of non-compliance.

/ / /

/ / /

---

[1]  The brief statement of facts and outline of the regulations presented here is taken from the Complaint and Defendant Witherspoon's Answer thereto, the Declarations submitted by PMSA in support of the motion and the regulations themselves.  PMSA's Statement of Undisputed Facts submitted herewith provides the detailed references in the record to on which the statements of fact are based.

[2]  These regulations define "ocean-going vessel" as a vessel that meets any one of four criteria: foreign flag registration, a length overall of 400 or more feet, a gross registered tonnage of 10,000 or more tons, or propulsion by a marine compression engine with a per-cylinder displacement of 30 liters or more.  13 CCR §2299.1(d) and 17 CCR §93118(d).

- 4 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

A.    **The Parties.**

Plaintiff PMSA is a mutual benefit corporation that is organized under California law. Its principal purposes include representation and promotion of its members' interests in legislative, legal, and administrative matters affecting its members. The members of the PMSA include a number of companies that own or operate foreign and U.S. flagged ocean-going commercial vessels subject to the CARB regulations. A number of its members are foreign companies. These members of the PMSA operate a significant number of vessels in international and interstate maritime commerce that make frequent calls at sea-ports in California. The vessels of the PMSA's members use auxiliary or diesel electric engines during navigation and when alongside the dock, and are subject to 13 CCR §2299.1 and 17 CCR §93118. These vessels are, therefore, the express subjects of the challenged regulations. CARB commenced implementation of the regulations on January 1, 2007, and has begun inspecting vessels upon arrival at California ports.

Defendant Catherine E. Witherspoon is the Executive Officer of CARB. Pursuant to California Health & Safety Code §§39515 and 39516, she is charged as Executive Officer with enforcement of regulations adopted by CARB.[3] By its Board Resolution No. 05-63, CARB specifically directed Ms. Witherspoon, as the Board's

---

[3]    The court has allowed four parties to intervene as defendants. The judgment sought by this motion would be effective as to the intervenors.

- 5 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1  Executive Officer, to enforce 13 CCR §2299.1 and 17 CCR §93118 statewide.  She

2  is sued in her official capacity of Executive Officer of CARB.

### B.    The Regulations.

CARB adopted 13 CCR §2299.1 and 17 CCR §93118, effective December

6, 2006.  Implementation and enforcement of the regulations commenced January 1,

2007.  To date, CARB has neither sought nor obtained authorization from the United

States Environmental Protection Agency to adopt or enforce these regulations.  Both

regulations establish standards relating to the emission of diesel particulate matter

(PM), sulfur oxides (SOx), and nitrogen oxides (NOx) from diesel auxiliary and

diesel electric engines of ocean-going vessels, including U.S. and foreign-flag ships

that operate within 24 nautical miles of the base low water line along the California

coast. The substance of both regulations is the same.    Subsection (e) of the

regulations:

1.    Prohibits operation of:

"any auxiliary diesel engine [including any diesel electric engine], while the vessel is operating in any of the Regulated California Waters [within 24 miles of the California baseline], which emits levels of diesel PM, NOx, or SOx in exceedance of the emission rates of those pollutants that would result had the engine used the following fuels:

/ / /

/ / /

/ / /

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

"(A)  Beginning January 1, 2007:

"1.    marine gas oil…; or

"2.    marine diesel oil,…with a sulfur content of no more than 0.5 percent by weight;

"(B)  Beginning January 1, 2010:  marine gas oil with a sulfur content of no more than 0.1 percent by weight…;" and

2.    Requires vessel owners and operators subject to the regulations to maintain records that contain the type of fuel used in each auxiliary engine operated within the 24 nautical miles of the California baseline, the "types, amounts, and the actual percent by weight sulfur content of all fuels purchased for use on the vessel," and the date, local time and position of each vessel:

a.    Upon entry into and departure from within 24 nm of the California baseline; and

b.    At the initiation and completion of any fuel switching procedures used to comply with the section prior to entry into or within the 24 nm zone.

Subsection (f)(1) of the regulations provides for imposition of "penalties, injunctive relief, and other remedies specified in [California] Health and Safety Code, section 42400 et seq., other applicable sections in the Health and Safety Code; and other applicable provisions as provided under California law for each violation."

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 7 -

Such penalties, relief and remedies include, among other things, injunctive relief, misdemeanor prosecution, civil and criminal fines of $25,000 to $75,000 for every day of non-compliance, and imprisonment for up to one year for each day of non-compliance to secure payment of civil penalties. Subsection (f)(2) of the regulations provides that "[a]ny failure to meet any provision, standard, criteria, or requirement" of the regulations "shall constitute a single, separate violation of this section for each hour that a person operates an ocean going vessel within" 24 nautical miles of the California coast "until such provision, standard, criteria, or requirement has been met."

## III.

## ARGUMENT

**A.   Summary Judgment Is Appropriate In This Case Because The Material Facts Are Undisputed And PMSA Is Entitled To Judgment As A Matter of Law.**

Rule 56(a) of the Federal Rules of Civil Procedure allows a party seeking relief upon a claim to move for summary judgment "in the party's favor upon all or any part thereof." On a motion for summary judgment, Federal Rule of Civil Procedure 56(c), requires the Court to decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A party opposing a properly made and supported motion

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 8 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

for summary judgment may not rest upon mere denials but "must set forth specific facts showing that there is a genuine issue for trial," <u>Fed. R. Civ. Pro</u>. 56(e). Moreover, the non-moving party who bears the burden of proving an element essential to this case must make a showing sufficient to establish a genuine issue of fact with respect to the existence of that element of the case or be subject to summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

An issue is genuine if there is evidence produced that would allow a reasonable jury to reach a verdict in favor of the non-moving party. <u>Anderson</u>, 477 U.S., at 248. The Court will assume the truth of direct evidence set forth by the opposing party, <u>see</u> <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 507 (9th Cir. 1992), but where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. <u>See Anderson</u>, 477 U.S., at 249-50; <u>TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 631-32 (9th Cir. 1987). Thus, "[a] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather the nonmoving party must introduce some significant probative evidence tending to support the claim." <u>Summers v. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1152 (9th Cir. 1997) (quoting <u>Anderson</u>, 477 U.S., at 252, 249); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288 (9th Cir. 1987) (summary judgment may be granted if "the evidence is merely colorable … or is not significantly probative").

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

In this case, there is no dispute about the facts necessary for the Court to decide the legal issues presented by the first two Claims for Relief asserted in Plaintiff's Complaint.  On their face, the regulations impose emissions standards on the auxiliary diesel engines of ocean-going vessels and these standards apply while the engines are in operation beyond the state's three-mile territorial limit.  It is undisputed that CARB did not obtain EPA authorization for the enforcement of the regulations, that CARB intends to enforce and is enforcing those regulations against PMSA's members, and that PMSA members include ship operators and owners who are subject to the regulations.  These undisputed facts show that the PMSA has standing to challenge the regulations, and otherwise establish the necessary facts to support a judgment that, as a matter of law, 13 CCR §2299.1 and 17 CCR §93118 are preempted by federal law and contravene the Supremacy Clause of the United States Constitution.

**B.** **Plaintiff is Entitled To An Injunction Against Enforcement Of The CARB Regulations Because These Regulations Impose Standards Relating To Emissions From Nonroad Engines And CARB Did Not Obtain EPA Authorization For The Regulations As Required By § 209(e)(2)(A) Of The Clean Air Act .**

**1.** **State Standards Relating to Emissions from Vessel Auxiliary Diesel Engines Are Preempted by §209(e)(2)(A) of the Clean Air Act.**

Section 209(e)(2)(A) of the Clean Air Act, 42 U.S.C. §7543(e)(2)(A), provides:

"In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such authorization shall be granted if the Administrator finds that—

(i)     the determination of California is arbitrary and capricious,

(ii)    California does not need such California standards to meet compelling and extraordinary conditions, or

(iii)   California standards and accompanying enforcement procedures are not consistent with this section."

Thus, §209(e)(2)(A) requires that for "nonroad engines" within the scope of this subsection, the U.S. EPA "shall...authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such...engines" if the statutory criteria and requirements for those standards have been met. This subsection preempts California from imposing emissions standards on auxiliary diesel engines used on ocean-going vessels, at least unless and until California obtains EPA authorization for such standards pursuant to the statute. Engine Mfrs. Ass'n v. U.S. EPA, 88 F.3d 1075 (D.C. Cir. 1996).

Since §209(e)(2)(A) governs regulation of "any nonroad...engines" not covered by §209(e)(1), the scope of §209(e)(2)(A) is defined, in part, by reference to §209(e)(1). §209(e)(1) expressly preempts any state regulation of:

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

"(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower[; and] (B) New locomotives or new engines used in locomotives." 42 U.S.C. §7543(e)(1)(A) and (B).

"Any nonroad...engines" that are not new construction or farm engines or new locomotive engines are, therefore, governed by §209(e)(2)(A). EMA v. U.S. EPA, 88 F.3d 1075 (D.C. Cir. 1996). By definition, auxiliary diesel engines onboard ocean-going vessels are nonroad engines.[4] They are also outside the scope of §209(e)(1). They are, therefore, nonroad engines that fall within the EPA authorization provisions of §209(e)(2)(A).

Section 209(e)(2)(A) preempts California from adopting or enforcing "standards or other requirements relating to emissions" for nonroad engines subject to this subsection unless California complies with the requirements of the subsection. Although this preemption is not express, the statute does, as held in EMA v. U.S. EPA, 88 F.3d, at 1087, "imply a preemption." EMA v. U.S. EPA considered whether §209(e)(2)(A) preempted state regulation of nonroad engines and concluded that it did. The court analyzed the preemption accomplished by the statute as follows:

> "Section 209(e)(2) does not expressly preempt any state regulation. The parties agree, however, that it does imply a preemption. Subsection (A) permits the EPA to authorize California to adopt emissions standards and requirements for nonroad sources not

---

[4] "Nonroad" engine is defined by the CAA as "an internal combustion engine (including the fuel system) that is not used in a motor vehicle." 42 U.S.C. §7550(10). Since the ships are not "motor vehicles," [see 42 U.S.C. §7550(2)], their engines are "nonroad". See also Bluewater Network v. Environ. Prot. Agcy., 372 F.3d 404 (D.C. Cir. 2004).

- 12 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

mentioned in § 209(e)(1).  Subsection (B) permits other states to opt in to already approved California regulations.  Obviously, if no state regulation were preempted, California would have no need to seek authorization for its regulations, and other states would not need to opt in to the California rules.  Thus, the California authorization provision assumes the existence of a category of sources that are subject to preemption.  *See* Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (state law impliedly preempted where obligations imposed by federal statute "reveal a purpose to preclude state authority").  In other words, states must be preempted from adopting any regulation for which California could receive authorization." 88 F. 3d, at 1087-88.

Thus, EMA v. U.S. EPA recognized the preemptive significance of the authorization requirement.  Congress would not have included the requirement unless it intended to preempt California from adopting emissions standards for nonroad engines without EPA authorization.

The second issue in EMA v. U.S. EPA was whether the preemption implied by §209(e)(2)(A) extends to "both new and non-new sources."  88 F.3d, at 1088.  After extended review of the legislative history and wording of the statute, the court concluded that it does.  Id., at 1088-1093.  There is no need to review all of the court's reasoning here; it is enough to note that the language of the statute itself---"In the case of any nonroad engines other than those referred to in [§209(e)(1)(A) and (B)], [emphasis added]"---plainly encompasses both used and new engines.  EMA v.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 13 -

U.S. EPA confirmed that this language means what it says. California must obtain

EPA authorization for any emission standards it adopts for "any nonroad engines."[5]

### 2. The CARB Regulations Impose Standards Relating to Emissions from Vessel Auxiliary Diesel Engines

To fall within the category of regulations subject to EPA authorization and §209(e)(2)(A), the CARB regulations must qualify as "standards or other requirements relating to emissions" within the meaning of the statute. The language of 13 CCR §2299.1(e) and 17 CCR §93118(e) sets "standards" because it prohibits operation of "any auxiliary diesel engine … which emits levels of diesel PM, NOx, or SOx in exceedance of those pollutants that would result had the engine used" the fuels specified. See Engine Mfrs. Ass'n v. South Coast Air Quality Management District, 541 U.S. 246, 253 (2004).

In EMA v. SCAQMD, the Supreme Court interpreted the meaning of the term "standard" as used in §209(a) of the Clean Air Act, 42 U.S.C. §7543(a). Section 209(a) prohibits states from adopting or enforcing "any standards relating to control of emissions from new motor vehicles or new motor vehicle engines." The Court decided that fleet purchase regulations adopted by the California South Coast Air Quality Management District established emission "standards" where they required purchasers of new motor vehicles for fleet use to buy vehicles with engines that

---

[5] CARB does not dispute that §209(e)(2)(A) applies to the auxiliary diesel engines on ocean-going vessels or that the statute applies to both new and used engines. CARB Staff Report: Initial Statement of Reasons for Proposed Rulemaking ("ISOR"), Oct. 2005, Appendix B, pp. 15-16.

- 14 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

either operated within certain emission limits or qualified as designated low emissions engines.

The Court analyzed the meaning of "standards" by first looking at the dictionary definition of "standard" ("established by authority, custom, or general consent, as a model; criterion, test," 541 U.S., at 252), and concluded that the purchase criteria were "standards" because:

> "To meet them the vehicle or engine <u>must not emit more than a certain amount of a given pollutant</u>, must be equipped with a certain type of pollution device, or must have some other design feature related to the control of emissions. This interpretation is consistent with the use of standard throughout Title II of the CAA (which governs emissions from moving sources) <u>to denote requirements such as numerical emissions levels within which vehicles or engines must comply</u>, e.g., 42 U.S.C. § 7521(a)(3)(B)(ii) or emission control technology with which they must be equipped, e.g., § 7521(a)(6)." 541 U.S., at 253. [emphasis added]

Section 209(e)(2)(A) uses "standards" language similar to that which the Supreme Court addressed in <u>EMA v. SCAQMD</u>. The question here, therefore, is whether the CARB regulations establish "standards" as that term is used in the statute and interpreted by the Supreme Court.

The CARB regulations are "standards" because they set emissions limits for auxiliary diesel and diesel electric engines. Under the CARB regulations, the engines cannot emit "levels of PM, NOx, or SOx in exceedance" of the amount that the engine would emit if it used the specified fuels. In order to meet the criteria established by the regulations, the auxiliary engines "must not emit more than a

- 15 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

certain amount of a given pollutant" (EMA v. SCAQMD, 451 U.S., at 253), i.e., the levels of PM, NOx, or SOx that the engine would emit using the specified fuels. Accordingly, the regulations establish emissions "standards" within the meaning of §209(e)(2)(A) and they require EPA authorization under that statute.

### 3.    The CARB Regulations Are Standards, Not "In-Use" Requirements

Section 209(e)(2)(A) does not include any exception for "in use" regulations. In EMA v. U.S. EPA, however, the Court of Appeals agreed with the EPA's interpretation of the statute that, by requiring state regulations to "otherwise conform to the requirements of this section," §209(e)(2)(A) incorporated the requirements of §209(d) of the Clean Air Act, 42 U.S.C. §7543(d).   Section 209(d) allows state regulation of the "use, operation, or movement of registered or licensed vehicles." Based on the EPA's reading of the statute, EMA v. U.S. EPA held that "in use" requirements were excluded from the "standards and other requirements" for which EPA authorization is required by §209(e)(2)(A).   The examples of permissible "in use" regulations given by the Court were "carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles." 88 F.3d, at 1094.

When it adopted its auxiliary diesel engine regulations, CARB concluded that its regulations are permissible "in-use" regulations, asserting that EPA authorization is not required because "the proposed regulation applies only to

- 16 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

existing engines and does not require retrofits" and because states "may regulate the use of marine engines once placed into service."    CARB Staff Report: Initial Statement of Reasons for Proposed Rulemaking ("ISOR"), Oct. 2005, Appendix B, at pp. 11-12. [6]  This analysis fails to acknowledge that §209(e)(2)(A) requires EPA authorization of standards relating to emissions from nonroad engines, regardless of whether those standards apply to "existing" (i.e., "used") engines or require retrofits. Such emissions standards are not transformed into "in-use requirements" just because they are applied to existing engines or regulate the engines only after they are "placed into service."  Since they set limits on emissions from those engines they are "standards" subject to EPA authorization, regardless of when they are applied or how they are enforced.

In EMA v. SCAQMD, the Supreme Court illustrated the distinction between an enforcement mechanism and a prohibited "standard." The Court considered the SCAQMD's argument that its Fleet Rules were not preempted "because they address the purchase of vehicles rather than their manufacture or sale," and stated:

> "This confuses standards with the means of enforcing standards. Manufacturers (or purchasers) can be made responsible for ensuring that vehicles *comply* with emission standards, but the standards themselves are separate from those enforcement techniques.  While standards target vehicles or engines, standard-enforcement efforts

---

[6]  The statement that the regulations do not require retrofits is correct to the extent that the regulations themselves do not state that engines must be retrofitted.  PMSA contends that some vessels have required or will require engine or fuel system retrofits to allow them to comply with the regulations.  For purposes of this motion for summary judgment, however, whether retrofits are required to comply with the regulations is not relevant since the regulations set "standards" regardless of whether they require retrofits.

- 17 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1900
Long Beach, California 90831-1800
(562) 435-2626

that are proscribed by § 209 can be directed to manufacturers or purchasers." [Emphasis in original] 541 U.S., at 253.

In this case, CARB's regulations prohibit engine emissions at "levels of PM, NOx, or SOx in exceedance of the emission rates of those pollutants that would result had the engine used" the specified low sulfur fuels. This is an emission standard regardless of whether or not it is enforced against original manufacturers, requires engine retrofits, or applies only to the use of existing engines.

CARB's assertion of its legal authority to regulate engines without EPA authorization once the engines are "placed in service" cannot be reconciled with the statutory requirement, recognized by CARB itself, that "California may regulate both new and used marine engines, but it must in either case obtain U.S. EPA authorization." ISOR, Appendix B, p. 11. If, as thus accepted by CARB, the fact that an engine is "used" rather than "new" is no basis for claiming that a standard is an exempt "in-use requirement," CARB's only remaining argument for why it may escape the EPA authorization process is that its regulations establish a low-sulfur fuel use requirement and that fuel use requirements do not require EPA approval. Thus, in its Final Statement of Reasons for Rulemaking (hereinafter "FSOR"), at page 116, CARB sought to distinguish EMA v. SCAQMD, stating:

> "Unlike *EMA II*, we believe the courts will characterize ARB's regulations as in-use operational requirements because the regulations place emission limits on in-use vessels without requiring specific retrofits or equipment purchases (i.e., it neither places requirements on manufacturers of new vessels nor requires retrofits of existing

- 18 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

vessels). Rather than requiring retrofits or equipment purchases, the regulations effectively limit the sulfur content of fuel used in regulated engines by employing emission limits based on the use of low sulfur distillate fuels. And U.S. EPA has already determined that such in-use requirements are not subject to preemption under CAA section 209(e). (Appendix A to Subpart A, 40 CFR 89). Given the U.S. EPA's final regulations interpreting CAA section 209(e), we believe the courts will hold the ARB regulations as a permissible in-use operational requirement rather than a preempted "standard or other requirement."[7]

Notably, this paragraph characterizes the regulations as placing "emission limits" on vessels and "employing emissions limits" based on fuel sulfur content. [See also Answer to Complaint, ¶ 12, admitting the allegation that the regulations "establish standards relating to the emission of diesel particulate matter (PM), sulfur oxides (SOx), and nitrogen oxides (NOx) from diesel auxiliary and diesel electric engines of ocean going vessels...."] EMA v. SCAQMD, however, makes clear that emissions "limits" and "standards" are preempted regardless of the manner in which they are imposed or enforced because "a standard is a standard" under the statute. 541 U.S., at 254. Rather than distinguishing EMA v. SCAQMD, CARB's description of the regulations in its FSOR underscores the fact that the regulations place limits on emissions from the ship's diesel auxiliary and diesel electric engines, and that they

---

[7] This statement by CARB refers to and relies on the EPA's policy statement in an Appendix to its general regulations governing nonroad engines. 40 C.F.R. Part 89, Subpart A, Appendix A. There, the EPA stated that it "believes that states are not precluded" from adopting "sulfur limits on fuel." Aside from the fact that states are precluded by statute from adopting emissions standards, CARB's reliance on this language in Appendix A to Part 89 is misplaced because the regulations to which the interpretation applies are expressly inapplicable to marine engines in foreign flag vessels such as those governed by the CARB regulations. See 40 C.F.R. §89.1(b)(4)(ii); 40 C.F.R. §94.1(b)(2); 40 C.F.R. Part 89, subpart A, Appendix A.

- 19 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1   are, therefore, standards within the meaning of the Clean Air Act as interpreted by

2   EMA v. SCAQMD.[8]

3          The plain language of the CARB regulations confirms that they impose

4   emissions standards and that they do not require a ship operator to use low sulfur

5

6   fuel.    Accordingly, even if the statute allowed an "in-use" exception to the

7   authorization requirement and that exception applied to the marine diesel engines

8

9   that are the subject of the regulations, CARB's regulations do not qualify for that

10  exception.   As CARB itself repeatedly stated during the rulemaking process, its

11  regulations set emissions limits and do not require the use of low sulfur fuel:

12

13          "[T]he regulation does not tell operators how to meet these limits nor
            does the regulation tell operators what equipment they must use to
14          meet these limits or how to operate such equipment.  In addition, the
            regulation provides operators with the flexibility to meet these limits
15          through the A[lternative] C[ompliance] P[lan] provision, which
            permits operators to use any number of alternative emission control
16          strategies...." ISOR, Appendix B, p. 10.

17

18          "The regulations contain no mandate or requirement for equipment to
            be installed on ships.  (ISOR at VI-1)  In fact, the regulations do not
19          even require operators to switch fuels, although ARB anticipates
            most owners and operators will choose to use low-emission marine
20          gas oil or marine diesel oil.  (Ibid)." FSOR, p. 95

21

22          "Indeed, the regulation[s] do not even require ship owners to use
23          certain fuels; under the regulations, operators can emit no more than
            what would result had the regulated engines used low sulfur marine
24          fuel oils, or the owners can operate under approved Alternative
            Control of Emissions (ACE) plans.  Such ACE's can involve
25

26  _____

27  [8]  See also, 13 CCR §2299.1(f)(2) and 17 CCR §93118(f)(2) defining violations of the regulations as "any
    failure to meet any provision, standard, criteria, or requirement" of the regulations [emphasis added].

28                                                  - 20 -

alternative control strategies that have nothing to do with installing particular equipment or even using certain fuels; the choice of which strategies to use in an approved ACE plan is up to the ship owners." FSOR, p. 107

"In any case, the regulation[s] do not mandate the use of such distillate fuels (see Response to Comment N.2.c.), and any retrofits or modifications that do occur would be performed because the shipowner has chosen to do so." FSOR, p. 107

These statements confirm that the regulations are not fuel use requirements but rather they are standards that the vessel engines must satisfy. The issue comes back to whether the regulations impose a "standard" within the meaning of §209(e)(2)(A) as that term has been interpreted by the Supreme Court in EMA v. SCAQMD. The CARB diesel auxiliary engine regulations are "standards" because they place emissions limits on those engines. EPA authorization of the regulations is, therefore, required.

4. **Section 209(e)(2)(A) of the Clean Air Act Prohibits CARB's Enforcement of the Regulations Because CARB Did Not Obtain EPA Authorization for those Regulations**

In their Answers to the Complaint, all of the defendants admit that CARB did not obtain EPA authorization for 13 CCR §2299.1 or 17 CCR §93118 before it began enforcing the regulations. CARB's failure to do so means that its enforcement of the regulations is preempted by §209(e)(2)(A) of the Clean Air Act until and unless it obtains such authorization. EMA v. U.S. EPA, supra; EMA v. SCAQMD, supra.

- 21 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1900
Long Beach, California 90831-1800
(562) 435-2626

The authorization requirement of §209(e)(2)(A) is a central component of the regulatory scheme that Congress adopted in passing the 1990 Amendments to the Clean Air Act. Among those amendments, §209(e)(2)(B) allows states other than California to regulate nonroad engines, but only if California adopts such regulations first, obtains EPA approval, and applies them for at least two years. Other states can then adopt and enforce such regulations, but only if they impose regulations identical to those adopted by California and approved by the EPA. Id., see also 62 Fed. Reg. 67735 (December 30, 1997). By this mechanism, Congress has given California a lead role in the regulation of nonroad engines but has done so in a way that assures national uniformity in the regulation of nonroad engines by all of the fifty states.

CARB's failure to abide by its obligation under §209(e)(2)(A) to obtain EPA approval of its regulations, therefore, creates three separate problems that §209(e)(2)(A) and §209(e)(2)(B) were intended to avoid. First, if CARB's failure to obtain EPA approval is allowed to stand, any state can adopt and enforce its own emissions standards without regard to whether they are the same or different than the standard set by any other state. The members of the PMSA would then potentially be subject to different emissions requirements, limits, and standards in each of the states where their ships may call. This is not what Congress intended when it gave California its important lead role in shaping the regulation of emissions from nonroad engines in the United States. Instead, the 1990 Amendments to the Clean

- 22 -

Air Act represent a regulatory scheme that is just as "carefully calibrated" for nonroad engines as the motor vehicle provisions earlier adopted by Congress as §209(a) through (d) of the Act. <u>EMA v. SCAQMD</u>, 451 U.S., at 255. That scheme is a blueprint for uniform national regulation of nonroad engines, and it is important that it be enforced here.

Second, CARB's failure to obtain timely EPA approval has also potentially jeopardized and postponed the ability of any other state to adopt or enforce emissions standards for vessel auxiliary diesel engines since no other state can do so until the California regulations have been authorized and in effect for two years. 42 U.S.C. §7543(e)(2)(B). This fallout effect of CARB's failure to obtain authorization underscores how important California's compliance with the statute is to a national uniform scheme to regulate emissions from nonroad engines.

Third, because California has not submitted these regulations to the EPA for review, there has been no consideration or determination by that federal agency regarding whether the regulations are "consistent" with the nonroad engine provisions of the Clean Air Act. §209(e)(2)(A)(iii). The EPA has exempted foreign flag vessels and their engines from regulation under the Act on the grounds that it is not clear whether Congress intended to allow regulation of such vessels by the EPA, and that, in any event, such vessels are subject to international rules that are consistent with EPA standards applicable to U.S. vessels. See 68 Fed. Reg. 9746,

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 23 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

9759ff (February 28, 2003); <u>Bluewater Network</u>, 372 F.2d, at 406-410.   Since

California has by-passed the statutory authorization requirement, there has been no

determination by the EPA whether these same principles apply to the California

regulation.  The statute commits this determination to the EPA in the first instance,

and California should be required to submit its regulations to the administrative

process.

### 5. Injunctive and Declaratory Relief Is Appropriate to Preclude Enforcement Pending EPA Authorization of the Regulations

In light of the foregoing, PMSA is entitled to judgment on its First Claim

for Relief as a matter of law.  That judgment should include relief in the form of both

a declaration pursuant to 28 U.S.C. §1651 that 13 CCR §2299.1 and 17 CCR §93118

are preempted by §209(e)(2)(A) of the Clean Air Act, and an injunction against the

enforcement of those regulations until and unless CARB obtains authorization for

the regulations from the United States Environmental Protection Agency.[9]

---

[9] <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 96 fn. 14, 103 S.Ct. 2890, 2899, fn. 14, 77 L.Ed.2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. §1331 to resolve."); <u>Bud Antle, Inc. v. Barbosa</u>, 45 F.3d 1261, 1269 (9th Cir. 1994) ("Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption.")

**C.    CARB's Regulations Contravene The Territorial Limits Placed On California's Authority By The Submerged Lands Act, 43 U.S.C. §§1301, et seq.**

13 CCR §2299.1 and 17 CCR §93118 regulate the conduct of vessels in foreign and interstate trade out to 24 nautical miles from California's coastline. This is beyond the State's authority and contrary to the Submerged Lands Act, Presidential Proclamations 5928 and 7219, and the Supreme Court's decisions in United States v. California, 381 U.S. 139 (1965) and United States v. California, 332 U.S. 19 (1947).

There are no decisions that directly address the question of whether a state has any authority to regulate engine emissions from U.S. or foreign-flagged vessels outside of the state's boundaries as established by federal law, perhaps because states have traditionally not sought to exercise their police powers to regulate the operation of ships beyond their borders. Prior decisions generally hold that the states can exercise their police powers to impose environmental regulations on vessel conduct within their own borders, as long as the state regulations are not otherwise preempted by federal law or policy. See e.g. U.S. v. Locke, 529 U.S. 89 (2000); Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978); Askew v. American Waterways Operators, Inc., 411 U.S. 325 (1973); Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440 (1960); Chevron v. Hammond, 726 F.2d 483 (9th Cir. 1984), cert. den., sub nom. Chevron U.S.A. v. Sheffield, 471 U.S. 1140 (1985). This authority has not

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 25 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

been extended to allow a state to regulate navigation, maritime commerce, or vessel conduct outside of the state's boundaries, however, and there are no Supreme Court cases that establish a state's right to do so.

By extending the geographic scope of its regulations outside of its borders, CARB has expanded the use of its police powers beyond their traditional territorial limits. It has done so in an area of activity---use of the sea beyond state boundaries for maritime pursuits---that is traditionally the sole domain of the federal government; and it has overstepped into an area that the federal government---through Presidential Proclamation and EPA regulations and statements of policy---has clearly articulated an intent to follow a national policy that precludes states from acting unilaterally to regulate maritime activity beyond their borders.   For these reasons, PMSA is entitled to a partial summary judgment on its second claim for relief that declares 13 CCR §2299.1 and 17 CCR §93118 contrary to the Submerged Lands Act and Presidential Proclamations 5928 and 7219 and enjoins enforcement of the regulations with respect to conduct more than three nautical miles from the California coast.

1.     **The Submerged Lands Act Establishes California's Boundary at Three Miles Seaward of the California Coastline**

California's geographic boundary extends only to three nautical miles seaward of California's coastline.  43 U.S.C. §§1301, 1311, and 1312; <u>United States</u>

- 26 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1   v. California, 381 U.S. 139 (1965); United States v. California, 332 U.S. 19 (1947).

2   In the first United States v. California decision, 332 U.S. 19, the Supreme Court held

3   that the United States, rather than the individual coastal states, possessed all

4   ownership rights in offshore lands and resources.   As the Court made clear, this

5   decision implicated the federal government's authority over the seas adjacent to the

6   individual states:

7

8

9       "The crucial question on the merits is not merely who owns the bare legal
10      title to the lands under the marginal sea. The United States here asserts
        rights in two capacities transcending those of a mere property owner. In
11      one capacity it asserts the right and responsibility to exercise whatever
        power and dominion are necessary to protect this country against dangers
12      to the security and tranquility of its people incident to the fact that the
        United States is located immediately adjacent to the ocean. The
13      Government also appears in its capacity as a member of the family of
        nations. In that capacity it is responsible for conducting United States
14      relations with other nations. It asserts that proper exercise of these
        constitutional responsibilities requires that it have power, unencumbered
15      by state commitments, always to determine what agreements will be
        made concerning the control and use of the marginal sea and the land
16      under it." [emphasis added]  332 U.S., at 29.

17

18

19  Thus, underlying the Court's determination that the marginal seas and the land under

20  it were owned and controlled solely by the United States rather than the individual

21  states were considerations of the federal government's constitutional power and

22  responsibility to determine how the United States will conduct its relations with

23  other nations.

24

25      This basis for the decision in the first United States v. California case was

26  reiterated in United States v. Louisiana, 339 U.S. 699, 704 (1950), where the

27

28                                          - 27 -

Supreme Court considered the territorial claims of the State of Louisiana.  There, the

Court stated:

> "[P]rotection and control of the area are indeed functions of national sovereignty.  The marginal sea is a national, not a state concern.  National interests, national responsibilities, national concerns are involved.  The problems of commerce, national defense, relations with other powers, war and peace focus there.  National rights must therefore be paramount in that area."

In response to the Supreme Court's decisions, Congress adopted the

Submerged Lands Act (43 U.S.C. §1301 et seq.) in 1953.  This Act provides, inter

alia:

> "The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary.  Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line,...." 43 U.S.C. §1311.

The establishment of these boundaries did not set limits on state sovereignty only

with respect to the sea bed and natural resources in and under the sea.  As the

Supreme Court stated in U.S. v. State of Alaska, 521 U.S. 1, 5 (1997):

> "Ownership of submerged lands--which carries with it the power to control navigation, fishing, and other public uses of water--is an essential attribute of sovereignty."

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

When it set the boundaries for the states by the Submerged Lands Act, moreover, by 43 U.S.C. §1314(a), the United States specifically retained its navigational and other rights even within the three-mile zone granted to the states:

> "The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 3 of this Act."

The Act thus limits the sovereignty, ownership and control of the states over the lands, resources and marginal sea to those within three nautical miles of the coast. It also reserves to the federal government all of its powers concerning "commerce, navigation, national defense, and international affairs" even within those boundaries. In the second United States v. California, 381 U.S. 139 (1965), the Supreme Court declared and delineated the precise seaward boundaries of the State of California based on the three nautical mile limit established by the Submerged Lands Act.

### 2. The Police Power of States Does Not Extend to Maritime Conduct Beyond the State's Boundaries

A number of cases have addressed the power of individual states to regulate the conduct of foreign and domestic vessels on the navigable waters within the state's boundaries for environmental or other health and safety purposes. See e.g.

- 29 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1   U.S. v. Locke, 529 U.S. 89 (2000), Ray v. Atlantic Richfield Co., 435 U.S. 151

2   (1978); Askew v. American Waterways Operators, Inc., 411 U.S. 325 (1973); Huron

3   Portland Cement Co. v. City of Detroit, 362 U.S. 440 (1960); Chevron v. Hammond,

4   726 F.2d 483 (9th Cir. 1984), cert. den., sub nom. Chevron U.S.A. v. Sheffield, 471

5

6   U.S. 1140 (1985). All of these cases concern the scope of a state's power to regulate

7   the conduct of parties that occurs within the territorial limits of the state. In each of

8   these cases, the issue was whether federal law preempted the state's regulation of

9

10  maritime commerce within those territorial limits. None of these cases have

11  extended the reach of the state's power beyond the state's territorial boundaries, and

12  they each have recognized that the issue of state regulation of oceangoing vessels,

13

14  even within the territorial limits of the states, presents significant questions of

15  national policy.

16

17      The absence of any Supreme Court decisions regarding the exercise of

18  police powers extraterritorially by a state is instructive. The paramount authority of

19  the national government over all maritime and navigational matters outside of the

20  territorial jurisdiction of the individual states is historically fundamental to the

21

22  nation's political character (see U.S. v. Locke, 529 U.S., at 1045, 1049-50), and

23  there are no examples of attempts by a state to impose regulations on ship operations

24  outside of its boundaries. By adoption of 13 CCR §2299.1 and 17 CCR §93118,

25

26  however, CARB has arrogated to the State of California the authority to regulate the

27

28

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

conduct of ocean-going vessels over more than 10,000 square miles of sea outside of the state's boundaries as established by federal statute.  As discussed below, there is no valid precedent for this extraordinary extraterritorial assertion of the state's police powers.  Although the cases discussed below allow states to apply their police powers to maritime commerce and navigation, they do so only where that power is exercised within the territorial waters of the state.  There is no precedent for what California has done here, and the decisions of the Supreme Court and other federal courts clearly reflect that California has pushed the use of its authority beyond permissible constitutional limits.

The first of the modern cases that considered the power of a state to regulate emissions from ocean-going vessels was <u>Huron Portland Cement Co. v. City of Detroit</u>, <u>supra</u>.  That case concerned a city ordinance applicable to combustion equipment "in the city."  362 U.S., at 442, n.1.  A vessel owner challenged application of the ordinance to vessels "during periods when the vessels were docked at the Port of Detroit."  Id., at 441.  The contention was that the ordinance was preempted by federal inspection and licensing laws that governed the vessels and that the ordinance was unduly burdensome on maritime activities or interstate commerce.

Noting that "the ordinance was enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants," the Court stated that

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 31 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

states have the power to enact legislation "designed to free from pollution the very air that people breathe." Id., at 442. According to the Court, such legislation "clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power," and "evenhanded local regulations to effectuate legitimate local public interest is valid unless preempted by federal action." Id., at 442-43.

Since the ordinances at issue applied only to the operation of equipment within the City of Detroit and the challenge was only to their application to ships while at the dock within the city, there was no issue in Huron Portland Cement Co. v. City of Detroit regarding the territorial scope of the city ordinance. The case does not, therefore, provide any basis for the expansion of the police powers beyond "local regulation" undertaken in the "local public interest."

Similarly, in Askew v. American Waterways Operators, Inc., supra, the court addressed a Florida statute that:

> "…impose[d] strict liability for any damage incurred by the State or private persons as a result of an oil spill in the State's territorial waters from any waterfront facility used for drilling for oil or handling the transfer or storage of oil (terminal facility) and from any ship destined for or leaving such facility." 411 U.S., at 327 (emphasis added).

For spills within the state, the statute also provided terminal liability for cleanup costs incurred by the state, made it a criminal offense for a pilot or master to fail to give notice of an oil discharge to designated state agencies, and required certain

- 32 -

clean-up equipment to be maintained by ships and terminals operating within the state. The Supreme Court determined that this statute did not conflict with federal laws governing the cleanup and liability for such spills, but the Court did not consider the power of the state to impose such liability or requirements on vessels for extraterritorial conduct or extraterritorial spills since the Florida statute reached only "oil spillage in her [Florida's] waters." 411 U.S., at 332.

Askew relied, in part, on the Supreme Court's decision in Just v. Chambers, 312 U.S. 383 (1941), in which the Court allowed application of Florida's wrongful death statutes to claims arising out of an accident that occurred "within the territorial limits of Florida." The court in Just v. Chambers, 312 U.S., at 389, as quoted in Askew, stated that:

> "[A] state, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, and provided that the state action does not contravene any acts of Congress nor work prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations." 411 U.S., at 339[emphasis added]

Thus, Askew approved the exercise of the state's police power in maritime affairs but only within the territorial limits of the state and only where the state law did not interfere with the maritime law or the "proper harmony and uniformity of international and interstate relations."

/ / /

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 33 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Ray v. Atlantic Richfield, supra, considered design and size limitations and tug escort and pilotage requirements that the State of Washington imposed on tankers navigating in Puget Sound. The Court described Puget Sound as "a body of inland water lying along the northwest coast of the State of Washington," and "an estuary consisting of 2500 square miles of inlet space and channels in the northwestern part of Washington." 435 U.S., at 154, n.1. Because Puget Sound is within the State of Washington, there was no issue in Ray regarding the territorial scope of the regulations.

Ray upheld Washington's tug escort requirement but otherwise held that the pilotage, design and size regulations were invalid because they were preempted by federal statutes and regulations. Since the Washington law at issue did not purport to regulate conduct outside of the State of Washington, the Court determined the constitutionality of the Washington law solely by measuring its provisions against existing federal statues and regulations that governed the design, size and operation of tankers. It did not consider the issue of territorial limits on Washington's exercise of its police power.

In the most recent of these cases, United States v. Locke, supra, the Supreme Court again considered a Washington statute that imposed "tanker design, equipment, reporting, and operating requirements" on tankers operating in Puget Sound. 529 U.S., at 97, 117-119. The Court held that the statute's crew training and

English proficiency requirements, its navigation watch requirement, and its

requirement for reporting of casualties occurring outside of the State were preempted

by Titles I and II of the Ports And Waterways Safety Act ("PWSA").   Since the

Washington statute did not directly regulate conduct beyond the state's boundaries,

the Court was not required to decide whether the state was precluded from regulating

conduct outside of its borders.   In reaching its conclusion, however, the Court noted

that an important question in assessing whether a state regulatory statute was

preempted by the federal government's regulatory scheme was the "extraterritorial

effect" of the state regulations.   As the Court said:

> "Limited extraterritorial effect explains why _Ray_ upheld a state rule
> requiring a tug escort for certain vessels, _id._, at 159-160 and why
> state rules requiring a registered vessel (_i.e.,_ one involved in foreign
> trade) to take on a local pilot have historically been allowed, _id.,_ at
> 159-160." 529 U.S., at 112.

Thus, although U.S. v. Locke did not decide whether extraterritorial regulation by a

state of vessels in foreign trade is prohibited, it did recognize the important

distinction between regulations address purely "local traffic or local peculiarities"

and "do not affect vessel operations outside the jurisdiction" from those that

"dictate" the conduct of the vessel before the ship reaches the state.   529 U.S., at

113.

In U.S. v. Locke, the Court was considering a state statute that, on its face,

governed conduct only within the state's territorial waters.   It struck down those

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 35 -

regulations, in part because the effect of the regulations was to require vessels to adjust their conduct outside of the state's jurisdiction to be able to meet the requirements of the local statute upon arrival in the state's waters. id., at 113. Here, the CARB regulations govern the extraterritorial conduct of the vessels directly. This is beyond the police powers of the State of California.

In the time between the Supreme Court's decision in Ray v. Atlantic Richfield and United States v. Locke, the Ninth Circuit held that an Alaska statute prohibiting oil tankers from discharging ballast into the territorial waters of Alaska were not preempted by parallel Coast Guard regulations that addressed ballast discharge from tankers. Chevron U.S.A. v. Hammond, supra. Relying on the "historic police powers of the states," the Court determined that the state's regulations of ballast discharges "within a state's territorial waters," were not preempted. Id., at 495. Throughout its opinion, the Court emphasized that the regulation of environmental matters is "particularly well-suited to local legislation." See Id., at 489. The Court catalogued a number of federal statutes using "the three mile demarcation for state's authority for ocean pollution," noting that the regulation at hand governed only "tanker deballasting within the state's territorial waters." Id., at 489, n.7. Whether Chevron U.S.A. v. Hammond remains valid law after U.S. v. Locke, is questionable, [See Chevron v. Sheffield, 471 U.S. 1140 (1985), Justice White dissenting], but Chevron v. Hammond relied heavily on the three-mile

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 36 -

territorial limit of the state's regulation to approve the regulations, acknowledging that "as to environmental regulations of deep ocean waters, the federal interest in uniformity is paramount." 726 U.S., at 492, n. 12.

In the foregoing cases, the courts have recognized a state's authority to exercise its police powers to further the health and safety of its residents and allowed states to regulate maritime commerce within their borders when to do so does not conflict with federal law or operate in an area of activity where the federal government has preempted the field. These cases, however, all pertain to regulations addressed to conduct within the territorial limits of the states. None of these cases allow states to impose requirements on vessels when operating outside of the state's territorial boundaries where considerations of uniformity and national policy in international relations are paramount.

The CARB auxiliary diesel engine regulations set emissions standards for engines on ocean going vessels in foreign and domestic trade while operating outside of the territorial jurisdiction of California. The regulations are, therefore, beyond the general police powers of the state as described by these cases. As such, they are not enforceable against such vessels when they are operating outside of the territorial limits of the state.

One of the principal cases cited by CARB in support of the extraterritorial force of its regulations is Skiriotes v. Florida, 313 U.S. 69 (1941). See ISOR,

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Appendix B, p. 21. The rationale for that decision, however, was not that states can exercise their police powers beyond their borders. Instead, the Court invoked the "power of a sovereign State to govern the conduct of its citizens on the high seas" to uphold the prosecution of a Florida citizen for conduct that may have occurred outside of the State's territorial limits. 313 U.S., at 78. Noting that the United States can, under international law, "control the conduct of its citizens upon the high seas," Id., at 77, the Court held that:

> "When its action does not conflict with federal legislation, the sovereign authority of the State over the conduct of its citizens upon the high seas is analogous to the sovereign authority of the United States over its citizens in like circumstances." Id., at 78-79

This expression of the sovereign's power to exercise authority over the conduct of its citizens "upon the high seas or in a foreign country" is not a territorial principle based on the exercise of a state's police power to protect the health and safety of its residents. Id., at 74. For example, the United States does not assert the power to regulate the conduct of non-U.S. citizens in Mexico or Canada simply because their conduct may have some impact on the health and safety of people living in California or Montana. Rather it is the right of a State to govern the conduct of its citizens without regard to where they may be that is the principle established by Skiriotes. This is why the Supreme Court distinguished between the application of the statute "to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation," which was "within the police power of the State" id.,

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 38 -

at 75, and the more general "sovereign authority" of the State over the conduct of its citizens, regardless of where they may be.     The exercise of the State's "police power" over citizens and non-citizens alike is dependent on the territorial jurisdiction of the State and power of the State to regulate local conduct for the health and safety of its residents.

The exercise of the State's sovereign authority over its citizens arises from "the duty of the citizen in relation to his own government" and is not dependent on territorial jurisdiction; in these cases, the territorial jurisdiction of the state is "beside the point." Id., at 73.     The decision in Skiriotes, therefore, does not support California's regulation of the conduct of U.S. and foreign-flagged vessels beyond three miles from the State's coast.

The Supreme Court and lower federal court cases regarding pilotage that CARB notes in its discussion of legal authority do not support the conclusion that the general police powers of a state extend beyond its borders or that states can exercise those powers to regulate the conduct of vessels in international or interstate trade beyond the territorial limits imposed by the Submerged Lands Act. Wilson v. McNamee, 102 U.S. 572 (1880); Gillis v. Louisiana, 294 F.3d 755 (5th Cir. 2002); The Whistler, 13 F. 295 (D.Ore. 1882); See ISOR, Appendix B, pp. 20-21.   In reviewing the pilotage cases, it should first be noted that pilotage of vessels in foreign maritime commerce has been the province of the states since before the

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

adoption of the Constitution, and that, in 1789, the First Congress passed legislation recognizing such pilotage as within the province of the individual states.    See generally, <u>Cooley v. Board of Wardens</u>, 53 U.S. 299 (1851).    As <u>U.S. v. Locke</u> stated, laws requiring the taking on of a local pilot have "historically been allowed" because of their "limited extraterritorial effect."  529 U.S., at 112.  Most importantly for the case here, however, the decisions cited do not extend the states' jurisdiction over vessels in foreign trade beyond the states' territorial limits.

In <u>Wilson v. McNamee</u>, a New York law required vessels either to use the pilot services of the first pilot to tender those services while the vessel was "bound to or from the port of New York, by the way of Sandy Hook" or pay the fee for those services.  102 U.S., at 572.  The pilot in the case tendered his services 50 miles from the Port of New York, presenting the issue of whether a tender outside of the jurisdiction of the State was effective.  Invoking the history of pilotage in the United States, the "universal law" of nations, and the congressional adoption of state laws of pilotage, and relying on <u>Cooley v. Board of Wardens</u>, the Court upheld the statute. 102 U.S., at 573-74.  The statute in <u>McNamee</u> did not require that the vessel use a pilot outside of the jurisdiction of the State of New York.  It merely required that the vessel either use the pilot "while bound to or from the Port of New York by way of Sandy Hook" (and presumably pay for those services) or not use those services and

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

pay the fee anyway. This is not an exercise of extraterritorial jurisdiction over the vessel.

This distinction was made clear in The Whistler. An Oregon statute allowed a ship's master to pilot the vessel "from outside the Columbia river bar into said river," but required that the master pay "full pilotage" to the first pilot to offer pilot services to the vessel "outside of the bar" even if he refused pilotage services. 13 F., at 297. The Oregon pilotage statute did not define "the limit of the bar pilot ground outwardly." The first offer to the Whistler was made "at some distance beyond the bar – say 30 miles." Id. The vessel crossed the Columbia Bar but did not use the pilot. The issue was whether the vessel was required to pay the fee even though the offer had been made outside the territorial boundaries of the state.

The district court held that the Whistler's master was required to pay the fee. In doing so, however, the court made the distinction between the "pilot ground," i.e., the area where the vessel alternatively had to use the pilot or pay the fee, and the pilot "cruising ground" where the pilot may offer its services to the vessel, citing the Supreme Court decisions in Lea v. The Alexander, 2 Paine 468 and Horton v. Smith, 6 Ben. 264. The court in The Whistler stated:

> "While it may be that the state cannot extend the pilot ground at the
> mouth of the river indefinitely into the sea, and probably not further
> than three miles beyond the headland, it does not follow that she may
> not permit and require her pilots to cruise for vessels at a much
> greater distance from the shore, nor that an offer of pilot service to be
> performed on the pilot ground, made at such distance, to a vessel

- 41 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

bound in the river, is not valid and effective, as if made within three miles of the shore." 13 F., at 297-98

Thus, the statute in The Whistler did not regulate the conduct of the vessel beyond the three-mile territorial limit.   It merely provided that if the vessel reached the pilot ground and crossed the bar within the territorial waters of the state, it had to honor an offer of pilot services tendered outside of those waters.   The case offers no support for the application of the CARB regulations outside to vessel conduct outside of the state's territorial waters.

In Gillis v. Louisiana, a group of river pilots licensed by the State of Louisiana challenged the state's authority to regulate pilotage in a ship channel more than three miles off the state's coastline.   The statute imposed a duty "to pilot seagoing vessels through navigable streams, channels, rivers, passes and bars within the State of Louisiana and across the bars and passes."  294 F.3d, at 757.   The pilotage area had historically been "accepted to include" a channel approximately 33 miles seaward of the three-mile limit, but in 2000, a Commission with administrative authority over pilotage in Louisiana determined that the state did not have authority to regulate pilotage of foreign and registry vessels beyond the three-mile limit.  After a Louisiana state court held that state law granted that authority to the Commission, the pilots sued to establish that the regulation of pilotage outside of the three-mile limit violated the federal Constitution and the Submerged Lands Act.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 42 -

The Fifth Circuit Court of Appeals held that Louisiana did have the power to regulate pilotage outside three miles, rejecting the pilots' argument that Louisiana's extraterritorial regulation of pilotage outside of the three-mile limit was precluded by the Submerged Lands Act.  The Court relied on <u>Wilson</u>, <u>The Whistler</u>, and <u>Warner v. Dunlap</u>, 532 F.2d 767 (1st Cir. 1976) to conclude that the issue of the state's territorial limits was "distinct from its right to control navigation."  294 F.3d, at 761, n.10.

As with the statutes considered in <u>Wilson v. McNamee</u> and <u>The Whistler</u>, the statute considered in <u>Gillis</u> did not regulate the conduct of vessels outside of three miles.  It required the pilots, licensed by the State of Louisiana, to provide pilotage services to ships outside of the territorial limits of the state.  The statute was not challenged by vessel owners utilizing those pilotage services, nor was there any indication in the opinion that the Louisiana statute required the vessel owners to use the services of the pilot beyond the state's territorial limits.  In fact, the statute at issue merely required that the vessel pay the pilot's fee if they did not use the services.  La. R.S. 34:1073, 34:1076(D), (E).  Thus, <u>Gillis</u> did not involve a case in which Louisiana sought to regulate the conduct of vessels beyond the three-mile limit.  Rather, as in <u>Wilson</u> and <u>The Whistler</u>, the statute merely required payment of the pilotage fee in the event that pilotage services offered outside the territorial limits were refused by a vessel that was bound for the state.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 43 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

<u>Gillis</u> also relied on <u>Warner v. Dunlap</u>, 532 F.2d 767, in which the First Circuit upheld a requirement imposed by the State of Rhode Island that all vessels traversing Block Island Sound's waters either take on a pilot licensed by the State of Rhode Island or "pay the established pilotage fee as if a pilot had been employed." 532 F.2d, at 772-73.  Like <u>Gillis</u>, <u>Warner</u> addressed challenges by pilots to the state's authority to require them to be licensed or to provide services to vessels outside of the territorial limits of the state.   Since the Rhode Island law did not require the vessels to use the pilotage services, but only to pay the fee whether or not the services were used, <u>Warner v. Dunlap</u> does not support the conclusion that a state can regulate the conduct of vessels outside of its territorial limits.   In any event, as the Supreme Court has reiterated numerous times, pilotage requirements are historically and practically unique in that they predated the Constitution and are within the explicit jurisdiction granted to the states by federal law since 1789.  <u>U.S. v. Locke</u>, 529 U.S., at 112; <u>Cooley v. Board of Wardens</u>, 53 U.S., at 302.  None of the pilotage cases support CARB's extraterritorial regulation of emissions from vessels outside of its three-mile territorial limit.

Similarly, CARB has referred to two decisions of the Supreme Court of Alaska that allowed that state to enforce certain restrictions on the harvest of crabs and shellfish outside of the state's territorial waters.  <u>State of Alaska v. Sieminski</u>, 556 P.2d 929 (Alaska 1976); <u>State of Alaska v. Bundrant</u>, 546 P.2d 530 (Alaska

- 44 -

1976).  Even if these cases were correctly decided they have no application here where the state has reached beyond its borders to regulate the conduct of U.S. and foreign-flagged vessels engaged in international and interstate maritime trade.

First, it should be noted that Sieminski pertained only to the prosecution of a citizen of Alaska for his taking of scallops outside of Alaska's territorial waters. The decision was sustainable, therefore, based on Skiriotes alone.  556 P.2d, at 933-34.  The case otherwise simply relied on Bundrant.

State of Alaska v. Bundrant upheld prosecutions under a state law that prohibited crabbing in an area seaward of Alaska's jurisdictional limits. Prosecutions under similar Alaskan regulations had previously been enjoined as unconstitutional by a three-judge federal court in Hjelle v. Brooks, 377 F.Supp. 430 (D.C. Alaska 1974).

In Hjelle, the regulations made it unlawful to transport, possess, buy, or sell in Alaska, any King Crab and certain other sea life taken during Alaska's closed season "in any waters seaward of that officially designated as a territorial waters of Alaska."  Id., at 438.  The plaintiffs were actively engaged in crab fishing in the Bering Sea outside of the territorial jurisdiction of the state and transported their catch to Alaska for sale or export.  The federal court issued an injunction against prosecution of the plaintiffs for violation of the regulations at issue because the

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 45 -

1    regulations "have a direct rather than indirect impact on extraterritorial conduct."

2    377 F.Supp., at 441.

3       The federal court reviewed a line of cases upholding "landing laws" that

4    allow states to protect fish and game within the boundaries of the state. Those laws

5

6    typically include a prohibition against possession or processing of the game or fish

7    within the state, regardless of whether that game or fish was taken within or outside

8

9    of the state's territorial boundaries. Bayside Fish Co. v. Gentry, 297 U.S. 422

10   (1936); Silz v. Esterberg, 211 U.S. 31 (1908); Hjelle v. Brooks, 377 F.Supp., at 440-

11   41. Hjelle concluded that the Alaskan regulations were likely unconstitutional and

12

13   enjoined state prosecutions under them since they directly regulated extraterritorial

14   conduct and not merely conduct within the territory of the state in a way that had an

15   incidental effect on extraterritorial conduct.

16

17      In State of Alaska v. Bundrant, the Supreme Court of the State of Alaska

18   invoked the federal court's view that the Alaska regulation would "pass

19

20   constitutional muster if its regulations were directed at conserving the crab fishery

21   within Alaska's waters by regulating crabbing in that area, and, in order to facilitate

22   enforcement, by prohibiting the possession of crab in the state during the closed

23

24   season, even if that crab were caught outside the state," to sustain the new

25   regulations. 546 P.2d, at 552. Focusing on the intent of the new regulations to

26   preserve the state's resources rather than on the direct effect of the law on

27

28                                            - 46 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

extraterritorial conduct, the Alaska court decided that it was enough that the intent of the regulations were intended to preserve the crab fishery within Alaska, regardless of whether the regulations directly regulated extraterritorial conduct.    The state court's   analysis, however, ignored what the Hjelle court found constitutionally objectionable about the earlier regulation, i.e., that it directly regulated conduct outside of the state rather than, as permissible under the landing law cases, imposing sanctions on possession of fish and game within the state regardless of where the fish or game had been taken.    In short, Bundrant was wrongly decided and did not correctly analyze the constitutional issue presented.    As Hjelle v. Brooks correctly reasoned, a state's direct regulation of the extraterritorial conduct of non-citizens is not permissible, regardless of the intent or purpose of the statute.

State of Alaska v. Bundrant was decided before either Ray v. Atlantic Richfield or U.S. v. Locke and concluded that the regulations' "effect on exterritorial conduct required no higher standard of review" and would be allowed "with only minimal proof that the extraterritorial regulation was necessary to preserve a migratory resource."    This conclusion is contrary to U.S. v. Locke because the extraterritorial effect of a state's regulations is a principal factor in determining the constitutionality of the state law.    Even if the Alaska Supreme Court cases were correctly decided, however, they have no application here.    To the extent those decisions approved state regulation of extraterritorial conduct of non-citizens, they

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1  rest entirely on the line of Supreme Court cases that recognize a state's authority to

2  act to preserve the fish and game reserves within the state. This is a far cry from

3  regulations which impose direct mandatory requirements on the extraterritorial

4
5  operation of vessels engaged in foreign and interstate maritime commerce.

6          3.    **Presidential Proclamations 5928 and 7219, EPA**
7                **Regulations and Policy Exempting Foreign Flag Ships from**
                **Clean Air Act Regulations, and the United States'**
8                **Approval of MARPOL Annex VI Preclude State**
                **Regulation of Vessel Emissions Beyond the Three-Mile**
9                **Limit**
10
11         As outlined above, state regulation of maritime activity outside of the

12
13  state's territorial limits is precluded by general principles of national uniformity in

14  national and international maritime and navigational affairs. In this case, moreover,

15  the exercise of federal authority is manifested in a number of ways directly relevant
16
17  to the CARB regulations. The territorial seas and contiguous zone beyond

18  California's three-mile boundary are subject to federal jurisdiction to the exclusion

19
20  of states pursuant to Presidential Proclamations 5928 and 7219. The federal EPA

21  has exempted foreign vessels from its engine emissions regulations, in part because

22  of a stated U.S. policy of working within the applicable international regulatory

23
24  scheme including MARPOL Annex VI to advance reduction of air emissions from

25  vessels engaged in international trade. MARPOL Annex VI, the international treaty

26  on emissions from ships, has recently entered into force and it has been signed by

27

28                                          - 48 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

the United States President with the advice and consent of the Senate, pending

enactment of enabling legislation by the United States Congress.  See Senate

Executive Session, p. S3400, April 7, 2006.  These specific expressions of national

authority and policy underscore why CARB's attempt to regulate conduct outside of

its territorial jurisdiction is not allowed.

    At the time that the Submerged Lands Act was adopted, the federal

government of the United States accepted a seaward three-mile territorial limit on its

boundaries.  In 1988, however, the President issued Presidential Proclamation No.

5928, which stated, in pertinent part:

> "International law recognizes that coastal nations may exercise sovereignty and jurisdiction over their territorial seas.
>
> "The Territorial sea of the United States is a maritime zone extending beyond the land territory and internal waters of the United States over which the United States exercises sovereignty and jurisdiction, a sovereignty and jurisdiction that extend to the airspace over the territorial sea, as well as to its bed and subsoil.
>
> "Extension of the territorial sea by the United States to the limits permitted by international law will advance the national security and other significant interests of the United States.
>
> "Now, THEREFORE, I, RONALD REAGAN, by the authority vested in me as President by the Constitution of the United States of America, and in accordance with international law, do hereby proclaim the extension of the territorial sea of the United States of America....

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 49 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1900
Long Beach, California 90831-1900
(562) 435-2626

"The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

"In accordance with international law, as reflected in the applicable provisions of the 1982 United Nations Convention on the Law of the Sea, within the territorial sea of the United States, the ships of all countries enjoy the right of innocent passage and the ships and aircraft of all countries enjoy the right of transit passage through international straits.

"Nothing in this Proclamation:

"(a)   extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom; or

"(b)   impairs the determination, in accordance with international law, of any maritime boundary of the United States with a foreign jurisdiction."

Proclamation No. 5928 was followed in 1999 by Presidential Proclamation No. 7219, which stated:

"International law recognizes that coastal nations may establish zones contiguous to their territorial seas, known as contiguous zones.

"The contiguous zone of the United States is a zone contiguous to the territorial sea of the United States, in which the United States may exercise the control necessary to prevent infringement of its customs, fiscal, immigration, or sanitary laws and regulations within its territory or territorial sea, and to punish infringement of the above laws and regulations committed within its territory or territorial sea.

"Extension of the contiguous zone of the United States to the limits permitted by international law will advance the law enforcement and public health interests of the United States.

- 50 -

Moreover, this extension is an important step in preventing the removal of cultural heritage found within 24 nautical miles of the baseline.

"NOW, THEREFORE, I, WILLIAM J. CLINTON, by the authority vested in me as President by the Constitution of the United States, and in accordance with international law, do hereby proclaim the extension of the contiguous zone of the United States of America… as follows:

"The contiguous zone of the United States extends to 24 nautical miles from the baselines of the United States determined in accordance with international law, but in no case within the territorial sea of another nation.

"In accordance with international law, reflected in the applicable provisions of the 1982 Convention on the Law of the Sea, within the contiguous zone of the United States the ships and aircraft of all countries enjoy the high seas freedoms of navigation and overflight and the laying of submarine cables and pipelines, and other internationally lawful uses of the sea related to those freedoms, such as those associated with the operation of ships, aircraft, and submarine cables and pipelines, and compatible with the other provisions of international law reflected in the 1982 Convention on the Law of the Sea.

"Nothing in this proclamation:

(a)     amends existing Federal or State law;

(b)     amends or otherwise alters the rights and duties of the United States or other nations in the Exclusive Economic Zone of the United States established by Proclamation 5030 of March 10, 1983; or

(c)     impairs the determination, in accordance with international law, of any maritime boundary of the United States with a foreign jurisdiction."

- 51 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Although Proclamations 5729 and 7219 specifically refer to UNCLOS, the United States is not a party to that Convention. The extension of the U.S. territorial sea to twelve miles and the contiguous zone to 24 miles is nevertheless consistent with the provisions of the United Nations Convention on the Law of the Sea ("UNCLOS"), 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994). The UNCLOS geographic delineation of territorial seas and contiguous zones are well-described in Moordian, Protecting "Sovereign Rights": The Case to Increase Coastal State Jurisdiction Over Vessel-Source Pollution In The Exclusive Economic Zone, 82 B.U.L. Rev. 67 (2002) ("Moordian") at fn. 11:

> "The waters immediately adjacent to a State constitute the State's territorial sea, within which the coastal State exercises sovereignty over the water, airspace, seabed, and seabed subsoil. UNCLOS, supra, art. 2(1), (2), at 400. The territorial sea may not extend beyond twelve nautical miles, as measured by the State's baseline—marked as the low-water line along the coast. Id. art. 3, at 400. The State's sovereignty over its territorial sea is limited by different legal regimes including the right of innocent passage, laws governing international navigation straights, and the regime governing archipelagic States. See generally id. pts. II, III, IV, at 400-18. Proceeding seaward, the next principal zone is the contiguous zone, not to extend beyond twenty-four nautical miles from the baseline, in which the coastal State may 'exercise the control necessary to... prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea.' Id. art. 33(1)(a), at 409."[10]

---

[10] As used in UNCLOS, "states" and "coastal states" refer to national governments not internal political subdivisions of those nations such as the State of California.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Thus, the extension of the territorial sea and contiguous zone accomplished by Presidential Proclamations 5928 and 7219 placed the policies of the United States squarely within internationally accepted principles with respect to the exercise of jurisdiction by coastal nations over the marginal seas adjacent to their coast. While the Proclamations expanded the national authority of the United States in a manner consistent with international law, they expressly disclaimed any intent to extend the rights, interests or jurisdiction of the individual states beyond their existing authority under federal law.

In 2003, the U.S. Environmental Protection Agency adopted regulations imposing emissions standards on new marine engines used aboard U.S flagged vessels. 40 C.F.R. §94.1 et seq. In doing so, the EPA explicitly exempted engines in foreign-flagged vessels from these regulations. 40 C.F.R. §94.1(b)(2). The EPA postponed this decision for later consideration, expressing two reasons for this action. See 68 Fed. Reg. 9746, 9759 (February 28, 2003). First, the EPA had not yet decided whether such engines fell within the definition of "new nonroad engines" or "new nonroad vehicles" for purposes of the Clean Air Act. Id. Second, the EPA stated:

> "…[O]ne of the reasons we intend to address a second phase of more stringent standards in a subsequent rulemaking is to facilitate the development of more stringent consensus international requirements. Adoption of international standards has the clear potential to maximize the level of emission reductions achieved from emission control on U.S. and foreign vessels. For example, consensus

- 53 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

international standards of appropriate stringency would facilitate and effectively reduce or remove the legal and policy objections to controlling emissions from foreign vessels, and therefore would facilitate achieving the greatest emission reductions from Category 3 vessels. This is one reason we determined to address the second phase of standards in a subsequent rulemaking timed to facilitate such international action, but also timed to allow us to proceed expeditiously on our own if appropriate international standards are not adopted." Id.

Since the adoption of the marine engine rules by the EPA in 2003, MARPOL Annex VI has entered into force, and the Senate has provided its advice and consent to the agreement. The EPA has taken an active role in promoting stringent engine emissions standards with the International Maritime Organization, the international body that administers MARPOL Annex VI, (See attached April 2007 submission to the IMO), and the Coast Guard has adopted and promoted a voluntary program for interim compliance with MARPOL Annex VI.

The assertion of U.S. authority over the territorial seas to 12 miles and the contiguous zone to 24 miles to the exclusion of any extension of State authority, the approval of MARPOL Annex VI by the United States, and the EPA's decision to defer enforcement of emissions standards on foreign flag vessels in order to pursue a policy of international negotiation and cooperation rather than unilateral action all reflect a uniform national policy with respect to regulation of emissions from vessels in foreign trade with the United States. At least with respect to the seas beyond California's boundaries as defined by the Submerged Lands Act, CARB's unilateral

adoption and enforcement of an emissions standard applicable to all vessels that transit these waters to call at California is directly contrary to this national policy. For this reason alone, the regulations are beyond the territorial powers of the State under the Act and should be enjoined.

CARB has also suggested in its Final Statement of Reasons that the Clean Air Act gives it express authority to "act for the nation" to regulate conduct outside of its territorial limits. See FSOR, at 142. The structure and language of the Act, however, establish exactly the opposite, i.e., the authority given to California pursuant to §209(e)(2)(A) is a territorially-based authority that does not extend California's jurisdiction beyond its three-mile territorial limit.

Specifically, §209(e)(2)(A) establishes a procedure for the EPA to "authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles and engines." §209(e)(2)(B) gives other states the authority to adopt California's standards once they are authorized by the EPA. Thus, §209(e)(2) is, by its terms, territorially-based and gives the others states and not California the power to regulate emissions within the boundaries of those other states. On it face, therefore, §209(e)(2) restricts California's authority to territory of the State of California itself.

Other evidence of congressional intent to limit the geographic authority of §209(e)(2)(A) of the Act appears at §243(e)(1) and (2), 42 U.S.C. §7583(e)(1) and

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

(2).    These subsections give the EPA the power to replace federal standards applicable to certain categories of engines adopted under §209(a-d) with standards made "in California" pursuant to waivers from the EPA under §209(a-d), 42 U.S.C. §7543(a-d).  This reference makes it clear that §209(a-d) is assumed to be applicable "in California" and nowhere else.  Since §209(e)(2) must be consistent with §209(a-d), see EMA v. EPA, 88 F.3d, at 1093-94, these provisions reflect a territorial limitation on California's authority under §209(e)(2)(A).

Finally, §328 of the Act, 42 U.S.C. §7627, provides for imposition of controls on emissions from "Outer Continental Shelf" sources, all of which are outside of the three-mile limit.  These sources are defined as limited to, among other things, "equipment, activities or facilities which are regulated by the Outer Continental Shelf Lands Act, 43 U.S.C.A. §1331."  This does not include ocean going vessels transiting the Outer Continental Shelf, unless they are servicing facilities on the Outer Continental Shelf itself.  Section 328(a)(3) of the Clean Air Act establishes a procedure for "each state adjacent to an OSC source" to promulgate and submit regulations to the EPA for approval and delegation of implementation to the state.  By requiring this specific procedure to allow states (including California) to obtain limited jurisdiction over sources outside of the territorial limits of the state, §328(a)(3) shows that no other provision of the Act, including  §209(e)(2)(A) grants extraterritorial authority to California or any other state with respect to any other

- 56 -

source of emission. If such authority were already given to California and the other states by §209(e)(2)(A) and (B) or any other provision of the Act, there would have been no need to make the specific delegation of authority accomplished by §328(a)(3).

The Clean Air Act, including the amendments of 1990 adding §209(e)(2)(A) were adopted against the backdrop of the Submerged Lands Act and more than 200 years of constitutional history during which States have been assumed not to have the authority to regulate vessel conduct outside of their territorial limits. It would be unusual if not unprecedented for Congress to cede such authority to the States. Thus, it would be expected that if Congress intended to extend California's territorial authority by the adoption of §209(e)(2)(A), it would have done so explicitly as it did in §328(a)(3). Instead, Congress adopted a territorially-based statute which ceded authority to each individual state within its own territory, specifically referred to companion regulations adopted under §209(a-d) as applicable "in California," and, when it decided to cede authority to the states to impose regulations on facilities on the Outer Continental Shelf beyond the States' territories, did so in express terms in §328(a)(3).

Accordingly, the only reasonable interpretation of §209(e)(2)(A) is that it allows California to obtain authorization for emissions standards applicable only "in California," i.e. within the territorial limits of the state as established by the

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

Submerged Lands Act.

## IV.

## CONCLUSION

For the foregoing reasons, plaintiff Pacific Merchant Shipping Association is entitled to summary judgment in this matter on its First Claim for Relief and partial summary judgment on the Second Claim for Relief insofar as that claim seeks a declaration that the application of CARB's regulations beyond its three-mile territorial limit is unlawful and unconstitutional. PMSA, therefore, requests that the court enter such a judgment and an injunction against the enforcement of those regulations according to the terms and conditions of the proposed Judgment submitted herewith.

Respectfully submitted,

Dated: May 7, 2007                      Flynn, Delich & Wise LLP


By: /s/ Erich P. Wise
       ERICH P. WISE
       Attorneys for Plaintiff
       PACIFIC MERCHANT SHIPPING
       ASSOCIATION

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 58 -