DAVID PETTIT (SBN 067128)
MELISSA LIN PERRELLA (SBN 205019)
ADRIANO MARTINEZ (SBN 237152)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, CA 90401
Telephone:    (310) 434-2300
Facsimile:    (310) 434-2399

Attorneys for Defendants-Intervenors
Natural Resources Defense Council, Inc., and
Coalition for Clean Air, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC MERCHANT SHIPPING ASSOCIATION, a California Mutual Benefit Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>CATHERINE E. WITHERSPOON, in her official capacity as Executive Officer of the California Air Resources Board,<br><br>        Defendant,<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC., COALITION FOR CLEAN AIR, INC., SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, and CITY OF LONG BEACH,<br><br>        Defendants-Intervenors. | Case No.: 2:06-CV-02791-WBS-KJM<br><br>NATURAL RESOURCES DEFENSE COUNCIL AND COALITION FOR CLEAN AIR'S OPPOSITION TO PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT<br><br>Date:      July 9, 2007<br>Time:     2:00 P.M.<br>Judge:    Hon. William B. Shubb<br>Courtroom:  5 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

    A.    Diesel Exhaust from Ocean-Going Vessels Poses a Significant and Growing Public Health Threat ........................................................................2

    B.    The Vessel Rules and Their Benefits....................................................................3

    C.    Regulatory Framework Under the Clean Air Act .................................................5

        1.    The Clean Air Act Requires State and Local Governments To Take the Lead in Cleaning the Air .......................................................5

        2.    The Scope of Preemption Under Section 209(e) of the Clean Air Act ...................................................................................6

III.    STANDARD OF REVIEW ....................................................................................7

IV.    TO DEMONSTRATE THAT THE VESSEL RULES ARE PREEMPTED, PMSA MUST OVERCOME THE PRESUMPTION AGAINST PREEMPTION ...........8

V.    THE VESSEL RULES ARE NOT PREEMPTED BY THE CLEAN AIR ACT .............8

    A.    The Vessel Rules Are In-Use Requirements That Are Allowed Under the Clean Air Act ...................................................................................9

    B.    The Vessel Rules Are Not Emissions Standards Preempted Under the Clean Air Act .................................................................................13

VI.    THE VESSEL RULES ARE NOT PREEMPTED BY THE SUBMERGED LANDS ACT ........................................................................................................16

VII.    CONCLUSION....................................................................................................21

# TABLE OF AUHORITIES

**FEDERAL CASES:**

*Askew v. American Waterways Operators, Inc.*, 411 U.S. 325 (1973) .......................................... 20

*Barber v. Hawaii*, 42 F.3d 1185 (9th Cir. 1994) .................................................................. 18, 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 7, 13

*Chevron v. Hammond*, 726 F.2d 483 (9th Cir. 1984) ................................................................ 20

*Chevron, Inc. v. NRDC*, 467 U.S. 837 (1984) ........................................................................... 10

*EMA v. EPA*, 88 F.3d 1075 (D.C. Cir. 1996) .................................................................... passim

*EMA v. SCAQMD*, 541 U.S. 246 (2004) ................................................................. 13, 14, 15, 16

*Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir. 2000) ..................................................... 5, 8

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986) ............................................................. 7

*Gillis v. Louisiana*, 294 F.3d 755 (5th Cir. 2002) ..................................................................... 19

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001) ..................................................................... 6

*Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960) ..................................... 8, 20

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................................................................. 8

*Newton v. Thomason*, 22 F.3d 1455 (9th Cir. 1994) .................................................................... 6

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) ................................................................... 20

*Union Elec. Co. v. EPA*, 427 U.S. 246 (1976) ............................................................................ 5

*United States v. Alaska*, 521 U.S. 1 (1977) ............................................................................... 20

*United States v. California*, 381 U.S. 139 (1965) ...................................................................... 20

*United States v. California*, 332 U.S. 19 (1947) ....................................................................... 20

*United States v. Locke*, 529 U.S. 89 (2000) .............................................................................. 20

1

**FEDERAL STATUTES:**

2  33 U.S.C. § 1161 ................................................................................................. 20

3  33 U.S.C. §§ 1221 *et seq* ................................................................................... 20

4  42 U.S.C. § 7401 ............................................................................................... 5, 8

5  42 U.S.C. § 7409 .................................................................................................. 5

6  42 U.S.C. § 7410 .................................................................................................. 5

7  42 U.S.C. § 7416 .................................................................................................. 8

8  42 U.S.C. § 7509 .................................................................................................. 5

9  42 U.S.C. § 7543 ............................................................................................... 6, 9

10  42 U.S.C. § 7547 ................................................................................................ 13

11  43 U.S.C. § 1332 ................................................................................................ 19

12  43 U.S.C. §§ 1301 *et seq* ................................................................................. 17

13  43 U.S.C. §§ 1331 *et seq* ................................................................................. 17

14

**FEDERAL REGULATIONS:**

15  40 C.F.R. § 89.1 ................................................................................................. 13

16  40 C.F.R. pt. 89 ................................................................................. 7, 10, 12, 13

17  40 C.F.R. § 94.1 ................................................................................................. 13

18  62 Fed. Reg. 67733-01 ....................................................................................... 10

19

**OTHER AUTHORITIES:**

20  Cal. Code Regs. tit. 13, § 2299.1 ............................................................ 3, 4, 5, 10

21  Cal. Code Regs. tit. 17, § 93118 ............................................................. 3, 4, 5, 10

22  Judiciary Committee Report, H.R. Rep. No. 83-215 ........................................ 17

23  Proclamation 5928 ............................................................................................. 20

24  Proclamation 7219 ............................................................................................. 20

25

26

27

28

I.    **INTRODUCTION.**

Plaintiff Pacific Merchant Shipping Association ("PMSA") urges this Court to interpret the federal Clean Air Act and federal Submerged Lands Act to tie the hands of state and local governments in their fight to protect their residents from harmful air pollution. If accepted, PMSA's argument would severely hamper the ability of states like California, which has some of the worst air quality in the nation, from effectively addressing major sources of pollution, namely emissions from large ocean-going vessels. PMSA's attempt to interpret the law in this manner flouts the intent of Congress to allow states to craft regulations to help them achieve attainment of federal air quality standards.

Air pollution from California's goods movement system—the network of ships, trucks, trains and other vehicles and equipment used to transport domestic and international goods—is responsible for 2,400 premature deaths annually and over 1.1 million school absences every year. If left unregulated, between 2005 and 2020, the cumulative cost of health impacts from such pollution will reach approximately $200 billion. Coastal communities, and especially children and the elderly, face the greatest dangers from this pollution. These emissions also contribute significantly to California's notorious exceedence of federal air quality standards. Following the mandate of the Clean Air Act to develop strategies to meet these standards, the California Air Resources Board ("CARB") adopted the rules at issue in this case.

The CARB rules were carefully designed to address the toxic air pollution generated by large ocean-going vessels, pollution that is expected to increase dramatically as global trade triples through the state over the next 15 years. The "fix" adopted in the rules—use of low-sulfur fuel in vessel auxiliary engines—is simple, effective, and has already been voluntarily surpassed by the largest container shipping company in the world, a member of PMSA.

PMSA argues that the CARB rules are preempted by the Clean Air Act and by the Submerged Lands Act. PMSA offers not a single fact in support of these arguments. Instead, PMSA relies on purely legal arguments that, as we will show below, cannot be made without a strong factual background, and are wrong in any event.

## II.  BACKGROUND.

### A.  Diesel Exhaust from Ocean-Going Vessels Poses a Significant and Growing Public Health Threat.

In 2004, there were approximately 10,000 vessel calls at California's ports, and this number will increase significantly as trade through California's ports doubles by 2010 and triples by 2020.[1] Further, vessel emissions as far out as 200 miles off California's coast have health impacts on California residents.  Pettit Decl., at Exh. A at 13 (ISOR, at IV-8).

Ocean-going vessels utilize large diesel engines[2] that have little or no emissions control and generally run on high emitting heavy fuel oil known as "bunker fuel." [3]  *Id.* at Exh. C at 37 (ERP, at ES-5).  Typical bunker fuel averages about 25,000 parts per million ("ppm") sulfur but may contain a sulfur content as high as 45,000 ppm which is *3,000 times* higher in sulfur content than the fuel used by most California on-road diesel engines.  *Id.* at Exh. C at 43 (ERP, at 41); Exh. A at 14 (ISOR, at VI-3).  Generally, ship engines that use fuel with a higher sulfur content produce more air pollution.  *Id.* at Exh. A at 15-16 (ISOR, at VII-2-3).  The emissions from diesel engines include diesel particulate matter ("PM"), oxides of nitrogen ("NOx") and sulfur oxides ("SOx") and are known to cause premature death, cancer, aggravated asthma and other respiratory illnesses, and increased risk of heart disease.  *Id.* at Exh. A at 10-12 (ISOR, at II-2-4).

In 1998, CARB identified diesel PM as a toxic air contaminant that contributes to over 70 percent of the potential cancer risk from toxic air contaminants in California.  *Id.* at Exh. C at 39 (ERP, at 7).  In 2006, CARB reported that air pollution from California's "goods movement

---

[1]    Declaration of David Pettit in Support of Natural Resources Defense Council ("NRDC") and Coalition for Clean Air's ("CCA") Opposition to PMSA's Motion for Summary Judgment and Partial Summary Judgment ("Pettit Decl."), at Exh. A at 21 (CARB Staff Report: Initial Statement of Reasons for Proposed Rulemaking ("ISOR"), at D-4); *see also id. at* Exh. C at 40 (CARB Proposed Emission Reduction Plan for Ports and Goods Movement in California, ("ERP"), at 14).  The ISOR and ERP are referenced in NRDC and CCA's Statement of Undisputed Facts at paragraphs 5-14, 16-18.

[2]    Two types of diesel engines are found on ocean-going vessels.  The main engine is used mainly to propel the vessel at sea.  Pettit Decl. Exh. A at 22 (ISOR, at D-6).  Auxiliary engines provide power for uses other than propulsion, such as electricity for lighting, navigation equipment, and refrigeration of cargo.  *Id.* at Exh. A at 22, 3. (ISOR, at D-6; ESR-4).

[3]    Bunker fuel is very viscous and requires heating to allow it to be pumped and injected into an engine. Bunker fuel typically contains much higher levels of sulfur, nitrogen-containing compounds, ash, and other compounds that increase exhaust emissions.  Pettit Decl. Exh. A at 3 (ISOR, at ES-4).

system"—the network of ships, trucks, trains and other vehicles and equipment used to transport domestic and international goods—was responsible for 2,400 premature deaths annually (over 6 premature deaths per day) and over 1.1 million school absences every year. *Id.* at Exh. C at 35, 38 (ERP, at ES-2, 2). Further, CARB concluded that between 2005 and 2020, the cumulative cost of health impacts from such emissions will reach approximately $200 billion. *Id.* at Exh. C at 36 (ERP, at ES-3). Communities closest to port operations, and especially children and the elderly, face the greatest impacts. *Id.* at Exh. A at 2 (ISOR, at ES-1).

Further, due to expected growth in goods movement activities, ship emissions of diesel PM and SOx are expected to increase to 23.3 tons per day ("TPD") and 180 TPD, respectively, by 2020—over a three-fold increase since 2001. *Id.* at Exh. C at 41-42 (ERP, at 20-21). NOx emissions are expected to increase by over two and one-half times—to 254 TPD during that same time period. *Id.* at Exh. C at 41 (ERP, at 20). And due to increased regulation of other goods movement sources such as trucks and harbor craft (i.e., tug boats), ship emissions are quickly becoming the largest contributor of goods movement emissions. By 2020, ship emissions will account for approximately 65 percent of all diesel PM emissions, 36 percent of all NOx emissions, and over 99 percent of all SOx emissions from the goods movement system. *Id.* at Exh. C at 41-42 (ERP, at 20-21).

**B.    The Vessel Rules and Their Benefits.**

On December 8, 2005, CARB adopted two rules: title 13, section 2299.1 and title 17, section 93118 of the California Code of Regulations (collectively, "Vessel Rules" or the "Rules"). The Vessel Rules require vessel operators, within 24 nautical miles ("nm") off the coast of California, to reduce the diesel PM, NOx, and SOx emissions from their auxiliary diesel and diesel electric engines to levels that would occur if the vessels used cleaner fuels.[4] Cal.

---

[4] Specifically, the emissions levels of diesel PM, NOx, and SOx are not to exceed the emission rates of those pollutants that would result had the engine used marine gas oil or marine diesel oil with less than or equal to 0.5 percent by weight sulfur. Cal. Code Regs. tit. 13, § 2299.1(e)(1)(A) (2006); Cal. Code Regs. tit. 17, § 93118(e)(1)(A) (2006). Further, the Rules also authorize CARB's Executive Officer to evaluate the feasibility of 1,000 ppm sulfur fuel and require its use, if feasible, beginning in 2010. Cal. Code Regs. Tit 13 § 2299.1(e)(1)(B), (j)(2); Cal. Code Regs. tit. 17, § 93118(e)(1)(B), (j)(2).

1  Code Regs. tit. 13, § 2299.1(e)(2006); Cal. Code Regs. tit. 17, § 93118(e)(2006). While vessel

2  operators can meet the specified emissions limits through a variety of approaches, including use

3  of cleaner fuels or by operating under an approved Alternative Control of Emissions Plan

4  ("ACE"), [5] Cal. Code Regs. tit. 13, § 2299.1(e)(1)(C), (g); Cal. Code Regs. tit. 17, §

5  93118(e)(1)(C), (g), most vessel operators are expected to comply by burning cleaner fuels in

6  their auxiliary engines. Pettit Decl. Exh. A at 4 (ISOR, at ES-8). Such fuels are readily

7  available.[6]

8         The Vessel Rules do not require vessel operators to replace their existing vessel engines

9  with different engines to comply with the Rules. Vessel operators can continue to use the same

10  vessels and engines as they did before the Rules were enacted. *See* Pettit Decl. Exh. B at 32-33

11  (FSOR, at 68-69). Moreover, the added cost of direct compliance with the Rules represents less

12  than one percent of the overall costs of a typical overseas voyage. *Id.* at Exh. A at 18 (ISOR, at

13  VIII-18). On December 6, 2006, the Rules were approved by the State Office of Administrative

14  Law, and became effective. All of PMSA's members are in full compliance with the Rules. [7]

15         Implementation of the Vessel Rules will result in immediate and significant reductions in

16  air pollution. In 2007 alone, the Rules will reduce 2.7 TPD of diesel PM, 1.9 TPD of NOx, and

17  22 TPD of SOx. *Id.* at Exh. A at 8 (ISOR, at ES-13). To put this in perspective, the Rules will

18  result in an estimated 75 percent reduction in diesel PM, 80 percent reduction SOx, and a 6

19

20  [5]    ACE plans were included in the Rules to provide vessel operators with the flexibility to implement
alternative emission control strategies that result in no greater emissions when compared to the use of the fuels

21  specified in the Rules. Cal. Code Regs. tit. 13, § 2299.1(g); Cal. Code Regs. tit. 17, § 93118(g).
[6]    Pettit Decl, at Exh. B at 31 (CARB Final Statement of Reasons for Rulemaking ("FSOR"), at 43); *see also*

22  *id.* at Exh. F at 53 (Plaintiff's Response to First Set of Requests for Admissions Propounded by Defendant Catherine
E. Witherspoon ("PMSA's Response to Defendant Witherspoon's 1st Set of RFA's"), at 2) (admitting that from

23  January 1, 2007 to the present, fuels specified in the Vessel Rules have been available to PMSA's members, subject
to very few exceptions, in quantities and locations sufficient to comply with the Rules). The FSOR is referenced in

24  NRDC and CCA's Statement of Undisputed Facts in paragraphs 11, 13 and 18; PMSA's responses are referenced in
paragraphs 5 and 11 of NRDC and CCA's Statement of Undisputed Facts.
[7]    Pettit Decl., at Exh. D at 44-45 (PMSA, Global Green-Cleaner Engines and Cleaner Burning Fuels,

25  http://www.pmsaship.com/current_clean_air_programs.html (last visited June 7, 2007)); *see also id.* at Exh. E at 47
(Plaintiff's Response to First Set of Interrogatories Propounded by Defendant Catherine E. Witherspoon ("PMSA's

26  Response to Defendant Witherspoon's 1st Set of Rogs"), at 2) (admitting that "as far as PMSA knows, all of its
members are complying [with the Rules] by use of the fuels listed in subsection (e)(1)(A) of the regulations and/or

27  cold ironing for some vessels at dock"). PMSA's webpage and interrogatory responses are referenced in NRDC and
CCA Statement of Undisputed Facts in paragraphs 1 and 3-5.

28

NRDC AND CCA'S OPPOSITION TO PMSA'S MOTION FOR SUMMARY JUDGMENT
Case No.: 2:06-CV-02791-WBS-KJM -4 -

1   percent reduction in NOx from an engine that previously used typical heavy fuel oil. *Id.*

2   Moreover, between 2007 and 2020, these Rules alone will prevent approximately 520 premature

3   deaths, 14,000 asthma attacks, 120,000 work loss days, and significantly reduce cancer risk. *Id.*

4   at Exh. A at 17, 9 (ISOR, at VII-7, ES-21).

5         **C.**    **Regulatory Framework Under the Clean Air Act.**

6                 **1.**    **The Clean Air Act Requires State and Local Governments To Take**

7                       **the Lead in Cleaning the Air.**

8         The Clean Air Act creates a federal-state partnership to combat air pollution, in which the

9   federal government sets standards (known as National Ambient Air Quality Standards) for how

10  clean the air must be, and state and local governments devise and carry out State Implementation

11  Plans ("SIP") to meet these standards. *See* 42 U.S.C. §§ 7409, 7410. As a result, the Clean Air

12  Act places the primary responsibility for achieving clean air in the hands of state and local

13  governments. *See id.* § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control . . .

14  is the primary responsibility of States and local governments."); *Exxon Mobil Corp. v. EPA*, 217

15  F.3d 1246, 1250 (9th Cir. 2000).

16        Devising and implementing a SIP is especially difficult in California because it has the

17  most serious and intractable air pollution problem in the nation.[8] Further, failing to meet federal

18  air quality standards not only jeopardizes the health of all Californians, it also exposes the state

19  to stiff penalties. *See, e.g.*, 42 U.S.C. § 7509(b)(1) (withholding federal highway funds for all

20  projects in region). Nevertheless, the Clean Air Act reflects Congress' "determination to 'tak(e)

21  a stick to the States' in order to guarantee the prompt attainment and maintenance of specified air

22  quality standards." *Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976) (quoting *Train v. NRDC*,

23  421 U.S. 60, 64 (1975)) (citations omitted).

24

25

26          [8]    Many California cities top the list for the most ozone and particulate polluted cities. *See* Pettit Decl., at

27  Exh. H at 58-63 (American Lung Association State of the Air: 2007 ("ALA Report"), at 5, 11, 19-21). The ALA Report is referenced in NRDC and CCA's Statement of Undisputed Facts at paragraph 15.

28

**2.    The Scope of Preemption Under Section 209(e) of the Clean Air Act.**

It was not until 1990 that Congress chose to define and regulate nonroad sources under the Clean Air Act. *Engine Mfrs. Ass'n v. EPA* (*"EMA v. EPA"*), 88 F.3d 1075, 1080 (D.C. Cir. 1996). The parties do not dispute that under the Clean Air Act Act, nonroad engines include the vessel auxiliary engines that are subject to the Rules at issue. PMSA Memorandum of Points and Authorities in Support of Motion for Summary Judgment and Partial Summary Judgment ("MSJ"), at 12.

The 1990 Amendments to the Clean Air Act established a two-tiered preemption scheme. 42 U.S.C. § 7543(e). Section 209(e)(1) explicitly preempts states and their political subdivisions, including California, from adopting and enforcing emissions standards for new nonroad engines that are smaller than 175 horsepower used in farm and construction, and for new locomotives and locomotive engines. *Id.* § 7543(e)(1).

In contrast, *EMA v. EPA* held that section 209(e)(2) "implicitly" preempts state and local governments from adopting emission standards and other requirements for all other nonroad vehicles and equipment beyond those categories expressly preempted under §209(e)(1). 88 F.3d at 1087. The court in *EMA v. EPA* interpreted this implied preemption provision to apply to both new and used equipment and vehicles. *Id.* at 1093.[9] However, similar to the motor vehicle regime under section 209(a), California may seek authorization from EPA to adopt and enforce its own nonroad emissions standards and other requirements (other than for those sources that are expressly preempted under §209(e)(1)). 42 U.S.C. § 7543(e)(2)(A).[10]

---

[9]    It is less than clear that this Court is bound by the result of a challenge under the federal Administrative Procedure Act ("APA") to rules promulgated by the EPA, which is the underlying fact pattern of *EMA v. EPA*. Ordinarily, courts in one circuit are not bound by rulings in another circuit. *E.g.*, *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001); *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994). And there is no arguable collateral estoppel effect on CARB of a decision under the APA, in a lawsuit brought by a party other than PMSA, that involved the question of whether the EPA–not CARB–violated the APA when enacting certain regulations. Moreover, NRDC and CCA believe that the *EMA v. EPA* majority wrongly concluded that states and local governments are preempted by section 209(e)(2) from adopting and enforcing emissions standards for used nonroad engines, and that the dissent by Judge Tatel correctly analyzed the issue. If Judge Tatel's reasoning is accepted, PMSA's Clean Air Act preemption argument vanishes.

[10]    Additionally, the court in *EMA v. EPA* held that in terms of the emissions "standards and other requirements" that states are preempted from adopting, "other requirements" refers only to ancillary enforcement

1    Moreover, Section 209(e) does not preclude states and their local subdivisions from

2    adopting and enforcing, without EPA authorization, "in-use requirements" expressly intended to

3    control emissions, including regulations on hours of usage, daily mass emission limits, or sulfur

4    limits on fuel once the engine is no longer new. *EMA v. EPA*, 88 F.3d at 1094; 40 C.F.R. pt. 89,

5    app. A, subpt. A.

6    **III.    STANDARD OF REVIEW.**

7    Summary judgment for defendants is proper when the plaintiff "fails to make a showing

8    sufficient to establish the existence of an element essential to that party's case, and on which that

9    party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

10    Plaintiff PMSA has the burden of proof at trial and, accordingly, it must establish "beyond

11    peradventure *all* of the essential elements" of its claims. *Fontenot v. Upjohn Co.*, 780 F.2d 1190,

12    1194 (5th Cir. 1986) (emphasis in original).

13    PMSA contends that there are no relevant factual issues and that it is entitled to judgment

14    as a pure question of law on its first and second claims for relief. PMSA's Statement of

15    Undisputed Facts only offers facts supporting PMSA's Article III standing, which the Natural

16    Resources Defense Council ("NRDC") and Coalition for Clean Air ("CCA") do not contest.

17    However, PMSA's approach shows a serious misreading of the federal laws that it relies

18    on. The issue of whether the federal Clean Air Act preempts the Vessel Rules at issue here is not

19    a pure question of law. Instead, the answer to the preemption question turns on whether, for

20    example, the Rules affect marine engine manufacturers—which they do not. Defendants have

21    offered admissible factual evidence on this issue, but PMSA has offered none.

22    Similarly, PMSA has completely missed the point of the cases dealing with preemption

23    under the federal Submerged Lands Act. Those cases teach that the critical inquiry is whether

24    there is an actual conflict between the demands of a local regulation and the demands of the

25

26    _____

27    mechanisms such as certificates and inspections, as in the motor vehicle preemption regime. *See EMA v. EPA*, 88 F.3d at 1093.

28

1  federal Act. Despite having the burden of proof on this issue, PMSA has not offered a single fact

2  showing that such a conflict exists – and, in fact, it does not.

3  **IV.    TO DEMONSTRATE THAT THE VESSEL RULES ARE PREEMPTED, PMSA**
        **MUST OVERCOME THE PRESUMPTION AGAINST PREEMPTION.**
4

5          In preemption analysis, the Supreme Court has "assum[ed] that the historic police powers

6  of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest

7  purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Regulating harmful

8  sources of air pollution, such as from marine vessels, falls squarely within the historic police

9  powers that the Supreme Court has sought to preserve against an overly expansive interpretation

10 of federal preemption. *See Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442

11 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls

12 within the exercise of even the most traditional concept of what is compendiously known as the

13 police power."); *see also Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000).

14 Indeed, the structure of the Clean Air Act, which proclaims that "states retain the leading role in

15 regulating matters of health and air quality," provides guidance on the robust nature of this

16 presumption against preemption in relation to state action that addresses critical sources of air

17 pollution. *Id.* at 1255; 42 U.S.C. § 7401(a)(3); 42 U.S.C. § 7416 (section titled "Retention of

18 State Authority"). Accordingly, in the realm of air pollution, "the authority of the states is

19 assumed not to have been preempted unless it was the clear and manifest purpose of Congress to

20 do so." *Exxon Mobil*, 217 F.3d at 1256. As discussed below, PMSA has failed to demonstrate

21 Congress' manifest purpose to preempt the Vessel Rules, *see id.* at 1256, under the Clean Air

22 Act and Submerged Lands Act, and thus, PMSA has failed to meet its burden of demonstrating

23 preemption.

24 **V.    THE VESSEL RULES ARE NOT PREEMPTED BY THE CLEAN AIR ACT.**

25         PMSA asserts that the Vessel Rules are preempted "emissions standards" under the Clean

26 Air Act. *See* PMSA MSJ, at 16. However, section 209(e) of the Clean Air Act only preempts

27 state and local governments from adopting and enforcing emissions standards that burden engine

28

1    manufacturers.  As discussed below, the Vessel Rules have no effect on manufacturers, and thus,

2    are not preempted emissions standards.  Moreover, PMSA has not alleged any facts that suggest,

3    let alone prove, that the Vessel Rules will have any impact on engine manufacturers.

4           Nor does PMSA dispute that under the Clean Air Act, states and local governments can

5    impose "in-use requirements" on used nonroad vehicles and engines without EPA authorization,

6    *see* PMSA MSJ, at 16, or that one of the compliance paths available under the Rules is expressly

7    defined as a permissible in-use requirement by EPA.  Also, PMSA has not shown any fact that

8    proves or even suggests that the Rules are not precisely the kind of Rules Congress intended to

9    exclude from preemption because they address the unique topographic, climate and pollution

10   conditions in California.

11          Accordingly, PMSA has hardly met its burden of demonstrating an "absence of a genuine

12   issue of material fact" on issues that go to the heart of its Clean Air Act claim, and as a result,

13   PMSA is not entitled to a judgment as a matter of law.

14   **A.      The Vessel Rules Are In-Use Requirements That Are Allowed Under the
             Clean Air Act.**

15

16          In *EMA v. EPA*, 88 F.3d 1075, 1094 (D.C. Cir. 1996), the court held that section 209(e)

17   of the Clean Air Act reserves the right of states and local governments to adopt and enforce "in-

18   use requirements" that are expressly intended to control emissions from used nonroad sources.

19   In so holding, the court agreed with EPA's interpretation that in-use requirements are not

20   preempted "standards." *Id.* at 1093-94.  Specifically, the D.C. Circuit concluded that Section

21   209(d) from the motor vehicle regime was incorporated into the nonroad regime. *Id.* at 1094.

22   Section 209(d) provides: "Nothing in this part shall preclude or deny to any State or political

23   subdivision thereof the right otherwise to control, regulate, or restrict the use, operation or

24   movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d).  Accordingly, states

25   retain authority to adopt in-use regulations even though they may be preempted from adopting

26   emission standards for new and used nonroad sources.

27

28

1    In response to the D.C. Circuit's decision, EPA reaffirmed its interpretation of state and

2    local government authority to adopt in-use requirements for nonroad sources—stating "simply

3    and clearly" that "state regulation of the use and operation of nonroad engines can occur when

4    the engines are no longer new." 62 Fed. Reg. 67733-01, 67735 n.9 (Dec. 30, 1997). In

5    particular, the agency declared that: "States are not precluded under section 209 from regulating

6    the use and operation of nonroad engines, such as regulations on hours of usage, daily mass

7    emission limits, or sulfur limits on fuel . . . once the engine is no longer new." 40 C.F.R. pt. 89,

8    app. A, subpt. A. This court should give EPA's interpretation of the scope of permissible in-use

9    requirements considerable weight and deference when determining the scope of preemption

10    under Section 209(e). *See Chevron, Inc. v. NRDC*, 467 U.S. 837, 844 (1984) ("We have long

11    recognized that considerable weight should be accorded to an executive department's

12    construction of a statutory scheme it is entrusted to administer, and the principle of deference to

13    administrative interpretations.").

14    Here, the Vessel Rules are permissible in-use regulations that seek to "control, regulate,

15    or restrict the use, operation or movement" of used ocean-going vessels by requiring vessels to

16    operate in such a way that the vessel's emissions are at or below what would be achieved had the

17    regulated engines used specified low sulfur fuels. Vessel operators can meet the specified

18    emissions limits through a variety of approaches, including use of cleaner fuels or by operation

19    under an approved ACE plan. Cal. Code Regs. tit. 13, § 2299.1(e), (g) (2006); Cal. Code Regs.

20    tit. 17, § 93118(e), (g) (2006). In fact, *any* auxiliary engine, regardless of its design or emissions

21    characteristics can comply with the Rules by simply using cleaner marine fuels, Pettit Decl., Exh.

22    B at 32-33 (FSOR, at 68-69), and PMSA has not demonstrated anything to the contrary.

23    The Rules are also precisely the type of in-use regulations that Congress sought to

24    authorize states and local governments to enact because they are "inherently local in character,"

25    in that they were crafted to address conditions unique to California. *EMA v. EPA*, 88 F.3d at

26    1094 n.58 (agreeing that Congress did not intend to preempt states from adopting in-use

27    requirements aimed at addressing local conditions). The Rules were designed to regulate vessel

28

emissions up to 24 nm off the California coastline in response to the meteorological and topographic conditions of California, which are not found in any other region in the nation. Further, tracer studies,[11] air quality modeling, and meteorological data analysis indicate that air flow patterns off California's coast are modified by local land and sea breeze circulations, which serve to transport offshore emissions to California's coastal air basins. Pettit Decl., at Exh. A at 23-28, 5 (ISOR, App. F, at F-1-6; ES-9) (approximately 75 percent of the auxiliary engine diesel PM emissions within 100 nm of the California coastline are emitted within the 24 nm boundary). Finally, CARB designed the compliance features of the Rules based on an in-depth analysis of the composition of marine vessel fleets traveling in California waters. *Id.*, at Exh. A at 19, 20 (ISOR, App. C at C-1-2). As a result, the Vessel Rules were specifically crafted for California's "local conditions" and it would "not make sense for Congress to require all states to follow California's lead on this issue" by allowing other states to "opt-in" to identical standards. *EMA v. EPA*, 88 F.3d at 1094 n.58.[12]

PMSA asserts that if the Rules are allowed to stand, its members might be subject to different requirements in different states. *See* PMSA MSJ, at 22-23. However, this was the known and intended result of authorizing states and local governments to adopt in-use requirements that address the *local* conditions of regions throughout the nation.[13] Moreover,

---

[11]    A tracer study involves the release of a known amount of a non-toxic, inert gas from either a moving or fixed point offshore and the subsequent sampling of the atmosphere for concentrations of that gas at sites onshore. Pettit Decl., at Exh. A at 23-24 (ISOR, App. F at F-1-2).

[12]    PMSA asserts that CARB's failure to obtain EPA approval for the Vessel Rules has jeopardized and postponed the ability of other states to adopt emissions standards. *See* PMSA MSJ, at 23. However, again, the Vessel Rules are not emissions standards, and all states, in addition to California have the authority to adopt in-use regulations for all used nonroad sources. Further, as discussed above, it makes no sense for California to take the lead on developing regulations like the Vessel Rules, and for other states to opt-in to identical regulations given that the Rules are tailored to address the unique climate, pollution, and topographic conditions of California. *See EMA v. EPA*, 88 F.3d at 1094 n.58.

[13]    With that said, CARB went to great lengths to study the impact of the Rules on the business community and to develop the Rules in a manner that was consistent with the interests of that community. CARB held five workshops to discuss draft language for the Rules and modified the Rules numerous times in response to comments received by the affected industry. Pettit Decl., at Exh. B at 30 (FSOR, at 27); *see also id.* at Exh. A at 5 (ISOR, at ES-9) (choosing 24 nm boundary because it significantly lowered the cost of the regulation while still providing great air quality benefits); *id.* at Exh. A at 18 (ISOR, at VIII-18) (concluding that added costs of direct compliance with the regulations represented less than one percent of the overall cost of a typical overseas voyage); *id.* at Exh. B at 32 (FSOR, at 68) (finding that ship operators can safely use distillate fuels and switch between heavy fuel oil and

1    even if burdens on nonroad operators were somehow relevant to the scope of preemption under

2    Section 209(e), PMSA has not alleged a single fact demonstrating that its members are actually

3    harmed by the Rules.

4        Further, PMSA asserts that because the Vessel Rules take the form of emissions limits

5    they must be preempted emissions standards. *See* PMSA MSJ, at 17. But, following the court's

6    decision in *EMA v. EPA*, EPA reaffirmed that at least some permissible in-use requirements

7    would take the form of emissions limits when it declared that "daily mass emissions limits"[14] are

8    permissible in-use regulations. 40 C.F.R. pt. 89, app. A, subpt. A. Accordingly, the fact that the

9    Vessel Rules also impose emissions limits does not transform the Rules into preempted

10    emissions standards.

11        Additionally, the fact that the Vessel Rules do not "mandate" the use of low sulfur fuel

12    does not transform the Rules into preempted emission standards either. *See* PMSA MSJ, at 20-

13    21. EPA's list of permissible in-use requirements is non-exhaustive; regulations on hours of

14    usage, daily mass emission limits, and sulfur limits on fuel are merely examples of the types of

15    in-use regulations that states can adopt. 40 C.F.R. pt. 89, app. A, subpt. A ("[S]tates are not

16    precluded under section 209 from regulating the use and operation of nonroad engines, *such as*

17    regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel . . . once the

18    engine is no longer new.") (emphasis added). And the fact that one method for complying with

19    the Rules is expressly characterized by EPA as a permissible in-use measure only bolsters the

20    validity of the Rules.

21        Finally, as a last-ditch effort, PMSA appears to argue that the Clean Air Act prohibits

22    CARB from applying in-use requirements "to marine engines in foreign flag vessels." PMSA

23    MSJ, at 19 n.7. However, section 209 does not mention foreign flag vessels, let alone exempt

24

25    distillate fuel); *id.* at Exh. A at 6-7 (ISOR, at ES-11-12) (including ACE plans and noncompliance fees in the Rules to provide flexibility to shipping industry).

26    [14]    A daily mass emission limit ("DMEL") is a specified limit, placed on the user, on the mass of a pollutant or combination of pollutants an engine or piece of equipment is permitted to release into the air within a 24-hour

27    period. A DMEL is met by the engine operator, who can for example, vary the number of hours of operation, the fuel used, the load on the engine, or other aspects of the engine's operation in order to meet the DMEL.

28

them from state in-use requirements.[15]  And it is of no consequence that EPA broadly declared

that states may adopt in-use regulations for nonroad sources in regulatory documents that do not

apply to foreign flag vessels.  *Id.*; *see also* 40 C.F.R. pt. 89, app. A, subpt. A.[16]

For these reasons, the Vessel Rules fall squarely within the scope of permissible in-use

regulations, and PMSA has failed to allege any facts to the contrary, let alone demonstrate "the

absence of a genuine issue of material fact" on this issue.  *Celotex Corp v. Catrett*, 477 U.S. 317,

323 (1986).

## B.    The Vessel Rules Are Not Emissions Standards Preempted Under the Clean Air Act.

PMSA alleges that the Rules are preempted under the Clean Air Act because they

mandate emissions limits for PM, NOx and SOx.  *See* PMSA MSJ, at 15.  However, PMSA

ignores the crucial distinction between preempted standards that place burdens on *manufacturers*

and legally permissible requirements imposed on *operators* of nonroad vehicles that have no

effect on the manufacturer.  This distinction is fundamental to the scope of preemption under

Section 209(e), consistent with the Supreme Court's decision in *Engine Mfrs. Ass'n v. South*

*Coast Air Quality Management District ("EMA v. SCAQMD")*, 541 U.S. 246 (2004), and

essential to the reservation of states' rights to impose in-use requirements.

Preliminarily, the Clean Air Act has a long history of protecting the engine manufacturer

from multiple regulations.  By enacting section 209(a), Congress sought to prevent "the

possibility of 50 different state regulatory regimes [that] raised the spectre of an anarchic

patchwork of federal and state regulatory programs, a prospect which threatened to create

nightmares for the *manufacturers*."  *EMA v. EPA*, 88 F.3d at 1079 (quoting *Motor & Equip.*

---

[15]    Similarly, Section 213, which provides EPA authority to promulgate emissions standards for new nonroad vehicles and engines does not exempt or mention foreign flag vessels either.  *See* 42 U.S.C. § 7547.

[16]    EPA's decision to defer regulation of foreign flag vessels in 40 C.F.R. § 89.1(b)(4)(ii) and § 94.1(b)(2) does not mean that Congress intended the Clean Air Act to preclude federal, state or local regulations of foreign flag vessels.  This is especially true in light of EPA's broad statement that "states are not precluded under section 209 from regulating the use and operation of nonroad engines." 40 C.F.R. pt. 89, app. A, subpt. A.  This statement applies broadly to all nonroad sources.  Additionally, California and other states are not required to wait until EPA has regulated a nonroad source before it can adopt in-use regulations.  Notably, EPA does not even have authority to adopt emissions standards for used nonroad engines; only new nonroad engines.  *See* 42 U.S.C. § 7547.

*Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979)) (emphasis added).  These same

policy concerns are the foundation for preemption under Section 209(e) as well.  *See EMA v.*

*EPA*, 88 F.3d at 1085 ("The [Clean Air Act's] treatment of nonroad source regulation is almost

identical to its treatment of motor vehicle regulation."); *id.* at 1089 (recognizing that the types of

regulations that might be preempted for used nonroad sources under 209(e) are those that "might

'relate back' to the original manufacturer").  Indeed, the fact that Congress reserved state and

local government authority to impose in-use requirements on operators of used nonroad sources,

*id.* at 1094, illustrates that section 209(e) was not designed to protect *operators* from multiple

regulations.  Nevertheless, PMSA somehow asserts that in light of the Supreme Court's decision

in *EMA v. SCAQMD*, the scope of preemption under Section 209(e) extends to protect operators

of nonroad sources.  PMSA is wrong.

In *EMA v. SCAQMD*, the Supreme Court determined that local air district "Fleet Rules" [17]

fell within the scope of preempted emissions "standards" under the motor vehicle regime of

Section 209(a) of the Clean Air Act even though they addressed the purchase of vehicles, rather

than their manufacture or sale.  *EMA v. SCAQMD*, 541 U.S. at 255.[18]  Central to the Court's

holding was that the Fleet Rules placed explicit restrictions on the types of engines a fleet

operator could acquire––creating a demand for such engines and potentially compelling

manufacturers to produce those engines.  *Id.* at 254-56 ("[T]he need to sell vehicles to persons

governed by the Rule would effectively coerce manufacturers into meeting the artificially created

demand . . . The demand is a demand, not generated by the market but compelled by the Rules,

which in turn effectively compels production.").  As a result, the Court found no distinction

between the purchase requirements at issue and preempted sales restrictions, and concluded that

---

[17]    Fleet Rules sought to reduce air pollution in the South Coast Air Basin of California by requiring operators
of specified vehicle fleets to acquire commercially available low emission or alternative–fuel vehicles when adding
or replacing fleet vehicles. *EMA v. SCAQMD*, 541 U.S. at 249-51. The rules covered fleets of street sweepers,
passenger cars, light-duty trucks and medium duty vehicles, and public transit vehicles and urban buses, solid waste
collection vehicles, air port transportation vehicles, and heavy-duty on-road vehicles. *Id.*

[18]    Notably, the Court did not hold that the Fleet Rules were preempted "*in toto*." *EMA v. SCAQMD*, 541 U.S.
at 258. The Court remanded the case to the District Court to decide a number of issues, including whether the rules
could be characterized as internal state purchasing decisions, and if so, whether a different standard for preemption
applies. *Id.* at 259.

the effect of both types of restrictions was the same: they placed different burdens on the manufacturer when Congress contemplated that there would be a uniform regulatory scheme. *Id.* at 255-56 ("The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."). Completely absent from the opinion, however, is any discussion that the Fleet Rules might be preempted because of the burden they placed on fleet operators. It is within this context that the Court held that the Fleet Rules fell within the scope of preemption and defined what constitutes a preempted emissions "standard" under section 209(a). *Id.* at 253.

Here, by contrast, the Vessel Rules do not require operators to replace their existing engines. Pettit Decl., at Exh. B at 32-33 (FSOR, at 68-69). Vessel operators can continue to use the same vessels and engines as they did before the Rules were enacted, *id.*, and can comply with the Rules by simply using cleaner fuels that are readily available.[19] As a result, the burden of compliance with the Rules falls squarely on the vessel operator, and there is no colorable argument that the Rules will burden the engine manufacturer and coerce it to change its product line in any way. In fact, PMSA has not alleged a single fact anywhere in its moving papers that the Rules would have any impact on engine manufacturers.

Further, PMSA's reliance on *EMA v. SCAQMD* is misplaced because it ignores what the Court did *not* hold. There is nothing in the opinion that suggests that an in-use operational control that imposes no requirements on the configuration of a nonroad engine is somehow a preempted "standard" under section 209(e). The Supreme Court did not hold that emissions limits that have *no* effect on engine manufacturers are preempted. In fact, the language of the opinion illustrates quite the contrary: the Court was preoccupied with the effect the Fleet Rules would have on manufacturers. *EMA v. SCAQMD*, 541 U.S. at 254-56. Thus, the proper interpretation of the scope of preemption under Section 209(e) is that, to be preempted, an

---

[19] *See* Pettit Decl., at Exh. B at 31 (FSOR, at 43); *id.* at Exh. F at 53 (PMSA's Response to Defendant Witherspoon's 1st Set of RFA's, at 2 (admitting that from January 1, 2007 to the present, fuels specified in the Vessel Rules have been available to PMSA's members, subject to very few exceptions, in quantities and locations sufficient to comply with the Rules)).

1    emission standard for used nonroad engines must burden the manufacturer, and requirements that

2    fall solely on the shoulders of operators are permissible in-use requirements.

3        Simply put, PMSA's motion tries to take the easy way out by lifting "snappy" quotes

4    from the Fleet Rules case out of context to argue that every emissions limit is a preempted

5    "standard." *See, e.g.*, PMSA MSJ, at 17. However, PMSA's gloss on the Fleet Rules case can't

6    be right because, if it is, then every state and local rule that imposes emissions limits on the

7    operation of nonroad engines would be a preempted "standard"—in direct contravention of the

8    clear Congressional intent to allow states to impose in-use regulations. *EMA v. EPA*, 88 F.3d at

9    1094. A careful reading of the Fleet Rules opinion demonstrates that the Court was concerned

10   that the proponents of the Fleet Rules attempted an "end run" around preemption of emission

11   standards by pretending that the rules only applied to purchasers, not to manufacturers. *EMA v.*

12   *SCAQMD*, 541 U.S. at 255-56. Here, the situation is totally different because PMSA has not

13   advanced any fact, or argument, that the Vessel Rules have or will have any affect whatsoever on

14   marine engine manufacturers. And, unlike the Supreme Court's view of the Fleet Rules, here,

15   there is no evidence of an "end run" where market demand would pressure engine manufacturers

16   to change the design or characteristics of their engines. *See id.* Just the opposite is true, because

17   the Vessel Rules allow operators to use any auxiliary engines including their existing engines.

18       PMSA has offered no fact showing that the Vessel Rules burden the engine

19   manufacturers. Therefore, PMSA is not entitled to summary judgment on its Clean Air Act

20   claim.

21   **VI.    THE VESSEL RULES ARE NOT PREEMPTED BY THE SUBMERGED LANDS**
         **ACT.**
22

23       PMSA concedes that California may exercise its police power within three nautical miles

24   of its coast. PMSA disputes whether California's police power, in the form of environmental

25   regulation, also extends seaward between three and 24 nautical miles. As PMSA also concedes,

26   there is no case saying that it does not. PMSA advances a number of policy reasons why its

27

28

1  desired result should occur, but at the end of the day that is an issue for Congress, not the courts,

2  to determine.

3      Preliminary, PMSA does not contest that air emissions from its ships, even those 24 miles

4  offshore, are dangerous to the health of California residents, or that the Vessel Rules are well-

5  designed to address those dangers.[20]  Nor does PMSA contend that there are any technical or

6  financial obstacles to compliance or that, aside from its Clean Air Act and Submerged Lands Act

7  claims, there is any actual conflict between the Rules and federal law.[21]  Instead, relying on the

8  Submerged Lands Act, PMSA makes a facial attack on California's ability to protect its citizens

9  from air pollution emitted from its member's ships.

10      The Submerged Lands Act, 43 U.S.C. §§ 1301 et seq., and the Outer Continental Shelf

11  Lands Act, 43 U.S.C. §§ 1331 et seq., establish California's geographic border at three nautical

12  miles offshore.  They say nothing about any limitation of California's police powers farther

13  offshore.  PMSA suggests that, from that negative, the Court should infer a positive:  that

14  California cannot enact air pollution regulations that govern emissions more than three miles out

15  to sea.  But there is absolutely no authority to back up such an inference.

16      The principal purpose for enactment of the Submerged Lands Act in 1953 was to confirm

17  the federal government's right to control leasing of oil and minerals found on the Outer

18  Continental Shelf.  Judiciary Committee Report, H.R. Rep. No. 83-215 (1953) as reprinted in

19  1953 U.S.C.C.A.N. 1385) ("Judiciary Committee Report").  There is nothing in the legislative

20  history of the Act to suggest that Congress intended the Act to prevent coastal states from

21  regulating air pollution from ships off their coasts.  Indeed, as PMSA's brief admits, PMSA

---

[20]    See e.g., Pettit Decl. at Exh. F at 54-55 (PMSA's Response to Defendant Witherspoon's 1st Set of RFA's at 3-4) (admitting that implementation of Vessel Rules reduces the aggregate levels of PM, NOx and SOx emitted from auxiliary engines on PMSA vessels); id. at Exh. E at 49-51 (PMSA's Response to Defendant Witherspoon's 1st Set of Rogs, at 5-7).

[21]    See Pettit Decl. at Exh. E at 49 (PMSA's Response to Defendant Witherspoon's 1st Set of Rogs, at 5); see also id. at Exh. D at 44-45 (PMSA webpage indicating all of its members are in compliance with the Rules); id. at ¶8, Exh. G at 56-57 (Coalition for Clean Air, 2007 Clean Air Leadership Awards Luncheon Announcement, http://www.coalitionforcleanair.org/pdf/CCA-2007-Awards-Luncheon-Sponsor-Flyer.pdf (last visited June 7, 2007)) (demonstrating CCA award to Maersk for voluntarily deciding to use low sulfur fuel in its main and auxiliary engines).  A copy of this CCA webpage is referenced in NRDC and CCA's Statement of Undisputed Facts at paragraph 2.

MSJ, at 27, at the time of enactment of the Submerged Lands Act the federal government's claim to offshore jurisdiction only extended three miles – so that the effect of the passage of the Act was to make federal and state offshore jurisdiction coterminous.

The Judiciary Committee Report explained:

> Representatives of the Federal departments, the States, and the offshore operators all urged the importance and necessity for the enactment of legislation enabling the Federal Government to lease for oil and gas operations the vast areas of the Continental Shelf outside of State boundaries. They were unanimously of the opinion, in which this committee agrees, that no law now exists whereby the Federal Government can lease those submerged lands, the development and operation of which are vital to our national economy and security. It is, therefore, the duty of the Congress to enact promptly a leasing policy for the purpose of encouraging the discovery and development of the oil potential of the Continental Shelf.

With respect to state jurisdiction over the outer continental shelf, the Judiciary Committee Report stated:

> The police power of each coastal State which so provides is made applicable to that area of the outer shelf which would be within its boundaries if such were extended to the outer edge of the shelf. The Secretary is authorized to fix the lines for each defined area of State jurisdiction. The execution of such police powers cannot be inconsistent with any applicable Federal laws. Provision is made that as to State taxation laws within such area it shall be limited to severance or production taxes and can only be levied by States which apply and administer their conservation laws and other governmental functions in the area. The rate of such taxes cannot be in excess of the rate within the State boundaries. Provision is made that the character of high seas of the waters above such lands in this area and the area of free and unimpeded navigation and navigational servitude shall not be affected.

As noted above, PMSA has not offered a single fact to show that the Vessel Rules are "inconsistent with any applicable Federal laws" within the meaning of the Judiciary Committee Report.

The leading Ninth Circuit case interpreting the Submerged Lands Act within three miles offshore is *Barber v. Hawaii*, 42 F.3d 1185 (9th Cir. 1994). In *Barber*, a citizens group brought suit over regulations of the state of Hawaii concerning anchorage and mooring privileges "within its ocean waters and navigable streams." *Id.* at 1188. Their action challenged "the

1  constitutionality of all Hawaii regulations and legislation affecting the rights of mariners to

2  anchor and navigate in the ocean waters surrounding the islands of Hawaii," *id.* at 1189, and

3  alleged preemption under the Submerged Lands Act. The Ninth Circuit rejected this argument,

4  holding that concurrent jurisdiction existed within the three mile limit and that the Hawaii

5  regulations were not in actual conflict with federal law. *Id.* at 1190. The Court also rejected

6  plaintiffs' claim of implicit preemption, holding that: "Congressional intent to preempt state

7  action is far from clearly manifest, federal regulation has not occupied the field of navigation and

8  the federal interest in navigation is not so dominant as the [plaintiff] implies." *Id.* at 1192.

9      In the pilotage context, the Fifth Circuit has held that Louisiana's regulation of pilotage

10  outside of the state's three mile limit is not preempted by the Submerged Lands Act. In *Gillis v.*

11  *Louisiana*, 294 F.3d 755, 756 (5th Cir. 2002), river pilots brought suit seeking a declaratory

12  judgment that the State of Louisiana had no authority to regulate pilotage on Calcasieu Ship

13  Channel more than three miles off the state's coastline. The pilots argued that, by enacting the

14  Submerged Lands Act, Congress limited the ability of the states to regulate pilotage beyond their

15  three mile seaward boundaries without express Congressional approval. *Id.* at 756. The Fifth

16  Circuit rejected the pilots' argument and upheld the state pilotage rules.[22]

17      *Barber* and *Gillis* teach that there is nothing in the Submerged Lands Act to suggest that

18  it gives the federal government exclusive, rather than concurrent, jurisdiction over the regulation

19  of air pollution between three and 24 miles offshore. Likewise, nothing in the Act purports to

20  occupy or dominate the field of regulation of offshore air pollution. Indeed, 43 U.S.C. § 1332,

21  part of the Outer Continental Shelf Lands Act, provides:

22      It is hereby declared to be the policy of the United States that . . . (5) the rights
        and responsibilities of all States and, where appropriate, local governments, to
23      preserve and protect their marine, human, and coastal environments through such

24

25  _____

    [22]    The *Gills* court also stated: "In addition to arguing federal preemption based on §8501, the Pilots assert
26  generally that various international treaties and presidential proclamations preclude by implication state regulation
    of pilotage further than twelve miles from the coast-the breadth of the nation's territorial sea. This argument, for
27  which the Pilots provide scant legal support, is without merit." *Gillis*, 294 F.3d at 762, n.13. PMSA makes a
    similarly weak argument at PMSA MSJ, at 48-54.

28

means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized . . . .

None of the cases cited by PMSA holds to the contrary. For example, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 448 (1960), approved the application of Detroit's criminal laws to the density and duration of smoke emitted from ships engaged in interstate commerce on the Great Lakes. Likewise, in *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 337 (1973), the Supreme Court held that Alaska's oil spill regulations were not preempted by the federal Water Quality Improvement Act of 1970, 33 U.S.C. §§ 1161 *et seq.*

In fact, no case cited by PMSA (other than *Huron Portland Cement, Co.*, which supports NRDC's and CCA's arguments) concerns or mentions the regulation of air quality. *United States v. California*, 332 U.S. 19, 22 (1947), and its companion case, *United States v. California*, 381 U.S. 139, 142 (1965), dealt with oil leasing rights within three miles off the California coast. *United States v. Alaska*, 521 U.S. 1, 1 (1977), concerned mineral leasing off Alaska's Arctic coast. *United States v. Locke*, 529 U.S. 89, 97 (2000), *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 155-56 (1978), and *Chevron v. Hammond*, 726 F.2d 483, 484 (9th Cir. 1984), all involve claims of preemption of state oil spill regulations by the Ports and Waterways Safety Act of 1972, 33 U.S.C. §§ 1221 *et seq.*, an issue not present in this case.

PMSA's reliance on Presidential Proclamations Nos. 5928 and 7219 is also misplaced because those documents have express savings clauses exempting state laws, and in any event have nothing to do with limiting state regulation of offshore pollution. Proclamation 5928 extended the territorial sea of the United States to 12 nautical miles offshore. It provides in part that: "Nothing in this Proclamation: (a) extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom . . . ." Proclamation 7219 established a "contiguous zone" extending 24 nautical miles offshore, and provides in part that: "Nothing in this proclamation: (a) amends existing Federal or State law . . . ."

What is most interesting about these Presidential Proclamations is what is *not* in them: there is nothing that even purports to limit the ability of a coastal state to regulate air pollution that originates offshore. Whether the President could do this by proclamation, or whether

1  Congress could do it by legislation, are interesting issues – but they are not issues in this case

2  because neither Congress nor any President has done so.

3  **VII.    CONCLUSION.**

4         For the reasons stated herein, PMSA's motion for summary judgment and partial

5  summary judgment should be denied.

6

7  Dated: June 8, 2007                     Respectfully submitted,

8
9                                          DAVID PETTIT
                                           MELISSA LIN PERRELLA
10                                         ADRIANO MARTINEZ
                                           NATURAL RESOURCES DEFENSE COUNCIL
11                                         1314 Second Street
                                           Santa Monica, CA 90401
12                                         Telephone:    (310) 434-2300
                                           Facsimile:    (310) 434-2399
13
                                           By:    /s/David Pettit
14                                                 David Pettit

15                                         Attorneys for Proposed Defendants-Intervenors
16                                         Natural Resources Defense Council, Inc., and
                                           Coalition for Clean Air, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 8th day of June 2007, she caused the following:

- NATURAL RESOURCES DEFENSE COUNCIL AND COALITION FOR CLEAN AIR'S OPPOSITION TO PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

- DECLARATION OF DAVID PETTIT IN SUPPORT OF NATURAL RESOURCES DEFENSE COUNCIL AND COALITION FOR CLEAN AIR'S OPPOSITION TO PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT; EXHIBITS THERETO

- NATURAL RESOURCES DEFENSE COUNCIL AND COALITION FOR CLEAN AIR'S RESPONSE TO PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

- NATURAL RESOURCES DEFENSE COUNCIL AND COALITION FOR CLEAN AIR'S STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

- [PROPOSED] ORDER DENYING PLAINTIFF PACIFIC MERCHANT SHIPPING ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

to be filed electronically using this Court's CM/ECF system. Pursuant to Civ. L.R. 5-135(a), an electronic Notice of this filing will be sent automatically to all parties, and constitutes service pursuant to Fed. R. Civ. P. 5(b)(2)(D).

Date:  June 8, 2007

/s/  Melissa Lin Perrella
MELISSA LIN PERRELLA
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second Street
Santa Monica, CA  90401
Tel:  (310) 434-2300
Fax: (310) 434-2399

Attorneys for Proposed Defendants-Intervenors
Natural Resources Defense Council, Inc., and
Coalition for Clean Air, Inc.