# Exhibit A



*California Environmental Protection Agency*

# AIR RESOURCES BOARD

## STAFF REPORT: INITIAL STATEMENT OF REASONS FOR PROPOSED RULEMAKING



## PROPOSED REGULATION FOR AUXILIARY DIESEL ENGINES AND DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES OF THE CALIFORNIA BASELINE

**Stationary Source Division
Emissions Assessment Branch
October 2005**

Exhibit A
Pg 1

## EXECUTIVE SUMMARY

Air pollution from maritime port activities is a significant and growing concern in California. Diesel-powered vehicles and engines at the ports emit soot, or diesel particulate matter (PM), and other air pollutants than can increase health risks to nearby residents. Port operations are also a significant source of oxides of nitrogen (NOx) which can contribute to the formation of regional smog, or ozone, and fine particulate matter.

Living in any area impacted by air pollution is harmful, particularly for children, the elderly, and those with compromised health. The communities closest to port operations face even greater impacts and have a greater localized risk due to exposures to high levels of diesel PM. This pollutant poses a lung cancer hazard for humans, and causes non-cancer respiratory and cardiovascular effects that increase the risk of premature death. In addition, in many cases, the populations nearby ports are economically disadvantaged and less able to obtain quality health care to address air pollution-related illnesses.

Unless substantial additional control measures are implemented, port-related emissions are expected to significantly increase as trade grows over the next 15 to 20 years. While the movement of goods through California ports is a vital component of the State's overall economy and provides a key link to international trade, it is essential that aggressive steps be taken to counter the projected emissions increases and ensure that the port-related emissions are reduced to health protective levels.

As one of several steps being taken to reduce emissions from port activities, the Air Resources Board (ARB) staff is proposing a regulation to reduce emissions from ocean-going vessel auxiliary engines. Implementation of this regulation will be an important and necessary step in the effort to improve the public health in communities near ports. A recent ARB study has shown that diesel PM emissions from hotelling (auxiliary engine emissions while vessels are moored) is the largest contributor of toxic pollutants to neighboring communities. The proposed regulation would reduce the emissions of diesel PM, NOx, sulfur oxides (SOx), and "secondarily" formed PM (PM formed in the atmosphere from NOx and SOx). The proposed regulation will reduce emissions from ocean-going vessel auxiliary engines through the use of cleaner marine distillate fuels, or equally effective alternative controls. This would result in immediate, substantial reductions in emissions upon implementation in 2007. Specifically, for the nearly 80 percent of vessels currently using heavy fuel oil in their auxiliary engines, compliance with the proposed regulation will result in an estimated 75 percent reduction in diesel PM, 80 percent reduction in SOx, and 6 percent reduction in NOx.

This proposed regulation is one of several measures currently under consideration that will continue progress in meeting the air quality goals defined in the Diesel Risk Reduction Plan and the State Implementation Plan and that will help offset the projected emissions increases in port-related emissions. Other regulations being proposed include measures to reduce emissions from cargo handling equipment, commercial

**Exhibit A**
**Pg 2**

4.    **What is an ocean-going vessel?**

Ocean-going vessels are generally very large vessels designed for deep water navigation.  Ocean-going vessels include large cargo vessels such as container vessels, tankers, bulk carriers, and car carriers, as well as passenger cruise vessels.  These vessels transport containerized cargo; bulk items such as vehicles, cement, and coke; liquids such as oil and petrochemicals; and passengers.

Ocean-going vessels travel internationally and may be registered by the U.S. Coast Guard (U.S.-flagged), or under the flag of another country (foreign-flagged).  The majority of vessels that visit California ports are foreign-flagged vessels.

5.    **What is an auxiliary engine?**

Auxiliary engines are diesel engines on ocean-going vessels that provide power for uses other than propulsion (except as noted below for diesel-electric vessels).  Auxiliary engines are usually coupled to generators used to produce electrical power.  On cargo vessels, most auxiliary engines are used to provide ship-board electricity for lighting, navigation equipment, refrigeration of cargo, and other equipment.  Typically, a cargo vessel will have a single, very large main engine used for propulsion, and several smaller auxiliary "generator-set" engines.

Passenger cruise vessels, and some tankers, use a different engine configuration which is referred to as "diesel-electric."  These vessels use large diesel generator sets to provide electrical power for both propulsion and ship-board electricity.  For the purposes of the proposed regulation, these large diesel generator sets are included in the definition of "auxiliary engines."

6.    **What fuels do ocean-going vessel operators use in auxiliary engines?**

Most vessel operators use either heavy fuel oil (HFO or residual fuel) or marine distillate fuels in their auxiliary engines.  HFO is a very viscous fuel that must be heated to allow it to flow through piping and be combusted in auxiliary engines.  HFO is often referred to as residual fuel or bunker fuel.  This fuel has high levels of sulfur, ash, and nitrogen containing compounds, and results in much higher emissions than the use of marine distillate fuels.   Marine distillate fuels include marine gas oil (MGO) and marine diesel oil (MDO).  These distillate fuels are similar to the diesel fuel used by landside sources.  According to an ARB survey of vessels visiting California ports, about 75 percent of auxiliary engines use HFO and about 25 percent use marine distillate fuels.

7.    **What emissions result from the auxiliary engines used on ocean-going vessels?**

Estimates of the statewide 2004 emissions of diesel PM, NOx, hydrocarbons (HC), and SOx, from ocean-going vessel auxiliary engines are presented in Table ES-1 below.

**Exhibit A**
**Pg 3**

ARB staff also estimated the potential non-cancer impacts associated with exposure to diesel PM from ocean-going vessel auxiliary engines. The non-cancer health effects evaluated include premature death, asthma attacks, work loss days, and minor restricted activity days due to diesel PM emissions from auxiliary engines. Based on the analysis, staff estimates that the average number of cases statewide per year that would be expected from exposure to the 2004 ocean-going vessel diesel PM emission levels are as follows:

- 31 premature deaths (for ages 30 and older), 16 to 48 deaths as 95% confidence interval (CI);
- 830 asthma attacks, 202 to 1,457 as 95% CI;
- 7,258 days of work loss (for ages 18-65), 6,143 to 8,370 as 95% CI;
- 38,526 minor restricted activity days (for ages 18-65), 31,403 to 45,642 as 95% CI.

9.    **What does the proposed regulation require?**

Under the proposed regulation, vessel operators are required to reduce diesel PM, NOx and SOx emissions to levels equivalent to the emissions levels that would occur if cleaner-burning distillate fuels were used. To meet this requirement, we expect that most vessel operators will elect to use the distillate fuels specified in the proposal. However, some may decide to implement an alternative emission control strategy that would achieve equivalent or greater emission reductions. Specifically, under the proposal, starting on January 1, 2007, vessel operators can comply by using one of the following distillate fuels when operating their auxiliary engines within 24 nm of the California Coastline: (1) marine gas oil (MGO); or (2) marine diesel oil (MDO) with less than or equal to 0.5 percent by weight sulfur. A 0.5 percent sulfur limit is specified for MDO because it tends to have a higher sulfur level than MGO. MGO is expected to average at or below 0.5 percent sulfur in California based on the results of a survey sent to vessel operators in 2005.

Starting on January 1, 2010, marine gas oil meeting a 0.1 percent sulfur limit is specified under the proposed regulation. This lower sulfur fuel will result in additional emission reductions of PM and SOx, compared to the January 1, 2007 requirement. This standard is consistent with a recently adopted European Union regulation. However, a feasibility analysis is required under the proposed regulation prior to implementation of this fuel requirement to investigate the supply, cost, and technical feasibility of using this fuel. Based on the results of this evaluation, modifications to this requirement could be proposed to the Board.

While ARB has the authority to regulate ocean-going vessel emissions, we recognize that uniform national or international regulation of vessel emissions would be preferable to most vessel operators. As such, we have included a provision in the staff's proposal that requires the Executive Officer to propose terminating or modifying the requirements of this proposal to the Board if the United States Environmental Protection Agency

**Exhibit A**
**Pg 4**

(U.S. EPA) or the International Maritime Organization adopts regulations that will achieve equivalent or greater emission reductions from vessels.

The proposed regulation does not address emissions from main engines (except for diesel-electric vessels), boilers, gas or steam turbine engines, or auxiliary engines on military vessels, which are exempted from the requirements of the proposed regulation. ARB staff plan to address main engines and other sources not regulated in this proposed rulemaking in the next couple of years.

10.  **How far offshore are ocean-going vessels required to comply with the proposed regulation?**

Under the proposed regulation, vessel emissions would be regulated up to 24 nm off the California coastline.  ARB has the authority to require emission reductions out to the California Coastal Water (CCW) boundary.  This is the region within which emissions are likely to be transported onshore, and it extends beyond the 24 nm boundary.  However, the 24 nm boundary which is shown as the gray area in Figure ES-3 was proposed because it significantly lowers the cost of the regulation while still providing the vast majority of the potential on-shore benefits in terms of reduced exposure to diesel PM.  Specifically, about 75 percent of the auxiliary engine diesel PM emissions within 100 nm of the California coastline is emitted within the 24 nm boundary. The 24 nm boundary is also easily defined for vessel operators.  The boundary is aligned in Central and Northern California with the outer boundary of the Contiguous Zone, an internationally recognized boundary which extends 24 nm offshore and is noted on most nautical charts.  In Southern California, the boundary consists of straight line segments approximately 24 nm offshore of the coastline.  This approximation is used because the outer edge of the Contiguous Zone extends around the Channel Islands, bringing the boundary well beyond 24 nm, and in some cases beyond the California Coastal Waters boundary.

**Figure ES-3:  Offshore 24 Nautical Mile Boundary for Proposed Regulation**



**Exhibit A
Pg 5**

**13.    Is the proposal technically feasible?**

Yes. Based upon ARB staff's analysis and discussions with numerous stakeholders, including the engine manufacturers, staff believes that the requirements of the proposed regulation are technically feasible. Under the proposal, vessel operators may comply by using cleaner-burning marine distillate fuels in their auxiliary engines instead of heavy fuel oils, or implementing alternative emission control strategies. For vessel operators that comply through the use of cleaner-burning fuels, they will need to ensure that they are using marine distillate fuels prior to entering the 24 nm boundary. ARB staff found that vessel operators already switch to marine distillate fuels prior to certain scheduled maintenance operations, and many also routinely switch to these fuels for air quality reasons in California. Discussions with the manufacturers also indicated that these engines can operate on marine distillate fuels provided certain precautions are followed, such as performing fuel switches according to recommended procedures. Beginning January 1, 2010, the proposal specifies a lower 0.1 percent sulfur marine distillate fuel. This standard will be subject to a feasibility evaluation prior to implementation to fully investigate the availability of this fuel and if any technical issues exist.

**14.    What key provisions are included in the proposed regulation to provide flexibility?**

The proposed regulation includes two provisions providing compliance flexibility. These provisions are summarized below.

      Alternative Control Plan

The alternative compliance plan (ACP) was included in the proposed regulation to provide vessel owner/operators with the flexibility to implement alternative emission control strategies that result in no greater emissions compared to the use of the fuels specified in the proposal. Alternative emission control strategies may include the use of shore-side electrical power, engine modifications, exhaust treatment devices such as diesel oxidation catalysts, and the use of alternative fuels or fuel additives. ACP plans may apply to a single vessel, or a fleet of vessels under the direct control of the applicant for an ACP.

There is also a specific provision that applies to vessels that shut off their diesel auxiliary engines and connect to shore-side power. Under this provision, emissions from auxiliary engines will be considered to meet the emission reduction requirements of the proposed regulation: (1) during travel from a previous port to a California port where shore-side power is used; (2) while docked and utilizing shore power; and (3) during travel to a subsequent port. This provision is designed to encourage the expanded use of shoreside power, which achieves greater emission reductions closest to nearby communities.

**Exhibit A**
**Pg 6**

Noncompliance Fee Provision

This provision provides vessel operators with the flexibility to pay a fee in lieu of compliance in certain limited circumstances. The funds collected under this provision would be used to substantially reduce emissions from: (1) port sources; (2) sources within 2 miles of port boundaries; or (3) oceangoing vessels within "Regulated California Waters." Under this program, the fee is designed to ensure that participants will not be provided an economic advantage compared to vessel operators complying with the regulation. The fee schedule is graduated such that subsequent visits would result in increasing fees.

This option could only be used in the following circumstances:

- vessel is unexpectedly redirected to a California port;
- vessel was not able to acquire a sufficient quantity of compliant fuel at the last fueling port;
- fuel was found to be out of compliance after leaving the last bunkering port;
- modifications are required and the vessel operator is not able to complete the modifications in time to meet the January 1, 2007 requirements; and
- modifications are required and the vessel will visit a California port a maximum of two times per calendar year, and a four times over the life of the vessel after January 1, 2007.

**15.    How does the regulation affect diesel-electric vessels?**

Diesel-electric vessels use large diesel generator sets to provide power for both propulsion and ship-board electricity. Passenger cruise vessels, and a few tankers, use this engine configuration. For the purposes of the proposed regulation, these large diesel generator sets are considered "auxiliary engines," and are covered by the proposed regulation. We are proposing to regulate these engines the same as other auxiliary engines because they are mechanically similar to the smaller auxiliary engines used on other vessels. Specifically, they are four-stroke, medium speed engines used in generator set applications. As such, these engines can meet the requirements of the proposed regulation. In fact, some diesel-electric cruise vessels currently use the distillate fuels specified in the proposed regulation near California ports.

**16.    How will ARB staff verify compliance with the proposed regulation?**

Enforcement of the proposed regulation will be achieved through random inspections of records, and fuel sampling/testing. ARB staff will coordinate vessel inspections with inspections conducted by other State agencies such as the California State Lands Commission to the extent feasible. During vessel inspections, records will be reviewed to determine when vessels traveled within "Regulated California Waters" and the fuels used during this time. Records on the quantity of fuel purchased, the fuel type, and the sulfur content of the fuel will be reviewed to determine compliance. Fuel samples will

be analyzed to ensure that they meet the ISO specifications for the fuel type and do not exceed the sulfur content limits under ISO or the proposed regulation.

As a long term goal, ARB staff wants to transition from compliance data being recorded in logs maintained on the vessel, to automated electronic data devices that can store and transmit data needed to assess compliance. ARB staff plans to work with vessel owners and equipment suppliers to develop and field test data recording and submittal systems that can provide compliance data on a real-time basis.

**17.   What businesses and public agencies will be affected by the proposed regulation?**

The proposed regulation would impact foreign and domestic businesses that own or operate large ocean-going vessels. This would include ocean shipping companies and passenger cruise vessel operators.

We do not expect significant impacts on "downstream" companies such as importers or exporters of goods, since the added costs imposed by the proposal are not expected to result in significant adverse impacts to vessel owners or operators. Similarly, we do not expect adverse impacts on California ports because we do not believe the added cost of the proposed regulation is great enough to induce vessel operators to divert cargos to ports outside California.

We do not predict any significant impact on public agencies. With the exception of military vessels, which are exempted from the requirements of the proposed regulation, public agencies in California generally do not operate ocean going vessels as defined in the proposal.

**18.   What are the health and environmental impacts of the proposed regulation?**

Upon implementation in 2007, the proposed regulation will result in immediate and significant reductions in emissions of diesel PM, NOx, SOx, and "secondarily" formed particulate matter. Specifically, considering only the directly emitted emissions (not secondarily formed PM), the proposed regulation will result in estimated statewide emission reductions of 2.7 TPD of diesel PM, 1.9 TPD of NOx, and 22 TPD of SOx in 2007. For perspective, the proposal would result in an estimated 75 percent reduction in diesel PM, 80 percent reduction in SOx, and a 6 percent reduction NOx from an engine that previously used typical heavy fuel oil. Beginning in 2010, the 0.1 percent sulfur limit will result in an additional 10 percent reduction in diesel PM. The estimated reductions for diesel PM, NOx and SOx, as shown in Table ES-2, reflect the use of the cleaner marine distillate fuels specified in the proposed regulation, although alternative control technologies could also be used to achieve equivalent reductions. The estimates do not reflect participation in the "noncompliance fee provision" in the proposal that allow shippers to pay a fee in lieu of compliance because we cannot predict the rate of participation. However, we would expect that the use of

## 25.    What is staff's recommendation?

We recommend that the Board approve the proposed regulation presented in this report (Appendix A).  The proposal will reduce emissions of diesel PM, NOx, and SOx, resulting in significant health benefits to the public.  In particular, communities near California's major ports and shipping lanes benefit from reduced exposure to the potential cancer risk from diesel PM.  Staff believes that the proposal is technologically and economically feasible and necessary to carry out the Board's responsibilities under State law.

## REFERENCES

(Directive 2005/33/EC) European Union Official Journal, Directive 2005/33/EC of the European Parliament and of the Council of 6 July 2005 amending Directive 1999/32/EC

**Exhibit A**
**Pg 9**

adsorbed organic compounds and the high number of ultrafine particles (organic carbon and sulfate).

The soluble organic fraction (SOF) consists of unburned organic compounds in the small fraction of the fuel and atomized and evaporated lube oil that escape oxidation. These compounds condense into liquid droplets or are adsorbed onto the surfaces of the elemental carbon particles. Several components of the SOF have been identified as individual TACs.

## B. Health Impacts of Exposure to Diesel PM, Ambient Particulate Matter, Ozone, and Sulfur Dioxide

The proposed regulation will reduce the public's exposure to diesel PM as well as reduce ambient particulate matter. In addition, the proposed regulation is expected to result in reductions in NOx and SOx. NOx is a precursor to the formation of ozone, and both NOx and SOx also contribute to secondarily formed PM in the lower atmosphere. The primary health impacts of these air pollutants are discussed below.

### Diesel Particulate Matter

Diesel PM is of specific concern because it poses a lung cancer hazard for humans as well as a hazard from noncancer respiratory effects such as pulmonary inflammation. (ARB, 1998a) Because of their small size, the particles are readily respirable and can effectively reach the lowest airways of the lung along with the adsorbed compounds, many of which are known or suspected mutagens and carcinogens. (ARB, 2002) More than 30 human epidemiological studies have investigated the potential carcinogenicity of diesel PM. On average, these studies found that long-term occupational exposures to diesel exhaust were associated with a 40 percent increase in the relative risk of lung cancer. (ARB, 1998b) However, there is limited specific information that addresses the variable susceptibilities to the carcinogenicity of diesel exhaust within the general human population and vulnerable subgroups, such as infants and children and people with preexisting health conditions. The carcinogenic potential of diesel exhaust was also demonstrated in numerous genotoxic and mutagenic studies on some of the organic compounds typically detected in diesel exhaust. (ARB, 1998b)

Diesel PM was listed as a TAC by ARB in 1998 after an extensive review and evaluation of the scientific literature by OEHHA. (ARB 1998c) Using the cancer unit risk factor developed by OEHHA for the TAC program, it was estimated that for the year 2000, exposure to statewide average population-weighted ambient concentrations of diesel (1.8 $\mu g/m^3$) could be associated with a health risk of 540 potential cancer cases per million people exposed over a 70 year lifetime.

Another highly significant health effect of diesel exhaust exposure is its apparent ability to act as an adjuvant in allergic responses and possibly asthma. (Dab, 2000; Diaz-Sanchez, 1996; Kittelson, 1999) However, additional research is needed at diesel

Exhibit A
Pg 10

exhaust concentrations that more closely approximate current ambient levels before the role of diesel PM exposure in the increasing allergy and asthma rates is established.

Ambient Particulate Matter

The key health effects categories associated with ambient particulate matter, of which diesel PM is an important component, include premature mortality; aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions and emergency room visits, school absences, work loss days, and restricted activity days); aggravated asthma; acute respiratory symptoms, including aggravated coughing and difficult or painful breathing, chronic bronchitis, and decreased lung function that can be experienced as shortness of breath. (U.S. EPA, 2000; U.S. EPA, 2003)

Health impacts from exposure to the fine particulate matter ($PM_{2.5}$) component of diesel exhaust have been calculated for California, using concentration-response equations from several epidemiological studies. Both mortality and morbidity effects could be associated with exposure to either direct diesel $PM_{2.5}$ or indirect diesel $PM_{2.5}$, the latter of which arises from the conversion of diesel $NO_x$ emissions to $PM_{2.5}$ nitrates. It was estimated that 2000 and 900 premature deaths resulted from long-term exposure to either 1.8 $\mu g/m^3$ of direct $PM_{2.5}$ or 0.81 $\mu g/m^3$ of indirect $PM_{2.5}$, respectively, for the year 2000. (Lloyd, 2001) The mortality estimates are likely to exclude cancer cases, but may include some premature deaths due to cancer, because the epidemiological studies did not identify the cause of death. Exposure to fine particulate matter, including diesel $PM_{2.5}$, can also be linked to a number of heart and lung diseases.

Ozone

Diesel exhaust consists of hundreds of gas-phase, particle-phase, and semi-volatile organic compounds, including typical combustion products, such as $CO_2$, hydrogen, oxygen, and water vapor. Diesel exhaust also includes compounds resulting from incomplete combustion, such as CO, ROG, carbonyls, alkenes, aromatic hydrocarbons, PAHs, PAH derivatives, and SOx. Ozone is formed by the reaction of ROG and NOx in the atmosphere in the presence of heat and sunlight. The highest levels of ozone are produced when both ROG and NOx emissions are present in significant quantities on hot, clear summer days. This pollutant is a powerful oxidant that can damage the respiratory tract, causing inflammation and irritation, which can result in breathing difficulties.

Studies have shown that there are impacts on public health and welfare from ozone at moderate levels. Short-term exposure to high ambient ozone concentrations have been linked to increased hospital admissions and emergency visits for respiratory problems. (Peters, 2001) Repeated exposure to ozone can make people more susceptible to respiratory infection and lung inflammation and can aggravate preexisting respiratory diseases, such as asthma. Prolonged (six to eight hours), repeated exposure to ozone can cause inflammation of the lung, impairment of lung defense mechanisms, and possibly irreversible changes in lung structure, which over time could lead to premature

Exhibit A
Pg 11

aging of the lungs and/or chronic respiratory illnesses such as emphysema and chronic bronchitis.

The population subgroups most susceptible to ozone health effects include individuals exercising outdoors, children and people with preexisting lung disease such as asthma, and chronic pulmonary lung disease. Children are more at risk from ozone exposure because they typically are active outside, during the summer when ozone levels are highest. Also, children are more at risk than adults from ozone exposure because their respiratory systems are still developing. Adults who are outdoors and moderately active during the summer months, such as construction workers and other outdoor workers, also are among those most at risk. These individuals, as well as people with respiratory illnesses such as asthma, especially asthmatic children, can experience reduced lung function and increased respiratory symptoms, such as chest pain and cough, when exposed to relatively low ozone levels during prolonged periods of moderate exertion.

### Sulfur Dioxide and Sulfates

Sulfur dioxide ($SO_2$) is a gaseous compound of sulfur and oxygen. $SO_2$ is formed when sulfur-containing fuel is burned by mobile sources, such as locomotives, vessels, and off-road diesel equipment. $SO_2$ is also emitted from several industrial processes, such as petroleum refining and metal processing.

$SO_2$ causes a wide variety of health and environmental impacts because of the way it reacts with other substances in the air. Particularly sensitive groups include people with asthma who are active outdoors and children, the elderly, and people with heart or lung disease. Effects from $SO_2$ exposures at levels near the one-hour standard include bronchoconstriction accompanied by symptoms, which may include wheezing, shortness of breath and chest tightness, especially during exercise or physical activity. Children, the elderly, and people with asthma, cardiovascular disease or chronic lung disease (such as bronchitis or emphysema) are most susceptible to these symptoms. Continued exposure at elevated levels of $SO_2$ results in increased incidence of pulmonary symptoms and disease, decreased pulmonary function, and increased risk of mortality.

Sulfates ($SO_4^{2-}$) are the fully oxidized ionic form of sulfur. Sulfates occur in combination with metal and / or hydrogen ions. In California, emissions of sulfur compounds occur primarily from the combustion of petroleum-derived fuels (e.g., gasoline and diesel fuel) that contain sulfur. This sulfur is oxidized to sulfur dioxide ($SO_2$) during the combustion process and subsequently converted to sulfate compounds in the atmosphere. The conversion of $SO_2$ to sulfates takes place comparatively rapidly and completely in urban areas of California due to regional meteorological features. When these are breathed, they gather in the lungs and are associated with increased respiratory symptoms and disease, difficulty in breathing, and premature death. (ARB 1991a,b; ARB 1994a,b; EPA, 2000a)

stations spanning over wide distances.  From these studies we can infer that pollutants emitted from offshore vessels can be transported to onshore areas and be available to participate in onshore atmospheric processes, influencing onshore air quality.

The onshore impacts of offshore emissions have also been investigated using air quality modeling.  A modeling study conducted by the Department of Defense has concluded that the emissions released within 60 nautical miles offshore in the southern California coastal region could transport to the coast (ARB, 2000).  Another modeling study conducted by the U. S. Navy using 10 years of hourly surface wind data to estimate the probability that offshore emissions would impact land from specified distances has shown that for California, the probabilities of offshore emissions being transported to the coast within 96 hours were greater than 80 percent from 50 nautical miles offshore (Eddington, 1997).

The U.S. EPA has set a 175 nautical mile boundary off from the United States coasts for development of vessel NOx emission inventory (Eddington, 2003; EPA, 2003).  The 175-mile area is based on the estimate of the distance a NOx molecule could travel in one day (assuming a 10 mile per hour wind traveling toward a coast, NOx molecules emitted 12 miles from the coast could reach the coast in just over one hour.  NOx molecules emitted 175 nautical miles (200 miles) could reach the coast in less than a day).  ARB has also conducted studies on the onshore impact of offshore emissions.  ARB's studies have demonstrated that pollutants released off California's coast can be transported to inland areas due to the meteorological conditions off the coast (Chen, 2005; ARB, 1982; ARB, 1983; ARB, 1984).

There has been very little actual in-transit measurement of the pollutant emissions from ships to better understand various aspects of vessel plume chemistry and reconcile differences between measurements and model predictions.  However, a recent study conducted by Chen et al (Chen, 2005), in which measurements of chemical species in vessel plumes were taken from aircraft transecting a vessel plume, indicates that the NOx half-life in a vessel's plume may be much shorter than predicted by photochemical models.  The study demonstrated a NOx lifetime of about 1.8 hours inside the vessel plume at noontime as compared to about 6.5 hours in the background marine boundary layer of the experiment.  Additional studies investigating vessel plume chemistry will help us better understand vessel plume chemistry and improve the photochemical models used to investigate the impacts of vessels on air quality.

The analysis of meteorological data can also be used to demonstrate that emissions released offshore can reach onshore airsheds.  In 1983, the ARB established the California Coastal Waters (CCW) boundary, based on coastal meteorology, within which pollutants released offshore would be transported onshore.  The development of the boundary was based on over 500,000 island, ship-board, and coastal observations from a variety of records, including those from the U.S. Weather Bureau, U.S. Coast Guard, Navy, Air Force, Marine Corps, and Army Air Force (ARB, 1982).  The CCW boundary ranges from about 25 miles off the coast at the narrowest to just over 100 miles at the widest.

## Table VI-1: Fuel Specifications

| Primary Use | Fuel Type | Fuel Grades | Fuel Specifications | Maximum Sulfur (%) | Maximum Sulfur (ppm) | Minimum Flashpoint (Centigrade) |
|---|---|---|---|---|---|---|
| Land | Distillate | CARB Diesel (2006)Ultra Low Sulfur Diesel (ULSD) | No. 2-D | 0.0015 | 15 | 52 |
| Land | Distillate | CARB Diesel (current) | No. 2-D | 0.05 | 500 | 52 |
| Land | Distillate | U.S. EPA Diesel | No. 2-D | 0.05 | 500 | 52 |
| Land | Distillate | Off-Road U.S. EPA Diesel | No. 2-D | 0.5 | 5,000 | 52 |
| *Marine* | *Distillate* | *Marine Gas Oil (MGO)* | *DMA* | *1.5* | *1,500* | *60* |
| *Marine* | *Distillate* | *Marine Diesel Oil (MDO)* | *DMB* | *2.0* | *2,000* | *60* |
| Marine | Residual | Intermediate Fuel Oil (IFO) 180 | RME/F-25 | 5.0[1] | 50,000 | 60 |
| Marine | Residual | Intermediate Fuel Oil (IFO) 380 | RMG/H-35 | 5.0[1] | 50,000 | 60 |
| Marine | Residual | Bunker fuel | RML-55 | 5.0[1] | 50,000 | 60 |

1. The International Maritime Organization (IMO) MARPOL 73/78 Annex VI, Regulations for the Prevention of Air Pollution from Ships, entered into force in May 2005, lowers the sulfur cap on residual fuel from 5.0% to 4.5% in 2007.

<u>Fuel Sulfur Properties of Currently Available Marine Distillates</u>

The fuel specifications discussed above essentially establish limits that cannot be exceeded for sulfur content and flashpoint. As shown, marine distillates meet the most stringent sulfur specification for marine fuels. In order to assess the impact on emissions from the use of marine distillates, staff evaluated the actual fuel sulfur properties of marine distillate fuel currently available. The two sources of fuel property information staff reviewed were the ARB Oceangoing Ship Survey and the Det Norske Veritas Petroleum Services fuel sample data. (DNV, 2005). The results are summarized in Table VI-2 and discussed below.

**Exhibit A**
**Pg 14**

discussed earlier in Chapter V of this report.  ARB staff has concluded that there are no alternative means of compliance with the requirements of H&SC sections 39666 that would achieve similar diesel PM emission reductions at a lower cost.

## B.    Effects on Air Quality

The proposed regulation will provide diesel PM, NOx, and SOx emissions reductions throughout California, especially in coastal urban areas many of which are non-attainment for the State and federal ambient air quality standards for $PM_{10}$, $PM_{2.5\,a}$ and ozone.

Emission Reduction Estimates

For 2007 through 2009, the emission reductions resulting from the proposed regulation were estimated based on the proportion of auxiliary engines using heavy fuel oil, and the differences in the emissions between auxiliary engines using 2.5 percent heavy fuel oil and 0.5 percent marine gas oil.  The sulfur levels for heavy fuel oil and marine gas oil represent the average sulfur contents for these fuels based on vessels visiting California ports based on the ARB's 2005 Ship Survey. (ARB, 2005).  Auxiliary engines using distillate fuels would generally be unaffected by the proposed regulation until 2010.

For 2010 and later, when the emission limit based on the anticipated use of 0.1 percent sulfur marine gas oil is implemented, we estimated the emission reductions based on: (1) the proportion of auxiliary engines using heavy fuel oil, and the differences in the emissions between auxiliary engines using 2.5 percent heavy fuel oil and 0.1 percent marine gas oil; and (2)  the proportion of auxiliary engines using distillate fuel, and the differences in the emissions between auxiliary engines using 0.5 percent marine gas oil and 0.1 percent marine gas oil.

The estimated reductions in PM emissions that would occur when switching from heavy fuel oil to distillate fuels result, in large part, from the lower sulfur content of distillate fuel, which reduces the formation of sulfate PM.  In addition, the lower ash content and lower density of distillate fuel also contributes to lower PM emissions (EPA, 2002).  The lower sulfur content of distillate fuel also directly contributes to lower SOx emissions. For example, lowering the sulfur content from 2.5 percent to 0.5 percent represents an 80 percent reduction in the sulfur content of these fuels, and results in an 80 percent reduction in SOx emissions.  The lower nitrogen content of distillate fuels also results in a reduction in NOx emissions (EPA, 2002).

The emission factors used to estimate the emissions and emission reductions from auxiliary engines are discussed in detail in Appendix D.  These emission factors are shown in Table VII-1 below.  The estimated percent emission reductions from auxiliary engines that switch fuels are shown in Table VII-2 below.  While these percent emission reductions represent our best estimates, we recognize that emissions test results for PM vary widely depending on the source of information.

**Exhibit A**
**Pg 15**

**Table VII-1:  Estimated Emission Factors (g/kw-hr)**

| Pollutant | HFO @ 2.5% sulfur | MGO @ 0.5% sulfur | MGO @ 0.1% sulfur |
|-----------|-------------------|-------------------|-------------------|
| NOx | 14.7 | 13.9 | 13.9 |
| SOx | 11.1 | 2.1 | 0.4 |
| PM | 1.5 | 0.38 | 0.25 |

**Table VII-2:  Estimated Emission Reductions for Auxiliary Engines Switching from Heavy Fuel Oil to the Specified Distillate Fuels**

| Pollutant | Percent Reduction: HFO to MGO @ 0.5% Sulfur | Percent Reduction: HFO to MGO @ 0.1% Sulfur |
|-----------|---------------------------------------------|---------------------------------------------|
| NOx | 6% | 6% |
| SOx | 80% | 96% |
| PM | 75% | 83% |

Table VII-3 below shows the auxiliary engine emissions within the 24 nautical mile boundary, which are subject to the proposed regulation.  The emissions are grown uncontrolled from 2004 to 2020 based on the growth assumptions discussed in Appendix D.

**Table VII-3:  Projected Emissions from Auxiliary Engines within 24 Nautical Miles of California's Coastline**

| Year | Auxiliary Engine Emissions (Tons per Day) | | |
|------|------|------|------|
| | PM | NOx | SOx |
| 2004 | 3.0 | 34 | 22 |
| 2007 | 3.8 | 43 | 28 |
| 2010 | 4.6 | 52 | 34 |
| 2015 | 6.2 | 69 | 45 |
| 2020 | 8.7 | 95 | 64 |

The ARB staff estimates that implementation of the proposed regulation will result in immediate and substantial reductions in diesel PM, NOx, and SOx emissions, as shown in Table VII-4 below.  Upon implementation in 2007, this represents about a 70 percent reduction in PM emissions from the baseline emissions subject to the regulation (emissions within the 24 nautical mile boundary).  In addition, the proposed regulation will result in reductions in carbon dioxide ($CO_2$), a global warming gas.  Specifically, the use of use of distillate marine fuels will result in about a 5 percent reduction in $CO_2$

**Exhibit A**
**Pg 16**

<u>Non-cancer Health Impacts and Valuations</u>

To determine the impacts from the proposed regulation on non-cancer health endpoints, ARB staff used the methodology described previously in Chapter IV but evaluated the change in ambient PM levels that are expected due to implementation of the proposed regulation.  This analysis shows that the statewide cumulative impacts of the emissions reduced through this regulation from year 2007 through 2020 are approximately:

- 520 premature deaths (260 to 810, 95% CI)
- 14,000 asthma attacks (3,400 to 24,000, 95% CI)
- 120,000 work loss days (103,000 to 140,000, 95% CI)
- 650,000 minor restricted activity days (530,000 to 770,000, 95% CI)

<u>Value of Non-Cancer Effects</u>

*Premature Death*:  The U. S. EPA has established $6.3 million (in 2000 $) for a 1990 income level as the mean value of avoiding one death.  (EPA, 2003)  As real income increases, people may be willing to pay more to prevent premature death.  The U.S. EPA further adjusted the $6.3 million value to $8 million (in 2000 $) for a 2020 income level.  Assuming that real income grew at a constant rate from 1990 and will continue at the same rate until 2020, we adjusted the value of avoiding one death for income growth.  We then updated the value to 2005 dollars and discounted values of avoiding a premature death in the future back to the year 2005.  The U.S. EPA's guidance of social discounting recommends using both three and seven percent discount rates. (EPA, 2000)

Based on these rates, the total valuation of the avoided premature deaths is about $3 billion at seven percent discount rate, and $4 billion at three percent discount rate.  Based on using the annual avoided deaths as weights, the weighted average value of reducing a future premature death, discounted back to the year 2005, is around $5 million at seven percent discount rate, and $7 million at three percent.  These are point estimates.  The uncertainty in the mortality estimates is on the order of 50 percent, so the valuation estimates are likewise uncertain, by plus-or-minus about 2 billion dollars*.*

*Non-Mortality Health Effects*:  To estimate the values of certain non-mortality health effects, we use U.S. EPA valuations, updated to 2005 dollars, for avoiding non-fatal health effects (EPA, 2003):

- $49 for acute asthma attack
- $180 for work loss day
- $58 for minor restricted activity day (MRAD)

**Exhibit A**
**Pg 17**

(2)     Affected businesses neither increase the cost to their customers, nor lower their cost of doing business through cost-cutting measures due to the proposed regulation.

These assumptions, though reasonable, might not be applicable to all affected businesses.

The results of the analysis are shown in Table VIII-9 below.  Using the ROE to measure profitability, we found that the ROE range for typical businesses from all industry categories would have declined by less than one percent due to the proposed regulation.  This represents a small decline in the average profitability of the affected businesses.  Overall, most affected businesses  will be able to absorb the costs of the proposed regulation with no significant impacts on their profitability.

### Table VIII-9: ROE Analysis of Businesses

| SIC Code | Description of SIC Code | Percent Change in ROE |
|----------|------------------------|-----------------------|
| 4412 | Deep Sea Foreign Transportation of Freight | -0.01 |
| 4424 | Deep Sea Domestic Transportation of Freight | -0.05 |
| 4481 | Deep Sea Passenger Transportation | -0.60 |

Comparison of the Costs of the Proposed Regulation with Vessel Operating Costs

This analysis compares the added costs of the proposed regulation with the normal operating costs of large ocean-going vessels.  While the costs of the proposed regulation are substantial, they are a small fraction of the overall operating costs for these businesses.  For example, based on a typical scenario, a container vessel would pay an extra $5,000 for fuel during visits to two California ports (see Appendix J-Part IV).  We do not expect this cost to have a significant impact on vessel operators, or businesses that rely on the goods transported by these businesses, because the added fuel cost represents a minor percentage of the overall transportation cost.  To put this in perspective, the total operating cost of a single Asia to U.S. West Coast voyage for a typical container vessel was estimated to be about 2 to 3 million dollars.  Therefore, the $5,000 added cost represents less than one percent of the total transportation cost for the voyage, or about a dollar per shipping container for a 5,000 TEU (transport equivalent unit) vessel, out of total costs on the order of $500 per TEU.  (Mercator, *supra*)

As compared to typical cargo vessels, the proposed regulation will have a larger impact on diesel electric-vessels (primarily cruise lines and some tankers).  Nevertheless, we do not think the added costs will significantly impact these vessel operators.  The added cost of the proposal for a typical cruise vessel visit to Mexico from the Los Angeles area would be about $16,000 (see Appendix J-Part III).  Because a typical cruise vessel for this voyage carries about 2,000 passengers (Carnival, 2005a), the added cost would be

**Exhibit A**
**Pg 18**

## I. INTRODUCTION AND BACKGROUND

In January 2005, the Air Resources Board conducted the Oceangoing Ship Survey (survey). The survey was intended for ship owners or operators (shipping lines, tanker operators, cruise lines, etc.) that operate in California. The information gathered through this survey is being used to update the statewide emissions inventory for oceangoing ships, support the development of a proposed regulation to reduce emissions from ship auxiliary engines, and provide information that will assist in the development of a feasibility study of providing dockside power for ships. The survey requested information only for oceangoing ships (both domestic and foreign-flagged) that visited California ports in 2004. This report provides an overview of the results from the survey. A copy of the survey is provided in the appendix.

An oceangoing ship is defined as a marine vessel that meets any one of the following criteria:

(1) the vessel carries a "registry" (foreign trade) endorsement on its United States Coast Guard certificate of documentation, or is registered under the flag of another country;

(2) the vessel is 400 feet or greater in length overall (LOA) as defined in 50 CFR § 679.2, as adopted June 19, 1996;

(3) the vessel is 10,000 gross tons (GT ITC) or more per the convention measurement (international) system as defined in 46 CFR 69.51-.61, as adopted September 12, 1989; or

(4) the vessel is propelled by a marine diesel engine with a per-cylinder displacement of 30 liters or greater.

Generally, vessels such as container ships, bulk carriers, tankers, and cruise ships meet the definition of an oceangoing ship, while harbor craft such as ferries, fishing vessels, and tug/tow boats do not.

The Oceangoing Ship Survey contained two parts. Part II-A requested information on individual ships and engines, while Part II-B requested information on California port visits. Specifically, Part II-A requested ship owners and operators to submit the following information for each ship:

- Vessel Name
- Lloyds/IMO Number
- Country Flag
- Vessel Age
- Vessel Type
- Ship Electrical Power
- Number of Main Engines
- Number of Auxiliary Engines
- Type of Engines
- Make of Engines
- Age of Engines
- Model of Engines
- Rated Power of Engines

- Type of Fuel Used
- Sulfur content of fuel
- Average Total Ship Power From Auxiliary Engines
- Whether Use of MGO Would Require Modification
- Cruise Power and Speed
- Completed Engine Modifications

Part II-B requested ship owners and operators to submit the following information for ships that visited the same California port five or more times in 2004:

- Vessel name
- Total number of port visits
- Typical number of port calls
- Month of visit
- Port of last call outside of California
- Identification of ports and berths
- Hours at port
- Next port call outside of California

The survey was distributed to approximately 150 potential owners, operators, and shipping agents. A total of 36 companies responded to the survey providing data on approximately 327 ships and over 1,400 engines. Approximately three fourths of these ships are used for transport of cargo or oil, while one fourth are cruise or passenger ships. Based on data from the California Lands Commission, we believe that this represents about 17 percent of the total oceangoing ships that visit California annually.

In the following sections, the results for the survey are presented including information regarding the vessels, main engine specifications, auxiliary engine specifications, and port activity of the vessel. Not all surveys had data entered for every data field. Blank data fields were not included in average or population numbers in the survey summaries.

**EXECUTIVE SUMMARY**

The California Air Resources Board (ARB) staff developed a statewide emissions estimation methodology from ocean-going vessels (OGVs) operating in California coastal waters and California ports and inland waterways. This effort was undertaken to support the development of a statewide emission control strategy addressing emissions from auxiliary engines on ocean-going vessels. The methodology reflects updated population and activity data for ocean-going vessels statewide. Emissions estimates were developed for main and auxiliary engines and eight vessel types, for the year 2004 and projected to 2010 and 2020. As shown in Table ES-1, there were approximately 10,000 vessels visits at California ports in 2004 and almost half of those visits were by container ships.

**Table ES-1: Estimated Statewide 2004 Ocean-Going Vessel Visits**

| Vessel Type | Numbers of Visits in 2004 |
|---|:---:|
| Auto | 750 |
| Bulk | 946 |
| Container | 4744 |
| General | 721 |
| Passenger | 687 |
| Reefer | 52 |
| RoRo | 34 |
| Tanker | 1941 |
| Totals | 9875 |

Table ES-2 presents the statewide estimate of emission from ocean-going vessels auxiliary engines for 2004. Table ES-3 presents similar information for emissions from the main engines.

**Exhibit A**
**Pg 21**

**Table ES–4: Ocean-going Vessel Diesel PM and NOx Emission Estimates for Main and Auxiliary Engines for 2004, 2010 and 2020 (tons per day)**

| Engine Type | 2004 Diesel PM | 2010 Diesel PM | 2020 Diesel PM | 2004 NOx | 2010 NOx | 2020 NOx |
|---|---|---|---|---|---|---|
| Main | 14.7 | 18.1 | 26.9 | 175.2 | 215.6 | 319.1 |
| Auxiliary | 3.9 | 6.2 | 12.7 | 43.6 | 68.1 | 137.7 |
| Total | 18.6 | 24.3 | 39.6 | 218.8 | 283.7 | 456.8 |

## I.    BACKGROUND

In this document, ARB staff provides background on the ocean-going vessel emissions inventory, our purpose and goals in preparing an emissions inventory update, and a general overview of the methodology and assumptions used to developed the inventory.

For the purposes of this inventory, an ocean-going vessel (OGV) is a commercial vessel greater than or equal to 400 feet in length or 10,000 gross tons; or propelled by a marine compression ignition engine with a displacement of greater than or equal to 30 liters per cylinder.  The emissions inventory includes all OGV emissions occurring within 100 nautical miles of the California coastline.  The 100 nautical mile boundary is generally consistent with the California Coastal Waters (CCW) boundary except along the south central coast (Ventura and Santa Barbara Counties) where the CCW boundary is approximately 30 nautical miles offshore.

OGV emissions occur during three distinct operating modes: transit (emissions from vessel operations between ports), maneuvering (slow speed vessel operations while in-port areas), and hotelling (also known as berthing; in-port emissions while moored to a dock).

Two types of engines are found on OGVs, main engines and auxiliary engines.  The main engine is a very large diesel engine used mainly to propel the vessel at sea.  Main engines are used during the transit and maneuvering modes.  Auxiliary diesel-fueled engines on OGVs provide power for uses other than propulsion (except for diesel-electric vessels).  Typically, an OGV will have a single, large main engine used for propulsion, and several smaller auxiliary "generator-set" engines.  Auxiliary engines are used during all three operating modes.  An exception to this configuration are diesel-electric vessels where diesel engine generator sets provide power for both propulsion and auxiliary power needs.

**Exhibit A**
**Pg 22**

## OFFSHORE EMISSIONS IMPACTS ON ONSHORE AIR QUALITY

The transport of air pollution over long distances and between air basins is well established. The emissions from ocean-going vessels (OCVs or vessels) can travel great distances and numerous studies have shown local, regional, and global impacts on air quality. (Endresen, 2003; Jonson, 2000; Corbett and Fishbeck, 1997; Streets, D.G., 2000; Saxe, H. and Larsen, T., 2004) Ocean-going vessels emit large quantities of several pollutants, however, the impacts of nitrogen oxides (NOx) and sulfur oxides (SOx) are the most often studied using various air quality models. In a recent study, using a bottom-up estimate of fuel consumption and vessel activity for internationally registered fleets, annual emissions from vessels worldwide were estimated to be significantly greater that previously considered. This study estimated that the global NOx from vessels is actually more than doubled from previous estimates. This study also suggests that near shore emissions impacts may be much larger than previously estimated. (Corbett and Koehler, 2003) Other studies indicate that vessel emissions can be a dominant contributor to sulfur dioxide concentrations over much of the oceans and in many coastal regions. (Capaldo, 1999) However, NOx and SOx are not the only pollutants of concern, as additional studies show coastal ozone and particulate matter impacts from OCV emissions. (Marmer and Langmann, 2005; Lawrence and Crutzen, 1999; Fagerli and Tarrasson, 2001; Eastern Research Group and Starcrest Consulting Group, 2003)

A study for the International Maritime Organization concludes that at any given time, most vessels are near a shore and that approximately 80 percent of the emissions are emitted near the coast, including the west coast of the United States. (International Maritime Organization, 2000) In California, ship emissions are becoming an increasingly important source of emissions as their relative contributions to the total amount of pollution is increasing as land based sources become more stringently controlled. For example, the Santa Barbara County Air Pollution Control District estimates that by 2015, NOx emissions from ships will comprise more than 60 percent of their total NOx inventory. (Murphy)

The issue of onshore impacts of offshore emissions has been a concern in California for several decades. Tracer studies, analysis of meteorological data and ambient monitoring data, and air quality modeling, are approaches used to determine the extent to which emissions released offshore can impact onshore areas.

### Tracer Studies

Tracer studies have been conducted off the California coast to determine characteristics of pollutant transport in California's coastal areas and they provide evidence of onshore impacts from offshore emissions. A tracer study involves the release of a known amount of a non-toxic, inert gas from either a moving or

**Exhibit A**
**Pg 23**

fixed point offshore and the subsequent sampling the of the atmosphere for concentrations of that gas at sites onshore. Brief descriptions of three such studies, from which we can infer that pollutants emitted from offshore ships can be transported to onshore areas and be available to participate in onshore atmospheric processes, are given below.

In 1977, a dual tracer study was conducted from a naval research vessel traveling 8 to 20 miles offshore. (ARB, 1983)  The two tracers, sulfur hexafluoride and bromotrifluromethane were released as the ship moved from the Long Beach area to the Santa Barbara channel. Twenty-nine onshore sites were established to monitor for the two tracers. The results showed both tracer gases were detected at sampling stations along the entire length of the network that ran from Ventura to Long Beach.

Another tracer study involving the Santa Barbara Channel conducted in 1980 was performed to collect data to be used in an air quality model and again showed pollutants emitted offshore were detected onshore. (ARB 1982; ARB 1984)  This study used sulfur hexafluoride in six tracer experiments emitted offshore and at Point Conception. Over 10,000 samples were gathered from on-shore sites and also from boats and airplanes to determine offshore transport paths. The results showed that pollutants emitted in the Santa Barbara Channel will be transported onshore and that very little dispersion occurs over water, and as a consequence, the pollutant concentration downwind can be elevated.

The most recent of the tracer studies discussed here was conducted as part of the 1997 Southern California Ozone Study. (ARB, 2000)  The objectives of this tracer study were two-fold. The primary objective was to obtain direct evidence regarding the trajectory of emissions from vessels transiting the coast and the impact on onshore air quality from two proposed shipping lanes. The secondary objective was to assess the ability of models to simulate the relevant physical processes that take place during transport of emissions offshore from the shipping lanes to onshore. A total of 51 onshore sampling site locations were selected from Santa Barbara to Oceanside, going inland as far as Santa Clarita Valley and the Rubidoux air monitoring station. Five perfluorocarbon (PFTs) tracers were used in this study. The tracer gases were released from both a fixed point offshore and from vessels moving simultaneously along two shipping lanes for a specified period of time. The results of the study showed that the tracer gases were detected on-shore and suggested that meteorology strongly influences the direction and magnitude of dispersion of the pollutants.

**Meteorology/Climatology**

Another source of information regarding onshore impacts is to examine the meteorology/climatology near the coast. In the early 1980's, based on a investigation of meteorological data, the Air Resources Board established the California Coastal Waters (CCW) as a boundary within which emissions that are

released, are transported on-shore.  In addition, ARB meteorology staff recently reviewed available data to determine if California meteorological and climatology support the transport of offshore emissions to coastal air basins.  A brief discussion on the development of the CCW and the more recent data review is presented below.

*California Coastal Water Boundary*:  Previous studies by the ARB have demonstrated that pollutants released off California's coast can be transported to inland areas due to the meteorological conditions off the coast.  In 1983, in the Report to the Legislature on Air Pollutant Emissions from Marine Vessels, the ARB established a boundary based on coastal meteorology within which pollutants released offshore would be transported onshore (ARB, 1983; ARB, 1984).  The development of the boundary defined as the California Coastal Waters (CCW) is based on over 500,000 island, shipboard, and coastal observations from a variety of records, including those from the U.S. Weather Bureau, Coast Guard, Navy, Air Force, Marine Corps, and Army Air Force. (ARB, 1984)  The area within the CCW boundary is defined as that area between the California coastline and a line starting at the California Oregon border at the Pacific Ocean.  The California Coastal Waters are shown in Figure 2.  This boundary ranges from about 25 miles off the coast at the narrowest to just over 100 miles at the widest.

### Figure 2:  California Coastal Waters



"California Coastal Waters" means that area between the California Coastline and a line starting at the California-Oregon border at the Pacific Ocean

thence to 42.0°N 125.5°W
thence to 41.0°N 125.5°W
thence to 40.0°N 125.5°W
thence to 39.0°N 125.0°W
thence to 38.0°N 124.5°W
thence to 37.0°N 123.5°W
thence to 36.0°N 122.5°W
thence to 35.0°N 121.5°W
thence to 34.0°N 120.5°W
thence to 33.0°N 119.5°W
thence to 32.5°N 118.5°W

and ending at the California-Mexico border at the Pacific Ocean. Coordinates shown above are exact.  Distances of California Coastal Waters boundary from coast are rough

Exhibit A
Pg 25

approximations.

*Review of Available Meteorological and Climatological Data*:  As previously documented in reports by the ARB (ARB, 1983; ARB  1984) the lower atmosphere is the medium in which air pollution is carried from one surface or near-surface pollution source to a surface based receptor.  In this medium, the direction of pollution transport and the dispersion of air pollutants are largely dependent upon the wind and the vertical temperature distributions (stability).

The wind and the stability along the coast of California are largely affected by the North Pacific high pressure cell, particularly during the summer.  It is a semi-permanent feature of the Northern Hemispheric large scale atmospheric circulation pattern, and it produces a predominantly northwesterly flow of maritime air over the California coastal waters.  This circulation pattern is modified to more westerly flow by continental influences as the air approaches the coast of California.

Another California weather characteristic that results from the location of the Pacific high is the steady flow of air from the northwest during the summer that helps drive the California Current of the Pacific Ocean.  The California Current sweeps southward almost parallel to the California coastline.  However, since the mean drift is slightly offshore, there is a band of upwelling immediately off the coast as water from deeper layers is drawn into the surface circulation.  The water from below the surface is colder than the semi-permanent band of cold water just offshore, which ranges from 25 to 50 miles in width.

The temperature of water reaching the surface from deeper levels is as much as 10° colder during the summer than is the water 200-300 miles farther west. Comparatively warm, moist Pacific air masses drifting over this band of cold water form a bank of fog which is often swept inland by the prevailing northwest winds out of the high pressure center.  In general, heat is added to the air as it moves inland during these summer months, and the fog quickly lifts to form a deck of low clouds that extend inland only a short distance before evaporating completely.  Characteristically, this deck of clouds extends inland further during the night and then recedes to the vicinity of the coast during the day.  This layer of maritime air is usually from 1,000 to 2,000 feet deep, while above this layer the air is relatively warm, dry, and cloudless.

Additionally, the air flowing around the Pacific high at upper levels is sinking (subsiding) and consequently warming due to compression.  This warm air above the cool coastal marine air produces a strong, persistent vertical temperature inversion which limits the vertical mixing of pollutants.

As stated above, the North Pacific high pressure cell produces a predominantly northwesterly flow of marine air over California Coastal Waters and, generally, this flow becomes more westerly as the air approaches the coast of California.

**Exhibit A**
**Pg 26**

Numerous climatological studies which describe the air flow patterns along the California coast clearly show this. Table 1 presents a summary of the wind flow direction frequencies measured at various locations along the California coast as shown in previous ARB reports. The table shows that onshore wind flow predominates during the spring and summer at all five locations, and during the fall at four out of the five sites. The table also shows that, on an annual basis, onshore winds are about twice as common as offshore winds at those given locations. The data in Table 1 are based on a relatively large data set. Because the data set covers multiple years, these wind flow percentages are not expected to change significantly over time. However, data from a more recent analysis are provided in Table 2 to show the consistency in wind flow patterns through the years. Table 2 shows the predominant wind flow at various coastal sites in California. The directions that are shaded correspond to onshore conditions. All coastal sites depicted in this table are dominated by onshore conditions and each site has at least eight months where onshore flow is the dominant wind direction. The data in Table 2, although depicted slightly different, are consistent with the data in Table 1.

### Table 1: Wind Flow Direction Frequencies in Coastal Areas of California[1]

| Station | Wind Direction | Seasonal Frequency[2] (%) | | | | |
|---|---|---|---|---|---|---|
| | | Spring | Summer | Fall | Winter | Annual |
| Oakland | Onshore | 75 | 83 | 62 | 47 | 67 |
| | Offshore | 20 | 13 | 27 | 42 | 25 |
| | Calm | 5 | 4 | 11 | 11 | 8 |
| | | | | | | |
| Vandenberg AFB | Onshore | 64 | 69 | 48 | 34 | 54 |
| | Offshore | 24 | 9 | 32 | 53 | 29 |
| | Calm | 12 | 22 | 20 | 13 | 17 |
| | | | | | | |
| Santa Barbara | Onshore | 50 | 62 | 44 | 32 | 47 |
| | Offshore | 26 | 21 | 29 | 24 | 25 |
| | Calm | 24 | 17 | 27 | 44 | 28 |
| | | | | | | |
| Point Mugu NAS | Onshore | 57 | 59 | 41 | 31 | 47 |
| | Offshore | 28 | 21 | 41 | 54 | 36 |
| | Calm | 15 | 20 | 18 | 15 | 17 |
| | | | | | | |
| Los Angeles | Onshore | 68 | 81 | 60 | 43 | 63 |
| | Offshore | 30 | 16 | 36 | 53 | 34 |
| | Calm | 2 | 3 | 4 | 4 | 3 |

Source: National Climatic Center

1. Period of Record:
Oakland – 1965-1978
Vandenberg AFB – 1959-1977
Santa Barbara – 1960-1964
Point Mugu NAS – 1960-1972
Los Angeles International – 1960-1978

2. Spring:  March, April, May;
   Summer:  June, July, August;
   Fall:  September, October, November; and
   Winter:  December, January, February

**Exhibit A**
**Pg 27**

**Table 2:  Prevailing Wind Direction at California Coastal Sites[1]**
**(1992-2002)**

| Station[2] | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFO | W | W | W | W | W | W | W | W | W | W | W | W |
| MRY | ESE | ESE | W | WNW | W | W | W | W | W | W | ESE | ESE |
| SBA | WSW | W | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW |
| OXR | W | W | W | W | W | W | W | W | W | W | W | NE |
| NTD | NE | W | W | W | W | W | W | W | W | W | NE | NE |
| SMO | SW | SW | SW | SW | SW | SW | SW | SW | SW | SW | SW | N |
| LAX | E | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | E |
| SNA | S | S | S | S | S | SSW | SSW | SSW | SW | SW | SW | S |
| OKB | W | NE | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | WSW | NNE |
| SAN | WNW | WNW | WNW | WNW | WNW | WNW | WNW | WNW | WNW | WNW | WNW | WNW |

Source: Western Region Climate Center (http://www.wrcc.dri.edu/)

[1] Prevailing wind direction is based on the hourly data from 1992-2002 and is defined as the direction with the highest percent of frequency.  Wind directions that are shaded correspond to onshore flow.
[2] SFO – San Francisco International Airport; MRY – Monterey Airport; SBA – Santa Barbara Airport; OXR – Oxnard Airport; NTD – Point Mugu Naval Air Station; SMO – Santa Monica Airport; LAX – Los Angeles International Airport; SNA – Santa Ana Airport; OKB – Oceanside Municipal Airport; SAN – San Diego Lindbergh Field

As stated above, the large scale climatological wind flow along the California coast is modified by the effects of local land/sea breeze circulations.  In effect, the local daytime sea breeze enhances the large-scale onshore component of the wind while the nighttime land breeze retards or occasionally reverses the flow.  Table 3 presents seasonal resultant winds by time of day for San Francisco International Airport and Point Mugu Naval Air Station.  The table shows the influences of the land/sea breeze circulations and shows that the onshore winds are generally stronger than offshore winds, a further indication of the transport of offshore emissions to receptor areas onshore.

**Exhibit A**
**Pg 28**

# Exhibit B

California Environmental Protection Agency



# Air Resources Board

# Final Statement of Reasons for Rulemaking
Including Summary of Comments and Agency Responses

**PUBLIC HEARING TO CONSIDER THE ADOPTION OF REGULATIONS
TO REDUCE EMISSIONS FROM AUXILIARY DIESEL ENGINES AND
DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING
VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES
OF THE CALIFORNIA BASELINE**

Public Hearing Date: December 8, 2005
Agenda Item No.: 05-12-5

regulations that will achieve equivalent or greater emission reductions from these engines on ocean-going vessels in California, the Executive Officer of the ARB will propose that the Board consider terminating or modifying  the regulations.  Regarding the complexity of the industry, we believe the ACE Plan provision provides flexibility to the industry, which will help address this concern by providing ship operators with the ability to tailor different emission reduction approaches to their particular vessel.

18.    **Comment**: The proposed regulations and the requirements set forth in the IMO's MARPOL Annex VI should be aligned.  Tighter IMO emission standards are anticipated. (ICS 1)

**Response**:   As discussed in the Staff Report (p. V-15), the requirements of the International Maritime Organization's MARPOL Annex VI do not achieve the emission reductions needed to protect public health in California.  In addition, there is no conflict between IMO Annex VI and the regulations.  Ship operators can comply with both requirements.  This is not unlike the requirements now for ships traveling within a Sulfur Emission Control Area in the Baltic Sea, or for ships subject to the European Union's Directive 2005/33/EC.  Finally, the possibility of tighter Annex VI MARPOL emission standards is not compelling since the U.S. is still not a signatory to the existing treaty, nearly ten years after it was adopted.  And even if IMO is currently discussing further tightening the Annex VI standards, there is no certainty that such standards, if they are ever ratified and enter into force, would achieve equivalent reductions within the same timeframe as ARB's regulations are designed to achieve.

19.    **Comment**: The ARB's "Diesel Particulate Matter Exposure Assessment Study for the Ports of Los Angeles and Long Beach" concludes that hotelling is the most significant source of risk and that it contributes over 90% of the risk from diesel PM emissions to local communities.  Transiting emissions from oceangoing vessels contribute only 1-3% of the risk.  This report supports our suggestion that the rule only target hotelling emissions at this time.  Hotelling emissions will: (1) address 90% of the risk in the ports; (2) send a signal to the vessel community that the state wants to work together with the industry to address the more difficult challenge of transiting emissions; and (3) reduce interest in legal challenges to CARB's jurisdiction. (WSPA 1)

**Response**:   See Response to Comment A.2 regarding the risk reduction associated with the commenter's proposal to limit the regulations to hotelling.  In addition, we do not believe it is necessary to modify the regulations as suggested by the commenter to demonstrate that the State wants to work with the industry.  The ARB staff worked extensively with the industry and other members of the public in developing the regulations.  As discussed in the Staff Report (p. I-4 to I-6), ARB held five public workshops or workgroup meetings to discuss draft language for the proposed regulations.   The ARB staff modified the regulations numerous times as a result of comments received by the affected industry during these workshops.  Finally, it would not be appropriate to modify the regulations based on potential interest in legal action.

**Response**:   As discussed in the Staff Report (Chapter VI, Section A), the fuels specified in the regulations for 2007 are available at ports worldwide.  The fuels that can be used to meet the emissions limit in 2007 include marine gas oil (MGO) with no sulfur limit or marine diesel oil (MDO) with a 0.5% sulfur cap.  As discussed in the Staff Report (Chapter VI), we believe the average sulfur content of these fuels will be at or below 0.5%.  Contrary to the commenter, we did not assume that these fuels will be 0.5% sulfur or less regardless of where it is purchased.  Rather, as discussed in the Staff Report, we believe that the sulfur content of MGO will be higher than 0.5% in some cases and less in others, with an overall average at or below 0.5%.

We agree that the 0.1% sulfur fuel specified for 2010 is not currently available at many ports.  However, it is becoming increasingly available, and we expect it to be sufficiently available by 2010 to allow ship operators to comply with the regulations.  Before the emission limit based on 0.1% sulfur fuel becomes effective, ARB staff will conduct a feasibility study evaluating the availability of this fuel by 2010.  If the feasibility study indicates that this fuel will not be available by the 2010 deadline, ARB will propose modifications to regulations, as specified in subsection (j) of the regulations.

Overall, we expect situations where compliant fuel is unavailable to be rare.  In these unique situations, a noncompliance fee is appropriate to mitigate the excess emissions and to prevent ship operators from deriving an economic advantage by purchasing less costly noncompliant fuels. See also Response to Comment B.3.

With regard to penalties, we believe the regulations are feasible, and we expect most vessel operators to comply with the requirements.  Therefore, it is appropriate to subject noncompliant vessel operators who do not meet the regulatory requirements (including the payment of noncompliance fees) to be subject to the penalties specified in Health and Safety Code 42400 et seq. and other provisions of State law as applicable.

> 30.   **Comment**: We urge the use of the cleanest fuel possible to the extent that marine vessels have access to low-sulfur fuels.  As such, we recommend that the Board emphasize the use of 2010 compliant fuels earlier as such fuels become available. (CAPCOA 1)

**Response**:   We believe 2010 is the earliest date by which we can specify an emissions limit based on the use of 0.1% sulfur fuel.  As stated in Appendix I of the Staff Report, this fuel is not now sufficiently available on a global basis to allow ships to comply with this fuel at this time.  In addition, the 2010 requirement is consistent with the European Union's Directive 2005/33/EC.

> 31.   **Comment**: CARB is proposing to mandate a fuel standard that exceeds prevailing ISO requirements, yet has not imposed any obligation for suppliers in the State to make such fuel available.  CARB lacks the authority to mandate international suppliers to make such fuel available and there is considerable uncertainty whether a sufficient supply of fuel will exist to meet CARB's requirements. (SSA)

g/kW-hr emission factor, but rejected it in favor of an emission factor developed for the U.S. EPA (with adjustments as noted).

In addition, Appendix B of the final "Diesel Particulate Matter Exposure Assessment Study for the Ports of Los Angeles and Long Beach," further analyzed this issue and graphed all known sources of PM emissions data from appropriate engines by the sulfur content of the fuel (emissions data was not used if the sulfur content of the fuel was unknown). This analysis further supports the use of the 1.5 g/kW-hr emission factor.

While the 0.8 g/kW-hr emission factor for auxiliary engines using heavy fuel oil and the 0.3 g/kW-hr emission factor for auxiliary engines using distillate fuel are both published from the same source (the 2002 Entec Report), there is no inconsistency with using the 1.5 g/kW-hr emission factor along with the 0.3 g/kw-hr emission factor. As discussed in the Staff Report, the ARB staff believes that the 0.3 g/kW-hr emission factor is reasonable while the 0.8 g/kW-hr emission factor is unreasonably low. The 0.72 g/kw-hr emission factor cited in the exposure assessment was simply part of a discussion summarizing the methodology used by Starcrest Consulting Group in their emissions inventory study for the Port of Los Angeles. Starcrest Consulting Group also used the 0.8 g/kW-hr emission factor discussed above with which we disagree.

## H.    Safety Issues

1.    **Comment**: There are substantial issues regarding safety that remain unresolved. The inclusion of an exemption for safety in the regulation is a step in the right direction, but we still believe the safety issue has been under-evaluated. (PMSA 2)

**Response**:   There are no unresolved safety issues. The safety issues raised during the rulemaking process have focused primarily on the use of the distillate fuels in marine engines that ordinarily use heavy fuel oil, and fuel switching between heavy fuel oil and distillate fuels at sea. The ARB staff investigated these issues at length and found that ship operators can safely use distillate fuels and switch between heavy fuel oil and the distillate fuel. These issues are discussed in the Staff Report (Chapter VI, Section B).

Specifically, under the subheading "Existing Practice," it is noted that: (1) most vessels currently perform the same types of fuel switches that are likely to occur under the regulations prior to maintenance operations in order to flush heavy fuel oil from engines; (2) several ship operators currently switch fuels every time they visit California ports; and (3) fuel switching to distillate fuels upon entry to ports was a standard practice for most vessels in the past. In addition, under the subheading "Fuel Switching and Safety," it is noted that procedures for conducting fuel transitions are well known, and manufacturers of marine engines and equipment publish procedures for conducting them. Finally, under the subheading "Technical and Safety Considerations," ARB staff noted that engine manufacturers uniformly reported that their engines designed for

heavy fuel oil could also use distillate fuels, subject to certain technical considerations, and as long as proper fuel switching procedures were used.

In addition, ship operators are not limited to complying with the regulations through the use of distillate fuels. The ACE Plan provision allows ship operators to use alternative emission control technologies if the operators choose not to use the cleaner distillate fuels.

As noted by the commenter, ARB staff incorporated a safety exemption into the modified regulatory language in the 15-Day Notice. The exemption addresses specific limited and temporary situations (e.g., due to severe weather, equipment failure, etc.) when compliance with the regulations could endanger the safety of the vessel, crew, cargo, or passengers. The ARB staff developed this exemption after extensive consultations with the Department of Fish and Game's Office of Spill Prevention and Response (OSPR), the San Francisco Harbor Safety Committee (SFHSC), and other stakeholders and interested parties.

2. **Comment**: We are concerned about the safety of requiring vessels to switch fuels while under transit. (WSPA 2)

**Response**: See Response to Comment H.1.

3. **Comment**: The regulation presents some safety issues. To address these, we suggest that the ARB phase in the regulation such that in 2007 the rule would only apply during hotelling (dockside), and then in 2008 it would also apply during transiting and maneuvering after conducting a navigational risk analysis with the Office of Spill Prevention and Response (OSPR). This recommendation is based on the following: (1) OSPR is tasked with reviewing regulations that impact the safe navigation of vessels and provided comments to the ARB advising that the regulations may interfere with navigation and safety. In their comments, OSPR discussed the problems with shifting fuels and concluded that prior to implementation of the rule, ARB sponsor a navigational risk and hazard analysis; (2) the San Francisco Harbor Safety Committee recommended that the ARB include a safety exemption (which ARB has agreed add to the regulation) and a phase-in period where the regulation applies only at dockside for the first year. (BP)

**Response**: We disagree. Based on staff's modifications to the regulatory text, we believe the regulations adequately address all safety concerns that were raised during the rulemaking. As discussed in Response to Comment H.1 and in the Staff Report, vessel operators can safely comply with the regulations. There is no need to modify the regulations to limit fuel switching to dockside operation while a navigational risk analysis is performed. This is because ship operators already conduct fuel switching at sea, either prior to maintenance, or for some vessels, prior to every California port visit. This demonstrates that vessel operators already know how to conduct fuel transitions safely.