1    EDMUND G. BROWN JR.
     Attorney General of the State of California
2    MARY E. HACKENBRACHT
     Senior Assistant Attorney General
3    LINDA BERG, State Bar No. 194667
     Deputy Attorney General
4    NICHOLAS STERN, State Bar No. 148308
     Deputy Attorney General
5     1300 I Street, Suite 125
      P.O. Box 944255
6     Sacramento, CA 94244-2550
      Telephone: (916) 323-3840
7     Fax: (916) 327-2319
      Email: Nicholas.Stern@doj.ca.gov
8
     Attorneys for Defendant Catherine E. Witherspoon
9

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE EASTERN DISTRICT OF CALIFORNIA

13                     SACRAMENTO DIVISION

14   PACIFIC MERCHANT SHIPPING              Case No.: 2:06-CV-02791-WBS-KJM
     ASSOCIATION,
15                                          **DEFENDANT CATHERINE E.**
                              Plaintiff,    **WITHERSPOON'S MEMORANDUM**
16                                          **OF POINTS AND AUTHORITIES IN**
                                            **OPPOSITION TO PLAINTIFF'S**
17        v.                                **MOTION FOR SUMMARY**
                                            **JUDGMENT AND PARTIAL**
18   CATHERINE E. WITHERSPOON, et al.       **SUMMARY JUDGMENT**

19                            Defendants.   Hearing:      July 9, 2007
                                            Time:         2:00 p.m.
20                                          Courtroom:    5
                                            Judge:        Hon. William B. Shubb
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    The Impact of Vessel Emissions on California's Air Quality . . . . . . . . . . . . . . . . . . . 3

      C.    Vessel Emissions Are a Major Source of Pollution in California. . . . . . . . . . . . . . . . 3

      D.    Vessel Emissions Within Twenty-Four Miles of California's Coast Affect On-Shore
            Air Quality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      E.    CARB's Vessel Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      F.    The Vessel Rules Will Assist California in Reaching Attainment for PM and Ozone.  7

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    The Vessel Rules Are Presumed Valid in the Face of a Clean Air Act Preemption
            Challenge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1.    To Show That a State's Historic Police Powers Are Preempted, PMSA Faces an
                  "Uphill Battle." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            2.    Regulating Air Pollution Is Included Among a State's Historic Police Powers. . 10

            3.    The Clean Air Act Not Only Preserves the Historic Role of the States to Regulate
                  Air Pollution, it Demands That They Do So.  . . . . . . . . . . . . . . . . . . . . . . . 11

            4.    California's History of Being the First to Regulate Air Pollution Makes the
                  Application of the Presumption Against Preemption Especially Appropriate
                  Here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    The Vessel Rules Are Authorized by Not One, but Two Sections of the Clean Air Act:
            Section 211(c) on Fuel Regulations and Section 209(d) on Use and Operation
            Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.    Section 211 of the Clean Air Act Allows States to Regulate Fuels for Nonroad
                  Sources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                  a.    The Vessel Rules Are Fuel Regulations. . . . . . . . . . . . . . . . . . . . . . . . 13

                  b.    The Clean Air Act Authorizes California to Adopt Fuel Regulations. . . . . 14

            2.    The Clean Air Act, Section 209(d), Allows States to Regulate the Use and
                  Operation of Vessels. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

i

a.   Use and Operation Regulations, like the Vessel Rules, Are Exempt from Preemption Because They Do Not Impact Manufacturers. . . . . . . . . . . . . 16

b.   Clean Air Act Case Law, Legislative History, and Regulations All State That Fuel Regulations, Such as Sulfur Limits, Are a Valid Type of Use and Operation Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

c.   The Vessel Rules Are Not Emission Standards. . . . . . . . . . . . . . . . . . . . . . 18

D.   Because Vessel Emissions Within Twenty-Four Miles of the Coast Have a Significant Impact on Air Quality, California May Regulate Those Emissions. . . . . . . . . . . . . . . . 22

   1.   PMSA Has Not Carried its Burden of Showing that States Are Powerless to Regulate Conduct in the Seas Beyond their Territorial Waters. . . . . . . . . . . . . 23

      a.   The Submerged Lands Act Does Not Address Whether California Can Regulate the Effects of Vessel Emissions. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      b.   PMSA's Cases Authorizing State Regulation of Pollution Within Their Territorial Waters Are Not a Limitation on State Regulations. . . . . . . . . . 24

      c.   The Cases Addressing Preemption Under the Ports and Waterways Safety Act Are Not Relevant to This Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      d.   PMSA's Own Cases Confirm That States May Enact Reasonable Regulations That Extend Beyond Their Own Boundaries. . . . . . . . . . . . . 27

   2.   Under the Effects Test, States May Adopt Reasonable Regulations Regarding Conduct that Substantially Affects State Territory. . . . . . . . . . . . . . . . . . . . . . . . 29

      a.   The Effects Test Provides the Appropriate Framework for Assessing the Propriety of the Vessel Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      b.   PMSA Has Not Carried its Burden of Showing the Absence of a Genuine Issue of Material Fact Regarding Its Submerged Lands Act Claims. . . . . . 31

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

ii

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3 <u>Federal Cases</u>

4 *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
   541 U.S. 246 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 18-20

5
*Abdul-Jabbar v. Gen. Motors Corp.,*
6   85 F.3d 407 (9th Cir.1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7 *Adamo Wrecking Co. v. U.S.,*
   434 U.S. 275 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8
*Aloha Airlines, Inc. v. Dir. of Taxation of Hawaii,*
9   464 U.S. 7 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 *Askew v. American Waterways Operators, Inc.,*
   411 U.S. 325 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
11
*Barber v. State of Hawai'i,*
12   42 F.3d 1185 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

13 *Bates v. Dow Agrosciences,*
   544 U.S. 431 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
14
*Celotex Corp. v. Catrett,*
15   477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16 *Chevron v. Hammond,*
   726 F.2d 483 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26
17
*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
18   467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19 *Cipollone v. Liggett Group,*
   505 U.S. 504 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
20
*Consolidated Gold Fields PLC v. Minorco,*
21   871 F.2d 252 (2d Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

22 *Engine Mfrs. Ass'n v. U.S. Envl. Prot. Agency,*
   88 F.3d 1075 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 15-18
23
*Exxon Mobil Corp. v. USEPA,*
24   217 F.3d 1246 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

25 *Florida Lime & Avocado Growers, Inc. v. Paul,*
   373 U.S. 132 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
26
*Gade v. National Solid Wastes Management Ass'n,*
27   505 U.S. 88 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment        Case No.: 2:06-CV-02791-WBS-KJM

iii

**TABLE OF AUTHORITIES (Continued)**

Page

*Gillis v. Louisiana*,
    294 F.3d 755 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*,
    471 U.S. 707 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hjelle v. Brooks*,
    377 F.Supp. 430 (D. Ak. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 31

*Horton v. Smith*,
    6 Ben. 264 (E.D.N.Y. 1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hunt v. Washington Apple Adver. Comm'n*,
    432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 24

*Lea v. The Alexander*,
    2 Paine 468 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Margolis v. Ryan*,
    140 F.3d 850 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Motor & Equip. Mfrs. Ass'n v. USEPA*,
    627 F.2d 1095 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19, 20

*Motor Vehicle Mfrs. Ass'n. of the U.S., Inc. v. New York State Dept. of Envtl. Conservation*,
    79 F.3d 1298 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Oliver v. Keller*,
    289 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Oxygenated Fuels Ass'n., Inc. v. Davis*,
    163 F.Supp.2d 1182 (E.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Ray v. Atlantic Richfield Co.*,
    435 U.S. 151 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 25, 26

*Strassheim v. Daily*,
    221 U.S. 280 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*The Whistler*,
    13 F. 295 (D. Or. 1882) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Train v. Natural Resources Defense Council, Inc.*,
    421 U.S. 60 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

iv

### TABLE OF AUTHORITIES (Continued)

Page

*U.S. v. Locke,*
    529 U.S. 89 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25, 26

*United States v. Aluminum Co. of America,*
    148 F.2d 416 (2d Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. California,*
    332 U.S. 19 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. California,*
    332 U.S. 804 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Neil,*
    312 F.3d 419 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Vasquez-Velasco,*
    15 F.3d 833 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Warner v. Dunlap,*
    532 F.2d 767 (1st Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


State Cases

*People v. Weeren,*
    26 Cal.3d 654 (Cal. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*State of Alaska v. Bundrant,*
    546 P.2d 530 (Ak. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28, 31

*State v. Jack,*
    125 P.3d 311 (Ak. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*State v. Stapansky,*
    761 So.2d 1027 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31


Federal Statutes and Regulations

42 U.S.C. § 7401(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

42 U.S.C. § 7407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 7407(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 7409(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 7409(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 7507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment       Case No.: 2:06-CV-02791-WBS-KJM

v

**TABLE OF AUTHORITIES (Continued)**

Page

42 U.S.C. § 7509(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

42 U.S.C. § 7521(a)(3)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

42 U.S.C. § 7521(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 7543 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7543(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

42 U.S.C. § 7543(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 7545 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7545(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 7545(c)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

42 U.S.C. § 7545(c)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 7545(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 31

40 C.F.R. Pt. 89, Subpt. A, App. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18


State Statutes and Regulations

Cal. Health & Safety Code,
    § 39602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    § 43013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    § 43018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Code Regs., tit. 13,
    § 2299.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
    § 2299.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11
    § 2299.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 2299.1(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 2299.1(d)(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    § 2299.1(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    § 2299.1(e)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    § 2299.1(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 2299.1(g)(1)(J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 2299.1(h)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 1956.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. Code Regs., tit. 17,
    § 93118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**TABLE OF AUTHORITIES (Continued)**

Page

<u>Other Authorities</u>

Approval and Promulgation of Implementation Plans – Texas – Lawn Service Equipment
Operating Restrictions,
    66 Fed. Reg. 57223 (Nov. 14, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. State Motor Vehicle Pollution Control Standards – Waiver of Federal Preemption –
Decision,
    58 Fed. Reg. 4166 (Jan. 13, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

California State Motor Vehicle Pollution Control Standards – Waiver of Federal Preemption
Notice of Decision,
    59 Fed. Reg. 48625 (Sept. 22, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California State Motor Vehicle Pollution Control Standards – Waiver of Federal Preemption
Notice of Decision,
    49 Fed. Reg. 18887 (May 3, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CARB, Proposed Emission Reduction Plan for Ports and Goods Movements,
    Mar. 22, 2006, http://www.arb.ca.gov/planning/gmerp/gmerp.htm . . . . . . . . . . . . . . . . . 11

Control of Emission From New Marine Compression-Ignition Engines at or Above 30 Liters Per
Cylinder,
    68 Fed. Reg. 9746 (Feb. 28, 2003) (codified at 40 C.F.R. pts. 9 & 94) . . . . . . . . . . . . . 5, 6

Control of Emissions of Air Pollutants From Nonroad Diesel Engines and Fuel,
    69 Fed. Reg. 38958 (final rule June 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Control of Emissions of Air Pollution From Locomotive Engines and Marine
Compression-Ignition Engines,
    72 Fed. Reg. 15938 (proposed April 3, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

MARPOL Annex VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Nonroad Sources and Emission Standards,
    59 Fed. Reg. 31306 (June 17, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Note, *Constructing the State Extraterritorially: Jurisdictional Discourse, The National Interest,
and Transnational Norms*,
    103 Harv. L. Rev. 1273 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Proclamation No. 5928,
    54 Fed. Reg. 777 (Dec. 27 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Proclamation No. 7219,
    64 Fed. Reg. 48701 (Aug. 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Proposed Approval and Promulgation of Implementation Plans – Texas – Airport Ground
Support Equipment,
    66 Fed. Reg. 16432 (Mar. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Restatement (Third) of Foreign Relations Law of the United States
    § 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-33, 32

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment    Case No.: 2:06-CV-02791-WBS-KJM

vii

**TABLE OF AUTHORITIES (Continued)**

Page

Restatement (Third) of Foreign Relations Law of the United States
§ 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 30, 31

United Nations Convention on the Law of the Sea, 1833 U.N.T.S. 397, S. Treaty Doc. No. 103-39, 1992 WL 725374
Pt. II, § 4, Art. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United Nations Convention on the Law of the Sea, 1833 U.N.T.S. 397, S. Treaty Doc. No. 103-39, 1992 WL 725374
Pt. XII, § 5, Art. § 211(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment    Case No.: 2:06-CV-02791-WBS-KJM
viii

**I.     INTRODUCTION**

California is home to some of the nation's busiest ports.  In 2004 alone, ocean-going vessels made more than 9000 calls on California's ports.  Vessel traffic to and from these ports is expected to increase ninety percent by 2020.  These vessels are powered by enormous diesel engines that run on low grade, tar-like bunker fuel, and emit high levels of diesel particulate matter, sulfur oxides, and nitrogen oxides.  Due to meteorological conditions, vessel emissions within twenty-four nautical miles of California's coast are blown into California, increasing California's air pollution and damaging the health of its citizens.

In 2005, the California Air Resources Board (CARB) adopted regulations to reduce these emissions.  These regulations, codified at California Code of Regulations, title 13 section 2299.1, and title 17, section 93118 (the Vessel Rules), require ocean-going vessels that access California's ports to use cleaner, low sulfur fuels or to devise alternative methods to achieve equivalent emission reductions, when they are within twenty-four nautical miles of California's coast.  Pacific Merchant Shipping Association (PMSA), an association of commercial shipping companies, whose vessels frequently visit California's ports, challenges these regulations.

PMSA contends that section 209 of the Clean Air Act preempts the Vessel Rules because they constitute "emission standards" for which CARB is required to obtain a preemption waiver from the United States Environmental Protection Agency (USEPA) before enforcement.  (PMSA P. & A. at 11:18-21.)  The flaw in PMSA's contention is that the Vessel Rules do not meet the Supreme Court's two-part definition of "emission standards":  the Rules are not "numerical emission levels," nor do they require vessels to be "equipped" with "emission-control technology."  *Engine Mfrs. Ass'n (EMA) v. S. Coast Air Quality Mgmt. Dist. (SCAQMD)*, 541 U.S. 246, 253 (2004).

Instead, section 211 of the Clean Air Act allows states to impose fuel regulations on nonroad sources of air pollution, like marine vessels.  And, section 209 of the Act allows states to adopt "use, operation, or movement" requirements, such as fuel regulations.  These types of regulations do not impose any burden on manufacturers, which is what section 209's preemption provision was designed to protect.  Each of these sections independently shows that the Clean

1   Air Act does not preempt the Vessel Rules; together, sections 209 and 211 demonstrate the

2   validity of the Vessel Rules conclusively.

3       PMSA also asks this court to enjoin the Vessel Rules to the degree that they extend beyond

4   California's territorial waters.  (Memorandum of Points and Authorities in Support of Motion for

5   Summary Judgment and Partial Summary Judgment by Plaintiff Pacific Merchant Shipping

6   Association, filed 5-7-07, Docket No. 41 (PMSA P. & A.) at 26:14-21.)  PMSA claims that the

7   edge of California's territorial waters creates a barrier that terminates California's authority to

8   regulate vessel emissions.  But, just as there is no barrier preventing vessel emissions from

9   blowing into California, there is no barrier preventing California from extending its regulations

10  beyond its territorial waters to address air pollution that impacts the state.  Under the "effects

11  test," as long as the regulation is reasonable, California may regulate extraterritorial conduct that

12  has a substantial effect within its territory.  Restatement (Third) of Foreign Relations Law of the

13  United States § 402 (Restatement Third).  In its motion PMSA does not even address this effects

14  test, much less carry its burden of demonstrating an absence of a genuine issue of material fact as

15  to whether the geographic scope of the Vessel Rules is justified under that principle.  Given

16  vessel emissions' substantial impact in California, this failure is fatal to PMSA's motion for

17  summary judgment, and PMSA's motion for summary judgment must be denied.

18  **II.    FACTUAL BACKGROUND**

19      **A.    The Parties**

20      In this action, defendant Catherine Witherspoon is sued in her official capacity as the

21  executive director of the California Air Resources Board (CARB).  CARB is the State of

22  California's air pollution control agency.  Cal. Health & Safety Code § 39602.  The Legislature

23  has authorized CARB to adopt not only emission standards but also in-use performance

24  standards and fuel specifications to control air pollution.  CARB is authorized to regulate

25  virtually every type of air pollution source, including nonroad sources, such as marine vessels.

26  Cal. Health & Safety Code § 43013(a), (b).  The Legislature has directed CARB to reduce air

27  pollution emissions to meet state standards as soon as possible.  Cal. Health & Safety Code

28  §§ 43013(h), 43018(a).

1    Plaintiff Pacific Merchant Shipping Association (PMSA) is an association that includes

2    twenty-two international shipping companies whose vessels are engaged in Pacific trade. (First

3    Amended Complaint for Injunctive and Declaratory Relief, filed 6-05-07, Docket No. 57, ¶7.) Its

4    members operate an array of commercial vessels, including cruise ships, tankers and container

5    vessels, that make frequent calls at California's ports. (PMSA, About PMSA, Member List,

6    http://www.pmsaship.com/member_list.html (last visited June 13, 2007); PMSA P. & A. at

7    5:9:12.)[1/]

8        **B.    The Impact of Vessel Emissions on California's Air Quality**

9    Ocean-going vessels are among the world's most polluting mobile sources per ton of fuel

10   consumed. (Declaration of Paul Milkey, filed June 13, 2007 (Milkey Decl.), ¶ 12.) They emit

11   sulfur oxides (SOx), nitrogen oxides (NOx), and diesel particulate matter (PM) at a far higher

12   rate than any California stationary sources or other mobile sources. (*Id*. at ¶ 13.) Marine engines

13   emit large amounts of pollutants because the vast majority of ships lack stringent pollution

14   control requirements and burn the poorest quality mobile source fuel. (*Id*. at ¶ 14.) According to

15   the United State's report to the United Nations earlier this year, "[a]ir pollution from ocean going

16   vessels (OGVs) is a significant source of damage to human health and welfare on a global scale,

17   and its overall contribution is rapidly growing." (Declaration of Nicholas Stern, filed June 13,

18   2007 (Stern Decl.), Exh. 4, at 2, ¶ 3.) CARB's Vessel Rules are addressing this problem by

19   requiring vessels to use low sulfur distillate fuel – fuel more like that used by trucks – when they

20   are within twenty-four miles of California's shore.

21       **C.    Vessel Emissions Are a Major Source of Pollution in California.**

22   Vessel emissions are a large and growing source of pollution in California. California has

23   eleven seaports that handled twenty-three percent of the United States's waterborne trade and

24   forty-two percent of all U.S. container trade in 2003. (PMSA, Trade and the Economy,

25   _____

26       1.  Although not part of this motion, Defendant Witherspoon contends that PMSA lacks
     associational standing. PMSA's discovery responses to date (Stern Decl., Exhs. 1, 2) show that it
27   does not have information regarding its members' vessels that is necessary to its claims. Since the
     direct participation of PMSA's members is necessary, PMSA does not have standing. *Hunt v.*
28   *Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

1    Economic Impact, http://www.pmsaship.com/economic_impact.html (last visited June 12,

2    2007).)  In 2004, ocean going vessels made a total of about 9400 calls on California ports, for

3    stays ranging from 12 to 120 hours.   (Milkey Decl., ¶ 15 and Exh. 1, III-5; Stern Decl., Exh. 2,

4    response to interrogatory #7.)  Vessel traffic is expected to increase twenty percent by 2010 and

5    ninety percent by 2020.  (Milkey Decl., ¶ 15 and Exh. 1, D-17.)  This projected increase in vessel

6    traffic will more than triple the emissions from auxiliary engines of vessels visiting California by

7    2020.  (Milkey Decl., ¶ 16 and Exh. 1, D-19.)

8         These ocean-going vessels typically have one engine for propulsion and several auxiliary

9    engines to produce electricity (called diesel-electric engines) for on-board uses, such as powering

10   navigation equipment and cargo refrigeration.  (Milkey Decl., ¶ 11 and Exh. 1, ES-4.)  Some

11   vessels, like cruise ships, use diesel-electric engines for both propulsion and on-board electricity.

12   The Vessel Rules apply to auxiliary engines as well as to these other, dual purpose, diesel-

13   electric engines, since both types of diesel-electric engines have a similar design.  (Milkey Decl.,

14   ¶ 11 and Exh. 1, ES-12.)  For simplicity's sake, CARB refers to all the covered diesel-electric

15   engines as auxiliary engines.

16        At current vessel traffic levels, auxiliary engines are a significant source of air pollution.

17   CARB estimates that, in 2004, the  auxiliary engines of vessels traveling within twenty-four

18   nautical miles of California's Coast generated about three tons per day of PM, thirty-three tons

19   per day of NOx, and twenty-two tons per day of SOx.  To puts this in perspective, the NOx

20   emissions from ship auxiliary engines alone exceed the NOx emissions from all petroleum

21   refining operations in California combined.  (Milkey Decl., ¶ 17.)  With increasing vessel traffic,

22   CARB estimates that, absent regulation, by 2020 auxiliary engine emissions within twenty-four

23   miles of the California coast will grow to nine tons per day of PM, ninety-five tons per day of

24   NOx, and sixty-four tons per day of SOx.  (*Id.* and Exh. 1, IV-6 & IV-7.)

25        These emission levels are so high, in part, because vessels usually use bunker fuel, also

26   called Intermediate Fuel Oil.  Bunker fuel contains mostly residual fuel, the lowest grade – and

27   cheapest – fuel available.  (*Id.* at ¶ 19.)  Residual fuel is the very end product of the oil refining

28   process, formulated from the residues remaining after the primary distilling stages of the refining

1    process.  (*Id.*)  It is a thick, tar-like mixture that must be heated to 100 to 200 degrees Celsius to

2    become sufficiently liquid that it can be pumped into the engine and combusted there.  (*Id.*)

3        Residual fuel contains an average of 27,000 parts per million (ppm) of sulfur.  (*Id.* at ¶ 20.)

4    By contrast, diesel fuel for trucks and other motor vehicles has been limited to 500 ppm since

5    1993.  42 U.S.C. § 7545(i)(1).  As discussed below, the Vessel Rules require auxiliary engines to

6    use diesel with a maximum level of sulfur in between these levels:  5000 ppm sulfur.

7

8        **D.    Vessel Emissions Within Twenty-Four Miles of California's Coast Affect On-
            Shore Air Quality.**

9        The PM, NOx, and SOx emitted by ocean-going vessels do not respect territorial

10    boundaries.  Instead, the pollutants travel to neighboring land masses, depending on local

11    meteorological conditions.

12        Numerous studies have shown that meteorological conditions cause pollutants emitted off

13    California's coast to impact onshore areas.  (Declaration of Daniel E. Donohoue, filed June 13 ,

14    2007 (Donohoue Decl.), ¶ 6.)  Prevailing onshore wind patterns cause some pollutants released

15    within a zone ranging from 27 to 102 miles from California's coast to be transported into

16    California.  (*Id.*)  Also, CARB's analysis of minute-by-minute wind speed and directional data

17    from various meteorological stations near the Port of Long Beach show that some of the PM and

18    most of the NOx and SOx emissions released within twenty-four nautical miles from California's

19    coast will be transported into California.  (*Id.* at ¶ 7.)

20        CARB's studies are consistent with the federal government's conclusions about the impacts

21    of off-shore vessel emissions.  (*Id.* at ¶ 8.)  Recognizing that ocean-going vessels are significant

22    contributors to air pollution, the United States Environmental Protection Agency (USEPA)

23    assumed that vessel emissions within 175 nautical miles of the United States coastline are

24    transported on shore.  Control of Emission From New Marine Compression-Ignition Engines at

25    or Above 30 Liters Per Cylinder, 68 Fed. Reg. 9746, 9754 (Feb. 28, 2003) (codified at 40 C.F.R.

26

27

28

1   pts. 9 & 94).[2/]  And the Department of Defense recently studied vessels approaching the Southern

2   California coastline, and found that emissions within sixty nautical miles of California's south

3   coast reach shore.  *Id.*

4       **E.  CARB's Vessel Rules**

5       The Vessel Rules are two nearly identical regulations, adopted by CARB in 2005 and which

6   became enforceable on January 1 of this year.[3/]  The purpose of the Vessel Rules is to reduce

7   emissions of diesel PM, NOx, and SOx from auxiliary engines on ocean-going vessels.  Cal.

8   Code Regs. tit. 13, § 2299.1(a).  They apply to both domestic and foreign-flagged vessels within

9   "Regulated California Waters," an area that includes California's internal waters, its ports, and

10  roughly twenty-four miles from its shoreline.  *Id.* § 2299.1(d)(26).

11      The Vessel Rules prohibit vessels from emitting "levels of diesel PM, NOx, or SOx in

12  exceedance of the emission rates of those pollutants that would result had the engine used the

13  [specified] fuels . . . ."  *Id.* § 2299.1(e)(1).  The Rules specify the use of either marine diesel oil

14  that contains less than 5000 ppm of sulfur, or marine gas oil.[4/]  Beginning in 2010, the Rules

15  require the use of marine gas oil with no more than 1000 ppm of sulfur, unless CARB finds that

16  such fuel is not readily available.  *Id.* § 2299.1(e)(1)(B), (j)(2).

17      CARB could have drafted the Vessel Rules to simply require the use of these low sulfur

18  distillates.  Instead, the Rules are drafted so that a vessel is presumed to be in compliance if it is

19  using the specified fuels.  *Id.* § 2299.1(e)(1)(C).  This way the Rules can allow owners and

20  ────────────────────────────────

21      2.  USEPA also noted that "Santa Barbara estimates that engines in ocean-going marine
    vessels currently contribute about 37 percent of total NOx" in that area, and that it is expected that,
22  by 2015, these emissions will increase sixty-seven percent, "contributing 61 percent of Santa
    Barbara's total NOx emissions."  *Id.* at  9756.
23
        3.  One regulation is entitled "Emission Limits and Requirements" and falls within the
24  Chapter on Standards for Fuels for Nonvehicular Sources.  Cal. Code Regs. tit. 13, § 2299.1 (2006).
    The other is entitled an "Airborne Toxic Control Measure," because the regulations reduce diesel
25  PM, which CARB classified as a toxic air contaminant in 1998.  Cal. Code Regs. tit. 17, § 93118
26  (2006).

27      4.  Marine gas oil normally contains less than 5000 ppm of sulfur, so the regulations do not
    specify a sulfur level for it.  Marine diesel oil sometimes has a higher sulfur level, so the Rules
28  specify that only marine diesel oil with less than 5000 ppm is compliant.  (Milkey Decl., ¶¶ 21-22.)

1   operators the option of providing CARB with any plan they devise that would result in the same

2   level of emissions as if they were using one of the specified fuels. *Id.* § 2299.1(g). Vessels also

3   can comply by turning off their auxiliary engines while in port and getting their power instead

4   from California's electrical grid (called "cold ironing"), since such power is generated using

5   much cleaner means than a vessel's auxiliary engines. *Id.* § 2299.1(g)(1)(J). Lastly, in a few

6   limited circumstances, vessel owners and operators can qualify to pay a fee rather than reduce

7   their emissions, and CARB must use the fees to support air quality programs. *Id.*

8   § 2299.1(h)(5)(C). While these options do provide flexibility, in the five months that the Vessel

9   Rules have been in effect, during which hundreds of vessels visited California ports thousands of

10  times, nearly all have complied by using the specified fuels and only three have paid the

11  noncompliance fee. (Milkey Decl., ¶ 25.)

12      The Vessel Rules also have a number of key exemptions. For instance, they do not apply to

13  vessels in "innocent passage" within Regulated California Waters – i.e., those vessels that are

14  just passing through, without stopping at a California port. Cal. Code Regs. tit. 13,

15  § 2299.1(c)(1). They also do not apply to vessels owned or operated by any government –

16  federal, state, local, or foreign. *Id.* § 2299.1(c)(3).

17

        **F.    The Vessel Rules Will Assist California in Reaching Attainment for PM and**
18          **Ozone.**

19      The Vessel Rules are resulting in substantial reductions in emissions that would otherwise

20  be contributing to California's air pollution. CARB estimates that, in 2007, the Vessel Rules will

21  reduce PM emission by 2.7 tons per day, NOx by 1.9 tons per day, and SOx by 22 tons per day.

22  (Milkey Decl., ¶ 23 and Exh. 1, VII-4.) CARB expects that, by 2020, the Vessel Rules will

23  reduce PM by 7 tons per day, NOx by 4.4 tons per day, and SOx by 61 tons per day. (*Id.*) These

24  reductions are part of an overall plan to bring California into compliance with federal air quality

25  standards.

26      The Clean Air Act requires states to meet national ambient air quality standards for certain

27  "criteria" pollutants, including ozone and PM. 42 U.S.C. § 7409(a). USEPA sets these standards

28  based on what is necessary to protect public health. *Id.* § 7409(b)(1). If a state's plan is

1    inadequate for meeting these standards, then the state is subject to sanctions.  *Id.* § 7509(b).

2        Both ozone and PM endanger the public health.  Long term PM exposure has been tied to

3    premature death in people with pre-existing heart or lung disease.  (Donohoue Decl., ¶ 9.)

4    Particulate matter from diesel engines – like those regulated by the Vessel Rules – cause cancer

5    and "is now widely understood to be a serious health hazard and a significant cause of premature

6    mortality."  (*Id.*; Stern Decl., Exh. 4, at 2, ¶ 3.)  Particulate matter composed of particles that are

7    2.5 microns or less in diameter (PM2.5), which is also being substantially reduced by the Vessel

8    Rules, is particularly hazardous because it can penetrate deeper into the lungs than larger

9    particles, and may enter the bloodstream.  (Donohoue Decl., ¶ 9.)  Additionally, public exposure

10   to high PM levels increases hospitalizations and emergency room visits for heart and lung

11   diseases, and increases asthma symptoms and acute and chronic bronchitis.  (*Id.*)

12       High ozone levels also impact the public health.  Ozone exposure is associated with

13   breathing problems, lung tissue damage, and has been associated with premature mortality in

14   people with lung and heart disease.  (*Id.* at ¶ 10.)  Additionally, ozone exposure is associated

15   with increased asthma rates for children and adolescents.  (*Id.*)

16       Most of California's populated areas have not been able to reach attainment of the national

17   air quality standards for ozone and PM.  (*Id.* at ¶ 11.)  The South Coast Air Basin, home to the

18   two largest ports on the West Coast, is in severe nonattainment for ozone and is in nonattainment

19   for PM2.5.  (*Id.*)

20       The Vessel Rules are a key component of California's overall plan to reduce these

21   pollutants.  (*Id.* at ¶ 12.)  The Vessel Rules reduce PM emissions directly, by reducing the PM

22   emitted by the auxiliary engines.  (*Id.* at ¶ 13.)  The Rules also reduce NOx and SOx emissions.

23   Both NOx and SOx are "precursor pollutants," pollutants that react in the air to form ozone and

24   PM2.5.  (*Id.* at ¶ 14.)  Reducing NOx and SOx will reduce PM2.5 and ozone concentrations,

25   particularly in California and help California attain national air quality standards.  (*Id.*)

26   **III.  ARGUMENT**

27       **A.   Standard of Review**

28       A motion for summary judgment is properly granted on a showing that there is "no genuine

1   issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.

2   R. Civ. P. 56(c). The party seeking summary judgment under Rule 56 has the initial

3   responsibility of identifying the basis for the motion and establishing the elements of its claim.

4   The nonmoving party must present evidence showing a genuine issue of material fact only when

5   the moving party has carried this initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

6   (1986).

7       Once PMSA has carried its initial burden, CARB need only demonstrate that the evidence,

8   taken as a whole, could lead a rational trier of fact to find in its favor. *Margolis v. Ryan*, 140

9   F.3d 850, 852 (9th Cir. 1998). In assessing whether CARB has met this standard, the Court does

10  not weigh the evidence. *Abdul-Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

11  Instead, viewing the evidence in the light most favorable to the nonmoving party, the Court

12  determines whether there is a genuine issue of fact for trial. *Id.*; *see also Oliver v. Keller,* 289

13  F.3d 623, 626 (9th Cir. 2002).

14
    **B.   The Vessel Rules Are Presumed Valid in the Face of a Clean Air Act Preemption**
15       **Challenge.**

16      The court must presume that the Vessel Rules are a valid exercise of California's historic

17  police powers unless PMSA shows that Congress's clear and manifest purpose was to supersede

18  them. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). This presumption against preemption

19  applies to the Vessel Rules because air pollution prevention is one of those historic police

20  powers. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 442 (1960). The Clean

21  Air Act itself directs that states have the primary responsibility for reducing air pollution, and it

22  even sanctions states if they do not adopt regulations sufficient to meet federal air pollution

23  standards. 42 U.S.C. §§ 7401(a)(3) and 7509(b); *Train v. Natural Resources Defense Council,*

24  *Inc.*, 421 U.S. 60, 64 (1975). This presumption against preemption applies with particular force

25  in California, which, with Congress's encouragement, has served as a laboratory for innovation

26  in the field of air pollution prevention for decades. *Engine Mfrs. Ass'n (EMA) v. U.S. Envl. Prot.*

27  *Agency (USEPA)*, 88 F.3d 1075, 1090 (D.C. Cir. 1996).

28

### 1. To Show That a State's Historic Police Powers Are Preempted, PMSA Faces an "Uphill Battle."[5/]

The Supreme Court has always strongly discouraged preemption of state statutes; to find preemption, there must be "an unambiguous congressional mandate to that effect." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). Even where a federal statute contains an express preemption provision, the courts will narrowly construe it. *Cipollone v. Liggett Group*, 505 U.S. 504, 518 (1992). The court has "a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences*, 544 U.S. 431, 449 (2005). "In preemption analysis, the Supreme Court is highly deferential to state law in areas traditionally regulated by the states." *Exxon Mobil Corp. v. USEPA*, 217 F.3d 1246, 1255 (9th Cir. 2000).

### 2. Regulating Air Pollution Is Included Among a State's Historic Police Powers.

The purpose of the Vessel Rules is to protect health and safety by reducing the amount of air pollution in California from vessel auxiliary engines. Air pollution regulations, such as these, have historically been a matter of state concern: "Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960); *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 715 (1985) (presumption that state health and safety regulations are not invalidated under the Supremacy Clause). In *Huron Portland Cement v. City of Detroit*, a vessel owner was subject to criminal prosecution because smoke emitted from the vessel's boilers violated Detroit's smoke abatement code. The Supreme Court rejected the vessel owner's preemption challenge, even though the boilers had been inspected and licensed in accordance with federal law. Thus, the presumption against preemption applies specifically to air pollution from "maritime activities." *Huron Portland Cement Co.*, 362 U.S. at 442; *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 164 (1978) (vessels must conform to reasonable,

---

5. *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 714 (1985).

1  nondiscriminatory conservation and environmental protection measures imposed by a state); *but*

2  *cf. U.S. v. Locke*, 529 U.S. 89, 108 (2000) (no presumption when the preemption challenge is

3  based on the Ports and Waterways Safety Act.)

> **3.    The Clean Air Act Not Only Preserves the Historic Role of the States to Regulate Air Pollution, it Demands That They Do So.**

6       Both the text and the legislative history of the Clean Air Act reenforce that the presumption

7  against preemption must be applied to PMSA's challenge to the Vessel Rules.  "The first section

8  of the Clean Air Act, entitled 'Congressional Findings,' makes clear that the states retain the

9  leading role in regulating matters of health and air quality: 'air pollution prevention (that is, the

10  reduction or elimination, through any measures, of the amount of pollutants produced or created

11  at the source) and air pollution control at its source is the primary responsibility of States and

12  local governments.'  42 U.S.C. § 7401(a)(3)."  *Exxon Mobil Corp. v. USEPA*, 217 F.3d 1246,

13  1254 (9th Cir. 2000).  Likewise, the Clean Air Act's legislative history reflects Congress's intent

14  to "maintain[] state authority to adopt and enforce the strongest standards to prevent air

15  pollution."  *Id.* at 1253.

16       States need this authority because the Clean Air Act obligates them to specify the manner in

17  which they will meet national air quality standards.  42 U.S.C. § 7407(a); *Exxon Mobil*, 217 F.3d

18  at 1254-55.  For instance, the Act requires states to adopt regulations to meet national standards

19  for ozone and particulate matter; the Vessel Rules are doing just that.  42 U.S.C. § 7407; Cal.

20  Code Regs. tit. 13, § 2299.1(a) (2006).  In fact, USEPA cites CARB's Emission Reduction Plan

21  for Ports and Goods Movements, (April 2006),[6] of which the Vessel Rules are a part, as one of

22  two examples of "[s]tate and local governments . . . working to protect the health of their citizens

23  and *comply with requirements of the Clean Air Act* . . . ."  Control of Emissions of Air Pollution

24  From Locomotive Engines and Marine Compression-Ignition Engines, 72 Fed. Reg. 15938,

25  15944 & n.10 (proposed April 3, 2007) (emphasis added).  USEPA's reference suggests that

26

27       6.   CARB, Proposed Emission Reduction Plan for Ports and Goods Movements, Mar. 22,
28  2006,  http://www.arb.ca.gov/planning/gmerp/gmerp.htm.    The Vessel Rules are discussed
throughout the Emission Reduction Plan, including on page 47.

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

11

1    USEPA finds the Vessel Rules to be not only consistent with the Clean Air Act but also an

2    example of the Act's intended consequence.

3        Furthermore, when states fail to submit an adequate plan for meeting the national air quality

4    standards, the USEPA can sanction them.[7]  Thus, the preemptive effect of the Clean Air Act

5    must be construed narrowly so that states can comply with the obligations that the Act imposes,

6    as California is trying to do with the Vessel Rules.

7           **4.    California's History of Being the First to Regulate Air Pollution Makes the
              Application of the Presumption Against Preemption Especially Appropriate**

8           **Here.**

9        The presumption against preemption is based in part on the historical role of states in

10   regulating within a particular field.  California regulated both motor vehicles and nonroad

11   sources of air pollution before anyone else, including the federal government.  *EMA v. USEPA*,

12   88 F.3d 1075, 1090 (D.C. Cir. 1996).  Congress respected this history when it enacted the Clean

13   Air Act:  "there are overwhelming indications in the legislative history that Congress intended

14   California to enjoy the broadest possible discretion in selecting a complete program of emissions

15   control . . . ."  *Motor & Equip. Mfrs. Ass'n (MEMA) v. USEPA*, 627 F.2d 1095, 1108 n.22 (D.C.

16   Cir. 1979).  "It is not Congress's 'clear and manifest purpose' to preempt the field where

17   California is concerned, just the opposite."  *Oxygenated Fuels Ass'n., Inc. v. Davis*, 163

18   F.Supp.2d 1182, 1187 (E.D. Cal. 2001).  Therefore, the application of the presumption against

19   preemption is especially compelling when applied to California's air pollution regulations.

20       **C.    The Vessel Rules Are Authorized by Not One, but Two Sections of the Clean Air
              Act:  Section 211(c) on Fuel Regulations and Section 209(d) on Use and Operation**

21           **Regulations.**

22       PMSA contends that the Vessel Rules are preempted by the Clean Air Act because they are

23   actually emission standards, for which California requires a preemption waiver from USEPA

24   under section 209.  (PMSA P. & A. at 11:18-22.)  CARB does frequently adopt emission

25   standards, and it is quite familiar with the process for obtaining waivers.  In fact, because

26   _____

27       7. USEPA can sanction a state that fails to develop an adequate pollution plan by prohibiting
     federal highway projects and by increasing expensive offset requirements for new and expanding

28   businesses there.  42 U.S.C. § 7509(b).

1    Congress gave California broad discretion in setting emission standards and made the scope of

2    USEPA's review so narrow, USEPA virtually always grants such waiver requests.  *E.g.*,

3    California State Motor Vehicle Pollution Control Standards – Waiver of Federal Preemption

4    Notice of Decision, 49 Fed. Reg. 18887, 18888-89 (May 3, 1984).  So, if the Vessel Rules had

5    required a waiver, certainly nothing would have prevented CARB from obtaining one.

6        But the Vessel Rules do not require a waiver.  Both the purpose and effect of these Rules are

7    to cause owners and operators of vessels to switch from bunker fuel to low sulfur diesel.

8    Although PMSA focuses on section 209 of the Clean Air Act, it is section 211 of the Act that

9    addresses fuels.  42 U.S.C. § 7545.  And, since section 211 preempts state regulation of fuels for

10   motor vehicles only, the Clean Air Act does not preempt fuel regulations for vessels.  42 U.S.C.

11   § 7545(c)(4).

12       As for section 209, it preempts states from adopting emission standards.  42 U.S.C. § 7543.

13   But, section 209(d) exempts use and operation regulations, which include regulating the sulfur

14   content of fuel, like the Vessel Rules.  42 U.S.C. § 7543(d).

15       These two sections of the Clean Air Act – 211 and 209 – show that the Act does not

16   preempt the Vessel Rules, especially when viewed in the light of the presumption against

17   preemption.  Therefore, PMSA's motion for summary judgment must be denied.

18
19       **1.    Section 211 of the Clean Air Act Allows States to Regulate Fuels for Nonroad Sources.**

20           **a.    The Vessel Rules Are Fuel Regulations.**

21       The Vessel Rules require vessels to use low sulfur distillate fuel instead of bunker fuel.  The

22   regulations provide for a number of alternative methods of compliance, yet, as CARB intended,

23   virtually all of PMSA's vessels are complying with the regulations by using low sulfur distillate

24   fuels.  The Clean Air Act does not preempt fuel regulations for nonroad sources, such as the

25   Vessel Rules, and does not require CARB to obtain a preemption waiver from USEPA.

26       In considering a preemption challenge to state regulation, one must look at the regulation's

27   "purpose and effect" to see whether it "sufficiently interferes" with federal law such that it

28   should be preempted.  *Aloha Airlines, Inc. v. Dir. of Taxation of Hawaii*, 464 U.S. 7, 13-14

1    (1983); *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98 (1992). CARB

2    designed these regulations so that most vessels would comply by switching to low sulfur

3    distillate.[8/]

4         CARB's expectation has proven to be true. In the five months that the Vessel Rules have

5    been in effect, during which time thousands of vessels have visited California ports (some

6    multiple times), only one has indicated to CARB its preference to comply with the Rules through

7    any method other than through fuel switching. (Milkey Decl., ¶ 25.) Furthermore, in response to

8    Defendant Witherspoon's interrogatory, PMSA admitted that all its members were complying by

9    fuel switching or cold ironing, although PMSA has refused to provide a vessel-by-vessel

10   breakdown. (Stern Decl., Exh. 2, response to interrogatory #1.) Even PMSA's website refers to

11   the Vessel Rules as just fuel regulations: "All PMSA members are in compliance with new

12   California Air Resources Board (CARB) regulations requiring the use of low sulfur diesel fuel in

13   vessels in California waters."[9/]

14          **b.    The Clean Air Act Authorizes California to Adopt Fuel Regulations.**

15        The Clean Air Act does not preempt fuel regulations for nonroad sources, such as the Vessel

16   Rules. What section 211 does preempt is fuel regulations for motor vehicles. 42 U.S.C.

17   § 7545(c)(4)(A). However, as another example of California's unique role in the regulation of

18   air pollution, it can regulate even motor vehicle fuels without the need for a waiver from USEPA.

19   42 U.S.C. 7545(c)(4)(B); *Motor Vehicle Mfrs. Ass'n. of the U.S., Inc. v. New York State Dept. of*

20   *Envtl. Conservation*, 79 F.3d 1298, 1302 (2nd Cir. 1996) ("Here too, California is exempt from

21   federal preemption: it may regulate fuel standards without seeking approval from the EPA");

22   _____

23       8. In its Final Statement of Reasons, CARB's response to a public comment that bunker fuel
     should be "limited, if not prohibited" was as follows: "We believe the regulations will accomplish

24   the commenter's goal without actually banning bunker fuel. We expect that most vessel operators
     will comply with the regulations by switching from bunker fuel to cleaner burning distillate fuel

25   within 24 nautical miles from the California coastline." CARB, Final Statement of Reasons for
     Rulemaking, Dec. 8, 2005, http://www.arb.ca.gov/regact/marine2005/marine2005.htm, p. 33,

26   response to Comment B.1.

27       9.    PMSA, Global Green, Cleaner Engines and Cleaner Burning Fuels,

28   http://www.pmsaship.com/current_clean_air_programs.html (last visited June 3, 2007).

1    *Oxygenated Fuels Ass'n v. Davis*, 163 F.Supp.2d 1182, 1184-1185 & n.2, 1187 (E.D.Cal. 2001).

2        As for nonroad sources, including vessels, there is no preemption at all of state fuel

3    regulations.  42 U.S.C. 7545(c)(4)(A).  USEPA confirmed that states are not preempted from

4    regulating fuels for nonroad sources:

5            This express preemption provision in section 211(c)(4)(A) applies only to
         controls or prohibitions respecting any characteristics or components of fuels
6            or fuel additives for motor vehicles or motor vehicle engines, that is,
         highway vehicles.  It does not apply to controls or prohibitions respecting any
7            characteristics or components of fuels or fuel additives for nonroad engines
         or nonroad vehicles.

8

9    Control of Emissions of Air Pollutants From Nonroad Diesel Engines and Fuel, 69 Fed. Reg.

10   38958, 39072 (final rule June 29, 2004). USEPA specifically mentioned that this applies to

11   "marine engines" and the "sulfur" content of "marine diesel fuel."  *Id.* at 39072-73.

12       The Vessel Rules are, in both purpose and effect, fuel regulations for vessels, which section

13   211 of the Clean Air Act allows without a preemption waiver from the USEPA.

14

15           **2.    The Clean Air Act, Section 209(d), Allows States to Regulate the Use and
                Operation of Vessels.**

16       An examination of section 209 confirms the conclusion reached under section 211, above:

17   the Clean Air Act does not preempt the Vessel Rules.  Section 209(d) of the Act exempts from

18   preemption state regulation of the "use, operation, or movement" of not only motor vehicles but

19   also nonroad vehicles, such as vessels.[10/]  Fuel regulations, including sulfur limits, such as the

20   Vessel Rules, are a type of use and operation regulation that are exempt from preemption.  *E.g.,*

21   *EMA v. USEPA*, 88 F.3d at 1094 n.58.

22       PMSA contends the Vessel Rules are actually "emission standards" that require a USEPA

23   preemption waiver.  But the United States Supreme Court has recently held that emission

24   standards are regulations that set "numerical emission levels" or require vessels to be "equipped"

25

26   _____

27       10. Clean Air Act, § 209(d), 42 U.S.C. § 7543(d), states: "Nothing in this part shall preclude
     or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict
     the use, operation, or movement of registered or licensed motor vehicles."  *EMA v. USEPA*, 88 F.3d
28   1075, 1094 (D.C. Cir. 1996) held that § 209(d) applies to nonroad vehicles as well as motor vehicles.

1    with "emission-control technology." *EMA v. S. Coast Air Quality Mgmt. Dist. (SCAQMD)*, 541

2    U.S. 246, 253 (2004). The Vessel Rules do not fall within either part of this definition of

3    emission standards. Rather, the Vessel Rules fit squarely within the Clean Air Act's use and

4    operation regulations, so no USEPA preemption waiver is required.

5

6              **a.    Use and Operation Regulations, like the Vessel Rules, Are Exempt from
                       Preemption Because They Do Not Impact Manufacturers.**

7         The leading case on the scope of the Clean Air Act's preemption of nonroad sources under

8    section 209(e) and the application of the use and operation exemption in section 209(d) is *EMA

9    v. USEPA*, 88 F.3d 1075 (D.C. Cir. 1996). The court first examined the history of section 209

10   preemption of new motor vehicles. Section 209 was the result of a compromise between

11   manufacturers, who feared having to manufacture fifty different types of engines to meet a

12   patchwork of fifty-one state and federal emission standards, and the states, who wanted to

13   maintain their historic control over pollution. *Id.* at 1079-80. In the end, because of California's

14   leadership in this area, it was allowed to develop its own emission standards, after getting a

15   USEPA preemption waiver, while other states were allowed to choose between California and

16   federal emission standards. 42 U.S.C. § 7507; *EMA v. USEPA*, 88 F.3d at 1080. Thus,

17   manufacturers must comply with two sets of emission standards – California and federal – but

18   they are protected from having to manufacture "third vehicles." 42 U.S.C. § 7507; *EMA v.

19   USEPA*, 88 F.3d at 1080.

20        Courts have extended this protection for manufacturers to used motor vehicles to prevent

21   states from circumventing section 209 preemption by imposing emission standards on used

22   vehicles that "relate back" to the original manufacturer. *EMA v. USEPA*, 88 F.3d at 1083, 1089-

23   90. In other words, if a state required new car owners – rather than manufacturers – to modify

24   their car engines to emit less than three grams of a pollutant per mile, then people would stop

25   buying cars that emitted over this amount; they would want to avoid having to make these

26   modifications themselves. Although not directly subject to this standard, manufacturers would

27   still need to redesign any of their cars that emitted more than three grams since, otherwise, no

28   one would buy these cars. Under the relate back rule, such a standard would be preempted

1    because it would impact manufacturers.  However, under section 209(d), each state retains the

2    ability to adopt its own use and operation regulations since such regulations do not impact

3    manufacturers.  *Id.* at 1090.

4        This rule applies equally to nonroad sources.  When, in 1990, Congress amended the Clean

5    Air Act to regulate nonroad sources, it treated them in much the same way as motor vehicles.  *Id.*

6    at 1080-81, 1086.  In particular, the court held that section 209(d) applies to nonroad sources, so

7    states are free to adopt use and operation regulations, including such regulations for the purpose

8    of *controlling emissions*.  *Id.* at 1094.

9        By dictating the fuel that vessel auxiliary engines must use, the Vessel Rules affect the use

10   and operation of vessels.  They do not impact manufacturers.  The Vessel Rules do not impact

11   manufacturers because, according to USEPA, "[i]n general, engines that are designed to operate

12   on residual fuel are capable of operating on distillate fuel."  Control of Emissions From New

13   Marine Compression-Ignition Engines, 68 Fed. Reg. 9746, 9767 (Feb. 28, 2003).   In fact, when

14   marine auxiliary engines are "to be shut down for maintenance, distillate fuel is often used to

15   flush out the fuel system."  *Id.*

16       In the five months that the Vessel Rules have been in effect, with hundreds of vessels

17   stopping thousands of times at California's ports, it appears that virtually all of them are

18   complying.  (Milkey Decl., ¶ 26.)  In a recent survey of over 447 vessels, only seventeen needed

19   any modifications, and those were just related to the addition of fuel tanks, piping, and pumps to

20   hold and deliver the low sulfur distillate.  (Milkey Decl., ¶ 27.)  PMSA's interrogatory responses

21   generally confirm that few vessels require any modifications.  (Stern Decl., Exh. 2, response to

22   interrogatory #2.)  PMSA does not offer any evidence in its motion to support a conclusion that

23   manufacturers are impacted.  This lack of impact surely explains why it is the vessel owners and

24   operators who are challenging the Vessel Rules rather than the manufacturers.

25       Thus, section 209 was designed to protect manufacturers from patchwork state regulations.

26   The Vessel Rules do not impact manufacturers.  Instead, the Vessel Rules are use and operation

27   regulations, which do not require a USEPA waiver.

28   ///

1

      **b.**    **Clean Air Act Case Law, Legislative History, and Regulations All State That Fuel Regulations, Such as Sulfur Limits, Are a Valid Type of Use and Operation Regulation.**

2

3        Fuel requirements are a valid type of use and operation regulation.  The court in *EMA v.*

4  *USEPA* quotes the statements of two Senators who specifically mention "setting fuel

5  requirements" and "specifying fuel quality specifications" as examples of the types of state

6  regulations that the Clean Air Act was not intended to preempt.  *EMA v. USEPA*, 88 F.3d at 1094

7  n.58.  USEPA regulations confirm that sulfur limits on fuel are exempt use and operation

8  regulations:  "EPA believes that states are not precluded under section 209 from regulating the

9  use and operation of nonroad engines, such as regulations on hours of usage, daily mass emission

10  limits, or *sulfur limits on fuel* . . . ."  Nonroad Sources and Emission Standards, 59 Fed. Reg.

11  31306, 31339 (June 17, 1994) (emphasis added); *see also* 40 C.F.R. Pt. 89, Subpt. A, App. A.[11]

12        Thus, the Vessel Rules, which are fuel requirements, are valid use and operation regulations

13  under section 209(d).

14              **c.**    **The Vessel Rules Are Not Emission Standards.**

15        PMSA asserts that the Vessel Rules are emission standards, which, unlike use and operation

16  regulations, require a USEPA preemption waiver before a state can enforce them.  42 U.S.C.

17  § 7543(e)(2).  But the Supreme Court has defined emission standards as "numerical emission

18  levels" or "emission-control technology with which [vehicles or engines] must be equipped."

19  *EMA v. SCAQMD*, 541 U.S. 246, 253 (2004).  The Vessel Rules do not fit within either part of

20

21

---

22      11.  PMSA contends that USEPA's interpretation of section 209(d) in Appendix A of 40
23  C.F.R. Pt. 89 does not apply to foreign-flagged vessels. (PMSA P. & A. at 19:26-28.) But USEPA's
interpretation has nothing to do with foreign versus domestic vessels; instead, it merely restates the
24  following holdings from *EMA v. USEPA*:  states are precluded from requiring retrofits of used
nonroad engines without a USEPA waiver, but states are not precluded from regulating the use and
25  operation of nonroad engines.  While PMSA's foreign/domestic distinction might be applicable to
the emission controls in other sections of 40 C.F.R Pt. 89, this distinction is nonsensical when
26  applied to Appendix A, especially since this application would be contrary to Clean Air Act case law
and legislative history.  In any event – with or without Appendix A – case law and legislative history
27  show that fuel regulations, like the Vessel Rules, are not preempted because they come within
section 209(d).
28

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment        Case No.: 2:06-CV-02791-WBS-KJM

18

1    this definition, so they are not preempted by section 209.[12/]

2         In *EMA v. SCAQMD*, engine manufacturers challenged SCAQMD's regulations regarding

3    the types of vehicles that certain fleet operators must purchase when adding or replacing vehicles.

4    The operators were required to purchase advanced alternative-fuel vehicles (powered by

5    electricity, for example, not diesel or gasoline) or vehicles that met certain CARB emission

6    standards (e.g., Low-Emission Vehicle standards[13/]).  SCAQMD argued that its regulations were

7    not emission standards because they applied to purchasers rather than to manufacturers.  The

8    Supreme Court rejected this distinction, stating that it "confuses standards with the means of

9    enforcing standards."  *Id.* at 253.  Whether the regulations applied to the manufacturer or the

10   purchaser was a distinction without a difference, since the "manufacturer's right to sell federally

11   approved vehicles is meaningless in the absence of a purchaser's right to buy them."  *Id.* at 255.

12   In other words, the Court held that SCAQMD's regulations were preempted emission standards

13   because they related back to the manufacturers.

14        In reaching its conclusion, the Court broke the definition of "emission standard" into two

15   parts:  "numerical emission levels with which vehicles or engines must comply, *e.g.,* 42 U.S.C.

16   § 7521(a)(3)(B)(ii), or emission-control technology with which they must be equipped, *e.g.*, §

17   7521(a)(6)."  *Id.* at 253.  Beginning with the second of these, the example cited by the Court

18   refers to a requirement that certain trucks be equipped with onboard vapor recovery systems.  42

19   U.S.C. § 7521(a)(6).  It is undisputed that the Vessel Rules do not require vessels to be equipped

20   with this or any other emission-control technology.  Hence, the Vessel Rules do not constitute

21   emission standards under this part of the Court's definition.

22        As for the other type of emission standard, those that set numerical emission levels, these

23

24        12.  Section 302(k) of the Clean Air Act has a different definition of emission standards, but
25   it does not apply to section 209 (*MEMA* v. *USEPA*, 627 F.2d 1095, 1112 n.35 (D.C. Cir. 1979)), and
     PMSA does not contend otherwise.

26        13.  There is no dispute that the Low-Emission Vehicle standards constitute emission
27   standards, and USEPA has granted CARB a preemption waiver for them.  Cal. State Motor Vehicle
     Pollution Control Standards – Waiver of Federal Preemption – Decision, 58 Fed. Reg. 4166 (Jan.
28   13, 1993).

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment        Case No.: 2:06-CV-02791-WBS-KJM

19

1  consist of quantitative limits that set a fixed maximum, independent of a particular engine's

2  characteristics. *Cf. Adamo Wrecking Co. v. U.S.*, 434 U.S. 275, 286 (1978) (an emission

3  standard is a "quantitative level," to be distinguished from the "techniques," "controls," and

4  "technology" used to attain an emission standard). The example of a numerical emission level

5  cited in *EMA v. SCAQMD* is 42 U.S.C. § 7521(a)(3)(B)(ii), which prohibits heavy duty trucks

6  from exceeding 4.0 grams of nitrogen oxide (NOx) emissions per brake horsepower hour. *EMA*

7  *v. SCAQMD*, 541 U.S. at 253. In other words, all heavy duty trucks are subject to this uniform

8  maximum standard, regardless of their particular engines' characteristics.

9      Similarly, in *MEMA v. USEPA*, 627 F.2d 1095 (D.C. Cir. 1979), the court agreed with the

10  USEPA's position that "the word 'standards' connotes a numerical value setting the quantitative

11  level of permitted emissions of pollutants by a new motor vehicle. Thus for example a regulation

12  limiting motor vehicle emissions of carbon monoxide to 3.4 grams per mile is in his view a

13  'standard.'" *Id.* at 1111. Again, the court's example of an emission standard consists of a

14  uniform maximum emission level, independent of the vehicles' characteristics, and quite unlike

15  the Vessel Rules.[14]

16      USEPA analyzes emission standards in the same way.[15] It found that a Texas rule requiring

17  ground support equipment (GSE) at airports to reduce emission of NOx by ninety percent was

18  not an emission standard, so it was not preempted:

19          The fact that the level of required reductions is quantified and is calculated
            based on the level of emissions generated by the GSE fleet in-use in a prior
20          year does not change the conclusion that assigning a general emissions
            reductions obligation to a fleet operator does not amount to an emissions
21          standard on non-road equipment.

22

23  _____

24      14. In *MEMA v. EPA*, the court construed "emission standards" narrowly because, otherwise,
    it "would frustrate Congress's intent to provide California with the broadest possible discretion in
25  selecting the best means for protecting the public health and welfare." *Id.* at 1112, n.35. This is a
    good example of how the presumption against preemption, discussed above, should be applied in
26  this context.

27      15. To the extent that the plain language of section 209 is insufficient to show that the Vessel
    Rules are valid use and operation regulations, USEPA's interpretation is entitled to deference.
28  *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).

1  Proposed Approval and Promulgation of Implementation Plans – Texas – Airport Ground

2  Support Equipment, 66 Fed. Reg. 16432, 16433 (Mar. 26, 2001).  Thus, just because a rule

3  requires a reduction in emissions, like the Vessel Rules, does not mean that it is an "emission

4  standard," even where the reduction is quantified.

5        Moreover, the fact that the Vessel Rules allow operators to comply by alternative means, as

6  well as by using low sulfur distillate, does not transform them into emission standards.  In

7  analyzing Texas's GSE regulation, USEPA stated as follows:

8            the compliance alternatives available to a fleet operator do not transform the
             general obligation to achieve a certain quantity of reductions into an
9            emissions standard on non-road equipment . . . but instead provides the fleet
             operators flexibility . . . .
10

11  *Id.*; *accord* Approval and Promulgation of Implementation Plans – Texas – Lawn Service

12  Equipment Operating Restrictions, 66 Fed. Reg. 57223, 57225-26 (Nov. 14, 2001).  (One of the

13  Texas rule's alternative means of compliance included running on electricity rather than

14  petroleum, just like the Vessel Rules.)  So, the Vessel Rules are fuel regulations, not emission

15  standards, even though they allow alternative means of compliance.

16        CARB does often set emission standards.  For instance, the emission standards for heavy-

17  duty diesel-cycle truck engines and medium-duty diesel engines are 0.20 grams per brake

18  horsepower-hour of nitrogen oxides, 0.14 grams per brake horsepower-hour of nonmethane

19  hydrocarbons, and 0.01 grams per brake horsepower-hour of particulate matter.  California

20  Exhaust Emission Standards and Test Procedures for 1985 and Subsequent Model Heavy-Duty

21  Diesel Engines and Vehicles, Cal. Code Regs. tit. 13, § 1956.8.  And, when CARB sets such

22  emission standards, it seeks a USEPA waiver.  *E.g.*, California State Motor Vehicle Pollution

23  Control Standards – Waiver of Federal Preemption Notice of Decision, 59 Fed. Reg. 48625

24  (Sept. 22, 1994).

25        The Vessel Rules, by contrast, do not set quantitative limits for auxiliary engines.  Rather,

26  each individual engine must emit no more than it would if it were operating on low sulfur

27  distillate fuel.  So, for example, Engine A might emit 10 grams per kilowatt hour of particulate

28  matter when running on low sulfur distillate, while Engine B might emit 20 grams under the

1   same circumstances.  Both engines would be in compliance, although emitting entirely different

2   levels of pollutants.  Engine B would not need to be modified whatsoever to bring its emissions

3   down to Engine A's level.  And, both engines could comply by simply operating on low sulfur

4   distillate, regardless of their emission levels.  Thus, the Vessel Rules affect the use and operation

5   of the engines; they do not set emission standards, and they are not preempted.

6           **D.    Because Vessel Emissions Within Twenty-Four Miles of the Coast Have a**
7                   **Significant Impact on Air Quality, California May Regulate Those Emissions.**

8           The Vessel Rules require vessels accessing California ports to switch to cleaner, low sulfur

9   fuels twenty-four nautical miles from California's coastline.  Conceding that CARB may regulate

10  vessels entering California's ports and can extend those regulations through its territorial waters,

11  PMSA contends that CARB's authority to regulate abruptly stops at that the edge of those waters,

12  three nautical miles from shore.  (PMSA P. & A. at 26:14-21.)

13          But PMSA has failed to identify a single case holding that a state is powerless to regulate

14  extraterritorial activity that has a substantial impact on a state.  In the vast majority of PMSA's

15  cases, the regulations reviewed did not extend beyond the states' territorial waters, and the courts

16  did not consider whether such regulations were permissible.  (*See infra*, sections III.D.1.b.-c.)

17  The few cases cited by PMSA involving extraterritorial regulations indicate that, under certain

18  circumstances, states may regulate conduct beyond their territorial waters, including when

19  extraterritorial conduct has a substantial effect within the state.  (*See infra*, section III.D.1.d.)

20  Although PMSA attempts to distinguish or discredit these cases, they represent the applicable

21  law.  When considering whether states can apply their regulations to conduct outside a state's

22  territorial waters, courts apply the "effects test," and will affirm reasonable regulations directed at

23  conduct that has a substantial effect in the state.  *See, e.g.*, *Strassheim v. Daily*, 221 U.S. 280

24  (1911) (criminal law); *State of Alaska v. Bundrant*, 546 P.2d 530 (Ak. 1976) (fishing

25  regulations).

26          Ignoring the effects test, PMSA contends that the Vessel Rules violate the Submerged

27  Lands Act solely because they operate beyond California's three nautical mile territorial limit.

28  But the effects test requires the court to consider factual issues, such as the effect that the

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

22

1    regulated conduct has on the state, and the ties between the regulated activity and the state.

2    PMSA has failed to address these issues, or to present any evidence regarding these factual

3    questions.  Accordingly, PMSA has failed to carry its initial burden of showing an absence of a

4    genuine issue of material fact, and its motion for partial summary judgment on the Submerged

5    Lands Act claims must be denied.

6              **1.    PMSA Has Not Carried its Burden of Showing that States Are Powerless to
                        Regulate Conduct in the Seas Beyond their Territorial Waters.**

7
                    **a.    The Submerged Lands Act Does Not Address Whether California Can
8                           Regulate the Effects of Vessel Emissions.**

9         PMSA argues that the Submerged Lands Act provides an outer limit to CARB's

10    Regulations.  (PMSA P. & A. at 26:14-21.)  The Submerged Lands Act is a grant of lands to the

11    states.  It is not a limitation on states' power.  To the degree that the Act is relevant to the issues

12    before this Court, it serves only to confirm that, absent a conflict with federal laws, California

13    can extend its regulations three nautical miles from its coastline.

14         The Submerged Lands Act was passed in response to the United States Supreme Court's

15    decision in *United States v. California*.  In that case, the Court held that the federal government

16    was the exclusive owner of the offshore submerged lands within three miles of the boundaries of

17    the United States.  *United States v. California*, 332 U.S. 19, 38-39 (1947) (*California I*), opinion

18    supplemented by *United States v. California*, 332 U.S. 804, 805 (1947); *Barber v. State of

19    Hawai'i*, 42 F.3d 1185, 1190 (1994).  As a result of this decision, states' territorial boundaries

20    ended at the low tide mark of their tidal shores.  *United States v. California*, 332 U.S. at 805.

21         In the Submerged Lands Act, Congress ceded the submerged lands within three nautical

22    miles of the coast to the coastal states.  *Barber*, 42 F.3d at 1190.  The scope of the Submerged

23    Lands Act is limited.  It "addresses only who retains title to submerged lands both within and

24    beyond the three-mile line, with particular reference to ownership and exploration of natural

25    resources in the seabed and subsoil."  *Gillis v. Louisiana*, 294 F.3d 755, 761 (5th Cir. 2002).  It

26    does not alter or limit a state's authority to exercise its police power over bodies of water outside

27    of that state's territorial limits.  *Id.* (finding that State may regulate pilotage in areas beyond its

28    territorial waters).

1    The Submerged Lands Act confirms that California may extend its regulations within three

2    nautical miles of its coast.  However, it provides no support for PMSA's contention that

3    California is powerless to regulate pollution beyond its territorial boundaries, regardless of the

4    impact on the state and the reasonableness of the regulation.

5

6    **b.    PMSA's Cases Authorizing State Regulation of Pollution Within Their Territorial Waters Are Not a Limitation on State Regulations.**

7        PMSA's brief includes an extensive discussion of two cases in confirming that states may

8    regulate vessel pollution within their territorial waters.  (PMSA P&A at 29:24-33:25, discussing

9    *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960) and *Askew v. American*

10   *Waterways Operators, Inc.*, 411 U.S. 325 (1973).)  In *Huron Portland Cement Co. v. City of*

11   *Detroit*, 362 U.S. 440 (1960), the United States Supreme Court held that Detroit could apply its

12   smoke abatement regulations to vessels that possessed valid federal licenses and operated in

13   interstate commerce.  And in *Askew v. American Waterways Operators*, 411 U.S. 325 (1973) the

14   United States Supreme Court found that Florida laws imposing state law liability for cleanup

15   costs for oil spills were not preempted by the federal Water Quality Improvement Act.  The

16   regulations that were reviewed in these cases applied to pollution generated within the state's

17   territorial waters.  The *Huron Portland* and *Askew* Courts were not presented with the issue of

18   whether a state could regulate polluters while they were outside a state's territorial waters, and

19   they provide no authority for the proposition that a state lacks authority to do so.

20       While these cases do not address the permissible geographic scope of state and local

21   pollution control regulations, they confirm that pollution regulations addressing local conditions

22   are historically within the state's police power and, absent an express conflict with federal law,

23   states may enact regulations regarding sea-to-shore pollution.  *Askew*, 411 U.S. at 343 (noting

24   that sea-to-shore pollution is historically within the reach of the police power of the States, and

25   will not be preempted absent a specific conflict with federal law); *Huron Portland*, 362 U.S. at

26   442 (explaining that pollution control regulations are within "the most traditional concept" of

27   police power, and states may regulate maritime pollution concurrently with the federal

28   government).  Accordingly, the only relevance of these cases is to show the strength of states'

1    interest in regulating air pollution, and to confirm that CARB, at the very least, has authority to

2    regulate vessels within its territorial waters.

3

4            **c.    The Cases Addressing Preemption Under the Ports and Waterways
     Safety Act Are Not Relevant to This Motion.**

5            PMSA also relies on cases addressing whether state regulations are preempted by the Ports

6    and Waterways Safety Act.  (PMSA P. & A. at 34:1-37:3, discussing *Ray v. Atlantic Richfield*

7    *Co.*), 435 U.S. 151 (1978), *United States v. Locke*, 529 U.S. 89 (2000), and *Chevron v.*

8    *Hammond*, 726 F.2d 483 (9th Cir. 1984).)  In so doing, PMSA takes these cases' references to

9    "local waters" out of context to argue that these cases indicate that the geographic scope of a

10   state's pollution regulations is limited to that state's territorial waters.  But these cases never

11   addressed a state's ability to extend its regulations beyond its territorial waters.  Instead, the sole

12   issue in these cases is whether the regulations were preempted by the Ports and Waterways

13   Safety Act (PWSA), a claim that has been dismissed from this action.  (Stipulation to Amend

14   Complaint re Third and Fourth Claims for Relief; Order, filed 6-05-07, Docket No. 53, at 2:5-10;

15   First Amended Complaint for Injunctive and Declaratory Relief, filed 6-05-07, Docket No. 57.)

16           The PWSA is a federal statute regarding tanker safety.  It was passed in 1967, in response to

17   the environmental disaster when the supertanker *Torrey Canyon* spilled 120,000 tons of crude oil

18   off the coast of England.  *Locke*, 529 U.S. 94, 101.  The PWSA preempts some, but not all,

19   regulations regarding tanker safety.  Whether a regulation is preempted depends, in part, on

20   whether the regulation falls within Title I or Title II of the PWSA.

21           Title I of the PWSA directs the Coast Guard to promulgate regulations regarding tankers,

22   but allows states to regulate their own ports and waterways relating to tanker safety and traffic

23   concerns, "so long as the regulation is based on 'the peculiarities of local waters that call for

24   special precautionary measures.'"  *Locke*, 529 U.S. at 109 (quoting *Ray v. Atlantic Richfield Co.*,

25   435 U.S. 151, 171 (1978)).  If a state regulation falls within the scope of the authorization of

26   Title I, it is permissible unless "compliance with both state and federal law is impossible, or

27   when the state law stands as an obstacle to the accomplishment and execution of the full

28   purposes and objective of Congress."  *Locke*, 529 U.S. at 109 (internal citations omitted).

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment       Case No.: 2:06-CV-02791-WBS-KJM

1    In Title II, Congress directs the Coast Guard to issue regulations regarding topics such as the

2  general design, construction, and operation of tankers, unrelated to specific local circumstances.

3  *Locke*, 529 U.S. at 110-11.  The *Locke* Court explained that in Title II, Congress left no room for

4  state regulation.  *Id.* at 111.

5    The *Locke* and *Ray* Courts recognized that Title I and Title II overlapped.  Therefore, to

6  determine whether a particular regulation falls under the conflict preemption of Title I or the field

7  preemption of Title II, the *Locke* and *Ray* Courts examined whether the regulation fell within the

8  state's authority to regulate conditions peculiar to local waters, or was instead a more general

9  design, construction or operational requirement.  Given the local nature of permissible

10  regulations, the relationship between the regulation and local conditions was a relevant inquiry.

11  *Locke*, 529 U.S. at 111-12; *Ray*, 435 U.S. at 171.  But this inquiry was related to whether the

12  regulation was preempted by the PWSA, not to whether states have jurisdiction to extend their

13  Vessel Rules beyond their territorial seas.

14    PMSA also relies on *Chevron v. Hammond*, 726 F.2d 483, in which the Ninth Circuit

15  approved an Alaska statute that regulates oil tankers' discharge of ballast into Alaska's territorial

16  waters.  In finding that the Alaska statute was not preempted by the PWSA, the *Hammond* court

17  examined the overall statutory scheme to determine whether, when it passed the PWSA,

18  Congress "implicitly intended to occupy the field of regulating the discharge of pollutants from

19  tankers within a state's territorial waters."  *Id.* at 488.  The *Hammond* court found the answer to

20  this question in the Clean Water Act.  In that Act, Congress permitted states to regulate the seas

21  within states' territorial boundaries.  But the seas outside the three-mile limit were covered by

22  other federal acts.  In particular, the Marine Protection, Research and Sanctuaries Act "*expressly*

23  preempts state regulation of such dumping . . . ."  *Id.* at 489 (emphasis in original).  Accordingly,

24  in approving the regulation, the *Hammond* court emphasized that the regulation was limited to

25  territorial waters, as authorized by Congress.

26    In contrast to *Hammond*, Congress has not expressly preempted the states from extending

27  their air pollution regulations into the United States's territorial waters and contiguous zone.

28  (Stern Decl., Exh. 2, at 5:9-19.)  Given the substantial impact that these emissions have on

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

26

1    California's air quality, *Hammond* provides no basis for finding that federal law prohibits the

2    geographic scope of the Rules.

3

          **d.   PMSA's Own Cases Confirm That States May Enact Reasonable**

4                  **Regulations That Extend Beyond Their Own Boundaries.**

5        In the only cases cited by PMSA that actually address whether a state may extend its

6    regulations beyond its territorial waters, the courts recognized that, under certain circumstances,

7    extraterritorial regulation is permissible.  Acknowledging, as it must, that courts have upheld

8    state laws regulating fishing and pilotage beyond the state's territorial seas, PMSA attempts to

9    discredit or distinguish these decisions.  These attempts fail.

10        First, PMSA argues that states may not enforce their pilotage laws against foreign vessels

11    beyond their territorial waters.  (PMSA P. & A., at 39:15-44:21.)  Contrary to PMSA's

12    arguments, two modern Court of Appeals decisions have confirmed that states may regulate

13    pilotage beyond their territorial waters.  In *Warner v. Dunlap*, 532 F.2d 767 (1st Cir. 1976), the

14    First Circuit Court of Appeal upheld a Rhode Island law requiring every vessel traversing Block

15    Island Sound to take on a pilot licensed by Rhode Island, even though the routes are more than

16    three nautical miles from shore and therefore outside of the State's territorial jurisdiction.  The

17    *Warner* court explained that a state's ability to regulate pilotage is distinct from the issue of its

18    territorial boundaries, and that "[s]tates have been permitted to assert their pilotage regulations at

19    distances considerably greater than three miles from their shores."  *Id.* at 772.  Similarly, in *Gillis*

20    *v. Louisiana*, 294 F.3d 755, 761 (5th Cir. 2002), the Fifth District Court of Appeals affirmed that

21    Louisiana may regulate pilotage beyond the state's territorial limits.[16]

22    _____

23        16.  PMSA also relies on *The Whistler*, an early Oregon District Court case, to argue that a
state may not extend its pilotage laws beyond its territorial waters.  (PMSA P. & A. at 41-42,

24    discussing *The Whistler*, 13 F. 295 (D. Or. 1882).)  In *The Whistler*, an Oregon law required that a
vessel either use an Oregon pilot within specific areas within the state's territorial waters, or pay for

25    pilotage services to the first pilot who offers those services.  In *The Whistler*, a pilot had offered his
services thirty miles from shore, and the vessel challenged the pilotage fee, in part on the ground that

26    the laws of Oregon do not extend to thirty miles from shore, where the pilot was cruising.  The court
found that the pilot was entitled to his fee, reasoning that, while there may be territorial limits on the

27    area where a pilot must actually pilot the vessel, it does not follow that a state "may not permit and

28                                                               (continued...)

1    PMSA attempts to distinguish these cases, arguing that the pilotage laws under review

2    regulate only the pilots, who are state citizens, and leave foreign vessels unregulated.  But these

3    laws require foreign vessels to take on and to pay a state-licensed pilot.  In so doing, the laws

4    regulate these vessels beyond the states' territorial seas.  Additionally, PMSA contends that the

5    pilotage cases are an anomaly, based on state's long history of regulating pilotage.  (PMSA P. &

6    A. at 44:13-17.)  In one sense, PMSA is correct.  Although the pilotage laws are consistent with

7    the effects test, in that shipwrecks have a substantial impact on the state, the courts upholding

8    these pilotage laws looked to states' long history of regulating pilotage rather then the effect on

9    the state.  *See*, *e.g.*, *Warner*, 532 F.2d at 772.  These cases nonetheless confirm that a states

10   ability to prescribe laws may extend beyond its territorial waters.

11   PMSA also discusses *State of Alaska v. Bundrant*, in which the Alaska Supreme Court

12   found Alaska could apply its crabbing regulations to noncitizens who were crabbing beyond

13   Alaska's territorial waters.  (PMSA P. & A. at 45:10-48:5.)   The *Bundrant* court found that the

14   regulations were justified because extraterritorial regulations were necessary to preserve a

15   migratory resource, and that it was permissible to apply the regulation to noncitizens based on the

16   numerous economic contacts between the crab fisherman and the State.  *State of Alaska v.*

17   *Bundrant*, 546 P.2d 530, 554, 556 (Ak. 1976).  PMSA argues that *Bundrant* is wrongly decided

18   and argues that the District Court case of *Hjelle v. Brooks*, 377 F.Supp. 430 (D. Ak. 1974)

19   properly holds that state fishing regulations must be limited to the state's waters.  (PMSA P.  &

20   A. at 47:10-14.)  But *Bundrant* is still good law, and the California and Florida Supreme Courts

21

22       16.  (...continued)

23   require her pilots to cruise for vessels at a much greater distance form the shore . . ."  *Id.* at 297-98.

24       Because *The Whistler* court was not called upon to decide whether states can extend their
25   pilotage laws more than three miles from shore, its speculation about the limits of a state's authority
     to regulate pilotage is dicta.  Additionally, PMSA errs when it indicates that this dicta was based on
26   United States Supreme Court decisions.  *Lea v. The Alexander*, 2 Paine 468, was a circuit court case,
     decided sometime between 1827 and 1840.  And *Horton v. Smith*, 6 Ben. 264, was an 1872 district
27   court case out of the Eastern District of New York.  Even if these courts' speculation about how far
     out states could extend their pilotage laws was not dicta, the recent *Gillis* and *Warner* decisions are
28   controlling.

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

28

1    have cited it with approval.  *People v. Weeren*, 26 Cal.3d 654, 666 (Cal. 1980); *State v.*

2    *Stapansky*, 761 So.2d 1027, 1035 (Fla. 2000).

3        Furthermore, PMSA's reliance on *Hjelle* is misplaced.  The *Hjelle* court considered the

4    crabbing regulations that were later affirmed in *Bundrant*.  But the *Hjelle* decision is not a final

5    ruling on the permissibility of the regulations.  Instead, the decision involved the issuance of a

6    preliminary injunction.  The *Hjelle* court granted the injunction because the regulations did not

7    appear to be focused solely on the impacts within the state's waters, but instead was, in part,

8    directed at protecting crabs in areas hundreds of miles beyond Alaska's territorial waters.  *Hjelle*,

9    377 F.Supp. at 441.  The court therefore concluded, based on the evidence before it, that the

10   challenged regulation had "a direct rather than indirect impact on extraterritorial conduct," and

11   that the state's evidence of its justification for the regulation "simply does not seem to provide a

12   nexus sufficient to withstand constitutional attack."  *Id.*  But the court "intimate[d] no opinion

13   whether Alaska may have other legitimate interests sufficient to justify its regulation of crabbing

14   in the Bering Sea Shellfish Area."  *Id.*  And the court left open the possibility that, at trial, Alaska

15   could present evidence of a sufficient interest to support the extraterritorial regulation.  *Id.  Hjelle*

16   does not preclude extraterritorial regulation.  Instead it indicates that, upon a sufficient showing

17   of an in-state effect, a state can extend its regulations beyond its territorial seas.

18       In its motion, PMSA asks this Court to find, as a matter of law, that California cannot

19   extend its regulation beyond its territorial waters.  But PMSA has failed to cite a single case that

20   supports this conclusion.  Instead, PMSA's own cases show that, under proper circumstances, a

21   state may regulate conduct in the seas beyond its territorial waters.

22              **2.    Under the  Effects Test, States May Adopt Reasonable Regulations**
                      **Regarding Conduct that Substantially Affects State Territory.**
23

                      **a.    The Effects Test Provides the Appropriate Framework for Assessing the**
24                          **Propriety of the Vessel Rules.**

25       Acknowledging, as it must, that in some circumstances, states may extend their regulations

26   into the seas beyond their territorial boundaries, PMSA contends that a state can extend its

27   regulations beyond its boundaries only when the regulation is being applied to the state's own

28   residents.  But international law recognizes several other bases for a state extending its

1  regulations beyond its boundaries.  Restatement (Third) of Foreign Relations Law of the United

2  States § 402; *United States v. Vasquez-Velasco*, 15 F.3d 833, 840 & n.5 (9th Cir. 1994).  One of

3  these bases is the effects test.  Restatement Third § 403.  PMSA's failure to address this test is

4  fatal to its motion for summary adjudication on their Submerged Lands Act claim.

5        Under the effects test, a state has jurisdiction to adopt regulations regarding "conduct

6  outside its territory that has or is intended to have substantial effect within its territory."

7  Restatement Third § 402(1)(c).  But the effects test does not give a state free rein to extend its

8  regulations outside of its jurisdiction every time there is an effect within the state.  The regulation

9  must be reasonable, based on factors that balance the interests of the regulating state and ensuring

10  that the regulation does not interfere with the sovereignty of another state.  Restatement Third §

11  403; Note, *Constructing the State Extraterritorially: Jurisdictional Discourse, The National*

12  *Interest, and Transnational Norms*, 103 Harv. L. Rev. 1273, 1277-78 (1990).  Absent

13  preemption, or other constitutional or international law limitations, this analysis applies equally

14  to state and federal laws.  Restatement Third § 402, Reporters' Note 5.

15        The effects test is not a new or controversial principle.  As early as 1911, the United States

16  Supreme Court acknowledged that a state could prosecute fraud that had an effect inside the

17  state, even though the criminal "never had set foot in the state until after the fraud was

18  complete."  *Strassheim v. Daily*, 221 U.S. 280, 284-85 (1911).  And federal courts have applied

19  the effects test to assess the application of federal antitrust laws, securities laws, and criminal

20  laws to foreign conduct.  *See, e.g.*, *United States v. Aluminum Co. of America*, 148 F.2d 416, 443

21  (2d Cir. 1945) (antitrust laws); *Consolidated Gold Fields PLC v. Minorco*, 871 F.2d 252, 261-62

22  (2d Cir. 1989) (anti-fraud laws); *United States v. Neil*, 312 F.3d 419, 422 (9th Cir. 2002)

23  (criminal laws).

24        The principle also applies to conduct at sea.  For example, *State v. Stapansky*, 761 So.2d

25  1027 (Fla. 2000), involved an assault that occurred on a foreign flagged cruise ship outside of

26  Florida's territorial waters.  Although both the suspect and victim were noncitizens, the Florida

27  Supreme Court found that the state's exercise of jurisdiction over the crime was permissible.

28  There was no conflict with federal law, and the act could have a substantial impact on Florida

1    tourism if crimes on cruise shops embarking and debarking in Florida were not prosecuted.  *Id.* at

2    1035-36; *see also*, *State v. Jack*, 125 P.3d 311 (Ak. 2005) (applying effects test to find that state

3    had jurisdiction over alleged rape on Alaska ferry operating in Canadian waters).

4        Similarly, the Alaska Supreme Court in *Bundrant* and the three-judge district court panel in

5    *Hjelle* effectively applied the effects test in assessing the validity of Alaska's regulations

6    regarding the taking of crabs from the Bearing Sea Shellfish Area.  In *Hjelle*, the court looked at

7    the nexus between Alaska's interests, and found that Alaska had not shown a sufficient direct

8    impact within the state to justify the regulation.  *Hjelle v. Brooks*, 377 F.Supp. 430, 441 (D. Ak.

9    1974); *see also supra*, section III.D.1.d.  And the *Bundrant* court upheld the same regulations,

10   finding that they were justified by the in-state harm caused by extraterritorial crab fishing.  *State*

11   *of Alaska v. Bundrant*, 546 P.2d 530, 554 (Ak. 1976).

12       Here, CARB extended the reach of its Vessel Rules to twenty-four nautical miles from the

13   California coast based on its conclusion that vessel emissions from within that distance reach

14   California and have a substantial effect on California's air quality.  Accordingly, the effects test

15   provides the appropriate framework for assessing the geographic scope of the Vessel Rules.

16           **b.    PMSA Has Not Carried its Burden of Showing the Absence of a**
             **Genuine Issue of Material Fact Regarding Its Submerged Lands Act**
17           **Claims.**

18       Applying the effects test to the Vessel Rules is a two-step process:  (1) Does the law

19   regulate conduct that has a substantial effect within its territory?  Restatement Third § 402(1)(c).

20   (2)  Is the regulation reasonable?  Restatement Third § 403.  To prevail on its motion for

21   summary judgment, PMSA must demonstrate an "absence of a genuine issue of material fact."

22   Fed. R. Civ. P. 56(c).  PMSA has failed to present *any* evidence showing the absence of a

23   genuine issue of material fact regarding vessel emissions' effect on California or the

24   reasonableness of the regulation.  As such, PMSA's motion for summary adjudication on its

25   Submerged Lands Act claim must be denied.

26       Furthermore, even at this early stage in the proceedings, the available evidence shows that

27   the Vessel Rules are a reasonable means of addressing conduct that has a substantial impact in

28   California.  PMSA itself admits that the NOx and SOx emitted by vessels traveling between three

and twenty-four nautical miles from the California coast are carried into California. (Stern Decl, Exh. 1, at 4:5-12, 5:1-6:8.) And numerous studies, conducted by both CARB and the federal government, establish that emissions released within a zone designated as California Coastal Waters, an area ranging from 27 to 102 miles from California's coast, impact California's air quality. (Donahoue Decl., ¶¶ 6-8.) The Vessel Rules addresses the effect that this pollution has on California's air. CARB estimates that 75 percent of the emissions that auxiliary engines release when they are within 100 nautical miles from California are emitted within 24 nautical miles of the coast, and are therefore subject to the Vessel Rules. (Milkey Decl, ¶ 18.)

These emissions degrade California's air quality and harm public health. California is not in compliance for PM and ozone, two pollutants that impact public health. The Vessel Rules will result in substantial reductions of PM, NOx and SOx. (Milkey Decl., ¶ 23.) Because NOx and SOx are precursor pollutants that form secondary PM and ozone, the Vessel Rules will result in reductions of on-shore PM and ozone. These Rules are an important part of CARB's overall plan for protecting the public heath and coming into compliance with federal standards. (Donahoue Decl., ¶¶ 12, 14.) Accordingly, the Vessel Rules regulate conduct that has a substantial impact on California, in the vitally important area of the public heath.

The regulations are also reasonable. To determine whether a regulation is reasonable, courts balance many factors, including the importance of the regulation to the state, the connection between the activity and the state, and any conflicts with international law and the laws of another state.[17] Restatement Third § 403. The Vessel Rules only apply to those vessels electing

---

17. Restatement Third, section 403 provides, in part:

(2) Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible

(continued...)

1  to use California's ports, taking advantage of state-of-the-art facilities developed on land held in

2  trust for the people of the State of California.  (Declaration of Dominic Holzhaus in Opposition

3  to Motion for Summary Judgment or Partial Summary Judgment by Plaintiff Pacific Merchant

4  Shipping Association, filed by City of Long Beach on 6-13-07, at ¶¶ 2, 5-7.)  And PMSA

5  concedes that CARB can extend its regulations with regard to these vessels out to its territorial

6  boundaries, three nautical miles from shore.  In light of the importance of the Rules of the State,

7  requiring vessels to use cleaner fuels for an additional twenty-one nautical miles is reasonable.

8        PMSA has made no showing that California's interest in regulating these emissions is

9  outweighed by any other interest.  The Vessel Rules do not conflict with any state or federal law.

10  As discussed above, the Vessel Rules do not conflict with the Clean Air Act.  (*See supra*,

11  sections III.B.-C.)  Although PMSA contends that the Vessel Rules are somehow precluded by

12  Presidential Proclamations 5928 and 7219, it never points to a specific conflict.  (PMSA P. & A.

13  at 49:7-51:28.)  In the Proclamations, the United States expressly provided that existing federal

14  and state jurisdiction, rights, interests, and obligations were unchanged.  Proclamation No. 5928,

15

16

     17.  (...continued)

17          for the activity to be regulated, or between that state and those whom the
            regulation is designed to protect;

18
               (c) the character of the activity to be regulated, the importance of
19          regulation to the regulating state, the extent to which other states regulate
            such activities, and the degree to which the desirability of such regulation is
20          generally accepted.

21             (d) the existence of justified expectations that might be protected or
            hurt by the regulation;
22
               (e) the importance of the regulation to the international political, legal,
23          or economic system;

24             (f) the extent to which the regulation is consistent with the traditions
            of the international system;
25
               (g) the extent to which another state may have an interest in regulating
26          the activity; and

27             (h) the likelihood of conflict with regulation by another state.

28  Restatement Third § 403(2).

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment        Case No.: 2:06-CV-02791-WBS-KJM

33

1    subd. (a), 54 Fed. Reg. 777 (Dec. 27 1988); Proclamation No. 7219, subd (a), 64 Fed. Reg. 48701

2    (Aug. 2, 1999); *see also* Natural Resources Defense Council and Coalition for Clean Air's

3    Opposition to Plaintiff Pacific Merchant Shipping Association's Motion for Summary Judgment

4    and Partial Summary Judgment, filed 6-8-07, Docket No. 58, at 20:17-21:2.

5         And PMSA does not contend that compliance with the regulations conflicts with

6    international law.  (Stern Decl., Ex. 2, at 5:9-18.)  The only international law even cited by

7    PMSA is MARPOL Annex VI, a treaty setting international standards for new vessel engines.

8    But PMSA concedes that Congress has not passed legislation necessary to make this treaty

9    effective in the United States.  (PMSA P. &. A. at 48-49.)  Furthermore, even if MARPOL were

10   effective, PMSA does not contend that the Vessel Rules conflict with it.  (*Id.*; *see also* Stern

11   Decl., Ex. 2, at 5:9-18.)  To the contrary, even if MARPOL were in effect in the United States,

12   international law provides that a locality may establish its own, more stringent, port entry

13   conditions to address on-shore pollution.  United Nations Convention on the Law of the Sea,

14   1833 U.N.T.S. 397, S. Treaty Doc. No. 103-39, 1992 WL 725374 (UNCLOS) Pt. XII, § 5, Art.

15   § 211(3); *see also* UNCLOS, Pt. II, § 4, Art. 33.  Because the Vessel Rules apply only to those

16   vessels accessing California ports, they are consistent with international law.  Accordingly,

17   PMSA has failed to carry its burden of establishing that there is an absence of a genuine issue of

18   material fact regarding the balancing test used to determine whether an extraterritorial regulation

19   is reasonable.

20        Relying solely on an argument that California is powerless to regulate vessel fuel use

21   beyond its territorial seas, PMSA presents no evidence regarding the impact of the emissions on

22   the state or the reasonableness of the Vessel Rules.  But PMSA's own cases establish that, when

23   extraterritorial conduct has a substantial in-state effect, a state may prescribe reasonable

24   regulations that extend beyond the state's territorial waters.  As such, PMSA has failed to carry

25   its burden on summary judgment of showing that there an absence of a triable issue of fact.

26   Accordingly, PMSA's motion for summary judgment on its Submerged Lands Act claims must

27   be denied.

28   ///

Def. Witherspoon's Memo. of P. & A. in Opp. to
Plfs' Mot. for Summary Judgment and Partial Summary Judgment          Case No.: 2:06-CV-02791-WBS-KJM

1    **IV.   CONCLUSION**

2         PMSA has failed to show that it is entitled to judgment as a matter of law on either of its

3    claims.  The Vessel Rules qualify as both fuel regulations and use and operation regulations,

4    neither of which is preempted by the Clean Air Act.  And PMSA has failed to show an absence

5    of a genuine issue of material fact regarding whether the Vessel Rules are a reasonable means to

6    address conduct that has a substantial impact on California's air quality.  Therefore, PMSA's

7    motion for summary judgment must be denied.

8                   Dated:  June 13, 2007

9                             Respectfully submitted,

10                            EDMUND G. BROWN JR.
                              Attorney General of the State of California

11
                              /s/ Nicholas Stern
12

13                            NICHOLAS STERN
                              Deputy Attorney General
14                            Attorneys for Defendant Catherine E. Witherspoon

15

16   30281086.4.wpd
     SA2006304038
17

18

19

20

21

22

23

24

25

26

27

28