

*California Environmental Protection Agency*

# AIR RESOURCES BOARD

## STAFF REPORT:  INITIAL STATEMENT OF REASONS FOR PROPOSED RULEMAKING



## PROPOSED REGULATION FOR AUXILIARY DIESEL ENGINES AND DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES OF THE CALIFORNIA BASELINE

**Stationary Source Division**
**Emissions Assessment Branch**
**October 2005**

**State of California**
**AIR RESOURCES BOARD**

**STAFF REPORT:  INITIAL STATEMENT OF REASONS**
**FOR PROPOSED RULEMAKING**

**Public Hearing to Consider**

**PROPOSED REGULATION FOR AUXILIARY DIESEL ENGINES AND DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING VESSLES WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES OF THE CALIFORNIA BASELINE**

To be considered by the Air Resources Board on December 8-9, 2005, at:

California Environmental Protection Agency
Headquarters Building
1001 "I" Street
Byron Sher Auditorium
Sacramento, California

Bob Fletcher, Chief
Stationary Source Division
Daniel E. Donohoue, Chief
Emissions Assessment Branch
Peggy Taricco, Manager
Technical Analysis Section

This report has been prepared by the staff of the Air Resources Board.  Publication does not signify that the contents reflect the views and policies of the Air Resources Board, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

**State of California**
**AIR RESOURCES BOARD**

**PROPOSED REGULATION FOR AUXILIARY DIESEL ENGINES AND DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES OF THE CALIFORNIA BASELINE**

<u>**Contributing Authors**</u>

Paul Milkey
Pingkuan Di
Ron Hand
John Lee
Kirk Rosenkranz
Alex Santos
Bonnie Soriano
Todd Sterling
Steven Yee

<u>**Legal Counsel**</u>

Floyd Vergara, Office of Legal Affairs

<u>**Supporting Divisions**</u>

PTSD, RD, MSCD

<u>**Acknowledgements**</u>

This report was prepared with the assistance and support from the other divisions and offices of the Air Resources Board.  In addition, we would like to acknowledge the assistance and cooperation that we have received from many individuals and organizations.

**Staff Report: Initial Statement of Reasons for Proposed Rulemaking
Proposed Regulation for Auxiliary Diesel Engines and Diesel-Electric Engines
Operated on Ocean-going Vessels within California Waters and
24 Nautical Miles of the California Baseline**

## TABLE OF CONTENTS

<u>Contents</u>                                                                                                    <u>Page</u>

Executive Summary ................................................................................................ ES-1

I.  Introduction ................................................................................................... I-1
    A.    Overview ................................................................................................ I-1
    B.    Purpose ................................................................................................. I-2
    C.    Regulatory Authority .............................................................................. I-2
    D.    Public Outreach and Environmental Justice ........................................... I-3

II.  Need for Control of Diesel Particulate Matter ................................................. II-1
    A.    Physical and Chemical Characteristics of Diesel PM ............................. II-1
    B.    Health Impacts of Exposure to Diesel PM, Ambient Particulate Matter,
          Ozone, and Sulfur Dioxide ..................................................................... II-2
    C.    Applicability of the Cancer Potency Factor for Diesel Particulate Matter to
          Engines Using Marine Gas Oil, Marine Diesel Oil, or Marine Heavy Fuel
          Oil ........................................................................................................ II-5
    D.    Health and Environmental Benefits from the Proposed Regulation ........ II-7

III.  Industry Characterization ............................................................................ III-1
    A.    Vessel Descriptions ............................................................................. III-1
    B.    Vessels That Visit California Ports ......................................................... III-4
    C.    Auxiliary Engines and Fuels ................................................................. III-6
    D.    Vessel Fuels and Fuel Systems ........................................................... III-10
    E.    The Shipping Lanes and Ocean-going Vessel Activity Off the Coast of
          California .............................................................................................. III-12

IV.  Emissions, Potential Exposures, and Risk ................................................... IV-1
    A.    Estimated Emissions from Ocean-going Vessel Auxiliary Engines ......... IV-1
    B.    Transport of Offshore Ocean-going Vessel Emission to Onshore ......... IV-7
    C.    Potential Exposures and Health Risks from Ocean-going Vessel Auxiliary
          Engine Diesel PM Emissions ................................................................ IV-9

V.  Summary of the Proposed Regulation .......................................................... V-1
    A.    Overview of the Proposed Regulation .................................................... V-1
    B.    Purpose ................................................................................................ V-1
    C.    Applicability .......................................................................................... V-2
    D.    Exemptions .......................................................................................... V-2

# TABLE OF CONTENTS (cont.)

| Contents | | | Page |
|---|---|---|---|
| | E. | Definitions | V-3 |
| | F. | Cleaner Fuel Option | V-5 |
| | G. | Recordkeeping and Reporting Requirements | V-6 |
| | H. | Noncompliance Fee Option | V-7 |
| | I. | Alternative Compliance Plan | V-8 |
| | J. | Test Methods | V-13 |
| | K. | Sunset and Technology Review Provisions | V-l3 |
| | L. | Severability | V-14 |
| | M. | Regulatory Alternatives | V-14 |
| | | | |
| VI. | | Technological Feasibility of the Proposed Regulation | VI-1 |
| | A. | Availability of Marine Distillate Fuels | VI-1 |
| | B. | Feasibility of Using Distillate Marine Fuels in Ocean-going Vessel Auxiliary Engines | VI-9 |
| | C. | Potential options for Alternative Control Plan | VI-15 |
| | | | |
| VII. | | Environmental Impacts | VII-1 |
| | A. | Legal Requirements | VII-1 |
| | B. | Effects on Air Quality | VII-2 |
| | C. | Estimating the Health Benefits Associated with the Reductions of Diesel PM Emissions | VII-5 |
| | D. | Reasonably Foreseeable Environmental Impacts as a Result of Potential Compliance Methods | VII-8 |
| | E. | Reasonably Foreseeable Mitigation Measures | VII-14 |
| | F. | Reasonably Foreseeable Alternative Means of Compliance with the Proposed Regulation | VII-14 |
| | | | |
| VIII. | | Economic Impacts | VIII-1 |
| | A. | Summary of the Economic Impacts | VIII-2 |
| | B. | Capital Costs | VIII-4 |
| | C. | Recurring Costs | VIII-7 |
| | D. | Total Industry Cost and Total Annual Cost | VIII-10 |
| | E. | Potential Additional Costs or Savings | VIII-10 |
| | F. | Estimated Cost to Businesses | VIII-12 |
| | G. | Potential Business Impacts | VIII-16 |
| | H. | Potential Impact on Business Competitiveness | VIII-19 |
| | I. | Potential Impact on Employment, Business Creation, Elimination or Expansion | VIII-19 |
| | J. | Potential Costs to Local, State, and Federal Agencies | VIII-20 |
| | K. | Cost-Effectiveness | VIII-20 |
| | L. | Analysis of Alternatives | VIII-23 |

# TABLE OF CONTENTS (cont.)

Contents                                                                    Page

IX.   Additional Considerations ................................................................IX-1
      A.    Ocean-going Vessels that Require Modifications to Comply ................IX-1
      B.    Vessel Noncompliance for Reasons Beyond the Reasonable Control of
            the Vessel Owner/Operator ..................................................IX-2
      C.    Diesel-Electric Vessels ........................................................IX-2
      D.    Scope of the Alternative Compliance Plan ..............................IX-4
      E.    Enforcement of the Proposed Regulation ..............................IX-4

## *APPENDICES*

Appendix A:   Proposed Regulation for Auxiliary Diesel Engines and Diesel-Electric
              Engines Operated on Ocean-Going Vessels within California Waters and
              24 Nautical Miles of the California Baseline
Appendix B:   ARB's Legal Authority
Appendix C:   2005 Ocean-going Ship Survey Summary of Results
Appendix D:   Emissions Estimation Methodology for Ocean-going Vessels
Appendix E:   Recommended Conversion Factors for Secondary Formation of PM-
              Nitrate from $NO_x$ Emissions
Appendix F:   Offshore Emissions Impacts on Onshore Air Quality
Appendix G:   Diesel Particulate Matter Exposure Assessment Study for the Ports of
              Los Angeles and Long Beach
Appendix H:   Noncompliance Fee Determination
Appendix I:   Low Sulfur Fuel Availability
Appendix J:   Costs Calculations
Appendix K:   Data Inputs for Health Impacts Analysis

# TABLE OF CONTENTS (cont.)

<u>Contents</u>                                                                                       <u>Page</u>

**List of Tables**

Table ES-1    2004 Emissions from Ocean-going Vessel Auxiliary Engines in CaliforniaES-5
Table ES-2    Estimated Emissions Reductions from the Implementation of the Proposed
              Regulation.................................................................................... ES-14
Table ES-3    Cost-Effectiveness of the Proposed Regulation................................. ES-16
Table ES-4    Estimated Added Fuel Cost to Typical Vessel Ship Operators .......... ES-17
Table ES-5    Summary of U.S. EPA and IMO Regulations ..................................... ES-18
Table I-1     Workshop/Outreach Meeting Locations and Times ................................I-4
Table II-1    State and National PM Standards ......................................................II-8
Table II-2    State and National Ozone Standards ..................................................II-9
Table III-1   Typical Size of Passenger Cruise Vessels Over the Years....................III-3
Table III-2   2004 California Port Calls by Vessel Type...........................................III-5
Table III-3   2004 Port Ranking by Ship Visits.......................................................III-5
Table III-4   Number of Auxiliary Engines.............................................................III-7
Table III-5   Auxiliary Engines Fuels...................................................................III-7
Table III-6   Average Sulfur Content of Fuel Used in Ocean-going Auxiliary EnginesIII-7
Table III-7   Ocean-going Vessel Auxiliary Engine Manufacturers ...........................III-8
Table III-8   Average Power Generated .................................................................III-9
Table III-9   Main Engine Types .........................................................................III-9
Table III-10  Diesel Main Engine Types ................................................................III-9
Table III-11  Selected ASTM Specification for Marine Fuels................................... III-11
Table IV-1    Estimated Statewide 2004 Ocean-going Vessel Auxiliary Engine
              Emissions ....................................................................................IV-3
Table IV-2    Estimated 2004 Ocean-going Vessel Auxiliary Engine Emissions By
              District.........................................................................................IV-5
Table IV-3    Estimated 2004 Ocean-going Vessel Auxiliary Engine Emissions
              Occurring Within the Proposed Regulatory Waters .............................IV-6
Table IV-4    Ocean-going Vessel Auxiliary Engine Projected Year 2010 and 2020
              Emissions Estimates......................................................................IV-7
Table IV-5    Summary of Area Impacted and Population Affected by Risk Levels ..IV-11
Table V-1     Noncompliance Fee Schedule, Per Vessel...........................................V-8
Table V-2     Comparison between Potential IMO/U.S. EPA Proposals and the ARB
              Staff Proposal .............................................................................V-17
Table VI-1    Fuel Specifications .........................................................................VI-3
Table VI-2    Current Sulfur Properties of Marine Fuel ............................................VI-3
Table VI-3    Marine Distillate Average Sulfur Content .............................................VI-5
Table VI-4    Common Refueling Ports for Ships that Visit California .........................VI-6
Table VII-1   Estimated Emission Factors ..............................................................VII-3
Table VII-2   Estimated Emission Reductions for Auxiliary Engines Switching from
              Heavy Fuel Oil to the Specified Distillate Fuels .....................................VII-3

Table VII-3    Projected Emissions from Auxiliary Engines within 24 Nautical Miles of
                California's Coastline ..........................................................................VII-3
Table VII-4    Emission reductions from Implementation of the Proposed Regulation VII-4
Table VII-5    Auxiliary Engine and Powerplant Emission Comparison.....................VII-10
Table VIII-1   Capital Cost Summary ........................................................................VIII-5
Table VIII-2   Marine Fuel Prices ..............................................................................VIII-8
Table VIII-3   Fuel Price Differential Due to Proposed Regulation............................VIII-8
Table VIII-4   Total Industry Annual Fuel Costs for Years 2007-2009 ......................VIII-9
Table VIII-5   Total Industry Annual Fuel Costs for 2010 and Later..........................VIII-9
Table VIII-6   Estimated Added Fuel Cost to Vessel Operators...............................VIII-12
Table VIII-7   Summary of Costs to Typical Businesses..........................................VIII-14
Table VIII-8   Summary of Costs to Typical Cruise Vessel Business.......................VIII-16
Table VIII-9   ROE Analysis of Businesses ...........................................................VIII-18
Table VIII-10 Cost Effectiveness of the Proposed Regulation for All Vessels: Attributes
                all Costs to Each Pollutant Individually ...........................................VIII-21
Table VIII-11 Diesel PM Cost-Effectiveness of the Proposal and Other
                Regulations/Measures ....................................................................VIII-22
Table VIII-12 Cost Effectiveness of the Proposed Control Measure for All Vessels
                Attributes Half of the Costs to Diesel PM and Half to NOx+SOx........VIII-22
Table VIII-13 Cost Effectiveness of Proposal on Diesel-Electric Vessels...............VIII-23

# TABLE OF CONTENTS (cont.)

Contents                                                                   Page

### List of Figures

Figure ES-1   Ocean-going Vessel Auxiliary Engine Diesel PM Emissions Estimates
              Projected to Year 2020 ....................................................................... ES-6
Figure ES-2   Estimated Diesel PM Cancer Risk from Vessel Auxiliary Engine Activity at
              the POLA and POLB................................................................................ ES-7
Figure ES-3   Offshore 24 Nautical Mile Boundary for Proposed Regulation............. ES-9
Figure ES-4   Estimated Diesel PM Emissions in 24 nm Zone With and Without the
              Implementation of the Proposed Regulation ...................................... ES-14
Figure III-1   Ocean-going Vessel Auxiliary Engine Age Distribution.......................... III-8
Figure III-2   USACE Shipping Lanes Off the Coast of California and the 24 nm
              Contiguous Zone ................................................................................. III-13
Figure IV-1   Ocean-going Vessel Emission Inventory Boundary ............................... IV-2
Figure IV-2   2004 NOx and Diesel PM Emission Distributions for Oceangoing Vessel
              Auxiliary Engines ................................................................................. IV-4
Figure IV-3   Estimated Diesel PM Cancer Risk from Ship Auxiliary Engines Activity at
              POLA and POLB................................................................................... IV-12
Figure V-1   Vessel Uses Auxiliary Engine Power at First Port Call and Shore-side
              Power at Second Port Call.................................................................... V-12
Figure V-2   Vessel Uses Shore-side Power at First Port Call and Auxiliary Engine
              Power at Second Port Call.................................................................... V-12
Figure VI-1   Sulfur Content of MGO at Pacific Rim Refueling Ports from 1995 to 2005 VI-5
Figure VI-2   Worldwide Marine Distillate Sales......................................................... VI-7
Figure VII-1   Estimated Diesel PM Emissions in 24 nm Zone With and
              Without the Implementation of the Proposed Regulation ..................... VII-4
Figure VII-2   Comparison of Affected Population Numbers With and Without the
              Proposed Ship Auxiliary Engine Fuel Regulation for the Years 2008 and
              2015...................................................................................................... VII-6
Figure VII-3   Comparison of Impacted Residential Areas With and Without the
              Proposed Ship Auxiliary Engine Fuel Regulation for the Years 2008 and
              2015...................................................................................................... VII-6

## EXECUTIVE SUMMARY

Air pollution from maritime port activities is a significant and growing concern in California. Diesel-powered vehicles and engines at the ports emit soot, or diesel particulate matter (PM), and other air pollutants than can increase health risks to nearby residents. Port operations are also a significant source of oxides of nitrogen (NOx) which can contribute to the formation of regional smog, or ozone, and fine particulate matter.

Living in any area impacted by air pollution is harmful, particularly for children, the elderly, and those with compromised health. The communities closest to port operations face even greater impacts and have a greater localized risk due to exposures to high levels of diesel PM. This pollutant poses a lung cancer hazard for humans, and causes non-cancer respiratory and cardiovascular effects that increase the risk of premature death. In addition, in many cases, the populations nearby ports are economically disadvantaged and less able to obtain quality health care to address air pollution-related illnesses.

Unless substantial additional control measures are implemented, port-related emissions are expected to significantly increase as trade grows over the next 15 to 20 years. While the movement of goods through California ports is a vital component of the State's overall economy and provides a key link to international trade, it is essential that aggressive steps be taken to counter the projected emissions increases and ensure that the port-related emissions are reduced to health protective levels.

As one of several steps being taken to reduce emissions from port activities, the Air Resources Board (ARB) staff is proposing a regulation to reduce emissions from ocean-going vessel auxiliary engines. Implementation of this regulation will be an important and necessary step in the effort to improve the public health in communities near ports. A recent ARB study has shown that diesel PM emissions from hotelling (auxiliary engine emissions while vessels are moored) are the largest contributor of toxic pollutants to neighboring communities. The proposed regulation would reduce the emissions of diesel PM, NOx, sulfur oxides (SOx), and "secondarily" formed PM (PM formed in the atmosphere from NOx and SOx). The proposed regulation will reduce emissions from ocean-going vessel auxiliary engines through the use of cleaner marine distillate fuels, or equally effective alternative controls. This would result in immediate, substantial reductions in emissions upon implementation in 2007. Specifically, for the nearly 80 percent of vessels currently using heavy fuel oil in their auxiliary engines, compliance with the proposed regulation will result in an estimated 75 percent reduction in diesel PM, 80 percent reduction in SOx, and 6 percent reduction in NOx.

This proposed regulation is one of several measures currently under consideration that will continue progress in meeting the air quality goals defined in the Diesel Risk Reduction Plan and the State Implementation Plan and that will help offset the projected emissions increases in port-related emissions. Other regulations being proposed include measures to reduce emissions from cargo handling equipment, commercial

harbor craft, and off-road diesel engines.  ARB staff is also pursuing additional air pollution control strategies for ocean-going vessels in the coming years, including addressing the main engines on ocean-going vessels, and exploring emission reduction options for vessels that make frequent port visits.

Presented below is an overview which briefly discusses the information presented in this document.  For simplicity, the discussion is presented in question-and-answer format.  It should be noted that this summary provides only brief discussions of the topics.  The reader is directed to subsequent chapters in the main body of the report for more detailed information.

## 1.    What is ARB proposing?

The proposed regulation requires that auxiliary engines on vessels operating within 24 nautical miles (nm) of the California coastline significantly reduce their diesel PM, NOx, and SOx emissions.  Emission reductions can be achieved by using cleaner-burning marine distillate fuels, or implementing equally effective alternative emission control strategies under an "Alternative Compliance Plan (ACP)."  For vessels complying with the fuel requirement, vessel operators will need to switch from the use of heavy fuel oil to marine distillate fuel while they are in port and while they are operating within 24 nm of the California coastline, unless they already use complying distillate fuels or choose to use distillate fuels on a permanent basis.  If operators choose to comply with the proposed regulation under an ACP, they must demonstrate that the alternative emission control strategies will result in no greater emissions relative to the emissions that would have occurred by complying with the fuel requirements.  The proposed regulation will apply to both U.S.-flagged and foreign-flagged vessels.

## 2.    Does ARB have the authority to regulate the emissions from ocean-going vessels as specified in the proposal?

Yes, under State and federal law, ARB can regulate both criteria pollutants and toxic diesel PM emissions from marine vessels.  Health and Safety Code (H&SC) sections 43013 and 43018 authorize ARB to regulate marine vessels to the extent such regulation is not preempted by federal law.  Also, H&SC § 39666 requires ARB to regulate emissions of toxic air contaminants (TAC) from nonvehicular sources, which include ocean-going vessels.  The proposed regulation reduces or limits emissions of diesel PM, which is both a TAC and criteria pollutant, and NOx and SOx, which are both criteria pollutants.

The proposed regulation is neither preempted under federal law, nor does it violate the Commerce Clause.  Federal authorization under section 209(e) of the Clean Air Act (CAA) is required for regulating new nonroad engines and for requiring retrofits on existing engines.  Ocean-going vessel engines, by definition, fall within the category of nonroad engines.  However, no federal authorization is required for implementing in-use operational requirements on existing marine vessels and their engines.  The proposed regulation is an in-use operational requirement because it does not apply to the

manufacturing process for an engine (i.e., new engine certifications), but only to the emissions of engines installed on ocean-going vessels that operate in California waters.

Further, the proposed regulation does not conflict with the Ports and Waterways Safety Act (PWSA) and U.S. Coast Guard regulations. As an even-handed regulation with substantial benefits, the proposed regulation does not violate the Commerce Clause. And federal and state cases support our authority to regulate both U.S. and foreign-flag vessels within California waters. Therefore, federal law neither preempts the proposed regulation, nor does the regulation violate the requirements of the Commerce Clause.

### 3.    Why is ARB proposing statewide implementation of this regulation rather than having the districts adopt regulations?

We are proposing statewide, uniform implementation of this regulation, rather than encouraging district-by-district adoption of different regulations, for practical reasons as well as ensuring that California speaks with "one voice" with regard to regulating foreign-flag vessels. Under H&SC § 43013 and 43018, ARB and the districts share concurrent jurisdiction over marine vessels, which are considered to be nonvehicular sources. In addition, H&SC § 39666(d) requires the districts to implement and enforce an ARB airborne toxic control measure (ATCM) or adopt and enforce an equally effective or more stringent ATCM. Thus, the districts are authorized to regulate the auxiliary diesel engines on vessels, and each district can do so provided its regulations are equally effective or more stringent.

The districts' authority notwithstanding, we believe it is prudent for the districts to coordinate their efforts with those of ARB and have ARB to take the lead role in implementing the ATCM. We believe this for several reasons. First, it is impractical for many districts to enforce an ATCM against ocean-going vessels, many of which make multiple visits to ports throughout California. Second, ARB has gained technical expertise over several years of developing this regulation, which would require a significant expenditure of district resources to replicate. Third, the districts are permitted but not required to adopt and enforce an equally effective or more stringent ATCM. By coordinating their efforts with ARB and having ARB take the primary lead in implementing the ATCM statewide, the districts will have met their statutory obligations under H&SC § 39666(d).

Equally important to the practical concerns are the international foreign commerce concerns. Under the dormant Foreign Commerce Clause, regulations that interfere with a nation's ability to "speak with one voice when regulating commercial relations with foreign governments," may be held invalid. Having a patchwork of district regulations different from ARB's proposal, may frustrate the efficient execution of the nation's foreign policy to speak with one voice. Thus, it would be in California's best interests to coordinate statewide efforts so that foreign-flag and U.S.-flag vessels visiting California ports only need to understand and meet one set of statewide regulations.

**4.    What is an ocean-going vessel?**

Ocean-going vessels are generally very large vessels designed for deep water navigation.  Ocean-going vessels include large cargo vessels such as container vessels, tankers, bulk carriers, and car carriers, as well as passenger cruise vessels.  These vessels transport containerized cargo; bulk items such as vehicles, cement, and coke; liquids such as oil and petrochemicals; and passengers.

Ocean-going vessels travel internationally and may be registered by the U.S. Coast Guard (U.S.-flagged), or under the flag of another country (foreign-flagged).  The majority of vessels that visit California ports are foreign-flagged vessels.

**5.    What is an auxiliary engine?**

Auxiliary engines are diesel engines on ocean-going vessels that provide power for uses other than propulsion (except as noted below for diesel-electric vessels).  Auxiliary engines are usually coupled to generators used to produce electrical power.  On cargo vessels, most auxiliary engines are used to provide ship-board electricity for lighting, navigation equipment, refrigeration of cargo, and other equipment.  Typically, a cargo vessel will have a single, very large main engine used for propulsion, and several smaller auxiliary "generator-set" engines.

Passenger cruise vessels, and some tankers, use a different engine configuration which is referred to as "diesel-electric."  These vessels use large diesel generator sets to provide electrical power for both propulsion and ship-board electricity.  For the purposes of the proposed regulation, these large diesel generator sets are included in the definition of "auxiliary engines."

**6.    What fuels do ocean-going vessel operators use in auxiliary engines?**

Most vessel operators use either heavy fuel oil (HFO or residual fuel) or marine distillate fuels in their auxiliary engines.  HFO is a very viscous fuel that must be heated to allow it to flow through piping and be combusted in auxiliary engines.  HFO is often referred to as residual fuel or bunker fuel.  This fuel has high levels of sulfur, ash, and nitrogen containing compounds, and results in much higher emissions than the use of marine distillate fuels.   Marine distillate fuels include marine gas oil (MGO) and marine diesel oil (MDO).  These distillate fuels are similar to the diesel fuel used by landside sources.  According to an ARB survey of vessels visiting California ports, about 75 percent of auxiliary engines use HFO and about 25 percent use marine distillate fuels.

**7.    What emissions result from the auxiliary engines used on ocean-going vessels?**

Estimates of the statewide 2004 emissions of diesel PM, NOx, hydrocarbons (HC), and SOx, from ocean-going vessel auxiliary engines are presented in Table ES-1 below.

These emissions estimates include emissions that occur within 100 nm or less off California's coast, emissions that occur in California inland waters such as emissions from vessels transiting to the ports of Stockton and Sacramento, and emissions that occur while vessels are in-port. The "boundary" of 100 nm was selected because it can be distinguished with relative ease and it is inclusive of the major areas of activity of the sources of interest.

**Table ES-1: 2004 Emissions from Ocean-going Vessel
Auxiliary Engines in California**

| Vessel Types | Number of Vessels | Numbers of Vessel Visits | 2004 Pollutant Emissions, Tons/Day | | | | |
|---|---|---|---|---|---|---|---|
| | | | NOx | HC | CO | PM | SOx |
| Auto | 225 | 750 | 1.11 | 0.03 | 0.08 | 0.10 | 0.71 |
| Bulk | 475 | 946 | 4.02 | 0.11 | 0.30 | 0.35 | 2.55 |
| Container | 594 | 4744 | 18.11 | 0.50 | 1.37 | 1.57 | 11.48 |
| General | 196 | 721 | 1.75 | 0.05 | 0.13 | 0.15 | 1.11 |
| Passenger | 44 | 687 | 14.44 | 0.39 | 1.09 | 1.39 | 10.24 |
| Reefer | 19 | 52 | 0.60 | 0.02 | 0.05 | 0.05 | 0.38 |
| RoRo | 13 | 34 | 0.40 | 0.01 | 0.03 | 0.03 | 0.25 |
| Tanker | 372 | 1941 | 3.16 | 0.09 | 0.24 | 0.27 | 2.00 |
| Totals | 1938 | 9875 | 43.6 | 1.20 | 3.29 | 3.91 | 28.7 |

As shown in Table ES-1, there are approximately 1,900 ocean-going vessels that visited California's ports in 2004, and these vessels made nearly 10,000 port calls. Of those 1,900 vessels that visited California's ports, 30 percent were container vessels, and these vessels represented more than 45 percent of the vessel visits to California's ports.

The emissions from ocean-going vessels are projected to grow significantly over time as trade continues to increase. The projected diesel PM emission estimates up to 2020 are presented in Figure ES-1.

**Figure ES-1:  Ocean-going Vessel Auxiliary Engine Diesel PM
Emissions Estimates Projected to Year 2020**



### 8.    What are the exposures and potential heath risks from ocean-going vessel auxiliary engine emissions?

The majority of California's ports are in urban areas and, in most cases, are located near where people live, work, and go to school.  This results in substantial exposures to diesel PM emissions from the operation of vessel auxiliary engines California.  Exposures to these emissions can result in increased cancer risk and non-cancer health impacts, such as premature death, irritation to the eyes and lungs, allergic reactions in the lungs, and asthma exacerbation.

Because analytical tools to distinguish between ambient diesel PM emissions from vessel auxiliary engines and that from other sources of diesel PM do not exist, we cannot measure the actual exposures to emissions from auxiliary engines.  However, modeling tools can be used to estimate potential exposures.  To investigate the potential risks from exposures to the emissions from auxiliary engines, ARB staff used dispersion modeling to estimate the ambient concentration of diesel PM that results from the operation of ocean-going vessel auxiliary engines that visit the Port of Los Angeles (POLA) and the Port of Long Beach (POLB).  The study area was a 20-mile by 20-mile grid centered on POLA and POLB.

The activities of vessel auxiliary engines resulted in significant cancer risk and other PM related health impacts on the nearby residential areas.  Figure ES-2 shows the estimated cancer risk isopleths for diesel PM emissions from vessel auxiliary engines (during transiting, maneuvering, and hotelling) at the Ports of Los Angeles and Long Beach superimposed on a map that covers the ports and the nearby communities.

ARB estimated the area in which the cancer risks are predicted to exceed 100 in a million to be about 13,500 acres with an exposed population of about 225,000. For the cancer risk level over 200 in a million, the impacted area is estimated to be about 2,260 acres, with an exposed population of about 48,000 people. Overall, about 99.5 percent of the study area (excluding port property and the surrounding ocean area) has an estimated cancer risk level of over 10 in a million due to auxiliary engine emissions. We estimate that about 2 million people live in the study area. ARB staff believes that the results from this analysis provide quantitative results for exposures around the Ports of Los Angeles and Long Beach and indicate that elevated risks also occur at other ports in California.

**Figure ES-2: Estimated Diesel PM Cancer Risk from Vessel Auxiliary Engine Activity at POLA and POLB (**Wilmington Met Data, Urban Dispersion Coefficients, 80th Percentile Breathing Rate, Emission = 405 TPY, Modeling Receptor Domain = 20 mi x 20 mi, Resolution = 200 m x 200 m)



ARB staff also estimated the potential non-cancer impacts associated with exposure to diesel PM from ocean-going vessel auxiliary engines.  The non-cancer health effects evaluated include premature death, asthma attacks, work loss days, and minor restricted activity days due to diesel PM emissions from auxiliary engines.  Based on the analysis, staff estimates that the average number of cases statewide per year that would be expected from exposure to the 2004 ocean-going vessel diesel PM emission levels are as follows:

- 31 premature deaths (for ages 30 and older), 16 to 48 deaths as 95% confidence interval (CI);
- 830 asthma attacks, 202 to 1,457 as 95% CI;
- 7,258 days of work loss (for ages 18-65), 6,143 to 8,370 as 95% CI;
- 38,526 minor restricted activity days (for ages 18-65), 31,403 to 45,642 as 95% CI.

## 9.    What does the proposed regulation require?

Under the proposed regulation, vessel operators are required to reduce diesel PM, NOx and SOx emissions to levels equivalent to the emissions levels that would occur if cleaner-burning distillate fuels were used.  To meet this requirement, we expect that most vessel operators will elect to use the distillate fuels specified in the proposal.  However, some may decide to implement an alternative emission control strategy that would achieve equivalent or greater emission reductions.  Specifically, under the proposal, starting on January 1, 2007, vessel operators can comply by using one of the following distillate fuels when operating their auxiliary engines within 24 nm of the California Coastline: (1) marine gas oil (MGO); or (2) marine diesel oil (MDO) with less than or equal to 0.5 percent by weight sulfur.  A 0.5 percent sulfur limit is specified for MDO because it tends to have a higher sulfur level than MGO.  MGO is expected to average at or below 0.5 percent sulfur in California based on the results of a survey sent to vessel operators in 2005.

Starting on January 1, 2010, marine gas oil meeting a 0.1 percent sulfur limit is specified under the proposed regulation.  This lower sulfur fuel will result in additional emission reductions of PM and SOx, compared to the January 1, 2007 requirement.  This standard is consistent with a recently adopted European Union regulation.  However, a feasibility analysis is required under the proposed regulation prior to implementation of this fuel requirement to investigate the supply, cost, and technical feasibility of using this fuel.  Based on the results of this evaluation, modifications to this requirement could be proposed to the Board.

While ARB has the authority to regulate ocean-going vessel emissions, we recognize that uniform national or international regulation of vessel emissions would be preferable to most vessel operators.  As such, we have included a provision in the staff's proposal that requires the Executive Officer to propose terminating or modifying the requirements of this proposal to the Board if the United States Environmental Protection Agency

(U.S. EPA) or the International Maritime Organization adopts regulations that will achieve equivalent or greater emission reductions from vessels.

The proposed regulation does not address emissions from main engines (except for diesel-electric vessels), boilers, gas or steam turbine engines, or auxiliary engines on military vessels, which are exempted from the requirements of the proposed regulation. ARB staff plan to address main engines and other sources not regulated in this proposed rulemaking in the next couple of years.

### 10. How far offshore are ocean-going vessels required to comply with the proposed regulation?

Under the proposed regulation, vessel emissions would be regulated up to 24 nm off the California coastline. ARB has the authority to require emission reductions out to the California Coastal Water (CCW) boundary. This is the region within which emissions are likely to be transported onshore, and it extends beyond the 24 nm boundary. However, the 24 nm boundary which is shown as the gray area in Figure ES-3 was proposed because it significantly lowers the cost of the regulation while still providing the vast majority of the potential on-shore benefits in terms of reduced exposure to diesel PM. Specifically, about 75 percent of the auxiliary engine diesel PM emissions within 100 nm of the California coastline is emitted within the 24 nm boundary. The 24 nm boundary is also easily defined for vessel operators. The boundary is aligned in Central and Northern California with the outer boundary of the Contiguous Zone, an internationally recognized boundary which extends 24 nm offshore and is noted on most nautical charts. In Southern California, the boundary consists of straight line segments approximately 24 nm offshore of the coastline. This approximation is used because the outer edge of the Contiguous Zone extends around the Channel Islands, bringing the boundary well beyond 24 nm, and in some cases beyond the California Coastal Waters boundary.

**Figure ES-3: Offshore 24 Nautical Mile Boundary for Proposed Regulation**



## 11.   Are the fuels specified in the proposed regulation available?

Yes.  It is important that these fuels be available at ports worldwide because vessel operators seeking to comply with the proposed regulation through the use of these fuels will need to use them upon entering the 24 nm boundary off California's coastline.  The fuels specified for January 1, 2007, are MGO, and MDO at or below 0.5 percent sulfur. MGO is widely available at ports worldwide since it is already used by harbor craft and many auxiliary engines on ocean-going vessels.  We are not proposing a sulfur limit for MGO at this time because some ports only have higher sulfur MGO available.  Because the proposed regulation has an initial compliance date of January 1, 2007, ARB staff had concerns that there would not be sufficient time or incentive for fuel refiners and suppliers worldwide to make fuel meeting a specified sulfur limit available at all bunkering ports.  However, we expect the sulfur content of the MGO used by vessels visiting California ports to average at or below 0.5 percent sulfur, based on the results of an ARB survey and data on historical trends in sulfur content for these fuels.  To provide additional flexibility to vessel operators, we are also allowing the use of MDO.  This fuel tends to have a higher sulfur content than MGO, so we are limiting this fuel to 0.5 percent sulfur.  Vessel owners can choose between using MDO that meets the sulfur limits or MGO.

Begining January 1, 2010, MGO meeting a 0.1 percent sulfur limit is specified under the proposed regulation.  While this fuel is not currently available at all ports worldwide, we believe it will become much more widely available by 2010, when a European Union directive requires the use of MGO meeting a 0.1 percent sulfur limit.  In addition, to ensure this requirement of the proposed regulation can be implemented, ARB staff is proposing that an evaluation be conducted prior to 2010 to investigate the availability of 0.1 percent sulfur MGO at bunkering ports worldwide.

## 12.   Will ocean-going vessels need to make modifications to the use the specified fuels?

According to a survey conducted by ARB staff, we expect that about 10 percent of the ocean-going vessels visiting California ports will require some type of modification to use the fuels specified in the proposed regulation.  The modifications needed are vessel-specific, and may include:

- expanding fuel storage capacity for distillate fuel;
- adding piping, instrumentation, valves, and vents;
- adding fuel processing equipment (settling tanks, filters, etc.); and/or
- modifying fuel pumps and fuel injectors.

The proposed regulation has provisions to provide additional time (up to five years to make vessel modifications) and flexibility to operators of these vessels (see item 14 below).

**13.    Is the proposal technically feasible?**

Yes.  Based upon ARB staff's analysis and discussions with numerous stakeholders, including the engine manufacturers, staff believes that the requirements of the proposed regulation are technically feasible.  Under the proposal, vessel operators may comply by using cleaner-burning marine distillate fuels in their auxiliary engines instead of heavy fuel oils, or implementing alternative emission control strategies.  For vessel operators that comply through the use of cleaner-burning fuels, they will need to ensure that they are using marine distillate fuels prior to entering the 24 nm boundary.  ARB staff found that vessel operators already switch to marine distillate fuels prior to certain scheduled maintenance operations, and many also routinely switch to these fuels for air quality reasons in California.  Discussions with the manufacturers also indicated that these engines can operate on marine distillate fuels provided certain precautions are followed, such as performing fuel switches according to recommended procedures.  Beginning January 1, 2010, the proposal specifies a lower 0.1 percent sulfur marine distillate fuel.  This standard will be subject to a feasibility evaluation prior to implementation to fully investigate the availability of this fuel and if any technical issues exist.

**14.    What key provisions are included in the proposed regulation to provide flexibility?**

The proposed regulation includes two provisions providing compliance flexibility.  These provisions are summarized below.

        Alternative Control Plan

The alternative compliance plan (ACP) was included in the proposed regulation to provide vessel owner/operators with the flexibility to implement alternative emission control strategies that result in no greater emissions compared to the use of the fuels specified in the proposal.  Alternative emission control strategies may include the use of shore-side electrical power, engine modifications, exhaust treatment devices such as diesel oxidation catalysts, and the use of alternative fuels or fuel additives.  ACP plans may apply to a single vessel, or a fleet of vessels under the direct control of the applicant for an ACP.

There is also a specific provision that applies to vessels that shut off their diesel auxiliary engines and connect to shore-side power.  Under this provision, emissions from auxiliary engines will be considered to meet the emission reduction requirements of the proposed regulation: (1) during travel from a previous port to a California port where shore-side power is used; (2) while docked and utilizing shore power; and (3) during travel to a subsequent port.  This provision is designed to encourage the expanded use of shoreside power, which achieves greater emission reductions closest to nearby communities.

<u>Noncompliance Fee Provision</u>

This provision provides vessel operators with the flexibility to pay a fee in lieu of compliance in certain limited circumstances.  The funds collected under this provision would be used to substantially reduce emissions from: (1) port sources; (2) sources within 2 miles of port boundaries; or (3) oceangoing vessels within "Regulated California Waters."  Under this program, the fee is designed to ensure that participants will not be provided an economic advantage compared to vessel operators complying with the regulation.  The fee schedule is graduated such that subsequent visits would result in increasing fees.

This option could only be used in the following circumstances:

- vessel is unexpectedly redirected to a California port;
- vessel was not able to acquire a sufficient quantity of compliant fuel at the last fueling port;
- fuel was found to be out of compliance after leaving the last bunkering port;
- modifications are required and the vessel operator is not able to complete the modifications in time to meet the January 1, 2007 requirements; and
- modifications are required and the vessel will visit a California port a maximum of two times per calendar year, and a four times over the life of the vessel after January 1, 2007.

**15.    How does the regulation affect diesel-electric vessels?**

Diesel-electric vessels use large diesel generator sets to provide power for both propulsion and ship-board electricity.  Passenger cruise vessels, and a few tankers, use this engine configuration.  For the purposes of the proposed regulation, these large diesel generator sets are considered "auxiliary engines," and are covered by the proposed regulation.  We are proposing to regulate these engines the same as other auxiliary engines because they are mechanically similar to the smaller auxiliary engines used on other vessels.  Specifically, they are four-stroke, medium speed engines used in generator set applications.  As such, these engines can meet the requirements of the proposed regulation.  In fact, some diesel-electric cruise vessels currently use the distillate fuels specified in the proposed regulation near California ports.

**16.    How will ARB staff verify compliance with the proposed regulation?**

Enforcement of the proposed regulation will be achieved through random inspections of records, and fuel sampling/testing.  ARB staff will coordinate vessel inspections with inspections conducted by other State agencies such as the California State Lands Commission to the extent feasible.  During vessel inspections, records will be reviewed to determine when vessels traveled within "Regulated California Waters" and the fuels used during this time.  Records on the quantity of fuel purchased, the fuel type, and the sulfur content of the fuel will be reviewed to determine compliance.  Fuel samples will

be analyzed to ensure that they meet the ISO specifications for the fuel type and do not exceed the sulfur content limits under ISO or the proposed regulation.

As a long term goal, ARB staff wants to transition from compliance data being recorded in logs maintained on the vessel, to automated electronic data devices that can store and transmit data needed to assess compliance.  ARB staff plans to work with vessel owners and equipment suppliers to develop and field test data recording and submittal systems that can provide compliance data on a real-time basis.

**17.    What businesses and public agencies will be affected by the proposed regulation?**

The proposed regulation would impact foreign and domestic businesses that own or operate large ocean-going vessels.  This would include ocean shipping companies and passenger cruise vessel operators.

We do not expect significant impacts on "downstream" companies such as importers or exporters of goods, since the added costs imposed by the proposal are not expected to result in significant adverse impacts to vessel owners or operators.  Similarly, we do not expect adverse impacts on California ports because we do not believe the added cost of the proposed regulation is great enough to induce vessel operators to divert cargos to ports outside California.

We do not predict any significant impact on public agencies.  With the exception of military vessels, which are exempted from the requirements of the proposed regulation, public agencies in California generally do not operate ocean going vessels as defined in the proposal.

**18.    What are the health and environmental impacts of the proposed regulation?**

Upon implementation in 2007, the proposed regulation will result in immediate and significant reductions in emissions of diesel PM, NOx, SOx, and "secondarily" formed particulate matter.  Specifically, considering only the directly emitted emissions (not secondarily formed PM), the proposed regulation will result in estimated statewide emission reductions of 2.7 TPD of diesel PM, 1.9 TPD of NOx, and 22 TPD of SOx in 2007.  For perspective, the proposal would result in an estimated 75 percent reduction in diesel PM, 80 percent reduction in SOx, and a 6 percent reduction NOx from an engine that previously used typical heavy fuel oil.  Beginning in 2010, the 0.1 percent sulfur limit will result in an additional 10 percent reduction in diesel PM.  The estimated reductions for diesel PM, NOx and SOx, as shown in Table ES-2, reflect the use of the cleaner marine distillate fuels specified in the proposed regulation, although alternative control technologies could also be used to achieve equivalent reductions.  The estimates do not reflect participation in the "noncompliance fee provision" in the proposal that allow shippers to pay a fee in lieu of compliance because we cannot predict the rate of participation.  However, we would expect that the use of

noncompliance fees would be very limited, and whatever fees that are generated would be used to achieve emission reduction around the ports.

### Table ES-2:  Estimated Emission Reductions from Implementation of the Proposed Regulation

|  | Auxiliary Engine Emission Reductions (Tons per Day) | | |
| --- | --- | --- | --- |
| Year | PM | NOx | SOx |
| 2007 | 2.7 | 1.9 | 22 |
| 2010 | 3.7 | 2.3 | 32 |
| 2015 | 5.0 | 3.2 | 43 |
| 2020 | 7.0 | 4.4 | 61 |

The emission reductions shown for 2007 reflect the initial implementation of the fuel specifications in the proposal, assuming that the average sulfur content of the fuel will be 0.5 percent.  The 2010 and later reductions reflect the use of 0.1 percent sulfur marine gas oil, which is scheduled to be implemented in 2010 subject to the results of a feasibility evaluation required under the proposed regulation.   Figure ES-4 provides a graphical depiction of the change in diesel PM emissions expected with implementation of the regulation.

### Figure ES-4:  Estimated Diesel PM Emissions in 24 nm Zone With and Without the Implementation of the Proposed Regulation



Significant air quality benefits are expected from the proposed regulation.  The reductions in diesel PM, NOx and SOx will help improve regional ambient air quality levels of PM and ozone.  We also anticipate significant health benefits due to reduced

mortality, incidences of cancer, PM related cardiovascular effects, chronic bronchitis, asthma, and hospital admissions for pneumonia and asthma-related conditions. These directly emitted diesel PM reductions are expected to reduce the number of premature deaths and other non-cancer health effects from air pollution in California. Staff estimates that the implementation of this regulation will avoid between 2007 and 2020 years approximately:

- 520 premature deaths (260 to 810, 95% CI)
- 14,000 asthma attacks (3,400 to 24,000, 95% CI)
- 120,000 work loss days (103,000 to 140,000, 95% CI)
- 650,000 minor restricted activity days (530,000 to 770,000, 95% CI)

With respect to potential cancer risk, ARB staff believes there will be significant reductions in exposures and potential cancer risks to residents that live near ports in California. For example, based on an analysis of the predicted 2008 and 2015 ambient diesel PM levels near the POLA and POLB, we estimate that in 2008 there will be a 70 percent reduction in the population-weighted average risk relative to the predicted risk levels in 2008 from ocean-going vessel auxiliary engine diesel PM emissions and a 78 percent reduction in 2015.

ARB staff has concluded that no significant adverse environmental impacts will occur from implementation of the proposed regulation. There will be no increase in emissions at any of the locations due to this proposed regulation. The locations experiencing the greatest emission reductions will be those areas nearest to the ports.

## 19.    What are the economic impacts of the proposed regulation?

The proposed regulation would directly impact businesses that operate large ocean-going vessels. These businesses would be required to reduce their emissions through the use of marine distillate fuels, or other equally effective emission control strategies. To estimate the costs of the proposed regulation, we assume compliance will occur through the use of marine distillate fuels. We also estimate that about ten percent of vessels will need to make some modifications to be able to use the specified fuels. For example, some vessels would add an additional fuel tank dedicated for the use of marine distillate fuels.

We estimate the total added fuel cost of the proposed regulation to be about $34 million annually, and about $38 million in 2010 when the lower sulfur fuel standard is scheduled to be implemented. We also estimate total capital costs of about $11 to $18 million for vessel modifications.

The total annual cost and cost-effectiveness of the proposed regulation is estimated in table ES-3 below by assigning all of the cost of the proposed regulation to each pollutant individually. Using this approach, the diesel PM cost-effectiveness would be about $26-27 per pound of diesel PM reduced. This estimate does not account for the fact that the proposed regulation would also reduce emissions of NOx and SOx. If half

of the compliance costs are attributed to diesel PM reductions, and half to NOx and SOx reductions, the diesel PM cost-effectiveness would be about $13-14 per pound.  Using either approach, these results compare favorably with the cost-effectiveness of other diesel PM regulations adopted by the Board.

**Table ES-3: Cost-Effectiveness of the Proposed Regulation\***

| Year | Total Annual Cost (dollars) | Emission Reductions (tons per year) | | | Cost-Effectiveness $/Ton and ($/pound) | | |
|---|---|---|---|---|---|---|---|
| | | NOx | PM | SOx | NOx | PM | SOx |
| 2007 - 2009 | 38 million | 575 | 730 | 5,800 | 66,000 ($33) | 52,000 ($26) | 6,600 ($3.20) |
| 2010 - 2011 | 42 million | 575 | 800 | 7,200 | 73,000 ($37) | 53,000 ($27) | 5,800 ($2.90) |

*The proposed regulation becomes effective on January 1, 2007.  A lower sulfur 0.1 percent marine gas oil is scheduled for implementation on January 1, 2010, subject to review.  The emission reductions and costs shown are based on the 2004 emissions inventory to be consistent with other 2004 data used.  The emission reductions in 2007 and 2010 will be greater than the emission reduction figures shown.

The cost to individual businesses will vary widely based on factors such as the following:

- number of vessels visiting California ports;
- number of California port visits per vessel;
- power generated by the auxiliary engines;
- whether the vessel is a "diesel-electric" vessel; and
- number of vessels requiring retrofits.

For example, a business that owns a single small cargo vessel that makes a single annual visit to a California port visit may incur an added cost of a couple thousand dollars.  On the other hand, a large vessel operator with several vessels making frequent California port visits may incur added fuel costs approaching a million dollars annually.

Table ES-4 below provides a summary of the added costs to a typical company.  The added costs are higher for operators of diesel-electric vessels because their engines use more fuel than the auxiliary engines on other vessels, and because they are primarily large cruise vessel companies that make more frequent visits to California ports.

**Table ES-4:  Estimated Added Fuel Cost to Typical Vessel Operators***

| Type of Company | Capital Cost* | Average Added Annual Fuel Cost |
|---|---|---|
| Cargo Vessel | $100,000 per vessel | $20,000 per company |
| Passenger Cruise Vessel/Diesel-electric | $100,000 to $500,000 per vessel | $2,000,000 per company |

* Most companies will not need to modify their vessels.  Average added annual fuel costs are rounded.

We estimate that affected businesses will be able to absorb the costs of the proposed regulation with no significant adverse impacts on their profitability.  This finding is based on the staff's analysis of the estimated change in "return on owner's equity" (ROE).  The analysis found that the overall change in ROE for typical businesses was less than one percent.  Generally, a decline of more than ten percent in ROE suggests a significant impact on profitability.  In addition, the added costs of the proposed regulation are a small fraction of the overall operating costs of these large vessels.

Another way to analyze the costs of the proposed regulation is to assume all of the added costs are passed on to the customer.  Using this type of analysis, we do not expect significant impacts on the customers of oceangoing vessel operators.  For example, we estimate that the added costs of the proposed regulation would add about a dollar per container for importers or exporters shipping containerized goods overseas.  We estimate that this represents less than one percent of the shipping cost.  For passenger cruise ships, we estimate the added cost of the proposed regulation for a typical Los Angeles to Mexico cruise would be about $8 per passenger, representing about a 2 percent fare increase.

Since the proposal would not significantly alter the profitability of most businesses, we do not expect a noticeable change in employment, business creation, elimination, or expansion, and business competitiveness in California.  We also found no significant adverse economic impacts on any local or State agencies.

**20.    How does the proposed regulation compare to other air quality regulations affecting ocean-going vessel auxiliary engines?**

The U.S. EPA and the International Maritime Organization (IMO) have adopted regulations designed to reduce the emissions from these engines.  However, these existing regulations will achieve relatively modest diesel PM reductions compared to the proposed regulation.  The U.S. EPA and IMO regulations are summarized below in Table ES-5.

**Table ES-5: Summary of U.S. EPA and IMO Regulations**

| Regulation | Description of Regulation | Comparison to the ARB Staff Proposal |
|---|---|---|
| IMO Annex VI New Engine Standards | Establishes NOx exhaust standards for new marine engines.  Engine manufacturers have complied since 2000. | ▪Standards do not reduce PM and achieve modest NOx benefits |
| U.S. EPA 1999 Category 1&2 Engine Rule | Establishes NOx+HC, PM, and CO exhaust standards for new marine engines.  Implementation starts in 2007 for most vessel auxiliary engines. | ▪ Standards only apply to U.S.-flagged vessels.<br>▪ Foreign trade exemption is provided that exempts most vessel auxiliary engines<br>▪ Benefits phase in slowly with vessel turnover |
| U.S. EPA 2003 Category 3  Engine Rule | Establishes NOx exhaust standards for new marine propulsion engines equivalent to IMO standards.  Would apply large "auxiliary" engines on diesel-electric vessels | ▪ Standards only apply to U.S. flagged vessels<br>▪ Eliminates the foreign trade exemption for category 1 & 2 vessels (see above) |
| Annex VI IMO marine fuel sulfur limit | Establishes a fuel sulfur cap of 4.5 percent. | Very little fuel is available with a sulfur content this high. |
| EPA Nonroad diesel Rule | Establishes sulfur limits for diesel fuel used in marine applications | Exempts heavy fuel oil, and marine diesel oil. |

In addition to the regulations summarized above (which apply to engines operated in the United States), the European Union countries have developed measures that will reduce emissions from oceangoing vessels.  In November, 2002, the European Commission adopted a European Union Strategy to reduce atmospheric emissions from seagoing ships.  A step toward implementing this strategy is *Directive 2005/33/EC of the European Parliament and Council Modifying Directive 1999/32 as Regards the Sulfur Content of Marine Fuels* (Directive 2005/33/EC).   Directive 2005/33/EC enters into force on August 11, 2005, and includes the following provisions:

- A 1.5 percent sulfur limit for marine fuels used by all seagoing vessels in the Baltic Sea starting May 19, 2006, and in the North Sea and English Channel starting in Autumn 2007;
- A 1.5 percent sulfur limit for marine fuels used by passenger vessels on regular services between EU ports, starting May 19, 2006; and
- A 0.1 percent sulfur limit on fuel used by inland vessels and by seagoing ships at berth in EU ports, staring January 1, 2010.

The provision regarding the use 0.1 percent sulfur fuel by seagoing ships at berth is very similar to the staff's proposal.  Like the staff's proposal, the EU control measure specifies a 0.1 percent sulfur limit in 2010.  However, the staff's proposal extends out 24 nm, while the EU proposal only applies at berth.

ES-18

**21.     How was this proposal developed?**

Staff began the development of the proposal with the creation of the Maritime Air Quality Technical Working Group (MWG) in late 2001.  During MWG meetings, staff discussed different approaches to reduce marine vessel emissions at the conceptual stage.  In late 2004, staff began a series of public workshops focused on the proposed regulation for auxiliary engines.  Extensive efforts were made to ensure that the public and affected parties were aware of and had the opportunity to participate in the development of this proposal.  For example, meetings to discuss the proposal were held at times and locations that encouraged public participation, including meetings at California ports and evening sessions.  Attendees included representatives from environmental organizations, community groups, port administration, vessel operators, engine manufacturers, fuel producers, the U.S. Coast Guard, local and federal air quality agencies, and other parties interested in marine emissions.  These stakeholders participated both by providing data and reviewing draft regulations, and by participating in open forum workshops, in which staff directly addressed their concerns.  During these meetings, ARB staff discussed a number of regulatory strategies at the concept stage, including the current proposal.  Nearly 400 individuals and/or companies were notified for each workshop through a series of mailings.  Notices were posted to ARB's marine and public workshops web sites and e-mailed to subscribers of the marine electronic list server.

As a way of inviting public participation and enhancing the information flow between ARB and interested parties, staff created a commercial marine Internet website (http://www.arb.ca.gov/msprog/offroad/marinevess/marinevess.htm) in 2001.  Since that time, staff has consistently made available on the website all related documents, including meeting presentations and draft versions of the proposed regulatory language.  The website has also provided workshop and meeting notices and materials, other marine related information, and has served as a portal to other websites with related information.

Recognizing that other states also have concerns about marine emissions, and that uniformity of requirements should be promoted, ARB set up a States Marine Emission Reduction Group.  ARB staff schedules periodic meetings with this group, which includes regulatory agencies in other states and Canada.

**22.     How does the proposed regulation relate to the State Implementation Plan for Ozone and PM?**

On October 23, 2003, ARB adopted the *Proposed 2003 State and Federal Strategy for the California State Implementation Plan* (State and Federal Strategy).  The State and Federal Strategy identifies the Board's regulatory agenda to reduce ozone and PM by establishing targets to develop and adopt new measures for each year from 2003 to 2006.  In addition to meeting federal requirements, the Statewide Strategy ensures continued progress towards California's own health-based standards.  The State and

Federal Strategy includes a commitment to reduce emissions from the existing fleet of ocean-going vessels. The proposed regulation will help to fulfill this commitment.

## 23. How does the proposed regulation relate to ARB's goals for Environmental Justice?

Environmental Justice is defined as the fair treatment of people of all races, cultures, and incomes with respect to the development, adoption, implementation, and enforcement of environmental laws, regulations, and policies. ARB's Environmental Justice Policies are intended to promote the fair treatment of all Californians and cover the full spectrum of ARB's activities.

The proposed regulation is consistent with the environmental justice policy to reduce health risks from toxic air contaminants in all communities, including those with low-income and minority populations, regardless of location. The proposal will reduce diesel PM, NOx and SOx emissions from ocean-going vessels for all communities near California ports and shipping lanes, particularly for communities near the ports of Los Angeles, Long Beach and Oakland.

## 24. What future activities are planned?

In addition to activities associated with monitoring and compliance with the proposed regulation, staff recognizes the need to conduct a number of other activities. These activities include:

- outreach to the vessel operators that only visit California ports occasionally to ensure that they are aware of the requirements of the proposal;
- develop procedures to implement the Noncompliance Fee Provision, and ensure funds are used effectively to reduce port and marine emissions; and
- continue to encourage the U.S. EPA and the IMO to take a more active role in reducing emissions from ocean-going vessels.

In addition, staff recognizes the need to achieve additional emission reductions from ocean-going vessels. Reducing emissions from the main propulsion engines on ocean-going vessels will be the next priority. While the emissions from these engines are mostly emitted outside the ports, they contribute far more emissions than those affected by the current proposal. Another area for investigation is the potential for emission reductions from vessels that make frequent calls at California ports. One such option for these vessels may be the use of shore-side power. ARB staff is developing a study of the feasibility of implementing shore-side power hookups that will investigate the technical and economic issues. These and other potential emission reduction strategies will be evaluated as part of an effort to develop a port and intermodal goods movement Comprehensive Emission Reduction Plan that will define the strategies needed to reduce public health impacts from ports and related activities. This effort, which is part of the Governor's Phase II Goods Movement Action Plan, is currently underway and it is expected to be completed by the end of 2005.

**25.    What is staff's recommendation?**

We recommend that the Board approve the proposed regulation presented in this report (Appendix A).  The proposal will reduce emissions of diesel PM, NOx, and SOx, resulting in significant health benefits to the public.  In particular, communities near California's major ports and shipping lanes benefit from reduced exposure to the potential cancer risk from diesel PM.  Staff believes that the proposal is technologically and economically feasible and necessary to carry out the Board's responsibilities under State law.


**REFERENCES**

(Directive 2005/33/EC) European Union Official Journal, Directive 2005/33/EC of the European Parliament and of the Council of 6 July 2005 amending Directive 1999/32/EC

## I.    INTRODUCTION

In this chapter, the Air Resources Board (ARB or Board) staff provides an overview of the Staff Report, discusses the purpose of the proposed regulation ("proposal"), and discusses the regulatory authority ARB has to adopt the proposed regulation.  We also discuss the process used to include all interested stakeholders in the development of the proposal, including providing opportunities for meaningful public participation.

## A.    Overview

This report presents the proposed regulation to reduce emissions of diesel particulate matter (PM), nitrogen oxides (NOx), and sulfur oxides (SOx) from diesel auxiliary engines used on ocean-going vessels within 24 nautical miles of the California Coastline.  A detailed summary of the requirements of the proposal are included in Chapter V.  The report also shares the information that ARB staff used in developing the proposal.  This information includes:

- the health effects associated with exposure to diesel PM, NOx, and SOx emissions (Chapter II);
- a description of the affected industry and the existing regulations designed to reduce emissions from auxiliary engines used on ocean-going vessels (Chapter III);
- the diesel PM, NOx, and SOx emission inventory and health risks posed by auxiliary engines used on ocean-going vessels (Chapter IV);
- a summary of the provisions in the proposal, and a discussion of the regulatory alternatives to the proposal that were considered (Chapter V);
- a discussion of the technical feasibility of using the fuels specified in the proposal, and other control technology options (Chapter VI);
- the environmental impacts of implementing the proposal (Chapter VII); and
- the estimated costs to industry and the fiscal impacts of these costs (Chapter VIII).

In developing the proposal, there were a number of technical and policy issues that had to be addressed.  These included the impacts of the proposal on diesel-electric vessels, vessels requiring modifications to use distillate fuel, and the scope of the Alternative Compliance Plan provision.  These and other key issues are discussed in Chapter IX, Additional Considerations.

The text of the proposal and other supporting information are found in the Appendices.

**B.    Purpose**

The purpose of this proposal is to reduce emissions of diesel PM, NOx, SOx, and "secondarily" formed PM (PM formed in the atmosphere from NOx and SOx emissions). Diesel PM emission reductions are needed to reduce the potential cancer risk, premature mortality and other adverse impacts from PM exposures to people who live in the vicinity of California's major ports and shipping lanes.  Reductions in diesel PM and SOx (which forms "secondary" sulfate PM in the atmosphere) will also contribute to regional PM reductions that will assist in California's progress toward achieving State and federal air quality standards.  Reductions in NOx, an ingredient in the formation of ozone pollution, will help reduce regional ozone levels and secondary nitrate PM.  The health impacts of these pollutants are described in Chapter II.

**C.    Regulatory Authority**

Under State and federal law, ARB can regulate both criteria pollutant and toxic diesel PM emissions from marine vessels.  Health and Safety Code (H&SC) sections 43013 and 43018 authorize ARB to regulate marine vessels to the extent such regulation is not preempted by federal law.  Also, H&SC § 39666 requires ARB to regulate emissions of toxic air contaminants (TAC) from nonvehicular sources, which include ocean-going vessels.  The proposed regulation reduces or limits diesel PM, which is both a TAC and criteria pollutant, and NOx and SOx, which are both criteria pollutants.

The proposed regulation is neither preempted under federal law, nor does it violate the Commerce Clause.  Federal authorization under section 209(e) of the Clean Air Act (CAA) is required for regulating new nonroad engines and for requiring retrofits on existing engines.  Ocean-going vessel engines, by definition, fall within the category of nonroad engines.  However, no federal authorization is required for implementing in-use operational requirements on existing marine vessels and their engines.

Further, the proposed regulation does not conflict with the Ports and Waterways Safety Act (PWSA) and U.S. Coast Guard regulations.  As a non-discriminatory regulation with substantial benefits, the proposed regulation does not violate the Commerce Clause.  And federal and state cases support our authority to regulate both U.S. and foreign-flag vessels within California Coastal Waters.  Therefore, federal law does not preempt the proposed regulation, nor does the regulation violate the requirements of the Commerce Clause.

The ARB's legal authority to promulgate the proposed regulation is discussed in more detail in Appendix B.

**D.    Public Outreach and Environmental Justice**

Environmental Justice

ARB is committed to integrating environmental justice in all of its activities.  On December 13, 2001, the Board approved "Policies and Actions for Environmental Justice," which formally established a framework for incorporating Environmental Justice into ARB's programs, consistent with the directive of California State law. Environmental Justice is defined as the fair treatment of people of all races, cultures, and incomes with respect to the development, adoption, implementation, and enforcement of environmental laws, regulations, and policies.  These policies apply to all communities in California, but recognize that environmental justice issues have been raised more in the context of low-income and minority communities.

The Environmental Justice Policies (Policies) are intended to promote the fair treatment of all Californians and cover the full spectrum of ARB's activities.  Underlying these Policies is a recognition that the agency needs to engage community members in a meaningful way as it carries out its activities.  People should have the best possible information about the air they breathe and what is being done to reduce unhealthful air pollution in their communities.  The ARB recognizes its obligation to work closely with all communities, environmental and public health organizations, industry, business owners, other agencies, and all other interested parties to successfully implement these Policies.

During the development process, ARB staff searched for opportunities to present information about the proposed regulation at places and times convenient to stakeholders.  For example, the meetings were held at times and locations that encouraged public participation, including meetings at California ports, and evening sessions.  Attendees included representatives from environmental organizations, community groups, port administration, vessel operators, engine manufacturers, fuel producers, the U.S. Coast Guard, local and federal air quality agencies, and other parties interested in marine emissions.  These individuals participated both by providing data and reviewing draft regulations, and by participating in open forum workshops, in which staff directly addressed their concerns.  Table I-1 below provides meeting dates that were made to apprise the public about the development of the proposed regulation.

**Table I-1:  Workshop/Outreach Meeting Locations and Times**

| Date | Meeting | Location | Time |
|------|---------|----------|------|
| December 6, 2001 | Maritime Working Group | Port of Long Beach | 10:30 a.m. |
| April 9, 2002 | Maritime Working Group | Port of Long Beach | 9:30 a.m. |
| May 23, 2002 | Maritime Working Group/Incentives Subgroup | Phillip Burton Federal Building, San Francisco | 10:00 a.m. |
| July 26, 2002 | Maritime Working Group | Port of Oakland | 9:00 a.m. |
| December 3, 2003 | Maritime Working Group | Port of Los Angeles | 10:30 a.m. |
| April 8, 2004 | Maritime Working Group | Cal/EPA Building, Sacramento | 10:00 a.m. |
| Sept. 9-10, 2004 | Conference on Air Quality, Int'l Trade and Transportation | Marina Hotel, San Pedro | 10:00 a.m. |
| October 27, 2004 | No Net Increase Air Quality Task Force | Sheraton LA Harbor Hotel, San Pedro | 1:00 p.m. |
| November 10, 2004 | Public Workshop | Cal/EPA Building, Sacramento | 1:30 p.m. |
| January 19, 2005 | Port Community Advisory Committee | Port of Los Angeles | 4:30 p.m. |
| February 24, 2005 | California Air Resources Board: Board Meeting | Cal/EPA Building, Sacramento | 9:00 a.m. |
| April 7, 2005 | Environmental Law Super Symposium | Omni Hotel, Los Angeles | 1:00 p.m. |
| May 18, 2005 | Public Workshop | Cal/EPA Building, Sacramento | 1:00 p.m. |
| August 15, 2005 | Workgroup Meeting | Teleconference | 9:00 a.m. |
| August 24, 2005 | Public Workshop | Port of Long Beach | 1:00 p.m. |
| August 24, 2005 | Community Workshop | Long Beach Senior Center | 6:00 p.m. |
| October 4, 2005 | Workgroup Meeting | Teleconference | 1:30 p.m. |
| October 7, 2005 | Bunkerworld Forum: Marine Fuel Sustainability | Hyatt Regency, San Francisco | 11:00 a.m. |

The proposal is consistent with the environmental justice policy to reduce health risks in all communities, including those with low-income and minority populations, regardless of location.  The proposal will achieve the most significant reductions in emissions in the

communities adjacent to the ports of Los Angeles, Long Beach, and Oakland, where the greatest shipping activity occurs.  The proposal will also provide air quality benefits to other coastal regions, particularly near shipping lanes and the other ports.

<u>Outreach Efforts</u>

Since the identification of diesel PM as a toxic air contaminant (TAC) in 1998, the public has been more aware of the health risks posed by the emissions of this TAC.  At many of ARB's community outreach meetings over the past few years, the public has raised questions regarding our efforts to reduce exposure to diesel PM.  At these meetings, ARB staff told the public about the Diesel Risk Reduction Plan adopted in 2000 and described some of the measures in that plan, including those for marine vessels.

To create a forum for the discussion of marine and port air quality issues, ARB formed the Maritime Air Quality Technical Working Group (Maritime Working Group or "MWG") in late 2001.  The MWG provided an opportunity for ARB staff to include the public in the early stages of developing strategies to reduce emissions from marine sources, including the emissions from the existing fleet of ocean-going vessels.  From late 2001 to early 2004, ARB held five such meetings.  During these meetings, ARB staff discussed a number of regulatory strategies at the concept stage, including the current proposal.  Five public workshops or workgroup meetings have also been held since late 2004 to discuss draft language for the proposed regulation.  During this process, staff has modified the proposal based on the comments received.

Nearly 400 individuals and/or companies were notified for each workshop through a series of mailings.  Notices were posted to ARB's marine and public workshops web sites and e-mailed to subscribers of the marine electronic list server.

Recognizing that other states also have concerns about marine emissions, and that uniformity of requirements should be promoted, ARB set up a States Marine Emission Reduction Group.  The ARB staff schedules periodic meetings with this group, which includes regulatory agencies in other states and Canada, including the following: Environment Canada, the Northeast States for Coordinated Air Use Management, the New York State Department of Environmental Conservation, the Puget Sound Clean Air Agency, the Alaska Department of Environmental Conservation, Northeast States Clean Air Foundation, Texas Commission on Environmental Quality, Washington State Department of Ecology, and the Oregon Department of Environmental Equality.   During these meetings, status reports are given on the progress of marine air quality projects, including the proposed regulation.

In addition to the public meetings presented in Table I-1, ARB staff and management participated in numerous meetings with industry, government agencies, and environmental groups over the past three years.  During these meetings, staff presented information on ARB's plans to regulate emissions from marine vessels, and incorporated the feedback from stakeholders.  Some of the groups participating were the Pacific Merchant Shipping Association, International Council of Cruise Lines,

Western States Petroleum Association, Ports of Los Angeles, Long Beach, Oakland, and San Francisco, the U.S. Maritime Administration, U.S. Environmental Protection Agency, U.S. Coast Guard, U.S. Navy, California Maritime Academy, California State Lands Commission, South Coast Air Quality Management District, Santa Barbara County Air Quality Management District, Coalition for Clean Air, Environmental Defense, Natural Resources Defense Council, Union of Concerned Scientists, Citizens for a Better Environment, Wilmington Coalition for a Safe Environment, and San Pedro Homeowners Association.

As a way of inviting public participation and enhancing the information flow between ARB and interested parties, staff created a commercial marine Internet web site (http://www.arb.ca.gov/msprog/offroad/marinevess/marinevess.htm) in 2001.  Since that time, staff has consistently made available on the web site all related documents, including meeting presentations and draft versions of the proposed regulatory language. The web site has also provided workshop, meeting notices and materials, and other marine related information, along with serving as a portal to other web sites with related information.

Outreach efforts have also included hundreds of personal contacts via telephone, electronic mail, regular mail, surveys, facility visits, and individual meetings with interested parties.  These contacts have included interactions with engine manufacturers and operators, emission control system manufacturers, local, national, and international trade association representatives, environmental, State agencies, military officials and representatives, and other federal agencies.

## II.    NEED FOR CONTROL OF DIESEL PARTICULATE MATTER

In 1998, the Air Resources Board identified diesel PM as a toxic air contaminant (TAC). Diesel PM is by far the most important TAC and contributes over 70 percent of the estimated risk from air toxic contaminants today.  In September 2000, ARB approved the "Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles" (Diesel Risk Reduction Plan).  The goal of the Diesel Risk Reduction Plan is to reduce diesel PM emissions and the associated cancer risk by 85 percent in 2020.  In addition, the Office of Environmental Health Hazard Assessment (OEHHA) identified diesel PM in 2001 as one of the TACs that may cause children or infants to be more susceptible to illness, pursuant to the requirements of Senate Bill 25 (Stats. 1999, ch. 731).  Senate Bill 25 also requires ARB to adopt control measures, as appropriate, to reduce the public's exposure to these special TACs (H&SC section 39669.5).  In the following sections, we describe the physical and chemical characteristics of diesel PM and discuss the adverse health and environmental impacts from the suite of pollutants emitted by diesel-fueled engines.

### A.    Physical and Chemical Characteristics of Diesel PM

Diesel engines emit a complex mixture of inorganic and organic compounds that exist in gaseous, liquid, and solid phases.  The composition of this mixture will vary depending on engine type, engine age and horsepower, operating conditions, fuel, lubricating oil, and whether or not an emission control system is present.  The primary gas or vapor phase components include typical combustion gases and vapors such as carbon monoxide (CO), carbon dioxide ($CO_2$), sulfur dioxide ($SO_2$), oxides of nitrogen (NOx), reactive organic gases (ROG), water vapor, and excess air (nitrogen and oxygen).

Many of the diesel particles exist in the atmosphere as a carbon core with a coating of organic carbon compounds, or as sulfuric acid and ash, sulfuric acid aerosols, or sulfate particles associated with organic carbon.  (Beeson, 1998)  The organic fraction of the diesel particle contains compounds such as aldehydes, alkanes and alkenes, and high-molecular weight polycyclic aromatic hydrocarbons (PAH) and PAH-derivatives.  Many of these PAHs and PAH-derivatives, especially nitro-PAHs, have been found to be potent mutagens and carcinogens.  Nitro-PAH compounds can also be formed during transport through the atmosphere by reactions of adsorbed PAH with nitric acid and by gas-phase radical-initiated reactions in the presence of oxides of nitrogen.  Fine particles may also be formed secondarily from gaseous precursors such as $SO_2$, NOx, or organic compounds.  Fine particles can remain in the atmosphere for days to weeks and travel through the atmosphere for hundreds to thousands of kilometers, while coarse particles deposit to the earth within minutes to hours and within tens of kilometers from the emission source.

Almost the entire diesel particle mass is in the fine particle range of 10 microns or less in diameter ($PM_{10}$).  Approximately 94 percent of the mass of these particles are less than 2.5 microns ($PM_{2.5}$) in diameter.  Diesel PM can be distinguished from noncombustion sources of $PM_{2.5}$ by the high content of elemental carbon with the

adsorbed organic compounds and the high number of ultrafine particles (organic carbon and sulfate).

The soluble organic fraction (SOF) consists of unburned organic compounds in the small fraction of the fuel and atomized and evaporated lube oil that escape oxidation. These compounds condense into liquid droplets or are adsorbed onto the surfaces of the elemental carbon particles.  Several components of the SOF have been identified as individual TACs.

## B.     Health Impacts of Exposure to Diesel PM, Ambient Particulate Matter, Ozone, and Sulfur Dioxide

The proposed regulation will reduce the public's exposure to diesel PM as well as reduce ambient particulate matter.  In addition, the proposed regulation is expected to result in reductions in NOx and SOx.  NOx is a precursor to the formation of ozone, and both NOx and SOx also contribute to secondarily formed PM in the lower atmosphere. The primary health impacts of these air pollutants are discussed below.

Diesel Particulate Matter

Diesel PM is of specific concern because it poses a lung cancer hazard for humans as well as a hazard from noncancer respiratory effects such as pulmonary inflammation. (ARB, 1998a)  Because of their small size, the particles are readily respirable and can effectively reach the lowest airways of the lung along with the adsorbed compounds, many of which are known or suspected mutagens and carcinogens.  (ARB, 2002)  More than 30 human epidemiological studies have investigated the potential carcinogenicity of diesel PM.  On average, these studies found that long-term occupational exposures to diesel exhaust were associated with a 40 percent increase in the relative risk of lung cancer.  (ARB, 1998b)  However, there is limited specific information that addresses the variable susceptibilities to the carcinogenicity of diesel exhaust within the general human population and vulnerable subgroups, such as infants and children and people with preexisting health conditions.  The carcinogenic potential of diesel exhaust was also demonstrated in numerous genotoxic and mutagenic studies on some of the organic compounds typically detected in diesel exhaust.  (ARB, 1998b)

Diesel PM was listed as a TAC by ARB in 1998 after an extensive review and evaluation of the scientific literature by OEHHA.  (ARB 1998c)  Using the cancer unit risk factor developed by OEHHA for the TAC program, it was estimated that for the year 2000, exposure to statewide average population-weighted ambient concentrations of diesel (1.8 $\mu g/m^3$) could be associated with a health risk of 540 potential cancer cases per million people exposed over a 70 year lifetime.

Another highly significant health effect of diesel exhaust exposure is its apparent ability to act as an adjuvant in allergic responses and possibly asthma.  (Dab, 2000; Diaz-Sanchez, 1996; Kittelson, 1999)  However, additional research is needed at diesel

exhaust concentrations that more closely approximate current ambient levels before the role of diesel PM exposure in the increasing allergy and asthma rates is established.

### Ambient Particulate Matter

The key health effects categories associated with ambient particulate matter, of which diesel PM is an important component, include premature mortality; aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions and emergency room visits, school absences, work loss days, and restricted activity days); aggravated asthma; acute respiratory symptoms, including aggravated coughing and difficult or painful breathing, chronic bronchitis, and decreased lung function that can be experienced as shortness of breath.  (U.S. EPA, 2000; U.S. EPA, 2003)

Health impacts from exposure to the fine particulate matter ($PM_{2.5}$) component of diesel exhaust have been calculated for California, using concentration-response equations from several epidemiological studies.  Both mortality and morbidity effects could be associated with exposure to either direct diesel $PM_{2.5}$ or indirect diesel $PM_{2.5}$, the latter of which arises from the conversion of diesel $NO_x$ emissions to $PM_{2.5}$ nitrates.  It was estimated that 2000 and 900 premature deaths resulted from long-term exposure to either 1.8 $\mu g/m^3$ of direct $PM_{2.5}$ or 0.81 $\mu g/m^3$ of indirect $PM_{2.5}$, respectively, for the year 2000.  (Lloyd, 2001)  The mortality estimates are likely to exclude cancer cases, but may include some premature deaths due to cancer, because the epidemiological studies did not identify the cause of death.  Exposure to fine particulate matter, including diesel $PM_{2.5}$, can also be linked to a number of heart and lung diseases.

### Ozone

Diesel exhaust consists of hundreds of gas-phase, particle-phase, and semi-volatile organic compounds, including typical combustion products, such as $CO_2$, hydrogen, oxygen, and water vapor.  Diesel exhaust also includes compounds resulting from incomplete combustion, such as CO, ROG, carbonyls, alkenes, aromatic hydrocarbons, PAHs, PAH derivatives, and SOx.  Ozone is formed by the reaction of ROG and NOx in the atmosphere in the presence of heat and sunlight.  The highest levels of ozone are produced when both ROG and NOx emissions are present in significant quantities on hot, clear summer days.  This pollutant is a powerful oxidant that can damage the respiratory tract, causing inflammation and irritation, which can result in breathing difficulties.

Studies have shown that there are impacts on public health and welfare from ozone at moderate levels.  Short-term exposure to high ambient ozone concentrations have been linked to increased hospital admissions and emergency visits for respiratory problems.  (Peters, 2001)  Repeated exposure to ozone can make people more susceptible to respiratory infection and lung inflammation and can aggravate preexisting respiratory diseases, such as asthma.  Prolonged (six to eight hours), repeated exposure to ozone can cause inflammation of the lung, impairment of lung defense mechanisms, and possibly irreversible changes in lung structure, which over time could lead to premature

aging of the lungs and/or chronic respiratory illnesses such as emphysema and chronic bronchitis.

The population subgroups most susceptible to ozone health effects include individuals exercising outdoors, children and people with preexisting lung disease such as asthma, and chronic pulmonary lung disease. Children are more at risk from ozone exposure because they typically are active outside, during the summer when ozone levels are highest. Also, children are more at risk than adults from ozone exposure because their respiratory systems are still developing. Adults who are outdoors and moderately active during the summer months, such as construction workers and other outdoor workers, also are among those most at risk. These individuals, as well as people with respiratory illnesses such as asthma, especially asthmatic children, can experience reduced lung function and increased respiratory symptoms, such as chest pain and cough, when exposed to relatively low ozone levels during prolonged periods of moderate exertion.

<u>Sulfur Dioxide and Sulfates</u>

Sulfur dioxide ($SO_2$) is a gaseous compound of sulfur and oxygen. $SO_2$ is formed when sulfur-containing fuel is burned by mobile sources, such as locomotives, vessels, and off-road diesel equipment. $SO_2$ is also emitted from several industrial processes, such as petroleum refining and metal processing.

$SO_2$ causes a wide variety of health and environmental impacts because of the way it reacts with other substances in the air. Particularly sensitive groups include people with asthma who are active outdoors and children, the elderly, and people with heart or lung disease. Effects from $SO_2$ exposures at levels near the one-hour standard include bronchoconstriction accompanied by symptoms, which may include wheezing, shortness of breath and chest tightness, especially during exercise or physical activity. Children, the elderly, and people with asthma, cardiovascular disease or chronic lung disease (such as bronchitis or emphysema) are most susceptible to these symptoms. Continued exposure at elevated levels of $SO_2$ results in increased incidence of pulmonary symptoms and disease, decreased pulmonary function, and increased risk of mortality.

Sulfates ($SO_4^{2-}$) are the fully oxidized ionic form of sulfur. Sulfates occur in combination with metal and / or hydrogen ions. In California, emissions of sulfur compounds occur primarily from the combustion of petroleum-derived fuels (e.g., gasoline and diesel fuel) that contain sulfur. This sulfur is oxidized to sulfur dioxide ($SO_2$) during the combustion process and subsequently converted to sulfate compounds in the atmosphere. The conversion of $SO_2$ to sulfates takes place comparatively rapidly and completely in urban areas of California due to regional meteorological features. When these are breathed, they gather in the lungs and are associated with increased respiratory symptoms and disease, difficulty in breathing, and premature death. (ARB 1991a,b; ARB 1994a,b; EPA, 2000a)

## C.     Applicability of the Cancer Potency Factor for Diesel PM to Engines Using Marine Gas Oil, Marine Diesel Oil, or Marine Heavy Fuel Oil

ARB staff, in consultation with OEHHA, has concluded that particulate matter emissions from ocean-going vessel diesel (compression ignition) engines operating on marine gas oil (MGO), marine diesel oil (MDO), or marine heavy fuel oil (HFO) constitute "diesel particulate matter" emissions.  As such, the cancer potency factor and chronic reference exposure level for exhaust emissions from diesel-fueled engines, approved by the Scientific Review Panel and adopted by the ARB in 1998, are applicable to exhaust emissions from ocean-going vessel diesel engines using MGO, MDO, or HFO.  The basis for staff's conclusion is presented below.

Marine Gas Oil and Marine Diesel Oil

For the following reasons, ARB staff believes the health values developed for diesel PM are appropriate for emissions from diesel engines using MGO and MDO:

- MGO and MDO are distillate fuels with most fuel properties nearly identical to diesel fuel.

Marine gas oil is generally the heavier middle fraction product from the atmospheric distillation of crude oil.  Conventional diesel is the lighter middle fraction product from the atmospheric distillation of crude oil.  The key fuel properties for marine distillate fuel (MGO and MDO) are very similar to conventional diesel fuel that is used for on-road and off-road diesel engines.  The density, heating value, and hydrogen and carbon content for MGO, MDO and conventional diesel fuel are essentially the same.  The viscosity of MGO and conventional diesel are very close to the same; while the viscosity of MDO is somewhat higher the MGO or conventional diesel fuel.

The main difference among these fuels is the sulfur content.  Since diesel used in on-road and off-road applications are required to meet ARB and U.S. EPA sulfur content limits, conventional diesel fuel generally has lower sulfur content than MGO or MDO.  As discussed earlier, the current average sulfur content for MGO used by vessels visiting California ports is about 0.5 percent (5000 ppm).  Diesel fuel meeting ARB specification averages about 0.014 percent (140 ppm) and is scheduled to be reduced to 0.0015 percent (15 ppm) in 2006.  Generally, MGO will be sold as MDO if it has come in contact with HFO.

- The fuel specifications for MGO and MDO are very similar to the diesel fuel specification that existed prior to 1993.

MGO and MDO fuel specifications are very similar to pre-1993 diesel fuel.  Pre-1993 diesel fuels, compared to post-1993 diesel fuel in California, generally had higher aromatic content (33 vs. 20-25 vol. percent), higher sulfur (<5000 vs. 100-150 ppm Wt.), lower cetane number (>40 vs. 50-55), higher PAHs (8 vs. 2-5 Wt. percent) and higher nitrogen (300-600 vs. 40-500 ppm Wt.)  (ARB, 1998).  This is important in that one of

the key health studies linking increases cancer risk with exposure to diesel exhaust emissions was based on railroad workers exposed to diesel exhaust emissions in the 1950s through 1970s.

Heavy Fuel Oil

The health values developed for diesel PM are also appropriate for emissions from diesel engines using HFO since the basic fuel properties of HFO are similar to diesel fuel, and since emission characteristics from diesel engines using HFO are similar to diesel engines using diesel fuel.

- HFO is a blended petroleum product containing the same classes of hydrocarbons as diesel fuel

Heavy fuel oil, like diesel fuel, is comprised of a complex mixture of aliphatic, naphthenic, and aromatic hydrocarbons.  With both types of fuel, the final product will contain varying amounts of these classes of hydrocarbons based on the crude oil used and the refinery process.  Heavy fuel oil simply contains a higher proportion of heavier (higher molecular weight - typically having a carbon number from $C_{20}$ to $C_{50}$) versions of the same hydrocarbon types, and higher levels of sulfur, metals, and other contaminants.

- Heavy fuel oil contains some diesel fuel

Marine fuels may be separated into two basic types of fuels: distillate and residual (EPA, 1999).  Distillate fuel (e.g., diesel fuel and marine gas oil) is composed of the fractions of crude oil that are separated in a refinery by a boiling process, while the remaining fraction that did not boil is referred to as residual.  To produce fuels that can be conveniently handled and stored in industrial and marine installations, and to meet marketing specifications limits, the high viscosity residual components are normally blended with MGO or similar lower viscosity fractions. (CONCAWE, 1998)  For example, the most common grades of marine heavy fuel oil (IFO-380 and IFO-180) are composed of a mixture of residual compounds and distillate components (EPA, 1999; FAMM, 2001).  Specifically, typical heavy fuel oil has been estimated to contain as much as 12 percent distillate (EPA, 1999).

- The emission characteristics of a marine diesel engine using HFO are similar to those of a diesel engine using diesel fuel

The diesel engines covered by the proposed regulation are larger versions of typical land-based diesel engines.  They operate on a compression-ignition "diesel" cycle similar to land-based diesel engines.  Marine diesel engines are designed to burn HFO, MGO, or MDO.  The combustion process is nearly identical for any of these fuels.  The liquid petroleum based fuel is injected into the engine where it is compressed to the point of auto-ignition.  The peak combustion temperatures are similar for all of the fuels. While the relative magnitude of the combustion products may vary with fuel; the relative

percentage of organic material, elemental carbon, and ash are similar among the various fuels. The percent of sulfates and sulfate bound water is higher as the sulfur content of the fuel increases. As a result of the nearly identical combustion process, we would expect that the major combustion products of an engine burning HFO will be similar in chemical nature to an engine using diesel fuel.

- The general classes of PM exhaust components from a marine diesel engine using HFO are similar to a diesel engine using diesel fuel

The PM components emitted from vessel auxiliary engines using heavy fuel oil are the same as those emitted from a typical diesel engine: elemental carbon, ash, soluble organic compounds, and a sulfate fraction (Man B&W, 2004). However, the overall levels of PM will be significantly higher, and a greater proportion of the PM will be from sulfate. Specifically, as discussed in Chapter IV, we estimate that a typical vessel auxiliary engine running on 2.5 percent sulfur heavy fuel oil will emit about 1.5 g of PM per kW-hr. This compares to an emission factor of about 0.3 g/kw-hr for the same engine running on marine gas oil with a sulfur content of about 0.25 percent. Much of this difference is due to the sulfur content of the fuel, since sulfate PM is estimated to be directly related to fuel sulfur. The higher ash content and density of heavy fuel oil is also expected to play a role in the higher emissions from engines using heavy fuel oil (EPA 2002).

- The particle size distribution of the exhaust emissions from a marine diesel engine using HFO is similar to the particle size distribution from a diesel engine using diesel fuel

Preliminary results from testing performed in 2005 by the University of California, Riverside, CE-CERT, in association with Maersk and CARB, indicate that over 85 percent of the particulate matter emissions from a marine diesel engines burning HFO are less than 2.5 microns in size. These results are similar to results for diesel engines using diesel fuel where 95 percent of the particulate were found to be less than 2.5 microns in size. (ARB, 1998) These very small particles are more likely to be inhaled deep into the lung and, as a result, may pose more of a health issue than larger particles.

## D.    Health and Environmental Benefits from the Proposed Regulation

Reducing diesel PM emissions from vessel auxiliary engines will have both public health and environmental benefits. The proposed regulation will reduce localized health risks associated with the operation of vessel auxiliary engines that are near receptors and will contribute to the reduction of the general exposure to diesel PM that occurs on a region-wide basis due to collective emissions from diesel-fueled engines. Additional benefits associated with the proposed regulation include further progress in meeting the ambient air quality standards for $PM_{10}$, $PM_{2.5}$, and ozone, and enhancing visibility.

Reduced Diesel PM Emissions

The estimated reductions in diesel PM emissions and the associated benefits from reduced exposure and risk are discussed in detail in Chapter VIII.

Reduced Ambient Particulate Matter Levels

Reducing diesel PM will also help efforts to achieve the ambient air quality standards for particulate matter. Both the State of California and the U.S. EPA have established standards for the amount of $PM_{10}$ and $PM_{2.5}$ in the ambient air. These standards define the maximum amount of PM that can be present in outdoor air. California's $PM_{10}$ standards were first established in 1982 and updated June 20, 2002. It is more protective of human health than the corresponding national standard. Additional California and federal standards were established for $PM_{2.5}$ to further protect public health (Table II-1).

**Table II-1:  State and National PM Standards**

| California Standard | | National Standard | |
|---|---|---|---|
| **$PM_{10}$** | | | |
| Annual Arithmetic Mean | 20 $\mu g/m^3$ | Annual Arithmetic Mean | 50 $\mu g/m^3$ |
| 24-Hour Average | 50 $\mu g/m^3$ | 24-Hour Average | 150 $\mu g/m^3$ |
| **$PM_{2.5}$** | | | |
| Annual Arithmetic Mean | 12 $\mu g/m^3$ | Annual Arithmetic Mean | 15 $\mu g/m^3$ |
| 24-Hour Average | No separate State standard | 24-Hour Average | 65 $\mu g/m^3$ |

Particulate matter levels in most areas of California exceed one or more of current State PM standards. The majority of California is designated as non-attainment for the State $PM_{10}$ standard (ARB 2002). Diesel PM emission reductions from diesel-fueled engines will help protect public health and assist in furthering progress in meeting the ambient air quality standards for both $PM_{10}$ and $PM_{2.5}$.

The emission reductions obtained from this proposal will result in lower ambient particulate matter levels and significant reductions of exposure to primary diesel and secondary PM resulting from NOx and SOx emissions from auxiliary engines. Lower ambient particulate matter levels and reduced exposure mean reduction of the prevalence of the diseases attributed to diesel PM, reduced incidences of hospitalizations, and prevention of premature deaths.

Reduced Ambient Ozone Levels

Emissions of NOx, a precursor to the formation of ozone in the lower atmosphere, will also be reduced by the proposed regulation. In California, most major urban areas and many rural areas are non-attainment for the State and federal 8-hour ambient air quality

standard for ozone.  Controlling emissions of ozone precursors would reduce the prevalence of the types of respiratory problems associated with ozone exposure and would reduce hospital admissions and emergency visits for respiratory problems. Ozone can also have adverse health impacts at concentrations that do not exceed the 8-hour NAAQS.  Reducing NOx emissions will also reduce secondarily formed PM (nitrates).

### Table II-2:  State and National Ozone Standards

|        | California Standard | National Standard |
|--------|---------------------|-------------------|
| 1 hour | 0.09 ppm (180 $\mu$g/m$^3$) |  |
| 8 hour | 0.07 ppm (137 $\mu$g/m$^3$) | 0.08 ppm (157 $\mu$g/m$^3$) |

Improved Visibility

In addition to the public health effects of fine particulate pollution, inhalable particulates including sulfates, nitrates, organics, soot, and soil dust contribute to regional haze that impairs visibility.

In 1999, the U.S. EPA promulgated a regional haze regulation that calls for states to establish goals and emission reduction strategies for improving visibility in 156 mandatory Class I national parks and wilderness.  California has 29 of these national parks and wilderness areas, including Yosemite, Redwood, and Joshua Tree National Parks.  Reducing diesel PM from stationary diesel-fueled engines will help improve visibility in these Class I areas.

## REFERENCES

(ARB, 1998)  California Air Resources Board.  *Evaluation of Factors That Affect Diesel Toxicity, Final Report.*  Contract No. 94-312, July 1998.

(ARB, 1998a) California Air Resources Board.  *Report to the Air Resources Board on the Proposed Identification of Diesel Exhaust as a Toxic Air Contaminant; Part A, Exposure Assessment*;  As Approved by the Scientific Review Panel on April 22, 1998.

(ARB, 1998b) California Air Resources Board.  *Resolution 98–35:  Identification of Particulate Emissions from Diesel-Fueled Engines as a Toxic Air Contaminant*; 1998.

(ARB, 1998c) California Environmental Protection Agency, Office of Environmental Health Hazard Assessment.  *Proposed Identification of Diesel Exhaust as a Toxic Air Contaminant: Health Risk Assessment for Diesel Exhaust; Appendix III, Part B*; 1998.
(ARB 1991a) California Air Resources Board, *Amendments to Regulations for the 24-Hour Ambient Air Quality Standard for Sulfur Dioxide.*  Staff Document, 1991

(ARB 1991b) California Air Resources Board, *Amendments to Regulations for the 24-Hour Ambient Air Quality Standard for Sulfur Dioxide*. Technical Support Document, 1991.

(ARB 1994a) California Air Resources Board, *Review of the One-Hour Ambient Air Quality Standard for Sulfur Dioxide.* Staff Report, 1994.

(ARB 1994b) California Air Resources Board, *Review of the One-Hour Ambient Air Quality Standard for Sulfur Dioxide.* Technical Support Document, 1994.

(ARB, 2002) California Air Resources Board. *The 2002 California Almanac of Emission and Air Quality*, 2002.

(Beeson, 1998) Beeson, W. L; Abbey, D. E.; Knutsen, S. F. *Long-term Concentrations of Ambient Air Pollutants and Incident Lung Cancer in California Adults: Results from the AHSMOG Study; Environmental Health Perspectives*; 1998.

(CONCAWE, 1998) CONCAWE. *Heavy Fuel Oils.* Product Dossier No. 98/109. May 1998

(Dab, 2000) Dab, W. S., et. al. *Air Pollution and Health: Correlation or Causality? The Case of the Relationship Between Exposure to Particles and Cardiopulmonary Mortality; Journal of the Air and Waste Management Association*; February 2001.

(Diaz-Sanchez, 1996) Diaz-Sanchez, D.; Tsien, A.; Casillas, A.; Dotson, A.R.; Saxon, A. *Enhanced Nasal Cytokine Production in Human Beings after in vivo Challenge with Diesel Exhaust Particles*; *J. Allergy Clin. Immunol;* 1996.

(EPA, 1999) United States Environmental Protection Agency. *In-Use Marine Diesel Fuel.* EPA420-R-99-027. August 1999.

(EPA, 2000) United States Environmental Protection Agency, Assessment and Standards Division, Office of Transportation and Air Quality. *Regulatory Impact Analysis: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements. EPA420-R-00-026*; December 2000.

(EPA, 2000a) United States Environmental Protection Agency, Office of Air Quality Planning and Standards, *SO2- How Sulfur Dioxide Affects the Way We Live & Breath,* November 2000.

(EPA, 2002) United States Environmental Protection Agency. Notice of Proposed Rulemaking (40 CFR part 94) *Control of Emissions of Air Pollution from New Marine Compression-Ignition Engines at or Above 30 Liters/Cylinders.* April 2002.

(EPA, 2003) United States Environmental Protection Agency, Assessment and Standards Division, Office of Transportation and Air Quality. *Draft Regulatory Impact Analysis: Control of Emissions of Air Pollution from Nonroad Diesel Engines and Fuel*. EPA420-R-03-008; April 2003.

(FAMM, 2001) Fuel and Marine Marketing (FAMM) *Everything You Need to Know About Fuels.*  March 2001.

(Kittelson, 1999) Kittelson, D.B., Arnold, M., Watts, W.F.  Review of Diesel Particulate Matter Sampling Methods (University of Minnesota); 1999

(Lloyd, 2001) Lloyd, A.C.; Cackette, T.A.  *Diesel Engines: Environmental Impact and Control; J Air Waste Management Association;* 2001.

(Man B&W, 2004) P. Lauer et.al., MAN B&W.  Emission and Chemical Composition of PM from medium speed 4-stroke Marine Engines for Different Fuels.  From the 9th ETH Conference on Combustion Generated Particles 2005 Zurich.  August 2005.

(Peters, 2001) Peters, A; Dockery, D. W.; Muller, J. E.; Mittleman, M.A.  *Increased Particulate Air Polltion and the Triggering of Myocardial Infarction Circulation*; 2001.

Takano, H.; Ichinose, T.; Miyabara, Y.; Shibuya, T.; Lim, H.B.; Yoshikawa, T.; Sagai, M.  *Inhalation of Diesel Exhaust Enhances Allergen-related Eosinophil Recruitment and Airway Hyperresponsiveness in Mice*; *Toxicol. Appl. Pharmacol;* 1998.  (Takano, 1998)

III.     **INDUSTRY CHARACTERIZATION**

Ocean-going vessels (or "vessels") that operate within 24 nautical miles of the California coastline ("regulated waters") would be subject to the requirements of the proposed regulation.  The requirements of the proposal would apply to both foreign-flagged and domestic vessels.  However, exemptions are provided for military vessels and vessels passing through regulated waters without stopping at a California port ("innocent passage").

For the purposes of the proposed regulation, an ocean-going vessel is defined as a commercial or military vessel that meets any one of the following criteria:

- a U.S.-registered vessel that is used in foreign trade, and has the appropriate U.S. Coast Guard endorsement;
- a foreign-registered vessel;
- a vessel greater than 400 feet in overall length;
- a vessel greater than or equal to 10,000 gross tons; or
- a vessel propelled by a marine compression ignition engine with a per cylinder displacement of greater than or equal to 30 liters.

Vessels meeting none of these criteria are classified as harbor craft (including pleasure craft), and are subject to more stringent fuel requirements than those specified in this proposal.[1]

In this chapter, we identify the types of vessels that are defined as ocean-going vessels, and also describe the types of engines and fuels currently being used by these vessels. Additional information on this industry can also be found in the U.S. EPA's Final Regulatory Support Document: Control of Emissions from New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder.  (U.S. EPA, 2003).

This section also identifies and summarizes the requirements of existing air pollution regulations that affect ocean-going vessels.

**A.   Vessel Descriptions**

Examples of the types of oceangoing vessels subject to the proposed regulation include container vessels, passenger cruise vessels, general cargo, reefers, RORO vessels, tanker vessels, and bulk carriers.  Brief descriptions of these vessel types are provided below.

---

[1] Specifically, only diesel fuel meeting CARB vehicular diesel fuel standards will be sold to harbor craft in California in 2007 (2006 in the South Coast Air Quality Management District).

Container Vessels

Container vessels are cargo vessels that carry standardized truck-sized containers. These containers have capacities measured in TEUs (Twenty-foot Equivalent Units). One TEU refers to a container with external dimensions of 8'x8'x20'. Capacity is sometimes also measured by FEU's, forty-foot equivalents, 8'x8'x40', since the majority of containers used today are 40 feet in length. Many vessels also have a number of container slots that will accept refrigerated containers.



Container vessel capacity is often described in terms of the number of TEU's the vessel can hold. Due to economies of scale, container vessel capacity has increased over the years. Currently, some large vessels are able to transport between 5,000 and 8,000 TEUs. This compares to older vessels built prior to 1970, which typically held less than 1,000 TEUs.

Most container vessels, like most ocean-going vessels, are propelled by large slow-speed two-stroke direct drive diesel engines (see figure 2). In addition, most container vessels have installed a number of smaller medium speed four-stroke auxiliary engines. The auxiliary engines, which are subject to the proposed regulation, provide electrical power for lighting, navigation equipment, and other ship-board uses.

Passenger Cruise Vessels



Passenger cruise vessels are passenger vessels used for pleasure voyages. These vessels typically stop at ports, where they coordinate activities for their passengers. Passenger cruise vessels also provide a number of entertainment options for their passengers while on the vessel. These vessels typically include swimming pools, exercise and recreation facilities, movie theaters, dance halls, casinos, and restaurants. As with other types of vessels, the size and capacity of these vessels has increased steadily over the years.

**Table III-1:  Typical Size of Passenger Cruise Vessels Over the Years**

| Year Built | Tonnage | Number of Passengers |
|:---:|:---:|:---:|
| 1970 | 18,420 | 377 passengers |
| 1980 | 37,600 | 707 passengers |
| 1990 | 74,140 | 975 passengers |
| 2000 | 137,300 | 1557 passengers |

(Solentwaters, 2005)

Cruise ship propulsion is typically provided by several diesel engines coupled to generators.  These generators produce electrical power that drives electric motors coupled to the vessel's propellers.  This arrangement provides the option to run the vessel at a slower speed, while operating fewer engines at their peak efficiency, as opposed to a single engine at low, relatively inefficient loads.  The same engines that are used for propulsion are also used to generate auxiliary power onboard the vessel for lights, refrigeration, etc.

Some vessels have the electric motor outside the ships hull in an azipod.  This method eliminates the need for a rudder as the pod can be rotated to provide thrust in any direction.  Some vessels also have a combination of a fixed propeller and azipods.

<u>Reefer Vessels</u>

A Reefer vessel is a type of vessel typically used to transport perishable commodities which require temperature-controlled transportation, mostly fruits, meat, fish, vegetables, dairy products, and other foods.  Reefer vessels are effectively large refrigerators, heavily insulated with glass fiber or similarly efficient insulation.  They are vessels that tend to be divided into many more spaces than conventional dry cargo vessel, so that different commodities can be separated and carried, if required, at different temperatures. Below deck, a reefer vessel resembles a large modern warehouse, and cargo is usually carried and handled in palletized form, moved about on conveyors or by electric fork lift trucks.

<u>RORO Vessels</u>

A RORO vessel carries wheeled cargo such as automobiles, trailers or railway carriages. RORO is an acronym for "roll on/roll off".  RORO vessels have built-in ramps, which allow the cargo to be "rolled on" and "rolled off" the vessel when in port. While smaller ferries that operate across rivers and other short distances often have these facilities, the term RORO is generally reserved for ocean-going vessels.



Typically new automobiles that are transported by vessel around the world are moved on ROROs.  These large new-car carriers are commonly called Pure Car Carriers (PCCs) or Pure Car Truck Carriers (PCTCs).  The largest PCC currently in service can carry over 7000 cars.

<u>Bulk Carriers</u>



Bulk carriers are vessels used to transport bulk items such as mineral ore, fertilizer, wood chips, or grain. They have large box-like hatches on their deck, designed to slide outboard for loading.

The bulk carriers primarily carry dry cargoes, which are shipped in large quantities and do not need to be carried in packaged form.  The principal bulk cargoes are coal, iron ore, bauxite, phosphate, nitrate and grains such as wheat.  The advantage of carrying such cargoes in bulk is that packaging costs can be greatly reduced and loading and unloading operations can be speeded up.

<u>Tanker Vessel</u>

Tanker vessels are vessels designed to transport liquids in bulk.  Tankers can range in size from several hundred tons, designed for coastal service, to several hundred thousand tons, for transoceanic voyages.  A wide range of products are carried by tankers, including:



- <u>hydrocarbon</u> products such as crude <u>oil</u>, <u>LPG</u>, and <u>LNG</u>
- <u>chemicals</u>, such as <u>ammonia</u>, <u>chlorine</u>, and <u>styrene monomer</u>; or
- <u>fresh water</u>

Different products require different handling and transport, thus special types of tankers have been built, such as "<u>chemical tankers</u>," "oil tankers," and "LNG carriers."

**B.    Vessels That Visit California Ports**

California is a key player in international shipping.  All of the vessel types described previously visit California ports delivering and receiving products used in California, the United States, and the rest of the world.  As shown in Table III-2 below, container vessels accounted for nearly half of the California port visits in 2004, followed by tankers at 19 percent of port visits.  The remaining categories of vessels each account for less than ten percent of vessel visits.

**Table III-2:  2004 California Port Calls by Vessel Type**

| Vessel Type | Number of Calls | Percentage of Total Calls |
|---|---|---|
| Container Vessels | 4,545 | 48% |
| Tankers | 1,811 | 19% |
| Bulk Carriers | 885 | 9% |
| Auto Carriers (RORO) | 713 | 8% |
| General Cargo/Reefers | 685 | 7% |
| Passenger Cruise Vessel | 652 | 7% |
| Barge | 106 | 1% |
| Other | 44 | <1% |
| Total | 9,441 | 100% |

( California State Lands Commission, 2004)

Table III-3 ranks California's ports by the number of vessel visits.  As shown in the table, over 50 percent of port calls occurred at the Ports of Los Angeles and Long Beach (which are adjacent to each other).  The Port of Oakland accounted for about 19 percent of the port calls, and the remaining ports individually received 5 percent or less of the vessel calls.

**Table III-3:  2004 Port Ranking by Vessel Visits**

| Port | Number of Calls | Percentage of Total Calls |
|---|---|---|
| Los Angeles/Long Beach | 5,083 | 54% |
| Oakland | 1,797 | 19% |
| Richmond | 491 | 5% |
| Carquinez | 463 | 5% |
| San Diego | 447 | 5% |
| Hueneme | 318 | 3% |
| San Francisco | 300 | 3% |
| El Segundo | 205 | 2% |
| Stockton | 133 | 2% |
| All Other | 203 | 2% |
| Total | 9,441 | 100% |

(California State Lands Commission, 2004)

## C.    Auxiliary Engines and Fuels

The following sections describe the types of engines currently being used by ocean-going vessels.  The information presented below was reported by vessel owners and operators in response to ARB's *Oceangoing Ship Survey* or "Survey" (January 2005). The Survey requested information only for oceangoing vessels that visited California ports in 2004.  Data was provided on approximately 327 vessels and over 1,400 engines.  For more detailed Oceangoing Ship Survey data, see Appendix C.

Most of the ocean-going vessels subject to the proposed regulation have both main propulsion (main engines) and auxiliary diesel engines.  The main engine for most vessels is a diesel-mechanical propulsion system, where the diesel engine is directly coupled to the propeller through a transmission.   The exception is passenger cruise vessels and a few tankers, where the main engines are coupled to electric generators which provide electric power to electric motors which are directly coupled to the propellers.  These are referred to as diesel-electric systems.

In most cases, the auxiliary engines provide power for uses other than propulsion.  Most auxiliary engines are part of a diesel-electric system that is used to provide power for a variety of on-board systems including lighting systems, onboard cargo handling equipment, heating and air conditioning systems, and emergency power.  Many passenger cruise vessels that have diesel-electric propulsion systems use the main engines to power electric motors that perform the same functions as auxiliary engines. Because of the relatively high electrical energy draw aboard a passenger cruise vessel, some also have gas turbine-electric systems aboard.  Below we provide summaries of selected data collected from the Survey with an emphasis on auxiliary engine information.

### Auxiliary Engines

All vessel owners responding to the Survey reported at least one auxiliary engine. Table III-4 summarizes the quantity of auxiliary engines the Survey reported.  The majority of the auxiliary engines are diesel compression ignition engines and all of the auxiliary engines reported are four-stroke engines.  A four-stroke engine completes one power cycle for every two revolutions of the crankshaft.  Therefore, there is one power stroke for every two revolutions of the crankshaft.  The four-strokes include: intake, compression, power, and exhaust.  The tables listed below provide more information on auxiliary engines on oceangoing vessels.

**Table III-4:  Number of Auxiliary Engines**

| Vessel Type | Minimum Number of Auxiliary Engines | Maximum Number of Auxiliary Engines | Average Number of Auxiliary Engines |
|---|---|---|---|
| Passenger/Cruise | 3 | 6 | 4.7 |
| Reefer | 4 | 4 | 4 |
| Auto Carrier | 2 | 4 | 2.9 |
| Container | 2 | 6 | 3.6 |
| Tanker | 1 | 6 | 2.7 |
| Other | 2 | 4 | 2.9 |

Tables III-5 and III-6 provide information on the type of fuel used to power the auxiliary engines and the average sulfur content of that fuel. According to the Survey, 25 percent of the auxiliary engines already use distillate fuel. The sulfur content of the distillate ranges from 0.03 – 1.5 percent with an average sulfur content of 0.5 percent.

**Table III-5: Auxiliary Engine Fuels**

| Fuel Used in Auxiliary Engine | Number of Engines Reporting in Survey | Percent of Total Engines |
|---|---|---|
| Heavy Fuel Oil | 877 | 75% |
| Distillate Fuel | 294 | 25% |

**Table III-6: Average Sulfur Content of Fuel Used in Ocean-going Auxiliary Engines**

| Fuel | Minimum Sulfur Content (%) | Maximum Sulfur Content (%) | Average Sulfur Content (%) |
|---|---|---|---|
| Heavy Fuel Oil | 0.15% | 4.0% | 2.5% |
| Distillate | 0.03% | 1.5% | 0.5%* |

* 0.5 for compression-ignition engines only (excludes turbines which use low sulfur fuel).

The manufacturers of the auxiliary engines were numerous, but five manufacturers accounted for almost 90 percent of the engines reported. These manufacturers are shown below in Table III-7.

**Table III-7: Ocean-going Vessel Auxiliary Engine Manufacturers**

| Engine Maker | Number of Engines | Percent of Total Engines |
|---|---|---|
| Man B&W | 324 | 29% |
| Daihatsu | 251 | 22% |
| Wartsila/Sulzer | 249 | 22% |
| Yanmar | 118 | 10% |
| MAK | 44 | 4% |
| Other | 151 | 13% |

Figure III-1 shows the distribution in age of the auxiliary engines.  It is interesting to note that a large percentage of the auxiliary engines are less than 10 years old.  Typically, the auxiliary engines last the life of the vessel, so the age distribution of these engines is similar to the age distribution of vessels visiting California ports.

**Figure III-1:  Ocean-going Vessel Auxiliary Engine Age Distribution**



Table III-10 provides information on the average power generated by the auxiliary engines when vessels are hotelling (dockside), maneuvering at ports, and transiting at sea.   The diesel generator set engines on passenger cruise vessels are defined as "auxiliary engines" for the purposes of the proposed regulation.  The power generated by these engines is much higher than for other vessels because these engines produce electrical power for both propulsion and ship-board electricity.

**Table III-8:  Average Power Generated**

| Type of Vessel | Power Generated While Hotelling (kw) | Power Generated While Maneuvering (kw) | Power Generated While At Sea (kw) |
|---|---|---|---|
| Passenger/Cruise | 7,500 | 13,800 | 34,000 |
| Container | 1,600 | 3,300 | 3,800 |
| Other | 1,450 | 1,700 | 4,200 |
| Auto Carrier | 600 | 1,300 | 580 |
| Tanker | 500 | 660 | 480 |
| Reefer | 1,200 | 1,200 | 2,000 |
| Average All Vessels | 2,000 | 3,420 | 6,600 |

Main Engines

According to the Survey, as reported in Table III-9, main engines are dominated by diesel engines, with only a small fraction being either gas or steam turbine. The diesel piston engines used on vessels are reciprocating internal combustion engines that operate on the same basic principles as land-based diesel engines. The main engine type results are shown below.

**Table III-9:  Main Engine Types**

| Engine Type | Number of Engines | Percent of Total Main Engines |
|---|---|---|
| Diesel Compression-Ignition | 289 | 96% |
| Steam Turbine | 9 | 3% |
| Gas Turbine | 2 | 1% |

Additional information was gathered regarding whether the diesel engines were either two or four-stroke. As shown in Table III-10 below, 95 percent of the main engines on oceangoing vessels were reported to be two-stroke engines. Reciprocating internal combustion engines may operate in a two or four-stroke cycle, where a stroke is one complete movement of the piston from one end of the cylinder to the other. Two stoke engines have higher horsepower to weight ratio than four-stroke engines, but two-stroke engines tend to have higher NOx emissions. According to the survey, main engines use primarily heavy fuel oil.

**Table III-10:  Diesel Main Engine Types**

| Diesel Engine Type | Number of Engines | Percent of Total Diesel Engines |
|---|---|---|
| 2-stroke | 271 | 95% |
| 4-stroke | 15 | 5% |

**D.    Vessel Fuels and Fuel Systems**

As explained in Section B, most oceangoing vessels are propelled by a single large slow-speed two-stroke direct drive diesel engine, with smaller medium speed four-stroke auxiliary engines providing electrical power for lighting, navigation equipment, and other ship-board uses. For these vessels, the large main engine almost always operates on heavy fuel oil (HFO), while the smaller auxiliary engines may run on either HFO or marine distillate fuels such as marine gas oil or marine diesel oil. Vessels that use HFO in both their main and auxiliary engines are referred to as mono-fueled (or uni-fueled) vessels, while vessels that use distillate fuels in their auxiliary engines are referred to as dual-fueled.

Diesel-electric vessels such as passenger cruise vessels use very large four-stroke medium speed engines coupled to generators to provide electrical power for both

propulsion and ship-board electrical power.  These vessels generally use HFO, although some have reported using marine distillate fuels close to shore to reduce their emissions.

### Fuel Types

The two basic types of marine fuels are distillate and residual.  Distillate fuel is composed of the lighter fractions of crude oil that are separated in a refinery by a boiling process, while the remaining fraction that did not boil is referred to as residual.

*Distillate Marine Fuels*

The two most common types of marine distillate fuels are marine gas oil (MGO) and marine diesel oil (MDO).  MGO is also referred to as DMA using official fuel specification terminology, where the "D" denotes a distillate fuel, the "M" indicates a marine fuel, and the "A" is the grade of fuel.  MDO is similar to MGO, but may have a somewhat higher viscosity and sulfur content.  This fuel is also referred to as DMB using official terminology, with the same nomenclature as for DMA fuel.  MDO is generally MGO that contains a limited amount of residual fuel from storage in tanks or piping that previously held residual fuel.  Other types of distillate marine fuels include DMX and DMC fuels.  DMX fuel is special grade of fuel generally used only in emergency backup generators, while DMC is a distillate fuel like DMB, except that it is intentionally manufactured from heavier boiling fractions from a distillation process, or is blended from DMA and residual fuels. (U.S. EPA, 1999).

*Residual Fuels*

Marine residual fuel (also called "heavy fuel oil") is generally a mixture of residual and distillate fuels referred to as intermediate fuel oil (IFO).  While there are numerous grades of marine residual fuels, the most common types are IFO-180 and IFO-380.  Using this informal terminology, the numbers used in naming these fuels refers to the viscosity limits at the common fuel handling temperature of 50°C.  Similar to the distillate fuels, there is also a parallel official terminology.  For example, IFO-380 fuel is referred to as either RMG-35 or RMH-35.  Using this terminology the "R" denotes a residual fuel, the "M" denotes a marine fuel, and the "35" is the maximum viscosity at 100°C. (U.S. EPA, 1999)

Listed below in Table III-11 are the common marine fuels discussed above, and the range in their allowable properties.

*Table III-11:  Selected ASTM Specifications for Marine Fuels*

|  | Distillate Fuels | | HFO/Residual Fuels | |
| --- | --- | --- | --- | --- |
| Specification | MGO (DMA) | MDO (DMB) | IFO 180 (RME/F-25) | IFO 380 RMG/H-35 |
| Min. Flash Pt. (°C) | 60 | 60 | 60 | 60 |
| Kinematic Viscosity (cSt@40°C) | 1.5-6 | 11 max | 25 * | 35* |
| Max % Sulfur (wt.) | 1.5 | 2.0 | 5.0** | 5.0** |
| Max. % Ash (wt.) | 0.01 | 0.01 | 0.10-0.15 | 0.15-0.2 |
| % Distillate | 100 | 99+ | 12 | 2 |

* Viscosity in centistokes at 100°C, ** IMO Annex VI limits sulfur to 4.5%.

<u>Fuel Handling</u>

Ocean-going vessels have complex fuel handling and processing systems that vary with the individual vessel.  Most have multiple fuel storage tanks that can hold various grades of fuel, both distillate and HFO.   Marine fuels undergo several processes before they are combusted in the engine.  Typically, fuel from the storage tank is: (1) pumped to a settling tank; (2) pumped to a centrifuge for removal of water and sludge; (3) pumped to service (day) tank; and (4) pumped to the engine for consumption. Depending on the vessel, there are different ways these processes are handled, some with complete segregation of fuel processes for different grades of fuel, and some utilizing the same fuel processing components for different grades of fuel (Marintek, 2003).  In addition, the complete fuel handling system will include additional filtration, venting, drainage, and other components.

The fuel processing steps mentioned above apply to both HFO and distillate fuels. However, heavy fuel oil must also be heated to 100 to 200 degrees Celsius to reduce its viscosity to a point where it can be pumped and combusted in the engine.  Because HFO is so viscous, vessel operators switch to distillate marine fuels prior to vessel dry-dock maintenance operations so that this fuel does not solidify in pipes and components when the engine is stopped.

## E.    The Shipping Lanes and Ocean-going Vessel Activity Off the Coast of California

The coastline of California stretches more than 800 miles, from Mexico in the south to Oregon in the north.  In 2004, California's ports were visited by more than 1,900 ocean-going vessels.  These vessels made approximately 10,000 visits to one or more of California's deep-water ports.

Ships typically travel in designated shipping lanes in high traffic areas near California's ports.  For example, there are designated shipping lanes that oceangoing vessels use within the Santa Barbara Channel and approximately 25 nautical miles south of the

Ports of Los Angeles and Long Beach. (Marine Exchange of Southern California). Similarly, there are designated shipping lanes within the San Francisco Bay and surrounding areas north to approximately Point Reyes, west to the Farallon Islands, and south to Half Moon Bay. (Marine Exchange of San Francisco).  Outside of the port areas, vessels are generally free to choose their routes, although certain vessel-specific requirements may apply.   For these low traffic areas, approximations must be made of the most likely routes.  To approximate the routes used by oceangoing vessels off California's coastline, including both designated shipping lanes and other areas, ARB staff used the "United States Army Corps of Engineers (USACE) Shipping Lanes," as shown in Figure III-2.

**Figure III-2:  USACE Shipping Lanes Off the Coast of California and the 24 nm Contiguous Zone**



**REFERENCES**

(California State Lands Commission, 2004) California State Lands Commission, Oceangoing vessel data on California ports visited, arrival port, last port, next port, 2004

(Marine Exchange San Francisco) Marine Exchange San Francisco.  Personal communication with ARB staff. September 26, 2005..

(Marine Exchange of Southern California) Marine Exchange of Southern California. Personal communication with ARB staff, September 26, 2005.

(Marintek, 2003) Marintek, *On Board Treatment of Ballast Water (Technologies Development and Applications) and Application of Low-sulfur Marine Fue*l. Sept. 2003

(Solentwaters, 2005) www.solentwaters.co.uk, Website dedicated to providing information on vessel types and shipping information, 2005.

(U.S. EPA, 2003) United States Environmental Protection Agency, Final *Regulatory Support Document:  Control of Emissions from New Marine Compression – Ignition Engines at or Above 30 Liters per Cylinders* (EPA420-R-03-004) January 2003 pp. 3-33 to 3-54.

(U.S. EPA, 1999)  United States Environmental Protection Agency, In-*Use Marine Diesel Fuel,* (EPA420-R-99-027) August 1999.

## IV.     EMISSIONS, POTENTIAL EXPOSURES, AND RISK

This chapter presents the most recent emissions inventory for diesel-fueled ocean-going vessel auxiliary engines operating offshore of California as well as at California's ports.  A discussion on the potential cancer and non-cancer health risks that may occur due to the operation of auxiliary engines is also provided.

## A.     Estimated Emissions from Ocean-going Vessel Auxiliary Engines

To develop an emissions estimate of the emissions from diesel-fueled ocean-going vessel auxiliary engines operating offshore of California as well as at California's ports, ARB staff developed a methodology that integrated information from three main sources of information:

- ARB's 2005 Ocean-going Vessel Survey;
- 2004 California State Lands Commission ocean-going vessel visit data; and
- the ocean-going vessel element of the 2001 Port of Los Angeles emission inventory.

Baseline emission estimates for the year 2004 were developed and emission projections to 2010 and 2020 were also developed using estimates of expected growth.  Details of the methodology are found in Appendix D.  Based on the information available to date, we believe the methodology has resulted in a reasonable estimate of the emissions from ocean-going vessel auxiliary engines.  However, there are continuing efforts by ARB and the major California ports to update and improve the ocean-going vessel emission inventories.  As new information becomes available from these efforts, the ocean-going vessel auxiliary engine emission inventory will be updated.

<u>Current 2004 Emission Estimates for Diesel-fueled Ocean-going Auxiliary Engines</u>

ARB staff estimate that the statewide operation of diesel-fueled ocean-going vessel auxiliary engines operating 100 nm or less off of California's coast, in California's ports, and inland waters results in approximately 4 tons per day or approximately 1,430 tons per year of diesel PM emissions.  These emission estimates are associated with the use of an ocean-going vessel's auxiliary engines to assist the propulsion engines during the maneuvering of the vessel or to power the vessels electrical systems while at dockside (hotelling).  The estimates also include emissions from ocean-going vessels powered by diesel-electric engines.  The emission estimation "boundary" of 100 nm was selected because it can be distinguished with relative ease and it is inclusive of the major areas of activity of the sources of interest.  Figure IV-1 provides a graphical representation of the 100 nm emission inventory boundary.  On the figure, the outer black line, which mirrors the California coastline, represents the inventory boundary while the shaded gray area is the region in which the proposed regulation would be applicable.

**Figure IV-1:  Ocean-going Vessel Emission Inventory Boundary**



In addition, based on a range of statewide NOx to PM conversion factors of 0.3 – 0.5 g $NH_4NO_3$/g NOx, ARB staff estimate a secondary formation of $PM_{10}$ nitrate from NOx emissions from ocean-going vessel diesel-fueled auxiliary engines to be between 13.1 and 21.8 tons per day.[2]  This estimate only reflects the potential conversion of the ocean-going vessel auxiliary engine NOx emissions associated with maneuvering and hotelling activities.  The ARB staff is unable at this time to adequately evaluate the potential for the formation of secondary $PM_{10}$ nitrate at sea due to a lack of documentation concerning the impacts of higher humidity at sea, less available ammonia at sea, and the overall deposition of PM in transport along the coast of California.  Because of this we believe these values are an underestimate of the quantities of secondary $PM_{10}$ nitrate formed from ocean-going vessel diesel-fueled auxiliary engines.

Estimates of statewide 2004 diesel PM, NOx, SOx, carbon monoxide, and hydrocarbons from ocean-going vessel auxiliary engines are presented in Table IV-1.

**Table IV-1:  Estimated Statewide 2004 Ocean-going Vessel Auxiliary Engine Emissions**

| Vessel Types | Numbers of Vessels | Numbers of Vessel Visits | 2004 Pollutant Emissions, Tons/Day | | | | |
|---|---|---|---|---|---|---|---|
| | | | NOx | HC | CO | PM | SOx |
| Auto | 225 | 750 | 1.11 | 0.03 | 0.08 | 0.10 | 0.71 |
| Bulk | 475 | 946 | 4.02 | 0.11 | 0.30 | 0.35 | 2.55 |
| Container | 594 | 4744 | 18.11 | 0.50 | 1.37 | 1.57 | 11.48 |
| General | 196 | 721 | 1.75 | 0.05 | 0.13 | 0.15 | 1.11 |
| Passenger | 44 | 687 | 14.44 | 0.39 | 1.09 | 1.39 | 10.24 |
| Reefer | 19 | 52 | 0.60 | 0.02 | 0.05 | 0.05 | 0.38 |
| RoRo | 13 | 34 | 0.40 | 0.01 | 0.03 | 0.03 | 0.25 |
| Tanker | 372 | 1941 | 3.16 | 0.09 | 0.24 | 0.27 | 2.00 |
| Totals | 1938 | 9875 | 43.6 | 1.20 | 3.29 | 3.91 | 28.7 |

As shown in Table IV-1, there are approximately 1,900 ocean-going vessels that visited California's ports in 2004.  Of those 1,900 vessels that visited California's ports, 30 percent were container vessels.  Those container vessels represented more than 45 percent of the vessel visits to California's ports.  As shown in Figure IV-2, container vessels represent approximately 50 percent of all the pollutants emitted by ocean-going vessel auxiliary engines; followed by passenger vessels, tankers, and bulk cargo and auto carriers.

---

[2] The conversion factor for the transformation of NOx to $NH_4NO_3$ was based on an analysis of annual-average conversion factors for secondary formation of $PM_{10}$ nitrate from NOx emissions at a number of urban sites in California.  A more detailed description of the methodology used to evaluate the conversion of NOx to $NH_4NO_3$ is found in Appendix E.



Figure IV-2:  2004 NOx and Diesel PM Emission Distributions for Ocean-going Vessel Auxiliary Engines

The ARB staff also estimated district-specific emissions associated with ocean-going vessel auxiliary engines.  The allocation of these estimates is based on the length(s) of United States Army Corps of Engineers shipping lanes associated with a specific district.  Table IV-2 presents a district-by-district estimate of emissions from ocean-going vessel auxiliary engines.

**Table IV- 2:  Estimated 2004 Ocean-going Vessel Auxiliary Engine Emissions By District (tpd)[3]**

| District | NOx | HC | CO | PM | SOx |
|---|---|---|---|---|---|
| Bay Area | 7.37 | 0.21 | 0.55 | 0.66 | 4.81 |
| Mendocino | 0.85 | 0.02 | 0.06 | 0.08 | 0.58 |
| Monterey Bay | 1.40 | 0.04 | 0.10 | 0.13 | 0.95 |
| North Coast | 1.47 | 0.04 | 0.11 | 0.13 | 1.00 |
| Northern Sonoma | 0.39 | 0.01 | 0.03 | 0.04 | 0.27 |
| San Diego | 5.50 | 0.16 | 0.42 | 0.53 | 3.83 |
| San Joaquin Valley | 0.39 | 0.01 | 0.03 | 0.03 | 0.23 |
| San Luis Obispo | 0.78 | 0.02 | 0.06 | 0.07 | 0.53 |
| Santa Barbara | 2.96 | 0.08 | 0.22 | 0.27 | 1.96 |
| South Coast | 21.32 | 0.59 | 1.62 | 1.89 | 13.78 |
| Ventura | 0.98 | 0.03 | 0.07 | 0.09 | 0.64 |
| Yolo-Solano | 0.18 | <0.01 | 0.01 | 0.01 | 0.11 |
| Total | 43.59 | 1.21 | 3.28 | 3.93 | 28.69 |

Note: The following districts had no ocean-going auxiliary engine emissions allocated to them; Amador, Antelope Valley, Butte, Calaveras, Colusa, El Dorado, Feather River, Glenn, Great Basin Unified, Imperial, Kern, Lake, Lassen, Mariposa, Modoc, Mojave Desert, Northern Sierra, Placer, Sacramento, Shasta, Siskiyou, Tehama, and Tuolumne.

Table IV-3 provides estimates of emissions from ocean-going auxiliary engines operating in the proposed regulated waters, which includes all of California's inland waters, estuarine waters, and all waters within 24 nautical miles (nm) of the California coastline.  The 24 nm proposed regulatory waters has been designated by ARB staff as the area where the proposed regulation would be enforced.  This area is shown in Figure IV-1 as the dark grey area adjoining the California coastline.

---

[3] The total emissions may vary slightly from the values shown in Table IV-1 due to rounding.

**Table IV-3:  Estimated 2004 Ocean-going Vessel Auxiliary Engine Emissions
Occurring Within the Proposed Regulatory Waters**

| Vessel Types | 2004 Pollutant Emissions, Tons/Day | | | | |
|---|---|---|---|---|---|
| | NOx | PM | HC | CO | SOx |
| Auto | 0.90 | 0.08 | 0.02 | 0.07 | 0.57 |
| Bulk | 3.76 | 0.33 | 0.10 | 0.28 | 2.38 |
| Container | 15.71 | 1.37 | 0.43 | 1.19 | 9.95 |
| General | 1.62 | 0.14 | 0.04 | 0.12 | 1.03 |
| Passenger | 8.31 | 0.80 | 0.23 | 0.62 | 5.89 |
| Reefer | 0.59 | 0.05 | 0.02 | 0.04 | 0.37 |
| RoRo | 0.34 | 0.03 | 0.01 | 0.03 | 0.21 |
| Tanker | 2.24 | 0.19 | 0.06 | 0.17 | 1.42 |
| Totals | 33.47 | 2.99 | 0.91 | 2.52 | 21.82 |

<u>Projected 2010 and 2020 Emission Estimates for Ocean-going Vessel Auxiliary
Engines</u>

The projected emission estimates for the years 2010 and 2020 are presented in
Table IV-4.  As discussed in the methodology included in Appendix D, the vessel type-
specific ocean-going vessel growth estimates were developed based upon historical
data of the installed power of the propulsion engines of ocean-going vessels from 1997
to 2003.  The vessel type-specific growth rates developed were the midpoint between
the best fit compounded growth rate for the seven data points and the best fit linear
(arithmetic) growth rate for the same data.

The port specific growth rates were applied to in-port emissions: hotelling and
maneuvering and in-transit emissions within 3 nm of the coast of the California
mainland.  In-transit emissions that occur in the outer continental shelf (beyond the
3 nm limit) cannot be tied directly to a single port; as a result, vessel type-specific
growth factors are used.  The vessel type specific growth factors are also used where
port specific factors are not available, such as passenger vessels calling on Monterey.
Details on the growth assumptions are provided in Appendix D.

Expected emission reductions and the impact on the ocean-going vessel auxiliary
engine emission estimates are discussed in Chapter VII, Environmental Impacts.

**Table IV-4:  Ocean-going Vessel Auxiliary Engine
Projected Year 2010 and 2020 Emission Estimates**

| Vessel Types | 2010 Emission, Tons per Day | | | | | 2020 Emission, Tons per Day | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | NOx | HC | CO | PM | Sox | NOx | HC | CO | PM | SOx |
| Auto | 1.35 | 0.04 | 0.10 | 0.12 | 0.86 | 2.63 | 0.07 | 0.20 | 0.23 | 1.67 |
| Bulk | 5.40 | 0.15 | 0.41 | 0.47 | 3.42 | 8.34 | 0.23 | 0.63 | 0.73 | 5.28 |
| Container | 23.22 | 0.64 | 1.76 | 2.02 | 14.72 | 33.71 | 0.93 | 2.55 | 2.93 | 21.37 |
| General | 2.36 | 0.07 | 0.18 | 0.21 | 1.50 | 4.42 | 0.12 | 0.33 | 0.38 | 2.80 |
| Passenger | 14.99 | 0.41 | 1.13 | 1.44 | 10.63 | 40.26 | 1.10 | 3.03 | 3.88 | 28.55 |
| Reefer | 0.86 | 0.02 | 0.07 | 0.08 | 0.55 | 1.27 | 0.03 | 0.10 | 0.11 | 0.81 |
| RoRo | 0.49 | 0.01 | 0.04 | 0.05 | 0.31 | 0.71 | 0.02 | 0.05 | 0.06 | 0.45 |
| Tanker | 2.99 | 0.08 | 0.23 | 0.26 | 1.89 | 4.09 | 0.11 | 0.31 | 0.36 | 2.59 |
| Totals | 51.66 | 1.42 | 3.92 | 4.65 | 33.88 | 95.43 | 2.61 | 7.20 | 8.68 | 63.52 |

**B.    Transport of Offshore Ocean-going Vessel Emissions to Onshore**

The transport of air pollution over long distances and between air basins has been well established.  The emissions from ocean-going vessels can travel great distances and numerous studies have shown local, regional, and global impacts on air quality. (Endresen, 2003; Jonson, 2000; Corbett and Fishbeck, 1997; Streets, 2000; Saxe and Larsen, 2004)  Tracer studies, air quality modeling, and meteorological data analysis are typical approaches used to determine the extent to which emissions released offshore can impact onshore areas.  Several studies support ARB staffs conclusion that emissions from ocean-going vessels released offshore the California Coast can impact onshore air quality.  These studies are briefly described below and provided in additional detail in Appendix F.

A tracer study involves the release of a known amount of a non-toxic, inert gas such as sulfur hexafluoride and perfluorocarbon, from either a moving or fixed point offshore and the subsequent sampling of the atmosphere for concentrations of that gas at sites onshore.  In California, there have been three tracer studies conducted to investigate the effect of offshore vessel emissions on onshore air quality (Chen, 2005; ARB, 1982; ARB, 1983; ARB, 1984).  The tracer gases were released from 8 to over 20 miles offshore.  All three studies resulted in tracer gases being detected at onshore sampling

IV - 7

stations spanning over wide distances.  From these studies we can infer that pollutants emitted from offshore vessels can be transported to onshore areas and be available to participate in onshore atmospheric processes, influencing onshore air quality.

The onshore impacts of offshore emissions have also been investigated using air quality modeling.  A modeling study conducted by the Department of Defense has concluded that the emissions released within 60 nautical miles offshore in the southern California coastal region could transport to the coast (ARB, 2000).  Another modeling study conducted by the U. S. Navy using 10 years of hourly surface wind data to estimate the probability that offshore emissions would impact land from specified distances has shown that for California, the probabilities of offshore emissions being transported to the coast within 96 hours were greater than 80 percent from 50 nautical miles offshore (Eddington, 1997).

The U.S. EPA has set a 175 nautical mile boundary off from the United States coasts for development of vessel NOx emission inventory (Eddington, 2003; EPA, 2003).  The 175-mile area is based on the estimate of the distance a NOx molecule could travel in one day (assuming a 10 mile per hour wind traveling toward a coast, NOx molecules emitted 12 miles from the coast could reach the coast in just over one hour.  NOx molecules emitted 175 nautical miles (200 miles) could reach the coast in less than a day).  ARB has also conducted studies on the onshore impact of offshore emissions. ARB's studies have demonstrated that pollutants released off California's coast can be transported to inland areas due to the meteorological conditions off the coast (Chen, 2005; ARB, 1982; ARB, 1983; ARB, 1984).

There has been very little actual in-transit measurement of the pollutant emissions from ships to better understand various aspects of vessel plume chemistry and reconcile differences between measurements and model predictions.  However, a recent study conducted by Chen et al (Chen, 2005), in which measurements of chemical species in vessel plumes were taken from aircraft transecting a vessel plume, indicates that the NOx half-life within a vessel's plume may be much shorter than predicted by photochemical models.  The study demonstrated a NOx lifetime of about 1.8 hours inside the vessel plume at noontime as compared to about 6.5 hours in the background marine boundary layer of the experiment.  Additional studies investigating vessel plume chemistry will help us better understand vessel plume chemistry and improve the photochemical models used to investigate the impacts of vessels on air quality.

The analysis of meteorological data can also be used to demonstrate that emissions released offshore can reach onshore airsheds.  In 1983, the ARB established the California Coastal Waters (CCW) boundary, based on coastal meteorology, within which pollutants released offshore would be transported onshore.  The development of the boundary was based on over 500,000 island, ship-board, and coastal observations from a variety of records, including those from the U.S. Weather Bureau, U.S. Coast Guard, Navy, Air Force, Marine Corps, and Army Air Force (ARB, 1982).  The CCW boundary ranges from about 25 miles off the coast at the narrowest to just over 100 miles at the widest.

**C.     Potential Exposures and Health Risks from Ocean-going Vessel Auxiliary Engine Diesel PM Emissions**

This section examines the exposures and potential health risks associated with particulate matter (PM) emissions from auxiliary engines on ocean-going vessels.  A brief qualitative discussion is provided on the potential exposures of Californians to the diesel PM emissions from ocean-going vessel auxiliary engine operations.  In addition, a summary is presented of a health risk assessment conducted to determine the 70-year potential cancer risk associated with exposures to diesel PM emissions from ocean-going vessel auxiliary engines associated with operations at the Ports of Los Angeles and Long Beach.  The ARB staff believes that the results from this analysis provide quantitative results for exposures around the Ports of Los Angeles and Long Beach and are generally applicable to other ports in California, providing a qualitative estimate for those areas.

Exposures to Diesel PM

As discussed previously, ocean-going vessels visit California ports and travel in waters along the coastline of California and within certain inland waterways.  The diesel PM emissions from auxiliary engines contribute to ambient levels of diesel PM emissions. Based on the most recent emissions inventory, there are about 10,000 visits to California ports by ocean-going vessels that have auxiliary engines.  The majority of ports are in urban areas and, in most cases, are located near where people live, work, and go to school.  This results in substantial exposures to diesel PM emissions from the operation of vessel auxiliary engines.  Because analytical tools to distinguish between ambient diesel PM emissions from vessel auxiliary engines and that from other sources of diesel PM do not exist, we cannot measure the actual exposures to emissions from diesel-fueled vessel auxiliary engines.  However, modeling tools can be used to estimate potential exposures.

To investigate the potential risks from exposures to the emissions from auxiliary engines, ARB staff used dispersion modeling to estimate the ambient concentration of diesel PM emissions that result from the operation of ocean-going vessel auxiliary engines that visit the Ports of Los Angeles and Long Beach.  The potential cancer risks from exposures to these estimated ambient concentrations of diesel PM were then determined.  The results from this study are presented below, and additional details on the methodology used to estimate the health risks are presented in Appendix G.

Health Risk Assessment

Risk assessment is a complex process that requires the analysis of many variables to simulate real-world situations.  There are three key types of variables that can impact the results of a health risk assessment for cargo handling equipment: the magnitude of diesel PM emissions, local meteorological conditions, and the length of time of exposure.  Diesel PM emissions are a function of the age and horsepower of the

engine, the emissions rate of the engine, and the annual hours of operation.  Older engines tend to have higher pollutant emission rates than newer engines, and the longer an engine operates, the greater the total pollutant emissions.  Meteorological conditions can have a large impact on the resultant ambient concentration of diesel PM, with higher concentrations found along the predominant wind direction and under calm wind conditions.  How close a person is to the emissions plume and how long he or she breathes the emissions (exposure duration) are key factors in determining potential risk, with longer exposures times typically resulting in higher risk.

To examine the potential health risks for ocean-going vessel auxiliary engines, ARB staff conducted a risk assessment for operations at the Ports of Los Angeles and Long Beach.  We evaluated the impacts from the 2002 estimated emissions for all sources of emissions at the two ports including ocean-going vessel auxiliary engines.  Meteorological data from Wilmington was used for the study.  The Wilmington site is about one mile away from the ports, and the measurements were collected in 2001.  The U.S. EPA's ISCST3 air dispersion model was used to estimate the annual average offsite concentration of diesel PM in the area surrounding the two ports.  The modeling domain (study area) spans a 20 x 20 mile area, which includes both the ports, the ocean surrounding the ports, and nearby residential areas in which about 2 million people live.  The land-based portion of the modeling domain, excluding the property of the ports, comprises about 65 percent of the modeling domain.  A Cartesian grid receptor network (160 x 160 grids) with 200-meter x 200-meter resolution was used in this study.  While grids within the ports were included in the network, the risks within these grids were excluded from the final risk analyses.  The elevation of each receptor within the modeling domain was determined from the United States Geological Service topographic data.

The potential cancer risks were estimated using standard risk assessment procedures based on the annual average concentration of diesel PM predicted by the model and a health risk factor (referred to as a cancer potency factor) that correlates cancer risk to the amount of diesel PM inhaled.  The methodology used to estimate the potential cancer risks is consistent with the Tier-1 analysis presented in the Office of Environmental Health Hazard Assessment (OEHHA) Air Toxics Hot Spots Program Risk Assessment Guidelines (OEHHA, 2002a; OEHHA, 2002b).  Following the OEHHA guidelines, we assumed that the most impacted individual would be exposed to modeled diesel PM concentrations for 70 years.  This exposure duration represents an "upper-bound" of the possible exposure duration.  The potential cancer risk was estimated by multiplying the inhalation dose by the cancer potency factor (CPF) of diesel PM (1.1 $(mg/kg-d)^{-1}$).

<u>Cancer Risk Characterization</u>

Emissions from vessel auxiliary engines resulted in significant health risk impacts on the nearby residential areas.  Figure IV-3 shows the risk isopleths for diesel PM emissions from vessel auxiliary engines (transiting and hotelling) at the Ports of Los Angeles and Long Beach superimposed on a map that covers the ports and the nearby communities.

As shown in Figure IV-3, the area in which the risks are predicted to exceed 100 in a million has been estimated to be about 13,500 acres with a population of 225,100.  For the risk level of over 200 in a million, the impacted areas have been estimated to be about 2,260 acres and about 48,000 people living around the ports who are exposed to the risk level.  Overall, about 99.5 percent of the effective modeling domain (excluding the port property and the surrounding ocean area) has an estimated risk level of over 10 in a million and about 99.6 percent of 2 million people who are living in the domain are exposed to the risk level (see Table IV-5).

Using the U.S. Census Bureau's year 2000 census data, we estimated the population within the isopleth boundaries.  The acres impacted and population affected for the risk ranges of 10-100, 100-200, 200-500, and over 500 are presented in Table IV-5.  As shown in Table IV-5, nearly 2 million people living in the area around the ports have a predicted cancer risk of greater than 10 in a million due to emissions from auxiliary engines.  Note that the size of the modeling domain was limited by the technical capabilities of the model.  However it is clear that a significant number of people outside the modeling domain area are exposed to risks greater than 10 in a million.

**Table IV-5:  Summary of Area Impacted and Population Affected by Risk Levels**

| Risk Level | Acres Impacted | Population Affected |
|------------|----------------|---------------------|
| Risk > 500 | 0 | 0 |
| Risk > 200 | 2,263 | 47,941 |
| Risk > 100 | 13,492 | 225,162 |
| Risk > 10 | 162,565 | 1,969,397 |

Note:  The effective modeling domain is the land area outside of port property, and is about 255 square miles or 163,435 acres.  The total population within the domain is about 2 million.

**Figure IV-3: Estimated Diesel PM Cancer Risk from Ocean-going Vessel Auxiliary Engine Activity at POLA and POLB**



Parameters:     Wilmington Met Data
                Urban Dispersion Coefficients
                80th Percentile Breathing Rate
                Emission = 405 TPY
                Modeling Receptor Domain = 20 mi x 20 mi
                Resolution = 200 m x 200 m

Non-Cancer Health Risks

A substantial number of epidemiologic studies have found a strong association between exposure to ambient particulate matter and adverse health effects. (CARB, 2002) As part of this study, ARB staff conducted an analysis of the potential non-cancer health impacts associated with exposures to the model-predicted ambient levels of directly emitted diesel PM (primary diesel PM) discussed above and extrapolated them to the rest of the state. The non-cancer health effects evaluated include premature death, asthma attacks, work loss days, and minor restricted activity days.
Based on our analysis, we estimate that the average number of cases statewide in 2004 due to emissions from auxiliary engines would be as follows:

- 31 premature deaths (for ages 30 and older), 16 to 48 deaths as 95% confidence interval (CI);
- 830 asthma attacks, 202 to 1, 457 as 95% CI;
- 7,258 days of work loss (for ages 18-65), 6,143 to 8,370 as 95% CI;
- 38,526 minor restricted activity days (for ages 18-65), 31,403 to 45,642 as 95% CI.

As stated previously, to estimate these statewide potential non-cancer health impacts from auxiliary engine emissions, ARB staff estimated the non-cancer health impacts from ocean-going vessel auxiliary engine emissions in the area surrounding the ports of Los Angles and Long Beach and extrapolated these results to predict statewide values based on the ratio of the mass emissions at the POLB and POLA to those in the rest of the State. A brief discussion on the methodology used to generate these estimates is provided below.

### Non-Cancer Health Effects Methodology

ARB staff assessed the potential non-cancer health impacts associated with exposures to the model-predicted ambient levels of directly emitted diesel PM (primary diesel PM) within each 200 meter by 200 meter grid cell within the modeling domain used for the POLA-POLB exposure assessment study. Because the study used the 2002 emissions estimates for auxiliary engine emissions at the ports, the ambient concentrations were adjusted to reflect the updated 2004 emissions inventory developed by ARB staff. The populations within each grid cell were determined from U.S. Census Bureau year 2000 census data. Using the methodology peer-reviewed and published in the Staff Report: Public Hearing to Consider Amendments to the Ambient Air Quality Standards for Particulate Matter and Sulfates (PM Staff Report; CARB, 2002), we calculated the number of annual cases of death and other health effects associated with exposure to the ambient PM concentrations modeled for each of the grid cells. For each grid cell, each health effect was estimated based on concentration-response functions derived from published epidemiological studies relating changes in ambient concentrations to changes in health endpoints, the population affected, and the baseline incidence rates. The total affected population was obtained by summing the results from each grid cell.

The selection of the concentration-response functions was based on the latest epidemiologic literature, as described in the PM Staff Report (ARB, 2002) and in Lloyd and Cackette (Lloyd and Cackette, 2001). Staff estimated that the ports of Los Angeles and Long Beach account for approximately 48% of total statewide emissions related to auxiliary engine activities. Hence, the statewide impact of the auxiliary engine emissions was estimated by dividing the estimated impacts in the modeling domain around the ports of Los Angeles and Long Beach by 0.48.

Several assumptions were used in quantifying the health effects of PM exposure. They include the selection and applicability of the concentration-response functions, exposure estimation, subpopulation estimation, baseline incidence rates, and the extrapolation from results in the modeling domain to the statewide results. These are briefly described below.

- Premature death calculations were based on the concentration-response function of Krewski et al. (Krewski et al, 2000) The ARB staff assumed that concentration-response function for premature mortality in the model domain is comparable to that in the Krewski study. It is known that the composition of PM can vary by region, and not all constituents of PM have the same health effects. However, numerous studies have shown that the mortality effects of PM in California are comparable to those found in other locations in the United States, justifying our use of Krewski et al's results. Also, the U.S. EPA has been using Krewski's study for its regulatory impact analyses since 2000. For other health endpoints, the selection of the concentration-response functions was based on the most recent and relevant scientific literature. Details are ARB's PM Staff Report (ARB, 2002).

- The ARB staff assumed the model-predicted exposure estimates could be applied to the entire population within each modeling grid. That is, the entire population within each modeling grid of 200 meter x 200 meter was assumed to be exposed uniformly to modeled concentration. This assumption is typical of this type of estimation.

- The ARB staff assumed the grid cell population had similar age distributions as the county in which it was located. The subpopulation used for each health endpoint was calculated by multiplying the all-age population for each grid cell by the county-specific ratio of the subpopulation used for the endpoint over the all-age population. For example, mortality estimates were based on subpopulations age 30 or more estimated from ratios of people over 30 over the entire population, specific for each county. For Los Angeles County, this value was 54 percent. These estimates were needed because information on the particular subpopulation in each modeling grid was not available.

- The ARB staff assumed the baseline incidence rates were uniform across each modeling grid, and, in many cases, across each county. This assumption is

consistent with methods used by the U.S. EPA for its regulatory impact assessment. The incidence rates match those used by U.S. EPA.

- Because only impacts from directly emitted diesel PM are estimated and a subset of health outcomes is considered here, the estimates should be considered an underestimate of the total public health impact. In addition, the model domain for the study was 20 miles by 20 miles and did not capture all of impacts on the surrounding communities from the POLA and POLB emissions.

- Without readily available modeled concentrations at other ports in California, staff extrapolated the results based on the modeling domain around ports of Los Angeles and Long Beach to infer statewide effects. In doing so, we assumed that the population density and the change in concentrations due to the regulation would be similar to those in the ports of Los Angeles and Long Beach.

## REFERENCES

(ARB, 1983)  California Air Resources Board, *Report to the California Legislature on Air Pollutant Emissions from Marine Vessels, Volume 1*, June 1983.

(ARB, 1982), California Air Resources Board, *Air Quality Aspects of the Development of Offshore Oil and Gas Resources,* February 25, 1982.

(ARB, 1984) California Air Resources Board, *Report to the California Legislature on Air Pollutant Emissions from Marine Vessels*, Appendices H to M, Volume VI1, June 1984.

(ARB, 2000) California Air Resources Board, et al , *Air Quality Impacts from NOx Emissions of Two Potential Marine Vessel control Strategies in the South Coast Air Basin*., November 2000.

(ARB, 2002) California Air Resources Board and Office of Environmental Health Hazard Assessment. Staff Report: Public Hearing to Consider Amendments to the Ambient Air Quality Standards for Particulate Matter and Sulfates, available at http://www.arb.ca.gov/research/aaqs/std-rs/pm-final/pm-final.htm. 2002.

(Chen, 2005) Chen, G. et al., 2005, "*An Investigation of the Chemistry of Ship Emission Plumes during ITCT 2002*," J. of Geophysical Research, 110, D10S90, doi:10.1029/2004JD005236.

(Corbett and Fishbeck, 1997)  Corbett, J.J. and Fishbeck, Paul, "*Emissions from Ships*", Science, Vol 278, 1997.

(Eddington, 1997) Eddington, Lee, et al., "*A Review of Meteorological Studies Pertaining to Southern California Offshore Ship Emissions And Their Effect on the Mainland*", Geophysics Branch, Naval Air Warfare Center Division, Point Mugu, CA, Geophysical Sciences Technical Note No. 200., February 1997.

(Eddington, 2003) Eddington, Lee and Rosenthal, Jay, *"The Frequency of Offshore Emissions Reaching the continental UW Coast Based on Hourly Surface Winds from a 10 Year Mesoscale Model Simulation"*, Geophysics Branch Technical Note. March 2003.

(Endresen, 2003)  Endresen, O., et al, "*Emission from international Sea Transportation and Environmental Impact*", Journal of Geophysical Research, 108, 2003.

(EPA, 2003)  United States Environmental Protection Agency, *Final Regulatory Support Document: Control of Emissions from New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder*, January 2003.

(Jonson, 2000)  Jonson, Jan E., et al, "*Effects of International Shipping on European Pollution Levels*", Norwegian Meteorological Institute, Research Report 41, July 2000.

(Krewski et al. 2000) Krewski D.; Burnett R.; Goldberg M.; Hoover K.; Stemiatychi J.; Jerrett M.; Abrahamovicz M.; White W. Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality, Health Effects Institute, Cambridge, Massachusetts; 2000. http://es.epa.gov/ncer/science/pm/hei/Rean-ExecSumm.pdf

(Lloyd and Cackette. 2001) Lloyd, A.C.; Cackette, T.A.; Diesel Engines: Environmental Impact and Control; J Air Waste Manage. Assoc. 2001, 51: 809-847. http://www.arb.ca.gov/research/seminars/lloyd/AWMA2001/JAWMADieselCritical Review.pdf

(OEHHA.  2002a)  *Air Toxics Hot Spots Program Risk Assessment Guidelines: The Air Toxics Hot Spots Program Guidance Manual for Preparation of Health Risk Assessments*.  Office of Environmental Health Hazard Assessment. June, 2002.

(OEHHA.  2002b)  *The Air Toxics Hot Spot Program Risk Assessment Guidelines: Part II-Technical Support Document for Describing Available Cancer Potency Factors*. Office of Environmental Health Hazard Assessment. June, 2002.

(Saxe and Larsen, 2004)  Saxe, H. and Larsen, T., "*Air Pollution from Ships in Three Danish Ports*," Atmospheric Environment, 38, 4057-4067, 2004.

(Streets, 2000)  Streets, D.G., "*The Growing Contribution of Sulfur Emissions from Ships in Asian Water, 1988-1995*", Atmospheric Environment, 34, 4425-4439, 2000.

## V.    SUMMARY OF THE PROPOSED REGULATION

In this chapter, we provide a plain English discussion of the key requirements of the proposed regulation for auxiliary diesel engines operated on ocean-going vessels (or "vessels").  This chapter begins with a general overview of the regulation and the approach taken in developing the requirements in the proposal.  The remainder of the chapter follows the structure of the proposed regulation and provides an explanation of each major requirement of the proposal.  This chapter is intended to satisfy the requirements of Government Code section 11346.2, which requires that a non-controlling "plain English" summary of the regulation be made available to the public.

### A.    Overview of the Proposed Regulation

The proposed regulation requires that auxiliary engines operating within 24 nautical miles (nm) of the California coastline significantly reduce their diesel particulate matter (PM), nitrogen oxide (NOx), and sulfur oxide (SOx) emissions.  Emission reductions can be achieved by using cleaner burning distillate marine fuels, or implementing alternative emission control strategies under an "Alternative Compliance Plan (ACP)."  For vessels electing to comply with the fuel requirement, vessel operators will need to switch from the use of heavy fuel oil to marine distillate fuel within 24 nm of the California coastline, unless they already use complying distillate fuels or choose to use distillate fuels on a permanent basis.  If operators choose to comply with the proposed regulation under an ACP, they must demonstrate that the alternative emission control strategies will achieve equivalent or greater emission reductions compared to the fuel requirements.

Our approach in developing the fuel and ACP requirements in the proposal was to apply the best available emission control strategy that could be applied to the variety of vessels visiting California ports.   Factors considered when establishing these requirements included the potential for near-source risk reduction in port communities, the cost and technical feasibility of using the fuels specified in the proposal, and sufficient availability of the specified fuels at ports worldwide.

### B.    Purpose

The purpose of this proposed regulation is to reduce emissions of diesel PM, NOx, SOx, and "secondarily" formed PM (PM formed in the atmosphere from NOx and SOx).  If adopted, the proposed regulation will achieve immediate, significant emission reductions upon implementation in 2007.  Specifically, the proposed regulation will have the following benefits:

- diesel PM emission reductions will reduce the potential cancer risk, premature mortality and other adverse health impacts from PM exposure to people who live in the vicinity of California's major ports and shipping lanes;

- diesel PM emission reductions will reduce regional exposure to PM, and help continue progress toward State and federal ambient air quality standards for $PM_{10}$ and $PM_{2.5}$;
- NOx emission reductions will reduce the formation of regional ozone and secondary nitrate PM; and
- reductions in SOx emissions will reduce the formation of secondary sulfate PM.

## C.     Applicability

This subsection explains who must comply with the proposed regulation.  Except for the exemptions described below, the proposal applies to any person who owns or operates an ocean-going vessel within 24 nm of the California coastline.  The definition of ocean-going vessel is key to this section.  In general, ocean-going vessels include large cargo vessels and passenger cruise vessels (see section on "Definitions" below).  The regulation applies to both U.S.-flagged vessels and foreign-flagged vessels.  Foreign-flagged vessels are vessels registered under the flag of a country other than the United States.

The proposed regulation includes language clarifying that the proposal does not change any applicable U.S. Coast Guard regulations and that vessel owners and operators are responsible for ensuring that they meet all applicable U.S. Coast Guard regulations.

## D.     Exemptions

The proposed regulation includes three exemptions.  First, the proposal does not apply to vessels while in "innocent passage."  As defined in subsection (d) of the proposal, "innocent passage" generally means travel within the 24 nm boundary off California's coastline without stopping or anchoring, except in limited situations such as when the vessel is in distress or must stop to comply with U.S. Coast Guard regulations.

An exemption is included for two-stroke slow-speed diesel engines as defined in subsection (d) of the proposal.  The design of these engines differs significantly from the four-stroke, medium speed engines used in virtually all auxiliary engine applications. While distillate fuels can be used in two-stroke slow-speed engines in some situations, the additional technical challenges associated with using distillate fuels in these engines make it impractical to subject these engines to the same performance standards as four-stroke medium speed engines.

An exemption is also included for military vessels.  Military vessels primarily use military specification distillate fuels that must be used on a consistent basis for military equipment globally.

## E.    Definitions

The proposed regulation provides definitions for a number of terms that are not self-explanatory, or have specific meaning within the context of the proposed regulation.  In this subchapter, we discuss some of the key definitions.

### *Auxiliary Engine*

Auxiliary engines are defined as engines designed primarily to provide power for uses other than for direct, mechanical propulsion.  Auxiliary engines include diesel generator set engines on diesel-electric vessels, which are used as a source of electricity for any use.  Generally, auxiliary diesel engines on cargo vessels are connected to generators and are used to produce electrical power primarily for ship-board uses such as lighting and navigation equipment.  These engines are generally four-stroke, medium speed engines.  In contrast, the main propulsion engines on cargo vessels are generally very large two-stroke slow-speed engines of a significantly different design than auxiliary engines.  Passenger cruise vessels are generally diesel-electric vessels, where several large diesel generator sets provide power for both propulsion and on-board electrical needs.  These large generator sets are included in the proposed regulation as "auxiliary engines" because they are similar in design to the smaller auxiliary engines on cargo vessels.  Specifically, they are four-stroke, medium-speed generator set engines.

### *Baseline*

The California "baseline" is the boundary line that divides the land and internal waters from the ocean.  This boundary line is determined by the United States Baseline Committee and shown on the official United States nautical charts published by the National Oceanic and Atmospheric Administration (NOAA).  Because the waterline rises and falls with the tide, the baseline is defined with respect to the tides.  For this regulation, we have defined the baseline as the mean lower low water line along the California coast, as shown on the applicable NOAA Nautical Charts authored by the NOAA Office of Coast Survey.  The NOAA routinely updates its nautical charts to update hazards to navigation and other information considered essential for safe navigation and any changes made to the baseline by the U.S. Baseline Committee.  It is our understanding that NOAA will be updating the charts for the California coast in the near future.  The California baseline is used in the definitions of "Territorial Sea" (which extends to 12 nautical miles from the California Baseline) and "Contiguous Zone" (which extends to 24 miles from the California baseline).

### *Marine Gas Oil*

Marine Gas Oil (MGO) is a marine grade distillate fuel very similar to on-road diesel fuel except that it has a higher flash point requirement and often a much higher sulfur content.  The International Organization for Standardization (ISO) sets standards for marine fuels under International Standard ISO 8217, including fuels designated DMX

and DMA, which correspond to marine gas oil. For example, the maximum sulfur content for grade DMA fuel is 1.5 percent by weight, and the minimum flash point is 60 degrees Celsius. If a fuel meets all of the standards for DMA or DMX fuels in the applicable ISO standard, then it qualifies in the proposed regulation as "marine gas oil." In practice, on-road diesel fuel in California often meets the specifications for DMA fuel and is sold for marine use. In most cases, DMX grade fuel is primarily used only for emergency generators, so marine gas oil is generally DMA grade fuel.

### Marine Diesel Oil

Marine Diesel Oil (MDO) is a marine grade distillate fuel very similar to marine gas oil except that it generally contains a small amount of marine residual fuel (heavy fuel oil) due to storage or transportation in tanks or piping that previously held marine residual fuels. The International Organization for Standardization (ISO) sets somewhat less stringent standards for MDO fuel, which corresponds to DMB grade fuel in ISO terminology. The sulfur content limit for DMB grade fuel is 2 percent, compared to 1.5 percent for DMA grade fuel (marine gas oil).

### Ocean-going Vessel

An ocean-going vessel is defined as a vessel meeting any of the following criteria:

- a vessel with a "registry" (foreign trade) endorsement on its U.S. Coast Guard certificate of documentation, or a vessel that is registered under the flag of a country other than the United States;
- a vessel greater than or equal to 400 feet in length overall (LOA) as defined in the Code of Federal Regulations (50 CFR § 679.2, as adopted June 19, 1996);
- a vessel greater than or equal to 10,000 gross tons (GT ITC) per the convention measurement (international system) as defined in 46 CFR 69.51-.61, as adopted September 12, 1989; or
- a vessel propelled by a marine compression ignition engine with a per-cylinder displacement of greater than or equal to 30 liters.

The criteria in the definition of ocean-going vessel are designed to include vessels that travel internationally, such as container vessels, auto carriers, tankers, and passenger cruise vessels. The definition is also designed to exclude harbor craft such as tug boats, fishing boats and ferries, which will be subject to more stringent fuel requirements in 2007. Specifically, diesel fuel sold to harbor craft in California will be required to meet California on-road "vehicular" standards.

### Territorial Sea and Contiguous Zone

Both the Territorial Sea and the Contiguous Zone represent internationally recognized over-water boundaries.   The Territorial Sea extends 12 nm offshore of the California coastline (or "baseline"), while the Contiguous Zone extends from the Territorial Sea to 24 nm offshore of the California coastline.  Together, these zones represent the region

subject to the proposed regulation approximately north of Point Concepción.  South of this point, a boundary approximately 24 nm off the shoreline is defined by straight line segments.  We selected this linear boundary south of Point Concepción because the Territorial Sea and Contiguous zone around the Channel Islands would bring the effective zone of the proposed regulation beyond the intended boundary of approximately 24 nm offshore of the California mainland coastline.

## F.     Cleaner Fuel Option

This section explains the types of fuels that may be used by operators of ocean-going vessels to comply with the requirements of the proposed regulation.  Under the proposed regulation, starting on January 1, 2007, vessel operators can comply with the proposal by using one of the following fuels when operating their auxiliary engines within 24 nm of the California coastline: (1) marine gas oil; or (2) marine diesel oil with less than or equal to 0.5 percent by weight sulfur.  A 0.5 percent sulfur limit is specified for marine diesel oil because it tends to have a higher sulfur level than marine gas oil.  Marine gas oil used by vessels that visit California ports is expected to average at or below 0.5 percent sulfur based on the results of a survey sent to vessel operators in 2005.  Specifically, the average sulfur content of distillate marine fuels used by vessel auxiliary engines was reported to be 0.5 percent, and we do not anticipate that this will increase in the future.

Starting on January 1, 2010, marine gas oil meeting a 0.1 percent sulfur limit is specified under the proposed regulation.  This lower sulfur fuel will result in additional emission reductions of PM and SOx, compared to the January 1, 2010 requirement.  This standard is also consistent with a recently adopted European Union regulation.  However, a feasibility analysis is required under the proposed regulation prior to implementation of this fuel requirement to investigate the supply, cost, and technical feasibility of using this fuel.  Based on the results of this evaluation, modifications to this requirement may be proposed to the Board.

Under the proposed regulation, vessel emissions would be regulated up to 24 nm off the California coastline.  The ARB has the authority to require emission reductions out to the California Coastal Water (CCW) boundary.  This is the region within which emissions are likely to be transported onshore, and it extends beyond the 24 nm boundary.  However, the 24 nm boundary was proposed because it significantly lowers the cost of the regulation while still providing the vast majority of the potential on-shore benefits in terms of reduced exposure to diesel PM.  Specifically, about 75 percent of the auxiliary engine diesel PM emissions within 100 nm of the California coastline is emitted within the 24 nm boundary.  The 24 nm boundary is also easily defined for vessel operators.  The boundary is aligned in Central and Northern California with the outer boundary of the Contiguous Zone, an internationally recognized boundary which extends 24 nm offshore and is noted on most nautical charts.  In Southern California, the boundary consists of straight line segments approximately 24 nm offshore of the coastline.  This approximation is used because the Contiguous zone extends around

the Channel Islands, bringing the boundary well beyond 24 nm, and in some cases beyond the California Coastal Waters boundary

## G.    Recordkeeping and Reporting Requirements

Recordkeeping

Recordkeeping, in addition to ship-board inspections and fuel testing, is necessary for ARB enforcement staff to verify that a vessel operator is complying with the requirements of the proposed regulation.  This section explains the recordkeeping requirements.

Beginning with the implementation of the fuel requirement on January 1, 2007, any person who owns or operates an ocean-going vessel within 24 nm of the California coastline will be required to maintain certain records (in English) for a minimum of three years.  These requirements do not apply to vessels that travel along California's coastline in "innocent passage," meaning traveling without stopping or anchoring, except in limited situations.  The records that must be maintained are as follows:

- the date, time, and position (longitude and latitude) of the vessel for each entry into and departure from the region covered by the proposed regulation;
- the date, time, and position (longitude and latitude) of the vessel at the initiation and completion of any fuel switching procedures used to comply with the fuel requirements in the proposed regulation.  Completion of fuel switching procedures means the moment at which auxiliary engines have completely switched from one fuel to another fuel;
- the date, time, and position (longitude and latitude) of the vessel at the initiation and completion of any fuel switching procedures within the region covered by the proposed regulation;
- the type of each fuel used (e.g. marine gas oil) in each auxiliary engine operated within the region covered by the proposed regulation; and
- the types and amounts of fuels purchased for use on the vessel, and the actual percent by weight sulfur content of such fuels as reported by the fuel supplier or a fuel testing firm.

Reporting and Monitoring Provisions

These provisions explain when the records described above will be provided (reported) to ARB.  The provisions also explain that access to vessels shall be provided to allow enforcement staff to verify compliance with the proposed regulation.  For example, enforcement staff may need to access the vessel to inspect records instead of requesting that they be mailed, or they may need to obtain a sample of fuel used by the vessels auxiliary engines.

Under these provisions, the recordkeeping information specified in the proposed regulation must be supplied in writing to the Executive Officer upon request.  Some of

the recordkeeping required by the proposed regulation may already be recorded to comply with other regulations or standardized practices.  In these cases, the information may be provided to ARB in a format consistent with these regulations or practices, as long as the required information is provided.

Vessel owners or operations may be requested to provide additional information needed to determine compliance with the proposed regulation.  For example, information about the auxiliary engines, fuel tanks, and fuel delivery system may be needed on a case-by-case basis.

To monitor compliance with the requirements of the proposed regulation, these provisions require that vessel owners or operators provide access to the vessel to employees or officers of the Air Resources Board.  This is to include access to records necessary to establish compliance with the requirements of the proposal and access to fuel tanks or pipes for the purpose of collecting fuel samples for testing and analysis.

## H.    Noncompliance Fee Option

The proposal contains this provision to address the limited situations where a vessel operator may not be able to comply with the proposed regulation for reasons beyond their reasonable control, or it may be impractical to comply.  Instead of providing exemptions for these situations, staff is proposing a provision that would allow a vessel owner or operator, under special circumstances, to pay a fee in lieu of complying with the proposed regulation.  The funds collected under this provision would be used for marine or port emission reduction projects, with the goal of achieving equivalent or greater emission reductions near affected communities.  Under this program, the vessel owners or operators would need to notify the Executive Officer that they will not meet the requirements of the regulation prior to entering the 24 nautical mile boundary (California Regulatory Waters).  The fees under this program are designed to ensure that participants will not receive an economic advantage over vessel operators that directly comply with the proposed regulation.  The fee schedule is graduated such that subsequent visits would result in increasing fee amounts.

This option could only be used in the following circumstances:

- the vessel owner is unexpectedly redirected to a California port and the vessel does not have a sufficient quantity of fuel complying with the requirements of the proposed regulation;
- due to reasons beyond the vessel operator's control, the vessel was not able to acquire a sufficient quantity of fuel complying with the requirements of the proposed regulation;
- due to reasons beyond the vessel operator's control, fuel necessary to comply with the requirements of the proposed regulation was found to be contaminated or otherwise out of compliance after the vessel left the last bunkering port prior to a California port call;

- modifications to a vessel are required to comply with the proposed regulation and the vessel operator is not able to complete the modifications in time to meet the January 1, 2007 requirements in the proposal. The vessel operator must submit a Compliance Retrofit Report that identifies the modifications necessary and the date by which modifications will be completed; and
- modifications to a vessel are required to comply with the proposed regulation and the vessel will visit a California port a maximum of two times per calendar year, and four times over the life of the vessel after January 1, 2007 (the effective date of the requirements in the proposal).

The non-compliance fees funds would be deposited into the port's Noncompliance Fee Settlement and Air Quality Mitigation Fund prior to leaving the port. The fee increases with each port visited while complying with this provision. The port visits are cumulative over the life of the vessel. For example, if a diesel-electric vessel visits a California port and uses the noncompliance fee option for the first time, the vessels owner would pay a fee of $32,500. If that same vessel visits another California port sometime later and again uses the noncompliance fee option, the vessel owner would pay a fee of $65,000; since this was the second port visited under this provision. The basis of the fees is discussed in Appendix H, Basis for the Noncompliance Fees. The fee schedule is shown in Table V-1, Noncompliance Fee Schedule, Per Vessel.

**Table V-1: Noncompliance Fee Schedule, Per Vessel**

| Noncompliance Fee Schedule | | |
|---|---|---|
| **Visit** | **Fee (per vessel)** | |
| | Diesel-Electric Vessels | Other Vessels |
| 1st Port Visited | $32,500 | $13,000 |
| 2nd Port Visited | $65,000 | $26,000 |
| 3rd Port Visited | $97,500 | $39,000 |
| 4th Port Visited | $130,000 | $52,000 |
| 5th or more Port Visited | $162,500 | $65,000 |

I.      **Alternative Compliance Plan**

The alternative compliance plan (ACP) is included in the proposed regulation to provide vessel owner/operators with the flexibility to implement alternative emission control strategies that achieve equivalent or greater emission reductions than the distillate fuel compliance option.  Alternative emission control strategies may include the use of shore-side electrical power, engine modifications, exhaust treatment devices such as diesel oxidation catalysts, the use of alternative fuels or fuel additives, and operational controls such as limits on idling time.

<u>Application Process</u>

To comply with the proposed regulation under the ACP, a vessel owner or operator must submit an application to ARB.  The application must demonstrate that the alternative emission control strategy employed will achieve equivalent or greater emission reductions in PM, NOx, and SOx from auxiliary engines, relative to the emission reductions that would have occurred by using the distillate fuel compliance option.  The proposed regulation specifies basic information that must be included in the application, such as emissions test data, and other information that demonstrates the emissions level to be achieved with the proposed alternative emission control strategy. ARB staff will develop a guidance document to assist applicants in making a demonstration of equivalent emission reductions.

The scope of the ACP is limited to auxiliary engines.  In other words, emission reductions from main engines or other sources may not be included in the ACP.  In addition, compliance with the ACP can be demonstrated on an individual vessel basis, or across a fleet of vessels with the same owner or lessor.

After an application for an ACP is submitted, ARB has 90 days to accept or deny the application.  If ARB staff finds that additional information is necessary, the applicant will be provided an opportunity to submit the necessary information.  It should be noted that submittal of an ACP application does not mean that the applicant is complying with the regulation.  The applicant must comply with the fuel requirements and other provisions of the regulation until an ACP application is granted.  For this reason, applicants may want to submit applications at least 90 days prior to the implementation date of the fuel requirement on January 1, 2007.

ARB may revoke or modify an ACP if it believes that an ACP has been granted to an owner or operator that is not complying with the provision or no longer meets the criteria of an ACP.  In addition, ACP applications may be inadequate if the 0.1 percent sulfur MGO requirement effective on January 1, 2010, is implemented.  As such, applicants may want to consider pursuing alternative emission control strategies that will also comply with this more stringent emission level.

<u>Additional provision for applicants using shore-side power</u>

There is an additional provision in the ACP that applies to vessels that connect to shore-side power, subject to certain conditions.  Specifically, the vessel must connect to power supplied by a utility company (or another source with equivalent or lower emissions per unit of delivered energy) and shut down all auxiliary engines subject to the proposed regulation.  The vessel must also connect to shore power within one hour after the vessel is secured at the port terminal, and continuously use this power until no more than one hour prior to when the vessel leaves the terminal.

If these conditions are met, the vessel would not be subject to the fuel-based emission limitation during travel from a previous port to a California port where shore-side power is to be used, while docked prior to utilizing shore-side power, and during travel to a subsequent port.  For example, a vessel operator could run their auxiliary engines on heavy fuel oil while traveling to a California port where shore-side power is to be used.  After docking at this port, the vessel would have one hour to shut off all its auxiliary engines and begin using shore-side electrical power.  When preparing to depart, the vessel could disconnect from shore-side power and run their auxiliary engines on heavy fuel oil for up to one hour prior to departing.  While departing port, the vessel operator could continue to run the auxiliary engines on heavy fuel oil.

If two California ports are visited in succession, and a vessel utilizes shore-side power only at the second port, the vessel would be considered to meet the emission reduction requirements of the ACP: (1) while traveling from the first port to the second port; (2) while dockside at the second port; and (3) while departing the second port.  While traveling to the first port, and during mooring at the first port, the vessel must comply with the requirements of the regulation through the use of distillate fuels or other emission control strategies (See Figure V-1).  For example, while traveling to the first port, a vessel operator may switch from heavy fuel oil to distillate fuels in the auxiliary engines prior to entering the 24 nautical mile boundary off California's coastline.  The distillate fuel would continue to be used while at dockside.  However, as soon as the vessel operator left the first port, the operator could switch to heavy fuel oil, which could be used thereafter except when the auxiliary engines are shut down while the vessel is connected to shore-side power at the second port.

If two California ports are visited in succession and a vessel utilizes shore-side power at the first port visited, the vessel would meet the requirements of the ACP during travel to this first port, during the time the vessel is dockside at the first port, and while traveling from the first to second port.  While dockside at the second port, and during the departure from the second port, the vessel must comply with the requirements of the regulation through the use of distillate fuels or other emission control strategies (See Figure V-2 below).  For example, while traveling to the first port, a vessel operator may use heavy fuel oil.  The heavy fuel oil could continue to be used while at dockside for up to one hour, after which the auxiliary engines must be shut off while shore-side power is connected.  While preparing to depart, the vessel could disconnect from shore-side power and begin operating the auxiliary engines on heavy fuel oil.  Heavy fuel could also be used in transit to the second port.  However, at some point prior to docking at the second port, the vessel operator would need to switch to distillate fuel or implement an alternative emission control strategy, which would be used at dockside and while the vessel departs the second port.

The additional provisions for applicants using shore-side power are included in the proposed regulation to encourage the use of shore-side power in recognition of its ability to greatly reduce diesel PM emissions released close to portside communities.  In addition, the use of shore-side power results in significant reductions in carbon dioxide (a global warming gas).

Applicants do not have to utilize this provision of the ACP in all cases when their emission control strategies utilize shore-side power.  They may choose to comply with the proposal using shore-side power under the general ACP provisions.  For example, if they cannot connect within one hour of mooring at the terminal, they can utilize the general provisions of the ACP.  However, the special provisions for shore-side power provide some advantages.  First, the application process would be simplified because less information would be needed to demonstrate compliance.  In addition, there may be instances where the emissions from a vessel would be greater overall while utilizing this provision compared to compliance with the fuel requirements in the proposed regulation.  However, we believe the benefits of reducing the risk resulting from near-shore PM emission reductions will generally offset any potential increases in overall emissions.

## Figure V-1

## Vessel Uses Auxiliary Engine Power at First Port Call and Shore-side Power at Second Port Call



## Figure V-2

## Vessel Uses Shore-side Power at First Port Call and Auxiliary Engine Power at Second Port Call



**J.      Test Methods**

The proposed regulation includes test methods to determine whether fuels meet the requirements of the proposed regulation.  Specifically, the proposed regulation references International Standard 8217 as adopted by the International Organization for Standardization in 1996.  ISO 8217 includes the properties necessary for a fuel to qualify as DMX or DMA grade fuel (marine gas oil), or DMB grade fuel (marine diesel oil), and specifies the test methods to be used to determine compliance with each of these properties.  The proposal also includes the test method to be used to determine the sulfur level of these fuels.

The proposed regulation allows the use of alternative test methods demonstrated to be equally accurate, as approved by the Executive Officer of ARB.  For example, ASTM equivalent methods are available for many or all of the ISO test methods specified in ISO 8217.

**K.      Sunset and Technology Review Provisions**

Sunset Provision

If the Executive Officer of the ARB determines that the IMO or the U.S. EPA adopts regulations that will achieve equivalent or greater emission reductions from ocean-going vessels in California, compared to the emission reductions achieved by the proposed regulation, then the Executive officer will propose to the Board for its consideration terminating or modifying the requirements of the proposed regulation.  This provision recognizes that it would be preferable to adopt regulations for ocean-going vessels on a national or international basis.

Feasibility Review

This section describes the feasibility evaluation that will be conducted relative to the January 1, 2010, fuel requirement to use 0.1 percent sulfur marine gas oil.  Under these provisions, an evaluation of the feasibility of this fuel requirement will be conducted by ARB staff no later than July 1, 2008.  The evaluation will consider, at a minimum, the following:

- the current availability of 0.1 percent sulfur MGO at bunkering ports worldwide;
- the ability of petroleum refiners and marine fuel marketers to supply this fuel by 2010;
- technical considerations such as whether fuel at this lower sulfur level will be compatible with all marine engines; and
- the cost of this fuel.

If, based on the evaluation, modifications to the regulation are necessary, staff will propose changes to the Board prior to January 1, 2009, (a year prior to the implementation date of the 0.1 percent sulfur fuel standard).

**L.      Severability**

This provision states that if a particular section of the proposed regulation is held to be invalid, the remainder of the proposal shall continue to be effective.

**M.      Regulatory Alternatives**

The Government Code section 11346.2 requires ARB to consider and evaluate reasonable alternatives to the proposed regulation and provide the reasons for rejecting those alternatives.  ARB staff evaluated five alternative strategies to the current proposal.  Based on the analysis, none of the alternative control strategies were considered more effective than the proposed regulation.  Full implementation of the proposed regulation is necessary to make progress toward ARB's goals of: (1) reducing diesel PM by 85 percent in 2020, as described in the Diesel Risk Reduction Plan; and (2) achieving State and federal air quality standards for PM and ozone.  The proposed regulation provides vessel operators with the flexibility to pursue alternative emission control strategies if they choose not comply with the fuel requirements in the proposal.

This section discusses each of the five alternatives and provides reasons for rejecting those alternatives.

    <ins>Alternative 1:  Do Nothing</ins>

As discussed in Chapter VII, the proposed regulation will result in significant reductions in diesel PM, NOx, and SOx emissions.  The diesel PM reductions are an important element of the Diesel Risk Reduction Plan, and along with other regulations to be adopted by ARB, will contribute to reducing cancer and noncancer health risks to the public associated with inhalation exposure to emissions of diesel PM.

The emission reductions from the proposal are also necessary to make progress toward compliance with State and federal air quality standards for ozone and PM in nonattainment areas throughout the State.  As discussed in Chapter IV, NOx and SOx emissions form "secondary" nitrate and sulfate PM, respectfully, in the atmosphere, while NOx emissions contribute to the formation of ozone.

In addition, ARB is required by H&SC Section 39658 to establish regulations for toxic air contaminants (TACs) such as diesel PM.  Further, H&SC Sections 39666 and 39667 require the ARB to adopt measures to reduce emissions of TACs from nonvehicular and vehicular sources.  In consideration of ARB's statutory requirements and the recognized potential for adverse health impacts to the public resulting from exposure to diesel PM and ozone, this alternative is not a reasonable option.

Alternative 2:  Rely on U.S. Environmental Protection Agency (EPA) and
International Maritime Organization (IMO) Regulations

As discussed in subsection K above, the proposed regulation includes a "sunset"
provision which requires the Executive Officer of ARB to consider terminating the
requirements of the proposed regulation if it is determined that the U.S. EPA or IMO
adopts regulations that will achieve equivalent or greater emission reductions from
vessel auxiliary engines compared to the emission reductions achieved by the proposed
regulation.  This provision recognizes that it would be preferable to adopt regulations for
ocean-going vessels on a national or international basis.  However, existing IMO and
U.S. EPA regulations will not achieve the needed emission reductions from the proposal
in the near term (prior to 2010), and it appears unlikely that the U.S. EPA or IMO will
adopt equally effective regulations in the next foreseeable future.  The following is a
brief summary of the status of IMO and U.S. EPA activities supporting our position that
we cannot wait for IMO or U.S. EPA to act.

IMO Annex VI NOx Standards

These standards apply to marine diesel engines greater than 130 kilowatts, which would
include the auxiliary engines covered by the ARB staff proposal.  However, these
standards only apply to NOx emissions, and therefore would not achieve the significant
PM benefits of the proposed regulation.

U.S. EPA 1999 Category 1&2 Engine Rule

The standards in this rule apply to new "category 1 & 2" engines (engines with a
displacement less than 30 liters per cylinder), which would apply to most auxiliary
engines covered by the ARB staff proposal (except the engines on diesel-electric
vessels such as cruise vessels).  This rule specifies standards for NOx plus
hydrocarbons, PM, and carbon monoxide.  However, this rule only applies to new
engines in U.S.-flagged vessels, which make up a very small proportion (less than 10
percent) of the vessels that visit California ports.  In addition, there is a foreign-trade
exemption for U.S.-flagged vessels.

U.S. EPA 2003 Category 3 Engine Rule

The U.S. EPA recently adopted standards for new "category 3" engines (the large
engines used for propulsion of ocean-going vessels).  These NOx standards would
apply to the large generator set engines used on diesel-electric vessels such as cruise
vessels.  However, the standards are identical to the IMO NOx standards and would
only achieve modest NOx emission reductions and no diesel PM reductions.  In
addition, they only apply to new engines on U.S.-flagged vessels, which represent a
very small proportion of the vessels visiting California ports.  In this rulemaking, U.S.
EPA also addresses "category 1" and "category 2" engines, with a displacement at or
above 2.5 liters per cylinders but less than 30 liters per cylinder (typical of auxiliary
engines used on ocean-going vessels).  On U.S.-flagged vessels, these engines would

be required to meet NOx standards equivalent to the IMO standards.  In addition, beginning in 2007, these engines would be subject to the U.S. EPA's standards for category 1 and 2 engines adopted in 1999.  In this rulemaking, U.S. EPA also eliminated the foreign trade exemption included in U.S. EPA's 1999 rule.  However, all these requirements would only apply to U.S. flagged vessels, which represent a small proportion of the vessels that visit California ports.

### EPA Nonroad Diesel Rule

Among other requirements, this rule would limit the sulfur content of diesel fuels for non-road applications.  For marine use, the rule would limit the sulfur content in diesel fuel to 0.05 percent (500 ppm) in 2007, and 0.0015 percent (15 ppm) in 2012 (EPA, 2004).  However, this rule does not apply to marine diesel oil or heavy fuel oil.  Since most ocean-going vessel auxiliary engines use heavy fuel oil, this would have little impact in reducing emissions from this source.

### Potential Tier II EPA Category 3 New Engine Standards

The U.S. EPA reportedly intends to adopt more stringent technology-forcing Tier 2 standards for category 3 engines in April, 2007. (EPA, 2003). However, these standards may again only apply to U.S.-flagged vessels, and may not address PM emissions.  In addition, we estimate that such standards would become effective for new engines in the 2010 timeframe and the emission reductions achieved by such a measure would phase in gradually as new vessels enter into service.  As such, the measure would not be expected to achieve significant reductions until well after 2010.

### Sulfur Emission Control Area (SECA)

The U.S. EPA, in association with ARB and other air quality agencies, is currently investigating the creation of SECA's under a process provided by the IMO.  Specifically, the IMO's Annex VI ("Regulations for the Prevention of Air Pollution from Ships") of the MARPOL Convention provides a mechanism to require the use of marine fuel with a sulfur content limit of 1.5 percent in designated areas.  The formation of a SECA may provide significant and necessary PM and SOx emission reductions to California if a West Coast SECA is established.  However, the benefits of such a program would not be comparable to the ARB staff proposal.  The percent PM and SOx emission reductions achieved from the use of 1.5 percent sulfur heavy fuel oil are far less than the reductions that would be achieved by the use of the distillate fuels specified in the proposed regulation.  Specifically, the U.S. EPA estimates an 18 percent PM reduction and a 44 percent SOx reduction from the use of 1.5 percent heavy fuel oil (EPA, 2002).  We estimate the use of the distillate fuel will result in a 75 percent PM reduction, an 80 percent SOx reduction, and a 6 percent NOx reduction.   It should be noted that the use of 1.5 percent heavy fuel oil may result in larger emission reductions overall because it would apply to the main and auxiliary engines of vessels, whereas the ARB staff proposal would only apply to auxiliary engines. However, the ARB staff proposal would achieve far greater emission reductions at dockside where diesel PM reductions are

most critical.  In addition, ARB staff plans to develop strategies to reduce the emissions from main engines on marine vessels in the next year or two.

A comparison between the ARB staff proposal and the potential regulations discussed in Alternative 2 are summarized in Table V-2.  As shown, none of the potential regulations are expected to achieve the same benefits as the measure proposed by ARB staff.

**Table V-2: Comparison between Potential IMO/U.S. EPA Proposals and the ARB Staff Proposal**

| Regulation | Comparison to the ARB Staff Proposal |
|---|---|
| IMO Annex VI NOx Standards | ▪Standards do not reduce PM |
| U.S. EPA 1999 Category 1&2 Engine Rule | ▪ Standards only apply to U.S. flagged vessels<br>▪ Benefits phase in slowly starting in 2007 for most engines<br>▪ Foreign-trade exemption for U.S. flagged vessels |
| U.S. EPA 2003 Category 3  Engine Rule | ▪ Standards only apply to U.S. flagged vessels<br>▪ Standards same as IMO and do not reduce PM for category 3 engines<br>▪ Rulemaking eliminates foreign trade exemption for certain category 1 & 2 engines on U.S.-flagged vessels |
| U.S. EPA Nonroad Diesel Rule | ▪ Specifies sulfur limits for diesel fuel used in marine applications, but exempts marine diesel oil & heavy fuel oil |
| Potential Tier II EPA Category 3 New Engine Standards (2007 adoption expected) | ▪ Standards may only apply to U.S.-flagged vessels<br>▪ Standards may not reduce PM<br>▪ Standards not expected to be effective until circa 2010<br>▪ Benefits phase in slowly beginning in 2010 with vessel turnover |
| Potential IMO SECA off California Coast | ▪ Significantly less reductions in diesel PM and SOx at dockside<br>▪ Standards expected to be effective later than the ARB staff proposal if implemented<br>▪No NOx benefit |

<u>Alternative 3:  Use Marine Distillate Fuels Only at Dockside</u>

Under this alternative, ocean-going vessels visiting California ports would only be required to use marine distillate fuels at dockside.  The emission reductions under this proposed alternative would be reduced by a minimum of 40 percent compared to the proposed regulation because the emissions from auxiliary engines on vessels at sea within the 24 nm boundary during transit would no longer be controlled.  Fewer health benefits would result from this approach, and the loss in emission reductions would be greater if auxiliary engines are allowed to transition from one fuel to another at dockside, since such transitions can take an hour or more.

The recurring fuel costs associated with the proposed regulation would be lower under this alternative.  There could also be a reduction in the cost impacts associated with modifying vessels to use distillate fuel, particularly with the diesel-electric vessels.  For

example, we anticipate that some vessels may not need an additional tank for storing distillate fuel if the fuel will only be used at dockside. However, given the variability involved, we cannot quantify the reduction in retrofit costs under this alternative. Nevertheless, looking at the overall industry costs, the retrofit costs are relatively small compared to the recurring added fuel costs. Therefore, the overall cost-effectiveness, in terms of dollars per pound of emissions reduced, of the alternative is expected to be similar to the proposed regulation. In summary, this alternative has similar cost-effectiveness to the ARB staff proposal, due to both reduced cost and reduced emission reductions. However, given the feasibility, cost-effectiveness, and health benefits of requiring reductions both at dockside and within the specified 24 nautical mile zone, Alternative 3 was judged inferior to the proposed regulation.

<u>Alternative 4:  Special Provisions for Diesel-Electric Vessels</u>

Under this alternative, diesel electric-vessels would have three compliance options: (1) use distillate fuels only at dockside as in Alternative 3 above; (2) use 1.5 percent sulfur heavy fuel oil within the 24 nm boundary and at dockside; or (3) retrofit vessels to use shoreside electrical power and connect at California terminals where the facilities are available.

Under the first option, the same situation applies as in Alternative 3, except that the option only applies to diesel electric-vessels (primarily cruise vessels). This option would achieve significantly less emission reductions and the cost would be reduced proportionately. The cost-effectiveness is expected to be similar to the staff's proposal.

For the option to use 1.5 percent sulfur heavy fuel oil, the estimated PM emission reductions are expected to be significantly less (about 18 percent versus 75 percent for staff's proposal relative to an engine burning standard high suflur heavy fuel oil). SOx emissions would be reduced by about 44 percent versus 80 percent for staff's proposal, and there would be no NOx reductions.  On the other hand, the cost of the 1.5 percent sulfur heavy fuel is currently much less than marine gas oil. As a result, the cost of this option would be considerably less than the cost associated with staff's proposal. Overall, we expect that the PM cost efffectiveness of this option would be in the same range as the proposed regulation.

The third option, utilizing cold ironing where available is difficult to analyze because vessels retrofitted for cold ironing would only plug into shoreside power if it is available. To date, only a few California port terminals have shoreside power facilities installed. Additional facilities are anticipated at the Ports of Los Angeles, Long Beach and Oakland. However, it will be several years before new additional shoreside power facilities are operational. As a result, we cannot quantify the emissions reductions for this option at this time.

Overall, the emission reductions from any of these options under this alternative would be significantly less than the ARB staff proposal, although the cost-effectiveness would be similar. As with Alternative 3, we judged this option to inferior.

<u>Alternative 5:  Exemption of Power used for Propulsion in Diesel-Electric Vessels</u>

Diesel-electric vessels have large diesel engines coupled to generators that supply electrical power for both propulsion and shipboard electrical uses.  Under this alternative, only the power generated for shipboard electrical uses would be subject to the proposed regulation.  The power generated for propulsion would not be subject to regulation.

Industry sources have suggested this alternative because the engines used for propulsion in other vessel types are not controlled under the staff proposal. Specifically, most other (non-diesel-electric) vessels have separate main engines mechanically connected to a propeller used for propulsion, and auxiliary engines used for shipboard power.  The main engines would not be subject to control, while the auxiliary engines would be covered.  For diesel-electric vessels, which have generator set engines that supply electrical power for both propulsion and shipboard electricity, all of the power and emissions generated by these engines would be subject to control.  As such, the costs are higher for operators of these vessels.

However, we feel it is appropriate to control all of the emissions from the engines on diesel-electric vessels, whether generated for shipboard electrical power or propulsion, because it is technically feasible and cost-effective to do so.  The engines used in diesel-electric vesssels are very similar to the auxiliary engines used in other vessels, except that they are larger.  Specifically, they are four-stroke, medium speed engines used in generator set applications.  The main engines in other vessels are generally two-stroke slow-speed engines.  These engines have a significantly different design that is less amenable to the use of distillate fuels.

Alternative 5 would achieve less emission reductions than the staff proposal because the amount of power (and thus emissions) generated by diesel-electric vessels for propulsion is significant, and would not be controlled under this alterntive.  The cost to ship operators would also be reduced proportionally because they would not need to use the more expensive distillate fuels (or other emission control strategies) for the power generated for propulsion.  However, the overall, the cost-effectiveness is expected to be similar to the staff's proposal.

Another consideration is the difficulty in separating out the power generated for propulsion and shipboard electricity.  For example, a typical diesel-electric cruise ship will have varying shipboard electrical power needs based on factors such as the effect of temperature on space heating or cooling for passenger cabins.  Propulsion power needs will also vary based on the speed of the vessel and ocean currents.  Even if the power used only for shipboard electrical uses could be clearly distinguished, it may be difficult for ship operators to limit the emissions only from the amount of power for shipboard use separately from the power used for propulsion.  Extensive recordkeeping would be necessary to ensure compliance under this alternative.

In summary, this alternative has similar cost-effectiveness to the ARB staff proposal, due to both reduced cost and reduced emission reductions.  This alternative would also require burdensome recordkeeping.  Given the cost-effectiveness, technical feasibility, and health benefits of controlling emissions from all power generated by these engines, Alternative 5 was judged inferior to the proposed regulation.

**REFERENCES**

(EPA, 2002) United States Environmental Protection Agency, *Control of Emissions of Air Pollution from New Marine Compression-Ignition Engines at or Above 30 Liters/Cylinder*, Notice of Proposed Rulemaking, April 30, 2002, Table VI.F-1.

(EPA, 2003) United States Environmental Protection Agency Regulatory Announcement, *Emission Standards Adopted for New Marine Diesel Engines*, EPA420-F-03-001, January 2003.

(EPA, 2004) United States Environmental Protection Agency Fact Sheet, *Clean Air Nonroad Diesel Rule*, EPA420-F-04-032, May 2004.