## VI.    TECHNOLOGICAL FEASIBILITY OF THE PROPOSED REGULATION

In this chapter, we discuss the technological feasibility of the proposed regulation.  In particular, we focus on the availability of the fuel that we expect most vessel operators will use to comply with the emission limits, and the ability of ocean-going vessels to use that fuel.  In addition, we discuss possible alternative emission reduction strategies that vessel operators may use.

It should be noted at the outset that the proposed regulation does not require the use of any specific fuels.  Rather, the proposed regulation requires vessel operators in regulated California waters to limit the emissions from their auxiliary engines to the levels of specified pollutants (diesel PM, NOx, SOx) equivalent to or lower than the levels that would have resulted had those engines used (1) marine gas oil (MGO), or (2) marine diesel oil (MDO) with a sulfur content of 0.5 percent or less.  In 2010, the proposed regulation further reduces these limits to the level of emissions from an engine operating on MGO with 0.1 percent sulfur to maximize the regulation's emissions benefits.

Vessel operators can meet these limits in one of several ways.  First, they can use MGO, or MDO with 0.5 percent sulfur or less, starting January 1, 2007.  For the second tier (2010) limits, they can use MGO with 0.1 percent sulfur or less.  As we stated above, vessel operators are not required to use these fuels, but there is an automatic presumption created that the operator has met the emission limits if he uses these fuels in the regulated engines.

Another way vessel operators can meet the emission limits is through the use of an approved Alternative Compliance Plan (ACP).  The ACP provides a high degree of flexibility by allowing vessel operators to implement alternative emission control strategies, provided such measures achieve equivalent or greater reductions relative to the emission reductions that would have occurred by using the marine distillate fuels described above.  Thus, if a vessel operator determines that there are overriding concerns justifying the use of other emission control strategies (e.g., safety during fuel switching, costs), the operator can seek, prior to entering California waters, ARB approval of an ACP, under which the operator would achieve equivalent or greater reductions using measures that the operator chooses.   In this way, the vessel operator maintains full control in determining which emission reduction strategy is best suited for each particular vessel, with due consideration for safety, costs, and other factors important to the operator.

### A.    Availability of Marine Distillate Fuels

The term "marine distillate" refers to specific grades of marine distillate fuels.  The proposed regulation allows the use of MGO that meets the specifications for DMX or DMA[4] grades as defined in Table I of the International Standard ISO 8217 (as revised in 1996).  The proposed regulation also allows the use of MDO (limited to 0.5 percent

---

[4] "D" means distillate, "M" means marine, and "A" is the grade of the fuel.

sulfur), which is fuel that meets all the specifications for DMB grades as defined in Table I of the International Standard ISO 8217 (as revised in 1996).  DMA is the most prominent marine distillate, and is available in the largest quantities.  DMX, which is similar in specification to CARB diesel, is used in smaller amounts and is required for use in emergency back-up engines on vessels.  DMB is basically DMA containing a limited amount of residual fuel (heavy fuel oil), typically due to storage or transfer of DMA in tanks or piping that previously held residual fuel.

In this section, we present information on the international fuel specifications for marine distillates, data on the current fuel sulfur levels found in fuels supplied to ocean-going vessels, and information on where vessels that come to California ports normally fuel.  In addition, we discuss our findings with respect to the volume of fuels needed to comply with the proposed regulation and the impact the proposed regulation could have on the availability of marine distillate fuel worldwide.  We also provide our preliminary findings on the availability of lower 0.1% sulfur distillate fuels we expect most vessels will use to comply with the proposed 2010 emissions limits.

<u>Fuel Sulfur Specifications for Marine Distillates</u>

The majority of marine distillates produced and sold worldwide conform to fuel quality standards categorized under ISO 8217.  These standards place limits on the fuels' chemical and physical properties, including sulfur content.  Table VI-1, Fuel Specifications, lists the sulfur content and flashpoint of land and marine based fuels that can be used to fuel compression-ignition ("diesel") engines.  The sulfur content of a fuel is important because the lower the sulfur content of the fuel, the lower the PM and SOx emissions.   Flashpoint is important for safety reasons; the minimum flashpoint for marine fuels is 60 degrees Celsius.  (ISO 8217, 1996).

In general, land-based fuels are required to meet more stringent State and federal sulfur specifications than marine distillates.  As shown in Table VI-1, the lowest sulfur content specifications are for land-based distillates – with the exception of U.S. EPA off-road diesel.  However, this exception will not be long-lived since the U.S. EPA off-road diesel specifications will in 2010 be harmonized with the on-road diesel specifications effective in 2007.  The marine fuels also differ from land-based distillates in the minimum flashpoint specification.  The lowest sulfur content specifications for fuels that meet the flashpoint specification for marine applications are found in the specifications for marine distillates.  In contrast the highest sulfur content specifications are found in residual marine fuels (heavy fuel oil).

**Table VI-1: Fuel Specifications**

| Primary Use | Fuel Type | Fuel Grades | Fuel Specifications | Maximum Sulfur (%) | Maximum Sulfur (ppm) | Minimum Flashpoint (Centigrade) |
|---|---|---|---|---|---|---|
| Land | Distillate | CARB Diesel (2006)Ultra Low Sulfur Diesel (ULSD) | No. 2-D | 0.0015 | 15 | 52 |
| Land | Distillate | CARB Diesel (current) | No. 2-D | 0.05 | 500 | 52 |
| Land | Distillate | U.S. EPA Diesel | No. 2-D | 0.05 | 500 | 52 |
| Land | Distillate | Off-Road U.S. EPA Diesel | No. 2-D | 0.5 | 5,000 | 52 |
| *Marine* | *Distillate* | *Marine Gas Oil (MGO)* | *DMA* | *1.5* | *1,500* | *60* |
| *Marine* | *Distillate* | *Marine Diesel Oil (MDO)* | *DMB* | *2.0* | *2,000* | *60* |
| Marine | Residual | Intermediate Fuel Oil (IFO) 180 | RME/F-25 | 5.0[1] | 50,000 | 60 |
| Marine | Residual | Intermediate Fuel Oil (IFO) 380 | RMG/H-35 | 5.0[1] | 50,000 | 60 |
| Marine | Residual | Bunker fuel | RML-55 | 5.0[1] | 50,000 | 60 |

1. The International Maritime Organization (IMO) MARPOL 73/78 Annex VI, Regulations for the Prevention of Air Pollution from Ships, entered into force in May 2005, lowers the sulfur cap on residual fuel from 5.0% to 4.5% in 2007.

<u>Fuel Sulfur Properties of Currently Available Marine Distillates</u>

The fuel specifications discussed above essentially establish limits that cannot be exceeded for sulfur content and flashpoint. As shown, marine distillates meet the most stringent sulfur specification for marine fuels. In order to assess the impact on emissions from the use of marine distillates, staff evaluated the actual fuel sulfur properties of marine distillate fuel currently available. The two sources of fuel property information staff reviewed were the ARB Oceangoing Ship Survey and the Det Norske Veritas Petroleum Services fuel sample data. (DNV, 2005). The results are summarized in Table VI-2 and discussed below.

**Table VI-2: Current Sulfur Properties of Marine Fuel**

| Fuel Specification | Average Fuel Sulfur Content (wt. %) | |
| --- | --- | --- |
| | ARB Survey (CA Vessels) | DNV (Worldwide) |
| DMA | 0.5% | 0.38% |
| DMB | (survey asked for marine distillate sulfur content) | 0.65% |
| Residual | 2.5% | - |

The ARB Oceangoing Ship Survey (ARB Survey) was sent out in January 2005 to 158 vessel operators and agents. The survey requested information about ocean-going vessels that visited California ports in 2004. To date, we have received information on 327 vessels that visit California ports. This represents about 17 percent of the total number of vessels that visited California in 2004 (ARB Survey, 2004).

From the survey responses, staff estimates that the average sulfur content of marine distillate fuels used in auxiliary engines is about 0.5 percent. (Note: Separate sulfur content estimates for DMA and DMB were not requested in the survey). The average sulfur content of residual fuel was reported to be about 2.5 percent. Both are well below the maximum specifications listed in Table VI-1, which are 1.5 to 2.0 percent for marine distillates and 5.0 percent for residual fuel.

DNV performs a service to the marine industry by sampling and testing marine fuels from many suppliers in ports throughout the world and claims to be responsible for testing 70 percent of the marine fuel tested worldwide. DNV collected samples of marine distillates from ocean-going vessels in 2003. (DNV, 2003) The average sulfur content of samples of DMA taken worldwide was 0.38 percent sulfur by weight – well below the 1.5 percent standard. For DMB, the average sulfur content from the samples was 0.65 percent sulfur by weight – well below the 2.0 percent standard. Among the different areas of the world, averages are calculated from the samples taken at each port. The minimum and maximum average sulfur content samples of DMA taken from any one area of the world were 0.05 percent (Mexico) to 0.97 percent sulfur (Saudi Arabia). The minimum and maximum average sulfur content samples of DMB taken from any one location in the world were 0.05 percent (Mexico) to 1.30 percent sulfur (Germany).

Table VI-3 lists the average marine distillate sulfur contents for those areas of the world where ocean-going vessels that operate in the Pacific Rim have historically refueled. As shown in Table 3, the sulfur content of marine distillates varies widely. Figure VI-1

shows the historical average sulfur content of all samples taken in these areas of the world over the last ten years.  As shown, the average sulfur content has ranged from a high of about 0.50 percent to a low of about 0.35 percent.  Although historical trends are no guarantee of future sulfur levels, staff believes current and future regulatory efforts to lower sulfur levels in all types diesel fuels will result in the average sulfur levels continuing to decline over the coming years; specifically, regulatory efforts to reduce emissions from diesel engines in California, the United States, Japan, and Europe.

**Table VI-3: Marine Distillate Average Sulfur Content (weight % Sulfur)**

| Area of World | **MGO** | **MDO** |
|---|---|---|
| | **DMA** | **DMB** |
| Netherlands | 0.30 | 1.02 |
| Malaysia | 0.40 | 0.36 |
| Mexico | 0.05 | 0.05 |
| Panama | 0.42 | 0.42 |
| Canada | 0.21 | 0.24 |
| Singapore | 0.53 | 0.53 |
| Japan | 0.12 | 0.77 |
| Hong Kong | 0.39 | 0.42 |
| Korea | 0.81 | 0.87 |
| China | 0.29 | 0.32 |
| United States | 0.23 | 0.68 |
| Average | 0.34 | 0.52 |

(Source: DNVPS, 2003)

**Figure VI-1:  Sulfur Content of MGO at Pacific Rim Refueling Ports from 1995 to 2005**



(Source: DNV, 2005)

Availability of Marine Distillate Fuel

Marine distillate fuel is currently available in most areas throughout the world.  (Beicip-Franlab, 2003).  Vessels typically obtain marine distillate via fuel barges, where the fuel is loaded on the barge either directly from a refinery terminal or from a storage tank at that is dedicated to marine distillate fuels.  Based on discussions with vessel operators, a key factor in determining where to refuel is finding a fueling location within a vessel's current route, where it is available at the lowest cost.

Table VI- 4 provides a listing of ports where ocean-going vessels that operate in California waters have historically refueled either before or after operating in California waters.

### Table VI-4: Common Refueling Ports for Vessels that Visit California

| Vessels that Visit California Ports May Refuel at the Following U.S. or International Ports | |
|---|---|
| **U.S. Port Locations** | **International Locations** |

| | |
|---|---|
| Los Angeles (POLB, POLA)<br>Santa Barbara (Hueneme)<br>Puget Sound<br>Oakland<br>San Diego<br>San Francisco<br>Savannah<br>Honolulu<br>Norfolk<br>New York/New Jersey<br>Charleston | Netherlands (Rotterdam)<br>Singapore<br>Japan (Shimzu, Tokyo, Osaka, Nagoya,<br>Moji, Hakata, Yokohama,  Kobe)<br>China (Hong Kong, Ningbo, Chiwan,<br>Quigdao, Xiamen)<br>South Korea (Busan, Kwangyand)<br>Mexico (Lazaro Cardenas)<br>Malaysia<br>Panama (Balboa, Manzanillo)<br>Canada (Vancouver, B.C.) |

**(ARB Bunker Survey, 2005; Correspondence, 2005; Starcrest Report, 2005)**

<u>Impact on Volume of Marine Distillate Required by Proposed Regulation</u>

Currently, ocean-going vessels use either heavy fuel oils or marine distillates in their auxiliary engines.  Based on the ARB Survey responses, about 75 percent of the oceangoing vessels use heavy fuel oil in their auxiliary engines and 25 percent use marine distillate.  As stated earlier, we expect most vessel operators will use marine distillates while within 24 nm of the California coastline to comply with the proposed regulation's emission limits.

Assuming all vessels elected to comply with the proposed regulation by using marine distillate, staff estimates that approximately 46 million gallons (150,000 metric tons) of low-sulfur marine distillate would be needed in 2007 and 61 million gallons (200,000 metric tons) would be needed in 2010.  This equates to less than 1 percent of the current total sales, 28.4 million metric tones (MT), for marine distillate worldwide. The distribution of marine distillate sales throughout the world is shown in figure VI-2. Marine distillate sales are highest in areas where Pacific Rim vessels have historically refueled -- Asia, Europe, and America.  (Beicip-Franlab, 2003; Marine Distillate Volume Calculation, 2005).

**Figure VI-2: Worldwide Marine Distillate Sales**



Based on the reasons discussed above, staff believes that the relatively small additional demand for marine distillate likely to be created by this rule will be met by existing refineries without significant modifications to existing infrastructure. However, operators who choose to replace all residual fuel used in their auxiliary engines with marine distillate may experience some scheduling conflicts and logistics issues when loading large amounts from local suppliers (e.g. 1,400 MT or more). We cannot predict the extent to which these delays may occur, if at all, but the primary limiting factor in these situations is the capacity of barges dedicated to carrying marine distillate fuels. (Barge Capacity, 2005)

Some commenters have suggested during the informal phase of this rulemaking that the proposal's emission limits based on the use of MGO be based instead on MGO that is capped at 0.5 percent sulfur. We do not agree with this suggestion. At this time, we believe that establishing an emissions limit based on a 0.5 percent sulfur cap for MGO is likely to result in a supply issue at some port locations. This would be especially true for ports in areas of the world that import marine distillate from refineries that use crude oil with a high sulfur content.

For example, South Korea imports all of their crude oil, and most of it comes from the Persian Gulf region. Persian Gulf crude oil is typically "sour" crude, meaning that it has a relatively high sulfur content that typically ranges from 0.8 to 2.3 percent. This high sulfur content is reflected in the DMA sample data summarized in Table VI-3, which lists Korea as having the highest average sulfur content of those countries listed at 0.81 percent. (Starcrest, 2005; Blumberg, 2003).

<u>Availability of Low-Sulfur Marine Distillate Fuel</u>

As noted previously, the proposed regulation limits emissions, starting in 2010, to levels based on the use of 0.1 percent sulfur marine distillate. It is important to note that this requirement is consistent with the recently adopted European Union Directive 2005/33/EC, which establishes a 0.1 percent sulfur standard for marine fuels used by

seagoing vessels at berth in European Union ports starting January 1, 2010.  (EU, 2005).

In an earlier version of the staff's proposal, we explored the feasibility of an emissions limit based on 0.2 percent sulfur marine distillate beginning in 2006.  We evaluated the availability of low-sulfur marine distillates and determined that low-sulfur marine distillate with a sulfur content of 0.2 percent or less cannot be reliably supplied in most port locations and there are many unanswered questions regarding the ability of the worldwide fuel market to make adjustments that would enable them to reliably supply the fuel in the near-term.  These findings are presented in Appendix I.

Based on the findings discussed in Appendix I, staff concluded it was not feasible to implement a requirement to use 0.1 or 0.2 percent marine distillate fuel in the near term (i.e., before 2010) without having additional information about world-wide fuel supplies and refining capacities.  As such, staff revised the proposal to its current version, which retains the majority of the emissions benefits and ensures that fuel will be available to comply with the proposed regulation in the near-term.

While the proposal retains an emissions limit based on the use of 0.1 percent low-sulfur fuel in 2010, many of the same concerns associated with the availability of less than 0.2 percent sulfur by weight marine distillate also apply to 0.1 percent sulfur marine distillate.  To address these concerns, the proposed regulation contains a feasibility review provision to ensure the fuel supply issues are thoroughly evaluated prior to implementation.

Under the review provision, the Executive Officer would evaluate by 2008 the feasibility of the 0.1 percent sulfur limit.  This evaluation would take into consideration the availability of the low-sulfur fuel at bunkering ports worldwide; the ability of petroleum refiners and marine fuel suppliers to deliver the fuel by the January 1, 2010 implementation date; the fuel lubricity and compatibility with heavy fuel oil during fuel transitions; and the costs of the fuel compared to marine gas oil with a sulfur content of greater than 0.1 percent.  If the Executive Officer determines that modifications are necessary, the Executive Officer would propose changes to the Board prior to January 1, 2009.

By harmonizing with the 2010 EU requirements for low sulfur marine distillates, the staff's proposal promotes international consistency and increases the availability of cleaner marine distillates at ports that refuel Pacific Rim vessels.

## B.    Feasibility of Using Distillate Marine Fuels in Ocean-going Vessel Auxiliary Engines

Currently, most ocean-going vessels use either heavy fuel oils or marine distillate fuels in their auxiliary engines.  According to ARB's 2005 Ship Survey ("Survey"), approximately 75 percent of the engines subject to the proposed rule currently use heavy fuel oil, while the other 25 percent use distillate fuels such as marine gas oil or marine diesel oil.  For the 75 percent of the engines that currently use residual fuel, the

proposed regulation would likely result in ship operators switching to distillate fuel prior to entering within 24 nm of the California coastline, assuming the operator selected this compliance option.

Because heavy fuel oil is virtually a solid at room temperature, it is heated to reduce its viscosity to the point where it can be pumped and injected into marine engines.  Once liquefied, heavy fuel oil behaves much like ordinary diesel in the engine.  By contrast, marine distillate fuels are liquids at room temperature, with properties already similar to typical on-road diesel fuel.

When an engine switches from one fuel to another, a transition period is generally needed to minimize rapid temperature changes; reduce fuel gassing; and ensure smooth, steady-state operation of the engine, as discussed in more detail below.  To accomplish this transition period, vessel operators typically use  a mixing tank.  The operator steadily increases the ratio of distillate fuel to heavy fuel oil in the mixing tank, which eventually results in only distillate fuel being fed into the engine.

Considering the available information as discussed below, we believe that vessel operators can safely make this fuel switch and continue to operate their auxiliary engines with distillate fuels while operating off California's coastline.  We also note these engines are certified by the manufacturer to International Maritime Organization nitrogen oxide emission standards through engine testing while the engine is operating on a distillate fuel, since heavy fuel oil properties are too variable.  (IMO Annex VI)  In addition, the European Union adopted a rule that will require the use of 0.1 percent sulfur fuel at dockside in 2010, which will also require these engines to switch to distillate fuel since heavy fuel oil is not available at this low sulfur level. (EU)  Finally, we note that the ACP provisions in the proposed regulation allow a vessel operator to achieve equivalent emission reductions by other means if the operator chooses not to use distillate fuel.

Existing Practice

Marine vessels currently perform the same type of fuel switches that are likely to occur under this regulation.  Vessel operators perform many of these fuel switches prior to dry-dock maintenance operations to prevent heavy fuel oil from solidifying in fuel lines and engine components after engine shut down.

More importantly, there are also some vessels that routinely switch from heavy fuel oil to distillate fuels during California port visits.  Specifically, NYK Line, a major container ship operator, reported that they are using low (0.2 percent) sulfur marine diesel oil in their auxiliary engines on 9 to 12 vessels while hotelling at the Port of Los Angeles.  (NYK Line, 2004; NYK Line, 2005)  These vessels use auxiliary engines made by three different engine manufacturers, and NYK Line reported no operational problems with their use of low-sulfur MDO.

Another example involves four steel coil carrier vessels operated by USS-POSCO Industries.  In these vessels, the operators switch from heavy fuel oil to ultra-low (less than 0.05 percent) sulfur diesel two to three hours prior to entering the Bay Area Air Quality Management District boundary on their regular routes between South Korea and Pittsburg, California.  (McMahon)  These fuel switches have been performed since the early 1990's to facilitate the use of on-board selective catalytic reduction emission control systems used to reduce emissions of nitrogen oxides.

Further, some passenger liners regularly switch fuels for air quality reasons.  For example, Carnival Cruise Lines, a major passenger cruise line, reported that it is company policy to switch to distillate MDO fuel when their vessels are within 3 miles of the California shore.  (Carnival, 2005a; Carnival 2005b)  Another cruise line, Crystal Cruises, also reported that it switches to MDO near California ports to reduce smoke, and that cruise line has not had any operational problems with this practice.  (Crystal Cruises, 2005)  Further, Marine Transport Lines, which operates under contract with the United States Maritime Administration, also reported that it switches to distillate fuel in its vessels prior to entering the Bay Area.  (MTL, 2005)

Finally, we should note that switching to distillate fuels upon entry to port was a standard practice for most diesel powered vessels in the past, when it was difficult for main engines to operate reliably on heavy fuel oil during maneuvering and low load operation.  The use of less expensive heavy fuel oil in auxiliary engines, and main engines during maneuvering, is a relatively recent development made possible by improvements in fuel heating technology.  (BMT, 2000)

<u>Vessel Fuel Infrastructure Needs</u>

Most vessels are equipped to run their auxiliary engines on either distillate fuel or heavy fuel oil.  Less than 10 percent of the vessels that participated in the ARB Ship Survey reported the need for vessel modifications to use marine gas oil in their auxiliary engines.  Specifically, 32 out of 358 vessels were reported to need modifications.  These changes may or may not require that the vessel be dry-docked.  Dry-dock maintenance typically occurs every five years, and many other maintenance operations are performed while the vessel is at dockside.

For vessel operators that reported the need to modify their vessels, the following types of changes were reportedly required:

- segregate an existing fuel tank for MGO;
- convert an existing heavy fuel oil tank to use MGO;
- add a fuel cooler;
- modify fuel pumps and injectors; and/or
- add a mixing tank and separate fuel treatment system.

Although most vessels have multiple fuel tanks, they may not have adequate capacity in their distillate fuel tanks to operate in the waters covered by the proposed regulation.

This is particularly true for diesel-electric vessels, and "mono-fueled" vessels (i.e., vessels that normally operate both their main and auxiliary engines on heavy fuel oil). In these cases, vessel owners may need to add a new tank, convert an existing heavy fuel oil tank to use MGO, or segregate an existing tank by installing a barrier inside the tank.

If a new or segregated tank is required, ancillary equipment such as pumps, piping, vents, filing pipes, gauges, and manhole access would be required, as well as tank testing. (Entec, 2002) In addition, fuel processing systems include settling tanks, filters, and centrifuges. While some vessel operators may be able to use their existing processing systems, other operators have reported that they will need to add to these systems, along with increased fuel capacity or other modifications.

As noted previously, mixing tanks are used to assist in a gradual transition from one fuel to another. (Wartsila, 2005a) As discussed below, sudden changes in fuel temperature or viscosity may cause damage to fuel pumps and injectors. One Survey participant reported that a mixing tank would be necessary. Fuel coolers may also assist in controlling fuel temperatures and viscosity during fuel transitions. One Survey participant reported the need for a fuel cooler.

Some Survey participants also reported the need to modify engine components such fuel pumps, injectors, and nozzles. However, engine manufacturers have stated that, with certain caveats, the engines they designed for heavy fuel can also operate on MGO. (Wärtsilä, 2004; Caterpillar, 2005; MAN B&W, 2005; Pielstick, 2004; Yanmar, 2005)

### Fuel Switching Procedures and Safety

As discussed above, marine engines can operate continuously during transitions between heavy fuel oil and distillate fuels. Procedures for conducting these transitions are well known since vessel operators perform these transitions prior to dry-dock maintenance. Engine manufacturers and marine equipment suppliers publish guidance for vessel operators that explain the recommended procedures. (MAN B&W, 2001; Aalborg) These procedures are designed to ensure a transition period from one fuel to another that controls temperature changes and ensures minimum fuel viscosity levels are maintained.

Engine manufacturers have commented that problems can occur if the transition is conducted too quickly, including fuel pump or injector scuffing, seizure, or cavitation, and fuel gassing. However, based on the fact that many vessels routinely transition from heavy fuel oil to distillate fuel, and virtually all vessels do this prior to dry-dock maintenance, we believe that vessel operators are well equipped to safely handle these transitions. We also note that equipment is available to vessel owners to automatically handle these fuel transitions.

As noted previously, we believe the safety of fuel transitions is amply demonstrated by the many vessels that routinely perform them. There are no problems reported for the vast majority of these fuel switches. However, there is a slight risk that temporary engine failure may occur if the vessel operator does not correctly follow procedures, possibly resulting in some loss of electrical power to the vessel. In these cases, a vessels' emergency backup generators, which run solely on marine distillate fuel, would become operational.

For diesel-electric vessels, which generally have several large diesel generator sets that provide power for both propulsion and onboard electrical power, a temporary failure in one or more engines could compromise vessel maneuverability to some degree. However, we do not believe fuel switching on diesel-electric vessels raises a significant problem for a number of reasons. First, the proposed regulation permits, but does not require, vessel operators to switch to the lower-sulfur distillate fuels. As we discussed previously, vessel operators can choose to comply with the regulation's emission limits with one of several options, only one of which is switching to the low sulfur fuels. Those vessel operators who believe fuel switching may cause problems that raise safety concerns have other options with which to comply. Second, as mentioned above under "existing practice," many diesel-electric cruise vessels currently switch to cleaner distillate fuels near California ports on a routine basis. Third, because there are generally several engines on diesel-electric vessels, it is likely that some engines would remain operational, providing the necessary power to the ship's systems. Fourth, the U.S. Coast Guard and shipping associations have recommended in some cases that fuel transitions in propulsion engines be performed away from confined areas. (PSSOA, 1999) The proposed regulation is entirely consistent with these recommendations because the 24 nautical mile boundary in the regulation would generally result in fuel transitions being performed in open water, for those operators that choose to switch fuels. Arguably, switching fuels at or prior to entering the 24 nm, should provide a greater margin for safety than conducting the switch much closer to the ports, which is the practice for some vessels.

<u>Technical and Safety Considerations</u>

ARB staff contacted the major manufacturers of auxiliary engines used on ocean-going vessels to determine whether these engines could operate on marine distillate fuel (marine gas oil or marine diesel oil). Based on our requests for information, engine manufacturers uniformly reported that their auxiliary engines designed for use with heavy fuel oil can also use distillate fuels. (Wartsila, 2004; Caterpillar, 2005; MAN B&W, 2005; Yanmar, 2005; Pielstick, 2004) However, they noted that certain technical and safety considerations need to be observed with the use of distillate fuels and during the transition from one fuel to another.

Given this, we believe that vessel operators already can and do safely use distillate fuels when they follow the engine manufacturers' recommendations. In some cases, modifications may need to be made to the fuel supply and processing equipment on the vessel. Each of these technical considerations is discussed below.

*Fuel Compatibility:*  Engine manufacturers have commented that there is always a risk of fuel incompatibility when blending two fuels, particularly between heavy fuel oil and distillate fuels (especially very low sulfur distillate fuels which tend to be low in aromatic hydrocarbons).  The main concern is that aromatic hydrocarbons in heavy fuel oil keep asphaltene compounds in solution, and the introduction of lower sulfur (often low aromatic) fuels may cause some asphaltene compounds to precipitate out of solution and clog fuel filters.

Much of the available information on this subject is focused on continuous blending of low sulfur distillate fuels with high sulfur heavy fuel oils to produce 1.5 percent sulfur fuel for Sulfur Emission Control Areas in Europe.  In these situations, there may be a greater potential for filter plugging to occur than during the temporary mixing of fuels that occurs during the switchover from one fuel to another.  Nevertheless, manufacturers have stated that incompatibility problems are a concern during fuel transitions as well.  However, as noted above, many vessels routinely transition from heavy fuel oil to existing marine distillate fuel without incident, and virtually all vessels do this prior to dry-dock maintenance.

We also note that some manufacturers have stated that the potential for incompatibility problems is more of a concern with the very low sulfur on-road fuels which tend to have the lowest aromatic levels.  (CIMAC, 2004; MAN B&W, 2005)  The proposed regulation limits emissions based on the use of regular MGO, or MDO at or below 0.5 percent sulfur, starting January 1, 2007.  As such, the distillate fuels used under the proposed regulation would be essentially the same fuels vessel operators now use when performing fuel transitions.

The proposed regulation also specifies a 0.1 percent sulfur level for 2010, consistent with a European Union Directive for vessels at dockside. (EU)  However, as specified in the proposed regulation, ARB staff will conduct a feasibility study prior to 2010 to investigate fuel compatibility as well as other issues, prior to implementing this fuel.

*Compatibility of Lubricants with Low Sulfur Fuels:*  Marine engine lubricants are matched to the expected sulfur content of fuel.  Specifically, sulfur in fuel results in acidic compounds in the engine that are neutralized by alkaline calcium compounds in the engine lubricant.  Higher "base number (BN)" lubricants are able to neutralize higher sulfur fuels.  When a relatively high BN lubricant is used with a low sulfur fuel, calcium deposits can form in the combustion chamber.

These problems are primarily associated with slow speed two-stroke engines, rather than the four-stroke engines covered by this proposed regulation.  (DNV, 2005)  One manufacturer stated that the effect of using low sulfur fuel with a relatively high BN lubricant is a long-term issue for four-stroke engines, whereas the impact is more immediate for two-stroke engines.  (Wartsila, 2005b)

For four-stroke engines that temporarily use lower sulfur fuels with a relatively high BN lubricant, problems are generally not expected unless low sulfur fuel is used for extended periods of time.  One engine manufacturer recommends that their four-stroke engines can continue to use the same high BN lubricant when a heavy fuel oil engine alternates between heavy fuel oil and distillate fuel.  (*Ibid*)  Another manufacturer reported that their heavy fuel oil engines are expected to be able to operate for up to 300 hours on marine gas oil with high BN lubricants.  (Yanmar, 5/1/05)  We do not expect vessels to spend close to 300 hours of operation while traveling within 24 nautical miles (nm) of the California coastline.  This is because a vessel would only need 40 hours to travel at 20 knots along the entire 800 nm California coastline.

*Lubricity:*  Several sources reported that lower sulfur fuels have lower lubricity, which could potentially cause fuel pump damage.  (DNV, 2005, App I; CIMAC, 10/04; MAN B&W, 5/05)  Some of these sources noted that low sulfur automotive diesel fuels have a minimum lubricity requirement, unlike marine fuels.  However, the concern appears to be related to the use of very low sulfur levels associated with landside diesel fuels, which have a lower sulfur content than what the proposed regulation specifies.  For example, one source states that sulfur levels below 0.05 percent, in conjunction with a viscosity below 2 centistokes, could lead to fuel pump problems.  (DNV, 2005, App. I)  Another source reported that lubricity is not considered a problem for their four-stroke engine fuel injectors as long as the sulfur content is above 0.01 percent.  This source mentioned that insufficient information was available to determine if fuel below this level would be problematic, but noted that lubricity additives could be added by the fuel manufacturer or marketer. (Wartsila, 2005b)  As noted previously, ship operators can comply with the proposed regulation through the use of marine gas oil with no sulfur limit, or though the use of marine diesel oil with a relatively high sulfur limit of 0.5 percent in 2007.  For 2010, there is a lower 0.1 percent sulfur limit.  However, this limit will be subject to a feasibility review that will consider this and other technical concerns prior to implementation.

*Low Viscosity:*  One manufacturer noted that the low viscosity of distillate marine fuels could potentially be a concern with some of their engines.  One of the potential impacts of low fuel viscosity is greater internal leakage in fuel pumps and injectors, resulting in lower fuel pressures, and less fuel delivered. (DNV, 2005) According to one manufacturer, the minimum viscosity of fuel supplied to their engines is in the range of 1.8 to 3 centistokes, and noted that minimum viscosity for marine gas oil (DMA) is 1.5 centistokes.  However, this manufacturer also noted that for their four-stroke engines low fuel viscosity is generally not a severe problem.  The manufacturer suggested that that a minimum viscosity could be specified when ordering distillate fuels, or modifications could be made to address this issue.  (Wartsila, 2005b)  One possible modification would be a fuel cooler since lowering the fuel temperature will increase its viscosity.

*Fuel Energy Content Differences:*  Marine distillate fuels have less energy than heavy fuel oils on a volume basis.  Some manufacturers have commented that this will reduce the output of a four-stroke engine by approximately 6-15 percent depending on the

engine model.  (Wartsila, 2005b; Yanmar, 2005; Pielstick, 2004)  Depending on the engine, governor adjustments or a change in the fuel "rack" position may address this issue.

*Pipe Leakage:*  Use of less viscous marine distillate fuels, and temperature changes that occur during transitions between heated heavy fuel oil and non-heated distillate fuel have been reported to increase the likelihood of fuel leaks.  However, such leaks would also be expected to occur during fuel transitions performed prior to dry-dock operations.  Such leaks can be prevented through maintenance, such as replacement of deteriorated gasket materials or o-rings, and tightening connections.

## C.    Potential Options for Alternative Control Plans

Below, we provide descriptions of diesel PM and NOx emission reduction control strategies that potentially could be used as compliance options under an alternative control plan.  These technologies are currently available or projected to be available in the near future.  In many cases, similar technologies have been used on stationary diesel engines, which are operated similarly to vessel auxiliary engines.  Each technology may not be by itself an alternative emission control strategy, but used in combination with other technologies may equal or exceed the required emission levels of the proposed regulation.  Additional information on the wide variety of emission reduction options for diesel fueled engines is provided in the Diesel Risk Reduction Plan.  (ARB, 2000)

### Cold Ironing or Alternative Marine Power

This option would allow vessels to use dockside electrical power (cold ironing) during hotelling, instead of operating ship-board auxiliary diesel engines to provide electric power.  Although there are technical challenges associated with providing cold ironing for vessels, this process is currently being used by several West Coast ports.  For example, the Princess Cruise vessels that dock in Juneau, Alaska and Seattle, Washington use shore-side power for hotelling.
USS-POSCO industries has four vessels that have been cold ironing at a Pittsburg, California terminal since the early 1990s.  The Port of Los Angeles retrofitted the China Shipping terminal to include shoreline power infrastructure.  Two China Shipping vessels began connecting to shore power in June 2004, with the goal of 70 percent of the vessels visiting the terminal using shore power.  Also at the Port of Los Angeles, shore-side infrastructure is currently being constructed to allow an NYK Atlas container vessel already built with cold ironing capabilities to use shore-side power.  The Port of Long Beach will also provide cold ironing capabilities for two British Petroleum tankers that regularly visit the port.  Finally, the U.S. Navy has been cold ironing in port at bases all over the world for several decades.

### Selective Catalytic Reduction (SCR)

Selective catalytic reduction (SCR) is an exhaust after-treatment method for controlling NOx emissions up to 90 percent or more. The SCR process basically works by using ammonia ($NH_3$) as a reagent, injecting it into the exhaust gas of the engine, in the presence of a catalyst. The ammonia and NOx emissions react in the presence of the catalyst to form nitrogen ($N_2$) and water. Atmospheric nitrogen is usually in its diatomic form of $N_2$ and the water is non-polluting. The ammonia is injected into the process with air or steam.

SCR systems have been installed on new marine engines for many years. For example the four USS-POSCO vessels mentioned above are equipped with SCR on their main engines. However, retrofitting SCR systems on existing vessels is challenging. Some SCR retrofit challenges are urea and ammonia storage and safety requirements. Also, SCR systems require a large amount of space near the engine.

### Diesel Oxidation Catalysts

Diesel oxidation catalysts (DOCs) have been used on many land-based engines. DOCs are generally referred to as "catalytic converters." DOCs are devices attached to the engine exhaust system similar to a muffler. They have chemical catalysts dispersed on a substrate within their interior which assist in the oxidation of carbonaceous pollutants – some of the soot emissions and a significant portion of the soluble organic fraction of diesel PM. These carbon-containing pollutants are oxidized to $CO_2$ and water. The catalysts that are used are known as the platinum group metals. These consist of platinum, iridium, osmium, palladium, rhodium, and ruthenium. Platinum is best suited as the catalyst for diesel engine control devices; therefore, it appears that it will be the main catalyst used in diesel catalytic converters. (Kendall, 2002/2003)

### Flow Through Filters

Flow through filter (FTF) technology is a relatively new technology for reducing diesel PM emissions. Unlike diesel particulate filters (DPF), in which only gases can pass through the substrate, the FTF does not physically "trap" and accumulate PM. Instead, exhaust flows through a medium (such as wire mesh) that has a high density of torturous flow channels, thus giving rise to turbulent flow conditions. The medium is typically treated with an oxidizing catalyst that is able to reduce emissions of PM, HC, and CO, or used in conjunction with a fuel-borne catalyst. Any particles that are not oxidized with the FTF flow out with the rest of the exhaust and do not accumulate. Also, limiting the sulfur fuel content to <350 ppm or less will limit clogging and reduce backpressure problems.

The filtration efficiency of an FTF is lower than that of a DPF, but the FTF is much less likely to plug under unfavorable conditions, such as high PM emissions, low exhaust temperatures, and emergency circumstances. The FTF, therefore, is a candidate for use in applications that are unsuitable for DPFs.

### Advanced Control Technology Inc. Technology

Advanced Control Technology Inc. (ACTI) has developed an emission reduction technology that they claim has the potential to remove 95 percent of NOx emissions and 90 percent of PM emissions.  The system would reduce emissions from marine engine auxiliary engines while at port by placing a flexible hood over the exhaust stack.  The flexible hood would be placed over the exhaust stack by a robotic arm, diverting the exhaust into a two stage "wet scrubbing" process where the pollutants would be removed.  The system would be placed on a mobile barge. (ENN, 2005)  Currently, ACTI is installing this technology at the J.R. Davis Roseville, California rail yard. Testing will follow with the goal of U.S. EPA certification.  (ARB, 2005)

### Slide Valve Technology

Replacing stock fuel injectors with slide valve fuel injector technology can result in a PM reduction of up to 50 percent, depending on the engine load.  Standard fuel injectors leave a residual volume of fuel that remains in the injector after the fuel is injected into the cylinder.  The remaining fuel drips into the cylinder during the non-combustion portion of the stroke, causing soot and PM.  The new slide valve technology reduces the residual fuel volume to a minimum, thereby reducing soot and PM emissions.  Most engine companies are installing slide valve technology on their new engines as standard equipment and also offering slide valves during normal injector maintenance replacement.  (Man B&W)

### Common Rail

Fuel pressure is distributed evenly to the injectors by an accumulator or rail.  The high pressure is supplied by a pump.  The rail pressure, at the start and the end of the injection is controlled electronically.  The common rail system offers the following advantages: high fuel pressure at all engine speeds, ability to offer pilot injection and post injection at all engine speeds, and most conventional injection systems can be replaced with a common rail system without major engine modifications.  (DieselNet, 2002a)

### Water Injection

Adding water to the combustion chamber absorbs heat when the water vaporizes, lowering the peak combustion temperatures and reducing NOx emissions.  Water can be introduced in a variety of ways:  direct water injection, fumigation into the intake air, or with the fuel in an emulsion.  Unmodified engines can use emulsified fuel, if the injection systems can handle the extra volume.  Other systems require major redesign to include separate water supply tanks, injection lines, fuel pumps, injectors, etc. Generally, a 1 percent increase of water equates to a 1 percent decrease in NOx emissions.  However, hydrocarbon and carbon monoxide emissions may increase using water injection strategies.  (DieselNet, 2003)

**REFERENCES**

(Aalborg)  Aalborg Industries.  "Operating Instructions --OM5580#60.2," sections 2.4&2.5, undated.

(ARB, 2000) California Air Resources Board.  *Risk Reduction Plan to Reduce Particulate Matter Emission from Diesel-Fueled Engines and Vehicles*; October 2000.

(ARB, 2005) Phone conversation with Mr. John Powell with ARB staff.  September 19, 2005

(ARB Bunker Survey, 2005) Results from questionnaire to shipping lines and fuel suppliers, 2005.

(Barge Capacity, 2005) General Petroleum, Royal Caribbean, World Fuel Services; Personal conversations with ARB staff regarding MGO-dedicated barge capacity in the LA-LB port area, 2005

(BeicipFranlab, 2003) BeicipFranlab, "Framework Contract for Technical Support in Relation to the Quality of Fuels, Advice on Marine Fuel," Draft Final Report, October 2003.

(Blumberg, 2003) K. Blumberg, M.Walsh, C.Pera, "Low-Sulfur Gasoline and Diesel: The Key to Lower Vehicle Emissions", 2003.

(BMT, 2000)  BMT Murray Fenton Edon Liddiard Vince Limited. "*Study on the Economic, Legal, Environmental and Practical Implications of a European Union System to Reduce Ship Emissions of SO2 and NOx*," Final Report for European Commission Contract B4-3040/98/000839/MAR/B1, Appendix 5, page 4 footnote, August, 2000.

(Carnival, 2005a)  Carnival Cruise Lines.  Personal conversation with ARB staff dated June 10, 2005.

(Carnival, 2005b)  Carnival Cruise Lines. Personal conversation with ARB staff dated circa June 16, 2005.

(Caterpillar, 2005)  Caterpillar.  Electronic mail communication with ARB staff dated April 22, 2005.

(CIMAC, 2004)  International Council on Combustion Engines.  CIMAC Fuel WG, Bulletin 1, "Use of Low Sulphur Diesel Fuels in Coastal Waters," October 26, 2004.

(Correspondence, 2005) BP, P and O Nedloyd, K-Line, Exxon Mobil, American President Lines; E-mail and Telephone conversations with ARB Staff, 2005

(Crystal Cruises, 2005)  Crystal Cruises.  Personal conversation with ARB staff dated August 17, 2005.

(DieselNet, 2002a) DieselNet, http://www.dieselnet.com/tech/engine_adv.html

(DieselNet, 2003) DieselNet, *Diesel Emission Control, water addition.* 2003 http://www.dieselnet.com

(DNV, 2003)  Det Norske Veritas.  Average Worldwide Sulfur Content Data for DMA, DMB, and DMC, 2003.

(DNV, 2005)  Det Norske Veritas.  "Regulations for the Prevention of Air Pollution from Ships: Technical and Operational Implications," February 21, 2005.

(ENN, 2005) Environmental News Network, *Device Could Cut Air Pollution at Long Beach, California Port*, January 11, 2005. Eric Johnson, Press Telegram

(Entec, 2002)  Entec UK Limited.  Quantification of Emissions from Ships Associated with Ship Movements between Ports in the European Community, July 2002, pps. 86-87.

(EU, 2005)   European Union Press Release.  "*Full Speed Ahead for Clean Ships as EU Parliament Adopts Marine Fuel Directive in Second Reading*," April 13, 2005.

(IMO Annex VI)  International Maritime Organization, "Annex VI of MARPOL 73/78 Regulations for the Prevention of Air Pollution from Ships and NOx Technical Code," Sections 5.3.2 and 6.3.1.1, 1998.

(ISO 8217, 1996) International Organization for Standardization, Petroleum products – Fuels (class F) – Specifications of marine fuels, 1996

(Kendall, 2002/2003) Kendall, Tom; Johnson Matthey.  *Platinum 2002,* http://www.platinum.matthey.com/publications/1051543656.html; *Platinum 2003,* http://www.platinum.matthey.com/publications/1059138410.html; May 2002 and May 2003.

(MAN B&W) "Emission Control MAN B&W Two-stoke Diesel Engines"  MAN B&W Diesel A/S, Copenhagen, Denmark. (undated) http://www.manbw.com/files/news/filesof4458/p9000.pdf

(MAN B&W, 2001)  MAN B&W.  "Procedure for Fuel Change-Over," April 18, 2001.

(MAN B&W, 2005)  MAN B&W.  Electronic mail communication with ARB staff dated May 3, 2005.

(Marine Distillate Volume Calculation, 2005) ARB, ARB staff methodology for estimating the amount of marine distillate required by the proposed regulation, 2005.

(McMahon)  McMahon, Kelly. "Development and Operation of DeNOx Controlled Ships by USS-POSCO Industries," undated.

(MTL, 2005)  Marine Transport Line.  Personal conversation with ARB staff dated May 31, 2005.

(NYK Line, 2004)  NYK Line (North America) Incorporated.  Letter to the Port of Los Angeles dated October 21, 2004.

(NYK Line, 2005)  NYK Line. Personal conversation with ARB staff dated August 17, 2005.

(Pielstick, 2004)  Pielstick.  Personal conversation with ARB staff dated February 10, 2004.

(PSSOA, 1999)  Puget Sound Steamship Operators Association.  Letter to Vessel Operators dated November 11, 1999.

(Starcrest Report, 2005) Starcrest Consulting Group, <u>Evaluation of Low Sulfur Marine Fuel Availability – Pacific Rim</u>, July 2005.

(Wärtsilä, 2004)  Wärtsilä. Personal conversation with ARB staff dated February 11, 2004.

(Wartsila, 2005a)  Wärtsilä . <u>Blending of Residual and Distillate Fuels Onboard</u>, section 3.2, February 15, 2005.

(Wärtsilä, 2005b)  Wärtsilä.  "Low Sulphur Guidelines," March 23, 2005.

(Yanmar, 2005)  Yanmar. Electronic mail communication with ARB staff dated May 1, 2005.

## VII.    ENVIRONMENTAL IMPACTS

This chapter describes the potential environmental impacts of the proposed regulation. The proposed regulation is intended to protect the health of California's citizens by reducing the exposure to the emissions from ocean-going vessel auxiliary engines. An additional consideration is the impact that implementation of the proposed regulation may have on the environment. Based upon available information, ARB staff has determined that no significant adverse environmental impacts should occur as the result of the proposed regulation. This chapter describes the potential impacts that the proposed regulation may have on air quality, water quality, and hazardous waste disposal.

## A.    Legal Requirements

The California Environmental Quality Act (CEQA) and ARB policy require an analysis to determine the potential environmental impacts of proposed regulations. Because ARB's program involving the adoption of regulations has been certified by the Secretary of Resources pursuant to Public Resources Code section 21080.5, the CEQA environmental analysis requirements may be included in the Initial Statement of Reasons (ISOR) for this rulemaking. In the ISOR, ARB must include a "functionally equivalent" document, rather than adhering to the format described in CEQA of an Initial Study, a Negative Declaration, and an Environmental Impact Report. In addition, staff will respond, in the Final Statement of Reasons for the regulation, to all significant environmental issues raised by the public during the public review period or at the Board public hearing.

Public Resources Code section 21159 requires that the environmental impact analysis conducted by ARB include the following:

- an analysis of reasonably foreseeable environmental impacts of the methods of compliance;
- an analysis of reasonably foreseeable feasible mitigation measures; and
- an analysis of reasonably foreseeable alternative means of compliance with the regulation.

Compliance with the proposed regulation is expected to directly affect air quality and potentially affect other environmental media as well. Our analysis of the reasonable foreseeable environmental impacts of the methods of compliance is presented below.

Regarding mitigation measures, CEQA requires an agency to identify and adopt feasible mitigation measures that would minimize any significant adverse environmental impacts described in the environmental analysis.

The proposed regulation is needed to reduce the risk from exposures to diesel PM as required by Health and Safety Code (H&SC) sections 39666 and to fulfill the goals of the Diesel Risk Reduction Plan. Alternatives to the proposed regulation have been

discussed earlier in Chapter V of this report. ARB staff has concluded that there are no alternative means of compliance with the requirements of H&SC sections 39666 that would achieve similar diesel PM emission reductions at a lower cost.

## B.    Effects on Air Quality

The proposed regulation will provide diesel PM, NOx, and SOx emissions reductions throughout California, especially in coastal urban areas many of which are non-attainment for the State and federal ambient air quality standards for $PM_{10}$, $PM_{2.5a}$ and ozone.

Emission Reduction Estimates

For 2007 through 2009, the emission reductions resulting from the proposed regulation were estimated based on the proportion of auxiliary engines using heavy fuel oil, and the differences in the emissions between auxiliary engines using 2.5 percent heavy fuel oil and 0.5 percent marine gas oil. The sulfur levels for heavy fuel oil and marine gas oil represent the average sulfur contents for these fuels based on vessels visiting California ports based on the ARB's 2005 Ship Survey. (ARB, 2005). Auxiliary engines using distillate fuels would generally be unaffected by the proposed regulation until 2010.

For 2010 and later, when the emission limit based on the anticipated use of 0.1 percent sulfur marine gas oil is implemented, we estimated the emission reductions based on: (1) the proportion of auxiliary engines using heavy fuel oil, and the differences in the emissions between auxiliary engines using 2.5 percent heavy fuel oil and 0.1 percent marine gas oil; and (2) the proportion of auxiliary engines using distillate fuel, and the differences in the emissions between auxiliary engines using 0.5 percent marine gas oil and 0.1 percent marine gas oil.

The estimated reductions in PM emissions that would occur when switching from heavy fuel oil to distillate fuels result, in large part, from the lower sulfur content of distillate fuel, which reduces the formation of sulfate PM. In addition, the lower ash content and lower density of distillate fuel also contributes to lower PM emissions (EPA, 2002). The lower sulfur content of distillate fuel also directly contributes to lower SOx emissions. For example, lowering the sulfur content from 2.5 percent to 0.5 percent represents an 80 percent reduction in the sulfur content of these fuels, and results in an 80 percent reduction in SOx emissions. The lower nitrogen content of distillate fuels also results in a reduction in NOx emissions (EPA, 2002).

The emission factors used to estimate the emissions and emission reductions from auxiliary engines are discussed in detail in Appendix D. These emission factors are shown in Table VII-1 below. The estimated percent emission reductions from auxiliary engines that switch fuels are shown in Table VII-2 below. While these percent emission reductions represent our best estimates, we recognize that emissions test results for PM vary widely depending on the source of information.

**Table VII-1:  Estimated Emission Factors (g/kw-hr)**

| Pollutant | HFO @ 2.5% sulfur | MGO @ 0.5% sulfur | MGO @ 0.1% sulfur |
|-----------|-------------------|-------------------|-------------------|
| NOx | 14.7 | 13.9 | 13.9 |
| SOx | 11.1 | 2.1 | 0.4 |
| PM | 1.5 | 0.38 | 0.25 |

**Table VII-2:  Estimated Emission Reductions for Auxiliary Engines Switching from Heavy Fuel Oil to the Specified Distillate Fuels**

| Pollutant | Percent Reduction: HFO to MGO @ 0.5% Sulfur | Percent Reduction: HFO to MGO @ 0.1% Sulfur |
|-----------|---------------------------------------------|---------------------------------------------|
| NOx | 6% | 6% |
| SOx | 80% | 96% |
| PM | 75% | 83% |

Table VII-3 below shows the auxiliary engine emissions within the 24 nautical mile boundary, which are subject to the proposed regulation.  The emissions are grown uncontrolled from 2004 to 2020 based on the growth assumptions discussed in Appendix D.

**Table VII-3:  Projected Emissions from Auxiliary Engines within 24 Nautical Miles of California's Coastline**

| Year | Auxiliary Engine Emissions (Tons per Day) | | |
|------|------|------|------|
|  | PM | NOx | SOx |
| 2004 | 3.0 | 34 | 22 |
| 2007 | 3.8 | 43 | 28 |
| 2010 | 4.6 | 52 | 34 |
| 2015 | 6.2 | 69 | 45 |
| 2020 | 8.7 | 95 | 64 |

The ARB staff estimates that implementation of the proposed regulation will result in immediate and substantial reductions in diesel PM, NOx, and SOx emissions, as shown in Table VII-4 below.  Upon implementation in 2007, this represents about a 70 percent reduction in PM emissions from the baseline emissions subject to the regulation (emissions within the 24 nautical mile boundary).  In addition, the proposed regulation will result in reductions in carbon dioxide ($CO_2$), a global warming gas.  Specifically, the use of use of distillate marine fuels will result in about a 5 percent reduction in $CO_2$

emissions compared with heavy fuel oil, and use of shore-side power would result in much greater percent reductions compared to the use of diesel auxiliary engines.

**Table VII-4:  Emission Reductions from
Implementation of the Proposed Regulation**

| Year | Auxiliary Engine Emission Reductions (Tons per Day) | | |
|------|------|------|------|
|      | PM   | NOx  | SOx  |
| 2007 | 2.7  | 1.9  | 22   |
| 2010 | 3.7  | 2.3  | 32   |
| 2015 | 5.0  | 3.2  | 43   |
| 2020 | 7.0  | 4.4  | 61   |

Figure VII-1 illustrates how the diesel PM emissions from ship auxiliary engines within the 24 nautical mile boundary will grow with and without the proposed regulation.  As shown, the growth in emissions would eventually negate the emissions reductions associated with the implementation of the proposed regulation.

**Figure VII-1:  Estimated Diesel PM Emissions in 24 nm Zone With and
Without the Implementation of the Proposed Regulation**



### C. Estimating the Health Benefits Associated with the Reductions of Diesel PM Emissions

Reduced Ambient Particulate Matter Levels

A substantial number of epidemiologic studies have found a strong association between exposure to ambient particulate matter (PM) and adverse health effects. (ARB, 2002) For this report, ARB staff evaluated the impacts the proposed regulation would have on potential cancer risks and conducted a quantitative analysis of four potential non-cancer health impacts associated with exposures to ambient levels of directly emitted diesel PM.

Reduction in Potential Cancer Risks

The reductions in diesel PM emissions that will result from implementation of the proposed regulation will reduce the publics exposures to diesel PM emissions and the potential cancer risks associated with those exposures.  The ARB staff used the air dispersion model and model inputs developed for the POLA and POLB health risk assessment to estimate the reductions in potential cancer risk that would result in the area surrounding the ports of POLA and POLB from implementation of the proposed regulation.  The ARB staff believes that the results from this analysis provide quantitative results for exposures around the Ports of Los Angeles and Long Beach and are generally applicable to other ports in California, providing a qualitative estimate for those areas.

To investigate the reductions in potential risks that will result as emissions from ocean-going vessel auxiliary engines decline, ARB staff used dispersion modeling and the projected 2008 and 2015 controlled and uncontrolled emissions inventories to estimate the ambient concentration of diesel PM emissions that result from the operation of cargo handling equipment at the Ports of Los Angeles and Long Beach in 2008 and 2015. The potential cancer risks from exposures to the projected controlled and uncontrolled 2008 and 2015 emissions were then estimated to determine how the potential risks will change.  As shown in Figures VII-2 and VII-3, we expect a significant decline in the number of people exposed to high risk levels from cargo handling equipment emissions and the acres impacted as the proposed regulation is implemented.[5]  Based on our analysis, which is summarized in Appendix K, we estimate that, in 2008, there will be a 70 percent reduction in the population-weighted average risk relative to uncontrolled risk levels in from ocean-going vessel auxiliary engine emissions and approximately a 78 percent reduction in 2015.

---

[5] Because the isopleths for risk levels at 10 in a million were outside the modeling domain, we are not able to quantify the expected regulatory impact on this risk level.  However, we believe that the risk levels greater than 10 in a million are also significantly reduced.

### Figure VII-2:  Comparison of Affected Population Numbers With and Without the Proposed Ship Auxiliary Engine Fuel Regulation for the Years 2008 and 2015



| Reduction of Affected Population Number by the Proposed Reg | | | |
|---|---|---|---|
| Year | Risk >100 | Risk > 200 | Risk > 500 |
| 2008 | 89.4% | 96.7% | 100.0% |
| 2015 | 92.7% | 98.0% | 100.0% |
| 2020 | 90.6% | 97.6% | 100.0% |

| | 2008 without Reg | 2008 with Reg | 2015 without Reg | 2015 with Reg | 2020 without Reg | 2020 with Reg |
|---|---|---|---|---|---|---|
| R > 100 | 704,995 | 74,630 | 1,045,555 | 75,870 | 1,191,262 | 112,440 |
| R > 200 | 223,561 | 7,464 | 379,237 | 7,570 | 499,675 | 12,100 |
| R > 500 | 18,885 | 0 | 52,277 | 0 | 84,760 | 0 |

### Figure VII-3:  Comparison of Impacted Residential Areas With and Without the Proposed Ship Auxiliary Engine Fuel Regulation for the Years 2008 and 2015



| Reduction of Impacted Areas by the Proposed Reg | | | |
|---|---|---|---|
| Year | Risk >100 | Risk > 200 | Risk > 500 |
| 2008 | 93.8% | 98.8% | 100.0% |
| 2015 | 95.9% | 99.3% | 100.0% |
| 2020 | 94.5% | 98.7% | 100.0% |

| | 2008 without Reg | 2008 with Reg | 2015 without Reg | 2015 with Reg | 2020 without Reg | 2020 with Reg |
|---|---|---|---|---|---|---|
| Risk >100 | 54,333 | 3,361 | 83,838 | 3,440 | 100,255 | 5,535 |
| Risk > 200 | 12,909 | 158 | 23,736 | 168 | 34,852 | 455 |
| Risk > 500 | 811 | 0 | 2,273 | 0 | 3,973 | 0 |

Non-cancer Health Impacts and Valuations

To determine the impacts from the proposed regulation on non-cancer health endpoints, ARB staff used the methodology described previously in Chapter IV but evaluated the change in ambient PM levels that are expected due to implementation of the proposed regulation.  This analysis shows that the statewide cumulative impacts of the emissions reduced through this regulation from year 2007 through 2020 are approximately:

- 520 premature deaths (260 to 810, 95% CI)
- 14,000 asthma attacks (3,400 to 24,000, 95% CI)
- 120,000 work loss days (103,000 to 140,000, 95% CI)
- 650,000 minor restricted activity days (530,000 to 770,000, 95% CI)

Value of Non-Cancer Effects

*Premature Death*:  The U. S. EPA has established $6.3 million (in 2000 $) for a 1990 income level as the mean value of avoiding one death.  (EPA, 2003)  As real income increases, people may be willing to pay more to prevent premature death.  The U.S. EPA further adjusted the $6.3 million value to $8 million (in 2000 $) for a 2020 income level.  Assuming that real income grew at a constant rate from 1990 and will continue at the same rate until 2020, we adjusted the value of avoiding one death for income growth. We then updated the value to 2005 dollars and discounted values of avoiding a premature death in the future back to the year 2005.  The U.S. EPA's guidance of social discounting recommends using both three and seven percent discount rates. (EPA, 2000)

Based on these rates, the total valuation of the avoided premature deaths is about $3 billion at seven percent discount rate, and $4 billion at three percent discount rate. Based on using the annual avoided deaths as weights, the weighted average value of reducing a future premature death, discounted back to the year 2005, is around $5 million at seven percent discount rate, and $7 million at three percent.  These are point estimates.  The uncertainty in the mortality estimates is on the order of 50 percent, so the valuation estimates are likewise uncertain, by plus-or-minus about 2 billion dollars**.**

*Non-Mortality Health Effects*:  To estimate the values of certain non-mortality health effects, we use U.S. EPA valuations, updated to 2005 dollars, for avoiding non-fatal health effects (EPA, 2003):

- $49 for acute asthma attack
- $180 for work loss day
- $58 for minor restricted activity day (MRAD)

The expected reduction in acute asthma attack is about 14,000 cases. The total valuation is about $0.4 million using a seven percent discount rate, and $0.6 million using a three percent discount rate.

For the 120,000 avoided work loss days, their valuation is about $14 million using a seven percent discount rate, and $18 million using a three percent discount rate. For the 650,000 avoided MRAD, their valuation is about $24 million using a seven percent discount rate, and $31 million using a three percent discount rate.

<u>Reduced Ambient Ozone Levels</u>

Emissions of NOx and ROG are precursors to the formation of ozone in the lower atmosphere. Exhaust from diesel engines contributes a substantial fraction of ozone precursors in any metropolitan area. Therefore, reductions in NOx and ROG from diesel engines would make a considerable contribution to reducing exposures to ambient ozone. Controlling emissions of ozone precursors would reduce the prevalence of the types of respiratory problems associated with ozone exposure and would reduce hospital admissions and emergency visits for respiratory problems.

**D.    Reasonably Foreseeable Environmental Impacts as a Result of Potential Compliance Methods**

The proposed regulation has two possible compliance routes, the fuels option, and the alternative compliance plan (ACP). Both options have potential environmental impacts.

The fuels option is expected to be the most common compliance method. A vessel complying with the regulation through this option may need to increase its storage capacity for distillate fuel by adding a tank or segregating an existing tank. Adding a fuel tank could potentially displace some cargo space, increasing the amount of fuel burned and emissions per a given amount of cargo transported. However, ARB staff does not expect a significant impact from the potential loss of cargo space. Most vessels already have multiple fuel tanks and are thereby able to accept multiple fuels. Specifically, according to the Survey, only about 10 percent of vessels would require modifications to use distillate fuels to comply with the proposed regulations (such as increasing their storage capacity for distillate fuels). Since some vessels reported the need for modifications not related to fuel storage, less than 10 percent of vessels would need to increase their storage capacity for cleaner burning fuels. For the minority of vessels that need to increase their fuel storage capacity, many may be able to segregate an existing tank as an alternative to adding a new tank. Finally, others will be able to add a new tank without impacting cargo capacity.

The use of a different fuel for California may also require increased fuel deliveries to the ship. This could potentially increase the possibility of fuel spills. However, refueling personnel can lower the possibility of fuel spills with training, and by following standard refueling operating procedures.

The ACP provides for a range of technologies that could be used to comply with the proposed regulation.  Listed below are some potential technologies that could be used to comply with the proposed regulation.  The ACP provisions are described in more detail in Chapter V.

<u>Selective Catalytic Reduction (SCR)</u>

The heart of the SRC system is the catalyst.  The reaction converting NOx to nitrogen and water occurs on the surface of the catalyst.  NOx compounds must come into contact with the catalyst in order to be converted.  Modern catalysts are usually made in the form of honeycomb structures.

Many catalysts materials contain heavy metal oxides which are hazardous to human health.  Vanadium pentoxide, for example, is on the U.S. EPA's Extremely Hazardous Substances.  In California, spent catalyst from SCR is considered to be hazardous waste and the volume of waste from SCR is large.  The disposal of catalyst is expensive, but some catalyst manufacturers provide for disposal and/or recycling of the catalyst.  In Japan, for example, titanium from titanium dioxide spent catalyst is used from paint pigment.  An advantage of precious metal catalysts is that they do not produce as much hazardous waste, and they have a salvage value at the end of their useful life, but the initial cost is higher.

Ammonia is necessary for the chemical reactions in SCR to work.  Unfortunately, ammonia is also a hazardous substance.  Ammonia is on the U.S. EPA's list of extremely hazardous substances under Title III, Section 302 of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  Ammonia is immediately dangerous to life and health (IDLH) at only 500 ppm.  It has a time weighted average (TWA) exposure limit (the maximum allowable exposure limit in a 10 hour day in a 40 hour week) of 25 ppm.  Ammonia has a pungent, suffocating odor.  Exposure to ammonia causes eye, nose, and throat irritation and it will burn the skin.

Ammonia is released from an SRC system because excess ammonia is required for efficient conversion of NOx to nitrogen.  Excess ammonia is required because of imperfect distribution of the chemical.  In theory, if the ammonia could be perfectly distributed so that the reactants could come into contact, no ammonia would be released, but in the real world this is not possible.  This is also analogous to the necessity for excess air required for combustion.  Excess air is required since all the oxygen molecules can't find all the fuel molecules to react with during the short period of time of combustion due to imperfect mixing of fuel and air.  The molar ratio of nitrogen oxide (NO) to ammonia in the SCR reaction is 1.0 (i.e. 1 ft$^3$ of ammonia is required to convert 1 ft$^3$ of NOx), and the molar ration of ammonia to nitrogen dioxide (NO$_2$) is two.  Over 80% of the NOx compounds in the exhaust are nitrogen oxide, so the SCR system is usually run with a ratio of ammonia to NOx around 1.0.  Further increase of the ratio will reduce NOx emissions, but emissions of ammonia will increase.

In an SCR unit, it is critical that the ammonia is injected and thoroughly distributed throughout the flue gas stream. This is done with the ammonia injected grid located upstream of the catalyst. Ammonia is drawn out of a storage tank and evaporated with the electrical heated or steam heated vaporizer. The vapor is then mixed with a carrier gas which is usually compressed air or steam. The carrier gas provides the momentum to deliver the gas into the exhaust stream.

The storage of ammonia is usually considered to be a greater potential hazard than the ammonia slip from the stack. Emitted levels of ammonia slip are far below the odor and health hazard thresholds of the chemical. Since ammonia is water soluble, it doesn't remain very long in the atmosphere.

Ammonia from SCR is stored in a tank and a relatively large amount of storage is required. Accidental release from storage could pose problems to communities surrounding the ship. Aqueous and anhydrous ammonia are the two types of ammonia used for ammonia injection. The aqueous form is favored in that the stored ammonia concentration can be limited and the volatilization rate is reduced, so it is safer. The aqueous form is used in more heavily populated areas.

Urea is a chemical that comes in the form of powder that can also be used in place of ammonia for SCR. The urea is dissolved with water and then injected into the exhaust stream. The urea breaks down to form nitrogen and hydrogen compounds that will react with nitrogen oxide. The temperature range for efficient NOx reduction with urea is higher than the exhaust temperature of most engines, so urea injection is limited to systems where there is supplemental firing applied to the exhaust stream.

Shoreside Port Electrification ("Cold Ironing")

Supplying shore power to a vessel while at port is an option to reduce hotelling emissions. While shore power is supplied to the ship, the auxiliary engines are turned off. This option does not completely eliminate emissions because most vessels continue to operate boilers. However the emissions from boilers is a small fraction of the hotelling emissions from most vessels, so overall emissions are reduced dramatically. Table VII-5 below compares the emissions per unit of energy for a marine auxiliary engine operating on residual fuel (heavy fuel oil) and distillate fuel (marine diesel oil), and for a power plant.

**Table VII-5:  Auxiliary Engine and Powerplant Emission Comparison**

| Pollutant | Residual (g/kw-hr) | MDO (g/kw-hr) | Powerplant (g/kw-hr) |
|-----------|--------------------|--------------------|----------------------|
| NOx | 14.7 | 13.9 | 0.0908 |
| PM | 1.5 | 0.3 | 0.012 |
| SOx | 12.3 | 1.1 | 0.006 |

Source: ARB, 2004

As stated previously, shoreside power eliminates the emissions from vessel auxiliary engines, but the power is produced by powerplants. Powerplants get their power from a variety of sources each with a variety of air emissions. Natural gas plays a dominant role in California's fuel-fired generating system and is the preferred fuel for powerplants because of its cleaner combustion characteristics compared to other fuels. Natural gas has negligible sulfur, which limits sulfur compound emissions; negligible ash, which limits particulate matter emissions; and NOx emission rates that are generally lower than from other fuel types. Natural gas provides 91 percent of the fuel – fired electrical generation in California. (ARB, 2004)

### Diesel Oxidation Catalyst (DOC)

Two potential adverse environmental impacts from the use of DOCs have been identified. First, as is the case with most processes that incorporate catalytic oxidation, the formation of sulfates increases at higher temperatures. Depending on the exhaust temperature and sulfur content of the fuel, the increase in sulfate particles may offset the reductions in soluble organic fraction emissions. Using low sulfur diesel fuel can minimize this effect. Second, a DOC could be considered a "hazardous waste" at the end of its useful life depending on the materials used in the catalytic coating. Because catalytic converters have been used on gasoline powered on-road vehicles for many years, there is a very well-established market for these items (see, for example, http://www.pacific.recycle.net – an Internet posting of buyers and sellers of various scrap materials). In the recycling process, the converters are broken down, and the metal is added to the scrap-metal stream for recycling, while the catalysts (one or a combination of the platinum group metals) are extracted and reused.

Because of platinum's high activity as an oxidation catalyst, it is the predominant platinum group metal used in the production of DOC. There is a very active market for reclaimed platinum for use in new catalytic converters, jewelry, fuel cells, cathode ray tube screens, catalysts used during petroleum refining operations, dental alloys, oxygen sensors, platinum electrode spark plugs, medical equipment, and platinum-based drugs for cancer treatment, to name a few. (Kendall, 2002) (Kendall, 2003)

### Catalyzed Diesel Particulate Filters

These devices are composed of a ceramic diesel particulate filter along with a platinum catalyst to catalyze the oxidation of carbon-containing emissions and significantly reduce diesel PM emissions. This is an obvious positive environmental impact.

However, there are also inorganic solid particles present in diesel exhaust, which are captured by diesel particulate filters. These inorganic materials are metals derived from engine oil, diesel fuel, or engine wear and tear. While the PM filter is capable of capturing inorganic materials, these materials are not oxidized into a gaseous form and expelled.

Because these materials would otherwise be released into the air, the filters are benefiting the environment by capturing these metallic particles, known as "ash." However, the ash that is collected in the PM filter must be removed from the filter periodically to maintain the filter's effectiveness.

Ash collected from a diesel engine using a typical lubrication oil and no fuel additives has been analyzed and is primarily composed of oxides of the following elements: calcium, zinc, phosphorus, silicon, sulfur, and iron.  Zinc is the element of primary concern because, if present in high enough concentration, it can make a waste a hazardous waste.  Title 22, CCR, section 66261.24 establishes two limits for zinc in a waste:  250 milligrams per liter for the Soluble Threshold Limit Concentration and 5,000 milligrams per kilogram for the Total Threshold Limit Concentration.  The presence of zinc at or above these levels would cause a sample of ash to be characterized as a hazardous waste.

Under California law, it is the generator's responsibility to determine whether their waste is hazardous or not.  Applicable hazardous waste laws are found in the H&SC, division 20; title 22, CCR, division 4.5; and title 40 of the Code of Federal Regulations.  Staff recommends owners that install a diesel particulate filter on an engine to contact both the manufacturer of the diesel emission control system and the California Department of Toxic Substances Control (DTSC) for advice on proper waste management.

The ARB staff has consulted with personnel of the DTSC regarding management of the ash from diesel particulate filters.  DTSC personnel have advised ARB that it has a list of facilities that accept waste from businesses that qualify as a conditionally exempt small quantity generator.  Such a business can dispose of a specific quantify of hazardous waste at certain Household Hazardous Waste events, usually for a small fee.  An owner who does not know whether or not he qualifies or who needs specific information regarding the identification and acceptable disposal methods for this waste should contact the DTSC.[6]

Additionally, the technology exists to reclaim zinc from waste.  For example, the Swedish company MEAB has developed processes for extracting zinc and cadmium from various effluents and industrial waste streams.  Whether reclamation for reuse will be economically beneficial remains to be seen.  (MEAB, 2003)

Because of the time and costs associated with filter maintenance, there are also efforts by industry to reduce the amount of ash formed.  Most of the ash is formed from the inorganic materials in engine oil, particularly from zinc-containing additives necessary to control acidification of engine oil – due in part to sulfuric acid derived from sulfur in diesel fuel.  As the sulfur content of diesel fuel is decreased, the need for acid neutralizing additives in engine oil should also decrease.  A number of technical programs are ongoing to determine the impact of changes in oil ash content and other

---

[6] Information can be obtained from local duty officers and from the DTSC web site at http://www.dtsc.ca.gov.

characteristics of engine oil on exhaust emission control technologies and engine wear and performance.

It may also be possible to reduce the ash level in diesel exhaust by reducing oil consumption from diesel engines. Diesel engine manufacturers over the years have reduced engine oil consumption in order to reduce PM emissions and to reduce operating costs for engine owners. Further improvements in oil consumption may be possible in order to reduce ash accumulation rates in diesel particulate filters.

In addition, measurements of NOx emissions for heavy-duty diesel vehicles equipped with passive catalyzed filters have shown an increase in the $NO_2$ portion of total NOx emissions, although the total NOx emissions remain approximately the same. In some applications, passive catalyzed filters can promote the conversion of NO emissions to $NO_2$ during filter regeneration. More $NO_2$ is created than is actually being used in the regeneration process; and the excess is emitted. The $NO_2$ to NOx ratios could range from 20 to 70 percent, depending on factors such as the diesel particulate filter systems, the sulfur level in the diesel fuel, and the duty cycle. (DaMassa, 2002)

Formation of $NO_2$ is a concern because it irritates the lungs and lowers resistance to respiratory infections. Individuals with respiratory problems, such as asthma, are more susceptible to the effects. In young children, nitrogen dioxide may also impair lung development. In addition, a higher $NO_2$/NOx ratio in the exhaust could potentially result in higher initial NO2 concentrations in the atmosphere which, in turn, could result in higher ozone concentrations.

Model simulations have shown that a $NO_2$ to $NO_X$ emission ratio of approximately 20 percent would nearly eliminate any impact of increased $NO_2$ emissions. (DaMassa, 2002). According to the model, at the $NO_2$ to NOx ratio of 20 percent, there will be a decrease of the 24-hour ozone exposure (greater than 90 parts per billion) by two percent while an increase of the peak 1-hour $NO_2$ by six percent (which is still within the $NO_2$ standard).

The health benefits derived from the use of PM filters are immediate and offset the possible adverse effects of increases in $NO_2$ emissions. For this reason, a cap of 20 percent $NO_2$ to NOx emission ratio was established for all diesel emission control systems through ARB's Verification Procedure.

**E.      Reasonably Foreseeable Mitigation Measures**

The ARB staff has concluded that no significant adverse environmental impacts should occur from adoption of and compliance with the proposed regulation.  Therefore, no mitigation measures would be necessary.

**F.      Reasonably Foreseeable Alternative Means of Compliance with the Proposed Regulation**

Alternatives to the proposed regulation are discussed in Chapter V of this report.  ARB staff has concluded that the proposed regulation provides the most effective and least burdensome approach to reducing children's and the general public's exposure to diesel PM and other air pollutants emitted from oceangoing auxiliary diesel-fueled engines.

## REFERENCES

(ARB 2002). Air Resources Board. May 2002. Public Hearing to Consider Amendments to the Ambient Air Quality Standards for Particulate Matter and Sulfates, Staff Report. http://www.arb.ca.gov/research/aaqs/std-rs/pm-final/pm-final.htm

(ARB, 2004). California Air Resources Board, *Report to the Legislature, Gas-Fired Power Plant NOx Emission Controls and Related Environmental Impacts;* May 2004.

(ARB, 2005). California Air Resources Board, *2005 Ocean-going Ship Survey Summary of Results*, September 2005.

(EPA 2000). United States Environmental Protection Agency. September 2000, *Guidelines for Preparing Economic Analyses.* EPA240-R-00-003 http://www.epa.gov/opei/pubsinfo.htm

(EPA, 2002) United States Environmental Protection Agency. Notice of Proposed Rulemaking (40 CFR part 94) *Control of Emissions of Air Pollution from New Marine Compression-Ignition Engines at or Above 30 Liters/Cylinders.* April 2002. (

EPA 2003). United States Environmental Protection Agency. April 2003.

United States Environmental Protection Agency, Assessment and Standards Division, Office of Transportation and Air Quality, Draft Regulatory Impact Analysis: Control of Emissions of Air Pollution from Nonroad Diesel Engines and Fuel. EPA420-R-03-008. CD-ROM. Research Triangle Park, North Carolina. http://www.epa.gov/otaq/cleaner-nonroad/r03008.pdf

(DaMassa, 2002). DaMassa, John. *Presentation: Air Quality Effects of Trap-Related Emissions (Updated)*, California Air Resources Board; February 6, 2002.

(Kendall, 2002). Kendall, Tom; Johnson Matthey. *Platinum 2002*; http://www.platinum.matthey.com/publications/1051543656.html; May 2002.

(Kendall, 2003). Kendall, Tom; Johnson Matthey. *Platinum 2003*; http://www.platinum.matthey.com/publications/1059138410.html; May 2003.

(MEAB, 2003). Metallextraktion AB (MEAB). *http://www.meab-mx.se/en/index.htm*; August 2003.

## VIII.    ECONOMIC IMPACTS

In this chapter, we present the estimated costs and economic impacts associated with the implementation of the proposed regulation.  The estimated capital and recurring costs are presented, as well as an analysis of the cost-effectiveness.  The economic impacts associated with the costs of the proposed regulation are presented for private companies, as well as governmental agencies.

Legal Requirements

In this chapter, we will also address certain legal requirements that must be satisfied in analyzing the economic impacts of the proposal.

Section 11346.3 of the Government Code requires State agencies to assess the potential for adverse economic impacts on California business enterprises and individuals when proposing to adopt or amend any administrative regulation.  The assessment shall include a consideration of the impact of the proposed regulation on California jobs, business expansion, elimination or creation, and the ability of California business to compete with businesses in other states.

In addition, the ARB is required under section 43013(b) of the Health and Safety Code (H&SC) to adopt standards and regulations, consistent with H&SC section 43013(a), for marine vessels to the extent permitted by federal law.  Health and Safety Code section 43013(a) authorizes ARB to adopt and implement "motor vehicle emission standards, in-use performance standards, and motor vehicle fuel specifications…which the State board has found to be necessary, cost-effective, and technologically feasible…"

A literal reading of H&SC section 43013(a) would lead one to conclude that the criteria "necessary, cost-effective, and technologically feasible" do not apply to a marine vessel regulation because marine vessels are non-vehicular by definition.  See H&SC section 39039.  However, because the Legislature placed the authorization to regulate marine vessels in H&SC section 43013(b), we will infer a legislative intent to require ARB to determine that its proposed regulations on marine vessels are "necessary, cost-effective, and technologically feasible."

Also, State agencies are required to estimate the cost or savings to any State or local agency and school district in accordance with instructions adopted by the Department of Finance (DOF).  The estimate shall include any non-discretionary cost or savings to local agencies and the cost or savings in federal funding to the State.

Finally, H&SC section 57005 requires the Air Resources Board to perform an economic impact analysis of submitted alternatives to a proposed regulation before adopting any major regulation.  A major regulation is defined as a regulation that will have a potential cost to California business enterprises in an amount exceeding ten million dollars in any single year.  The estimated cost of the proposed regulation does exceed ten million dollars in a single year, although much of the cost will be borne by businesses based

outside of California.  Nevertheless, we have conducted an economic impact analysis of submitted alternatives to the proposal.

The following is a description of the methodology used to estimate costs as well as ARB staff's analysis of the economic impacts on California businesses and State and local agencies.

## A.    Summary of the Economic Impacts

Under the proposed regulation, ocean-going vessel (or "vessel") operators can comply through the use of distillate marine fuel or equally effective emission control strategies. This requirement would apply when ships are within 24 nautical miles (nm) of the California coastline.

To estimate the costs of compliance with the proposed regulation, the use of distillate marine fuel will be assumed because the costs can be predicted more accurately compared with the wide range in potential costs from the multitude of potential alternative control strategies.  In addition, it is unlikely that alternative control strategies would be pursued unless they are less expensive than the use of distillate marine fuels.

To estimate the costs for 2007 through 2009, we assume that vessel operators will use marine gas oil (MGO) to comply with the proposed regulation.  For 2010 and later, we assume that vessel operators will use of 0.1 percent sulfur MGO.  However, it should be noted that the 2010 emission limit will be subject to a feasibility evaluation that will consider the supply of this fuel in 2010, as well as technical issues.  Therefore, it is possible that this standard could be modified.  In addition, throughout the analysis, the costs to passenger cruise vessels (diesel-electric vessels) and cargo vessels (generally direct drive motor-ships) will be analyzed separately due to the differences in these vessel types.

Since the majority of vessels currently use heavy fuel oil in their auxiliary engines, most vessel operators will need to switch to more expensive marine distillate fuel in California upon entering the 24 nm boundary.  This fuel is roughly twice as expensive by weight as heavy fuel oil.  The added cost to businesses due to the higher cost of using distillate fuel will vary widely based on the amount of heavy fuel oil they use in California.  For example, a business that owns a single small cargo vessel that makes a single annual visit to a California port may incur an added cost of a couple thousand dollars, while an operator of a large fleet of vessels that make frequent California port visits may incur costs exceeding a million dollars annually.  On average, we estimate the added annual fuel cost for a typical cargo vessel operator at about $20,000 per company ($17,000 for years 2007 to 2009, and $19,000 for 2010 and later).  For passenger cruise vessel operators, we estimate the added annual fuel cost at about $2 million per company ($1.7 million for years 2007 to 2009, and $1.9 million for 2010 and later).  For the entire oceangoing shipping fleet that visits California, we estimate an added annual fuel cost of about $34 million (2007-2009), and $38 million (2010 and later).   These estimates are based on current fuel consumption and do not account for growth.

In addition, we estimate that about five percent of non-diesel-electric (cargo) vessels, and about forty percent of diesel-electric (passenger cruise) vessels will need some modifications such as adding a new fuel tank and piping.  These costs will vary widely with the type of modifications, but we estimate the average cost to be on the order of $100,000 per vessel for cargo vessels, and $100,000 to $500,000 for diesel-electric vessels.  We estimate the total retrofit cost to the industry at about $11 million to $18 million dollars.

We do not expect significant economic impacts to the industry based on the added costs of the proposed regulation.  The added costs of the regulation are relatively minor compared to the overall operating expenses of these vessels.   In addition, based on an analysis of the change in "return on owners equity" (ROE) for typical businesses, the added costs of the proposed regulation would result in less than a one percent change in ROE.  Generally, a decline of more than ten percent in ROE suggests a significant impact on profitability.  Because the proposed regulation would not alter significantly the profitability of most businesses, we do not expect a noticeable change in employment, business creation, elimination, or expansion, and business competitiveness in California.   We also do not expect significant economic impacts on governmental agencies on the local, state, or federal level.  Military vessels are exempt from the proposed regulation.

We also do not expect significant impacts on the customers served by ocean-going vessel operators, even assuming that all of the added costs are passed on to customers.  For example, we estimate that the added cost of the proposed regulation would add about a dollar per container for importers or exporters shipping containerized goods overseas.  We estimate that this represents less than one percent of the shipping cost.  For passenger cruise ships, we estimate the added cost of the proposed regulation for a typical Los Angeles to Mexico cruise would be about $8 per passenger, representing about a 2 percent fare increase.

The overall cost-effectiveness of the proposed regulation, considering only reductions in diesel PM, is estimated to be about $52,000 per ton of diesel PM reduced ($26 per pound of diesel PM) from 2007 to 2009, and about $53,000 per ton of diesel PM reduced ($27 per pound of diesel PM) in 2010 and later, when the 0.1 percent sulfur marine gas oil limit is scheduled to be implemented.  This is similar to the cost-effectiveness of other regulations adopted by the Board to reduce diesel PM.  However, the proposed regulation would also reduce emissions of nitrogen oxides (NOx) and sulfur oxides (SOx).  Attributing half the cost of the proposed regulation to diesel PM, and half to NOx plus SOx, the  cost-effectiveness for 2007 to 2009 would be about $26,000/ton ($13/pound) of diesel PM reduced, and about $3,000/ton ($1.50/pound) of NOx+SOx reduced.  For 2010 and later, the cost-effectiveness would be about $27,000/ton ($14/pound) of diesel PM reduced, and about $2,700/ton ($1.40/pound) of NOx+SOx reduced.

The health benefits of implementing the proposed regulation are substantial. The estimated statewide benefit of reduced premature mortality is about $3 billion at a seven percent discount rate, and $4 billion at a three percent discount rate.


**B.    Capital Costs**

In order to use marine distillate fuels in their auxiliary engines, some vessel owners will need to add additional tanks and piping, or make other modifications to their vessels. This will result in capital costs to the vessel owner. To estimate the number of vessels requiring modifications, we conducted the ARB 2005 Ship Survey ("Survey"). The Survey requested that respondents identify whether their vessels will require modifications to use distillate fuel and the nature of the changes if needed. (ARB, 2005). Eleven companies reported 32 vessels that would require modifications out of 358 total vessels reported in the Survey (i.e., less than 10 percent would require retrofits). More specifically, 8 cargo vessel operators reported 15 vessels requiring modifications, and 3 cruise vessel operators reported 17 vessels requiring modifications. The types of retrofits reported by vessel operators included the addition of fuel tanks, segregation of existing fuel tanks for distillate fuels, addition of a mixing tank and fuel treatment equipment, and fuel pump and fuel injector modifications.

Estimated Average Retrofit Cost per Vessel

The average cost to modify a vessel to use distillate fuel is difficult to estimate because the cost will vary widely based on the particular vessel and the type of modifications. One common modification would be the addition of a tank for distillate fuel, or the partitioning of an existing tank. To estimate the potential cost to add a tank, ARB staff reviewed the available literature, contacted marine engineering firms, and requested information from respondents to the Survey. Our findings and recommendations are summarized below.

The U.S. EPA estimated the cost to add a fuel tank and associated piping to allow a vessel to use cleaner fuel (either distillate or 1.5% sulfur heavy fuel oil) at $50,000. (U.S. EPA, 2002). Relatively little information was provided in the U.S. EPA report detailing how the estimate was derived, so marine engineering firms were contacted to estimate the cost of installing an additional tank that would allow a typical cargo vessel to comply with the proposal. They responded that the $50,000 estimate in the U.S. EPA report was reasonable assuming the vessel is in dry-dock for other maintenance (Herbert Engineering, 2005; Sweeney, 2005).

Others have reported higher costs. For example, a report prepared for the European Union estimated the cost to install a tank, as well as pumps, gauges, and ancillary equipment at 25,000 € (~$30,000) for a 30 meter vessel, and 80,000 € (~$96,000) for a 100 meter vessel. (Entec, 2002). However, the vessels mentioned in the report are smaller than those subject to the proposed control, and it is unclear whether or not the fuel tanks would provide capacity only for auxiliary engine use. ARB staff also

contacted respondents to the Survey that indicated that some of their vessels would require retrofits.  Only one company responded with an estimate of $350,000 to $500,000 for a passenger cruise vessel.  However, as discussed later in this chapter, cruise vessels and other diesel-electric vessels may have higher retrofit costs than other types of vessels.  For this reason, a separate business impacts analysis was performed for these vessels, which account for less than three percent of the vessels that visit California annually.  Considering the information available and the uncertainty in estimating the retrofit costs, ARB staff proposes to double the U.S. EPA estimate for cargo vessels and use $100,000 per vessel retrofit (except for diesel-electric vessels) to avoid underestimating the cost.  For diesel-electric vessels (cruise vessels and some tankers), ARB staff proposes a range from $100,000 to $500,000.

Total Capital Cost of the Proposed Regulation

The capital cost was estimated based on the estimated number of vessels requiring modifications and the cost per vessel.  These costs were analyzed separately for non-diesel-electric (cargo) vessels, and diesel-electric (cruise vessels) as shown in Table VIII-1 below.

For cargo vessels, 15 of the 317 cargo vessels reported in the Survey (about 5 percent) were reported to require modifications.  According to the California State Lands Commission (CSLC), 1,945 unique vessels (excluding barges) visited California in 2004 (CSLC, 2005).  Excluding the 44 cruise vessels from the data, there are about 1,900 cargo vessels.  Applying the 5 percent modification rate to the CSLC data (less barges and cruise vessels), we estimate that about 95 cargo vessels would require modifications.  Assuming the cost of these retrofits averages $100,000 per vessel, we estimate the total capital cost for cargo vessels would be about $9.5 million.

For cruise vessels, the Survey can be used to directly estimate the number of vessels to be modified because the Survey coverage was nearly complete.  Forty-one vessels were reported out of 44 reported by the CSLC data, and 17 of these were indicated to require modifications.  Using the 17 vessels and a range in cost from $100,000 (the average for other vessel types) to $500,000 (the highest estimate received as discussed above), the estimated total capital cost to the cruise vessel industry is $1.7 to $8.5 million.

**TableVIII-1: Capital Cost Summary**

| Industry Sector | Estimated Retrofit Cost ($/Vessel) | Estimated Number of Retrofitted Vessels | Total Industry Capital Cost ($/year) |
|---|---|---|---|
| Cargo Vessels | $100,000 | 95 | $9.5 million |
| Passenger Cruise Vessels | $100,000 to $500,000 | 17 | $1.7 to $8.5 million |
| Total | N/A | 197 | $11 to $18 million |

There are a number of reasons why the actual capital costs may be different than our estimate.  First, the number of vessels requiring retrofits (and the associated total capital costs) may be lower or higher than the above estimate.  This is because we modified the proposed regulation after the Survey was conducted to remove the sulfur limit cap on marine gas oil (MGO) for the initial fuel requirement, whereas MGO with a sulfur cap of 0.2% sulfur was the proposed requirement at the time of the Survey.  As such, some vessels may not need to add tankage and associated piping to comply with the proposal because they may already carry complying marine distillate fuels.

The current proposal still includes a provision requiring the use of 0.1% sulfur marine gas oil in 2010 subject to a feasibility review.  However, this proposal is designed to align with the European Union's Directive which requires the use of 0.1% sulfur MGO for vessels at dockside and in inland waterways. (EU, 2005).  It is likely many vessels may already be planning vessel retrofits to meet the EU requirement.

Moreover, the inclusion of a noncompliance fee option to the proposal will also reduce the number of vessels that will need to perform retrofits.  Under this option, which was not included in the proposal at the time of the Ship Survey, an infrequent visitor that would otherwise need to perform vessel modifications to use distillate fuel could pay a fee in lieu of compliance with the proposal's fuel requirements.

Another factor that may affect the actual capital costs is the number of new visitors to California ports.  As stated above, we based the total capital cost on the estimated total number of vessels that may require modifications to visit California ports in 2004.  However, in subsequent years, there will be some new vessels visiting California ports.  These could be vessels that did not visit California ports previously, or new vessels that have been added to the worldwide fleet.  Some of these vessels may be required to perform modifications to use distillate fuel under the proposed regulation.

The actual number of these new vessels is difficult to estimate due to a variety of variables, including growth in the various shipping sectors, vessel turnover, and route changes initiated by individual businesses due to normal fluctuations in demand.  The number of new vessels also could change as vessel owners try to minimize the number of vessels that would require modifications.   Nevertheless, to determine an upper end cost estimate, we compared vessel visits over a two-year period.  Based on our analysis of State Lands Commission data for 2003 and 2004, we estimate that roughly 50 percent of the vessels in 2004 did not visit in 2003. (CSLC, 2005).  Assuming capital costs are proportional to the number vessels, we estimate the capital costs at about half the initial year total capital cost of $11 to $18 million, or $5.5 to $9 million annually, increasing the total present value cost of the regulation from $165 to $171 million,  to $184 to $200 million (over a five year lifetime).  Under this scenario, the 2007-2009 cost-effectiveness for PM would increase from about $52,000 per ton PM reduced, to $58,000 - $63,000 per ton PM reduced (see Appendix J-Part II).

## C.    Recurring Costs

The recurring costs associated with the purchase of distillate fuel were determined and accounted for in the cost analysis.  We calculated the recurring costs based on the current estimated fuel consumption and the price differential between existing fuels and the cleaner fuels required by the proposal for the years 2007-2011.  For years 2007-2009, we calculated the cost based on the consumption of heavy fuel oil in auxiliary engines and the differential in price between the most widely used type of heavy fuel oil (HFO-380) and standard marine gas oil (MGO).  For 2010 and 2011, we based the cost on the sum of: (1) the estimated current consumption of heavy fuel oil and the differential in price between HFO-380 and MGO with a 0.1 percent sulfur cap; and (2) the estimated current consumption of standard MGO and the differential in price between standard MGO, and MGO with a 0.1% sulfur cap.  Growth in the industry was not projected for this analysis, nor did we attempt to factor in expected price increases due to inflation, given the highly volatile and unpredictable nature of petroleum prices.  However, we believe that growth and inflation are likely to have similar effects on both fuels, such that the differential will remain relatively constant.  Our assumptions for fuel consumption rates and the price differential between MGO and HFO-380 are described below.

Fuel Consumption Estimates

As shown in detail in Appendix B, we estimated fuel consumption within the 24 nautical mile boundary based on: (1) the estimated NOx emissions from auxiliary engines operating within this zone; (2) the energy specific NOx emission factor for medium speed four-stroke auxiliary engines using heavy fuel oil (Entec, 2002), which allowed emissions to be converted to associated energy in kilowatt-hours; and (3) the brake specific fuel consumption for these engines (*Ibid*), which allowed energy to be converted to estimated fuel consumption.  Based on this information, we estimate that about 172,000 metric tons of fuel is currently consumed by auxiliary engines statewide within the 24 nm boundary.

Based on the Survey, we estimate about 92 percent of the fuel used by diesel-electric engines, and 72 percent of the fuel used by auxiliary engines on all other vessels was heavy fuel oil.  Overall, about 78 percent of the fuel (by weight) used by all auxiliary engines was heavy fuel oil, and the remaining 22 percent was distillate fuel.  Applying this breakdown to the total fuel consumption of 172,000 metric tons, we estimate that about 134,000 metric tons of heavy fuel oil and 38,000 metric tons of distillate fuel are used by the vessels traveling within 24 nm of California's coastline.

Price Premium for Cleaner Fuels

To determine the estimated price differential between heavy fuel oil and distillate fuels complying with the proposed regulation, we estimated an average cost differential using current prices for HFO-380, the most common grade of heavy fuel oil, and marine gas oil. (Bunkerworld, 2005).  As shown in Table VIII-2 below, prices were averaged over

the time period from March, 2005 through September, 2005 using three major bunkering ports: Singapore, Rotterdam, and Fujairah.  Fuel prices tend to be volatile and may change significantly in the future.  However, we believe that the price differential between HFO and MGO will be fairly constant.

Table VIII-2: Marine Fuel Prices ($/tonne)*

| Fuel | Fujairah | Singapore | Rotterdam | Average |
|------|----------|-----------|-----------|---------|
| MGO | 512 | 504 | 523 | 513 |
| HFO-380 | 261 | 264 | 243 | 256 |
| Difference | 251 | 240 | 280 | 257 |

   *    Bunkerworld, 2005.  Prices averaged from March to September, 2005.
       A "tonne" equals a metric ton, or 2200 pounds.

To determine the cost differential between standard marine gas oil and 0.1 percent marine gas oil, we used a report prepared for the European Union.  The report estimated the price premium for 0.1 percent sulfur marine gas oil compared to standard marine gas oil with no sulfur limit at 14-21 €/metric ton, or about $21/metric ton using the median cost from the range and a conversion of 0.83 Euro per dollar. (Beicip-Franlab, 2002).  Table VIII-3 summarizes the estimated price differential for the cleaner fuels specified in the proposed regulation.

Table VIII-3: Fuel Price Differential Due to Proposed Regulation

| Year | Fuel Change | Price Premium* ($/tonne) |
|------|-------------|--------------------------|
| 2007-2009 | HFO-380 to Standard MGO | 257 |
| 2010  and later | HFO-380 to 0.1% S MGO | 278 |
| 2010 and later | Standard MGO to 0.1% S MGO | 21 |

*Reflects data from Table VIII-2 above and "Advice on the Costs to Fuel Producers and Price Premium Likely to Result from a Reduction in the Level of Sulphur in Marine Fuels Marketed in the EU," Beicip-Franlab, April 2002.  A "tonne" equals a metric ton, or 2200 **pounds.**

Total Recurring Costs

The total annual recurring costs for years 2007-2009, and 2010 and later, for each industry sector and for the total marine industry are shown below in Tables VIII-4 and VIII-5.  These estimates are based on the estimated fuel consumption by sector and price differentials shown in Table VIII-3 above.

Table VIII-4:  Total Industry Annual Fuel Costs for Years 2007-2009

| Marine Industry Sector | Estimated HFO Consumed (tonne)* | Price Differential ($ per tonne) | Total Sector Cost (millions) |
|---|---|---|---|
| Auto Carrier | 3,500 | $257 | $0.90 |
| Bulk | 14,000 | $257 | $3.60 |
| Container | 58,000 | $257 | $14.9 |
| General | 6,000 | $257 | $1.50 |
| Passenger | 40,000 | $257 | $10.3 |
| Reefer | 2,200 | $257 | $0.60 |
| RORO | 1,300 | $257 | $0.30 |
| Tanker | 9,000 | $257 | $2.3 |
| Total | 134,000 | $257 | ~$34 |

* Estimated annual fuel consumption based on methodology used above for total industry fuel consumption.

The total annual recurring fuel cost estimates for 2010 and later reflect the use of somewhat higher cost 0.1 percent sulfur marine gas oil, as shown in Table VIII-5 below. Specifically, the current estimated fuel consumption of heavy fuel oil is multiplied by the higher incremental cost ($278) between heavy fuel oil and 0.1 percent sulfur marine gas oil.  The current estimated fuel consumption of marine distillate fuels is multiplied by the higher incremental cost ($21) between standard marine gas oil and 0.1 percent marine gas oil.  These costs were added to obtain the total recurring fuel cost by industry sector.

We do not expect significant additional recurring costs to the industry due to recordkeeping and reporting requirements, crew time, or other factors, which are discussed in section E of this Chapter.

Table VIII-5:  Total Industry Annual Fuel Costs for 2010 and Later

| Marine Industry Sector | Estimated HFO Consumed (tonne)* | Estimated MGO Consumed (tonne)* | Price Differential (HFO to 0.1% S MGO) | Price Differential (Std. MGO to 0.1% S MGO) | Total Sector Cost (millions) |
|---|---|---|---|---|---|
| Auto Carrier | 3,500 | 1,100 | $278 | $21 | $1.0 |
| Bulk | 14,000 | 5,300 | $278 | $21 | $4.0 |
| Container | 58,000 | 22,600 | $278 | $21 | $16.6 |
| General | 6,000 | 2,300 | $278 | $21 | $1.7 |
| Passenger | 40,000 | 2,600 | $278 | $21 | $11.2 |
| Reefer | 2,200 | 850 | $278 | $21 | $0.63 |
| RORO | 1,300 | 500 | $278 | $21 | $0.37 |
| Tanker | 9,000 | 3,200 | $278 | $21 | $2.6 |
| Total | 134,000 | ~38,000 | $278 | $21 | ~$38 |

**\*** Estimated fuel consumption based on methodology used above for total industry fuel consumption.

## D.    Total Industry Cost and Total Annual Cost

Total Industry Cost

We estimate the total statewide cost of the proposed regulation over a 5 year period to be about $165-171 million dollars.  This estimated cost was derived from the present value of the capital costs shown in Table VIII-1 combined with the present value of the recurring costs shown in Tables VIII-4 and VIII-5, over a 5 year period (see Appendix B).

Total Annual Cost

The total annual cost, including the total capital costs from Table VIII-1, and the recurring costs from Tables VIII-4 and VIII-5, is estimated to be about $38 million for years 2007-2009, and about $42 million for 2010 and 2011 (See Appendix B).  The majority of the estimated total annual cost is contributed by the recurring fuel costs.

## E.        Potential Additional Costs or Savings

There may be some other costs and potential cost savings that could be incurred under the proposed regulation, but data were not available to enable quantification of these possible impacts.  Nevertheless, the net impact of these costs and savings is not expected to be significant.  These are briefly described below.

Distillate fuel may result in lower or higher maintenance costs

Marine distillate fuel has a lower sulfur and ash content than heavy fuel oil and may result in a permanent, ongoing reduction in engine maintenance in some engines due to

a reduction in deposit formation (Croner, 2002). On the other hand, the use of lower viscosity distillate fuel may make leaks at weak pipe joints more likely than the use of heavier fuels, requiring additional maintenance. Because these effects, to the extent they may occur, are very engine and vessel-specific, we cannot quantify the overall potential savings or added costs from changes in maintenance costs.

Crew time/training

The fuel switching operations necessary under the proposed regulation may be automated or performed manually, depending on the specific vessel. Depending on the fuel system, training of the vessel crew may be required. Vessel crew time would also be required to perform the fuel transition upon entering and leaving the 24 nautical mile boundary. Because of the uncertainty in the extent additional crew time and training may be needed, we are not able to estimate these costs. However, to the extent crew training is required, we expect such crew training to be minimal because vessels must already switch to marine gas oil prior to dry dock maintenance, and fuel transitions may be handled with the existing crews.

Dry-dock costs

The proposed regulation provides up to a one year extension for a small minority of vessels requiring significant modifications to comply with the proposed regulation (i.e., a fraction of the 10 percent of vessels requiring some modification). In addition, a noncompliance fee provision provides an option that allows vessel operators to pay a fee in lieu of compliance for up to five port visits per vessel, if their vessel requires modifications to comply with the proposal. However, even with these provisions, there may still be a small number of vessels that need to make modifications in response to the proposed regulation prior to a regularly scheduled dry-dock date. This would result in lost business opportunities while the vessel is out of service for modifications. We are not able to predict the extent this would occur and therefore cannot accurately quantify these costs.

Fueling costs

Some manufacturers have reported that the proposed regulation may result in more frequent fueling because they may use a smaller tank for the more expensive fuel that can be used to comply with the proposed regulation. However, we cannot predict the extent to which this would occur and the industry has not supplied estimates of these costs.

Loss of Cargo Capacity

For the minority of vessels that will need to add a fuel tank to comply with the proposed regulation, there is a possibility that the addition of the tank will reduce the cargo carrying capacity of the vessel. However, vessel owners can in many cases opt to

segregate a volume of an existing tank to avoid this impact.  We are unable to estimate the extent of these potential impacts.

Recordkeeping

We do not expect significant added costs to the industry due to the recordkeeping and reporting requirements in the proposed regulation.  The proposed regulation would require records be kept of: (1) the date, time, and position of the vessel upon entry to and exit from the 24 nm boundary, and upon initiation and completion of fuel transitions; and (2) fuel purchases, and the types of fuels used within the 24 nm boundary.  The recording of fuel purchases and fuel use is already required in accordance with standard practices as well as other regulations and Vessel Classification Society requirements.  Recording the date, time, and position of the vessel as required by the proposed regulation would be an added requirement, but we do not expect these activities to require significant time or costs to comply as these can easily be logged either manually or automatically.  We expect that existing vessel crews can readily record these data.  Finally, the proposed regulation does not require periodic reporting of records.  Reporting is only required upon request.

## F.    Estimated Cost to Businesses

The proposed regulation would primarily impact businesses that operate large ocean-going vessels.  These costs are estimated below for typical (average) businesses.  However, the cost to individual businesses will vary widely based on factors such as the following:

- number of vessels visiting California ports;
- number of California port visits per vessel;
- power generated, and thus fuel consumed, by the auxiliary engines;
- whether the vessel is a "diesel-electric" vessel; and
- number of vessels requiring retrofits.

For example, a business that owns a single small cargo vessel that makes a single annual visit to a California port visit may incur an added fuel cost of a couple thousand dollars.  On the other hand, a large vessel operator with several vessels making frequent California port visits may incur added fuel costs approaching a million dollars annually.

Table VIII-6 below provides a summary of the range of added fuel costs that could be incurred by shipping companies.  As shown, most companies make relatively few visits and would incur proportionally lower costs, while a small number of large operators would incur costs up to about $1 million.  The average added fuel costs for travel in the 24 nm boundary associated with a California port visit ($3,400/visit) was approximated by dividing the total annual industry recurring cost for years 2007 to 2009, $34 million dollars (see Table VIII-4), by the roughly 10,000 port visits to California ports.  In

addition, as described below, operators of diesel-electric vessels such as passenger cruise vessels are expected to incur greater costs.

**Table VIII-6:  Estimated Average Added Fuel Cost to Vessel Operators***

| Number of Companies | Number of California Port Visits | Added Fuel Cost @$3,400 per Visit |
|---|---|---|
| 3 | 200-300 | $680,000-$1 million |
| 6 | 100-199 | $340,000-$677,600 |
| 20 | 50-99 | $170,000-$336,600 |
| 210 | 10-49 | $34,000-$166,600 |
| 221 | 5-9 | $17,000 - $30,600 |
| 83 | 4 | $13,600 |
| 124 | 3 | $10,200 |
| 265 | 2 | $6,800 |
| 500 | 1 | $3,400 |
| 1432 Total | ~10,000 Total | N/A |

* Company and port visit information based on the California State Lands Commission data.   Added costs assume no diesel-electric vessels, which represent less than 3% of the fleet visiting California.

We do not believe that the vessel operators subject to this proposed vessel would qualify as small businesses due to the large capital and operating costs associated with vessel operation.  Typical container vessels are estimated to cost on the order of $50 to $100 million (Mercator, 2005).  In addition, Government Code section 11342.610 excludes businesses in transportation and warehousing with annual gross receipts exceeding one and a half million dollars from its definition of "small business."  We believe that the annual gross receipts for a profitable vessel owner or operator would far exceed this level in order to be profitable.  For example, a single Asia to U.S. West Coast voyage for a typical container vessel costs about $2 to $3 million. (*Ibid*) Therefore, we do not believe there are any small businesses directly affected by the proposed regulation.  As such, we have only included costs in this analysis for typical businesses.

The capital and recurring costs to typical businesses are discussed below.  Separate analyses are performed for operators of non-diesel-electric vessels (mainly cargo vessels) and diesel-electric vessels (passenger cruise vessels and some tankers), which are expected to incur greater costs.  Diesel-electric vessels make up less than three percent of the fleet that visits California.

Capital Costs to Typical Businesses (except diesel-electric vessels)

As discussed previously, capital costs due to the proposed regulation would include vessel modifications, such as adding fuel tanks and piping, or engine modifications. These costs are vessel-specific and are expected to vary widely, with most vessels requiring no retrofits and a few incurring significant costs.  According to ARB's Survey,

only about 5 percent of non-diesel-electric (cargo) vessels are expected to require modifications. For those companies with vessels that require modifications, the Survey reported a range of one to four vessels requiring modifications per company. Overall, 8 companies reported a total of 15 vessels requiring modifications, or an average of roughly 2 per company. Based on an estimated cost of $100,000 per vessel (section B above), the total cost for a typical company with vessels requiring modifications would be about $200,000, with a range from $100,000 to $400,000.

Recurring Costs to Typical Businesses (Except Diesel Electric Vessels)

The recurring cost for typical businesses is based on the ongoing higher cost of marine distillate fuels that would be required by the proposed regulation. The total cost to a particular company will vary directly with the amount of fuel consumed by the company's vessels operated in California. To determine the average annual ongoing cost for a typical business, we divided the total estimated fuel cost of the regulation for non-diesel-electric vessels by the number of shipping companies that operated ocean-going vessels in California in 2004, as reported by the California State Lands Commission. Specifically, we divided the total recurring cost of $24 million for years 2006-2009 as shown in Table VIII-4 (excludes diesel-electric cruise vessels), and $27 million in 2010 and subsequent years as shown in Table VIII-5, by the approximately 1,400 companies reported by the California State Lands Commission to be responsible for vessel visits to California. (SLC, *supra*) This resulted in an average added fuel cost per company of about $17,000 per year (2006-2009) and $19,000 per year (2010 and later).

Summary of Costs to Typical Businesses (except passenger cruise vessels)

Table VIII-7 below summarizes the costs to a typical business with and without vessels requiring retrofits. As noted previously, only about 5 percent of non-diesel-electric vessels are expected to require modifications, so the cost to most affected businesses would be represented by the recurring higher cost of fuel only. The capital costs are annualized over a five year period, after which only the recurring costs would remain.

### Table VIII-7: Summary of Costs to Typical Businesses

| Affected Business | Capital Cost | Annualized Capital Cost* | Recurring Cost | Total Annual Cost |
|---|---|---|---|---|
| Modifications on 2 vessels | $200,000 | $46,200 | $17,000 - $19,000 (2010) | $63,200 - $65,200 (2010) |
| No Modifications | 0 | 0 | $17,000 - $19,000 (2010) | $17,000 - $19,000 (2010) |

*Capital costs annualized over 5 years, 5% interest rate. Recurring cost based on use of marine gas oil meeting ISO sulfur standards (pre 2010).

Costs to Businesses Operating Diesel-Electric Vessels

In this section, we analyze the costs to businesses operating diesel-electric vessels. These businesses are analyzed separately because we expect the proposed regulation to result in greater impacts on diesel-electric vessels, compared to other types of vessels.

The cost impacts of the proposed regulation are greater for diesel-electric vessels because the large diesel generator sets on these vessels are used for both propulsion and ship-board electricity. Therefore, the amount of fuel used by these engines is greater than for auxiliary engines on other types of vessels, and the cost impacts are larger by a commensurate amount.

To determine the impacts on diesel-electric vessels, we focused solely on passenger cruise vessels. Based on the Survey, all passenger cruise vessels serving California were reported to be diesel-electric. With the exception of a couple of tankers that are diesel-electric (but exempt from the proposed regulation because they use slow-speed two-stroke engines), the Survey results did not report any other diesel-electric vessels. However, ARB staff is aware of at least one diesel-electric tanker that recently entered into California that uses an engine that would be subject to the proposed regulation. (Seafarers, 2005)

To put the cost impacts of diesel-electric vessels into perspective, we estimated the average fuel cost associated with a single port visit.   To estimate this cost, we divided the total estimated added cost to the cruise vessel industry, $10.3 million (2007-2009), by the 687 port calls to California per the CSLC, yielding about $15,000 per port visit, compared with about $3,400 per port visit for non-diesel-electric vessels as discussed above.

To determine the recurring fuel cost on a typical cruise vessel business, we divided the total estimated added fuel cost of $10.3 million (2007-2009) to $11.2 million (2010 and later) annually by the six companies that reported to the survey. This resulted in an added annual fuel cost of nearly $2 million per company ($1.7 for 2007-2009, and $1.9 million per company for 2010 and later). However, it should be noted that this cost is relatively high compared to businesses operating other types of vessels because cruise vessels make more trips to California ports on average than other types of vessels, and because the passenger cruise industry has undergone mergers in the last few years that have consolidated more vessels under fewer companies.

In addition to higher fuel costs, it appears that these vessels are more likely to require modifications. According to the Survey, 17 of the 41 cruise vessels were reported to require vessel modifications. We also note that the California State Lands Commission reported 44 passenger cruise ships visiting California in 2004. (SLC, *supra*) Therefore, the industry participation in the Survey was nearly complete and the cost of modifying the 17 vessels reported should be a fairly accurate indication of the overall cruise vessel industry cost.

For those cruise vessel operators with vessels that require modifications, the Ship Survey reported a range of 1 to 12 vessels requiring modifications per company. Specifically, 3 companies reported a total of 17 vessels requiring modifications, or an average of roughly 6 vessels per company. Based on an estimated retrofit cost of $100,000 per vessel, the total capital cost for a typical company with 6 vessels requiring modifications would be about $600,000, or about $140,000 annualized over 5 years using a 5 percent discount rate. However, there is a possibility that the average cost of modifications per vessel is higher for cruise vessels than for other types of vessels. This is due to the greater amounts of distillate fuels that would be needed to comply with the proposed regulation, and associated fuel tank capacity, piping, and fuel processing equipment. Only one diesel-electric vessel operator (a cruise vessel operator) provided an estimate of the cost of modifying a vessel to comply with the proposed regulation. This estimate, at $350,000 to $500,000 per cruise vessel, was higher than the other sources of information cited previously. Nevertheless, based on the $500,000 figure as an upper bound, the estimated cost to a typical company with 6 vessels requiring retrofits would be about $3 million, or about $700,000 annualized over five years with a 5 percent discount rate.

Table VIII-8 provides a summary of the estimated costs to the cruise vessel industry. As mentioned previously, about 17 of the 41 cruise vessels reported in the Ship Survey were reported to require retrofits. However, the annual cost of fuel is much higher than the annualized retrofit costs, even when using the upper end retrofit cost estimate of $500,000 per vessel.

**Table VIII-8: Summary of Costs\* to Typical Cruise Vessel Business**

| Affected Business | Capital Cost | Annualized Capital Cost\* | Recurring Cost | Total Annual Cost |
|---|---|---|---|---|
| Retrofits on 6 vessels | $600,000 to $3.0 million | $140,000 to $700,000 | $1.7-1.9 million | $1.8-2.6 million |
| No Retrofits | 0 | 0 | $1.7-1.9 million | $1.7-1.9 million |

\*Capital costs annualized over 5 years at a 5% discount rate. Recurring cost based on the use of marine gas oil meeting ISO sulfur standards (pre 2010).

## G.    Potential Business Impacts

In this section, we analyze the potential impacts of the estimated costs of the proposed regulation on business enterprises. Section 11346.3 of the Government Code requires that, in proposing to adopt or amend any administrative regulation, State agencies shall assess the potential for adverse economic impact on California business enterprises and individuals. The assessment shall include a consideration of the impact of the proposed or amended regulation on the ability of California businesses to compete with businesses in other states, the impact on California jobs, and the impact on California business expansion, elimination, or creation.

This analysis is based on a comparison of the annual return on owner's equity (ROE) for affected businesses before and after the inclusion of the capital and recurring costs associated with the proposed regulation. The analysis also compares the estimated added costs of the proposed regulation to the overall operating costs of these vessels

ARB staff does not have access to financial records for many of these companies. However, it should be noted that many of these businesses are not California-based businesses. Many are foreign owned enterprises, sometimes involving complicated ownership arrangements involving consortiums of investors.

As stated in Section E above, we do not believe that the businesses subject to this proposed regulation would qualify as small businesses due to the large capital and operating costs associated with vessel operation.

Analysis of Return on Owner's Equity (ROE)

In this section, we evaluate the potential economic impact of the proposed regulation on California businesses as follows:

(1)     Typical businesses affected by the proposed regulation are identified from port visit data from the California State Lands Commission. The Standard Industrial Classification (SIC) codes associated with these businesses are listed in Table VIII-9 below;

(2)     The annual costs of the proposed regulation are estimated for each of these businesses based on the SIC code. For ranges in cost estimates, the high end of the range was used;

(3)     The total annual cost for each business is adjusted for both federal and state taxes; and

(4)     The adjusted costs are subtracted from net profit data and the results used to calculate the ROE. The resulting ROE is then compared with the ROE before the subtraction of the adjusted costs to determine the impact on the profitability of the businesses. A reduction of more than 10 percent in profitability is considered to indicate a potential for significant adverse economic impacts. This threshold is consistent with the thresholds used by the U.S. EPA and others.

Using publicly available financial data from 2002 to 2004 for the representative businesses, staff calculated the ROEs, both before and after the subtraction of the adjusted annual costs, for the typical businesses from each industry category. These calculations were based on the following assumptions:

(1)     All affected businesses are subject to federal and state tax rates of 35 percent and 9.3 percent, respectively; and

(2)    Affected businesses neither increase the cost to their customers, nor lower their cost of doing business through cost-cutting measures due to the proposed regulation.

These assumptions, though reasonable, might not be applicable to all affected businesses.

The results of the analysis are shown in Table VIII-9 below.  Using the ROE to measure profitability, we found that the ROE range for typical businesses from all industry categories would have declined by less than one percent due to the proposed regulation.  This represents a small decline in the average profitability of the affected businesses.  Overall, most affected businesses  will be able to absorb the costs of the proposed regulation with no significant impacts on their profitability.

**Table VIII-9: ROE Analysis of Businesses**

| SIC Code | Description of SIC Code | Percent Change in ROE |
|---|---|---|
| 4412 | Deep Sea Foreign Transportation of Freight | -0.01 |
| 4424 | Deep Sea Domestic Transportation of Freight | -0.05 |
| 4481 | Deep Sea Passenger Transportation | -0.60 |

Comparison of the Costs of the Proposed Regulation with Vessel Operating Costs

This analysis compares the added costs of the proposed regulation with the normal operating costs of large ocean-going vessels.  While the costs of the proposed regulation are substantial, they are a small fraction of the overall operating costs for these businesses.  For example, based on a typical scenario, a container vessel would pay an extra $5,000 for fuel during visits to two California ports (see Appendix J-Part IV).  We do not expect this cost to have a significant impact on vessel operators, or businesses that rely on the goods transported by these businesses, because the added fuel cost represents a minor percentage of the overall transportation cost.  To put this in perspective, the total operating cost of a single Asia to U.S. West Coast voyage for a typical container vessel is estimated to be about 2 to 3 million dollars.  Therefore, the $5,000 added cost represents less than one percent of the total transportation cost for the voyage, or about a dollar per shipping container for a 5,000 TEU (transport equivalent unit) vessel, out of total costs on the order of $500 per TEU.  (Mercator, *supra*)

As compared to typical cargo vessels, the proposed regulation will have a larger impact on diesel electric-vessels (primarily cruise lines and some tankers).  Nevertheless, we do not think the added costs will significantly impact these vessel operators.  The added cost of the proposal for a typical cruise vessel visit to Mexico from the Los Angeles area would be about $16,000 (see Appendix J-Part III).  Because a typical cruise vessel for this voyage carries about 2,000 passengers (Carnival, 2005a), the added cost would be

about $8 per passenger.  For a relatively low cost 3 or 4 day Mexico cruise, about $350 (Carnival, 2005b), a 2 percent increase in fare would be needed to offset the increased fuel cost.

Because the added costs of the proposed regulation are such as small percentage of the overall operating costs for both cargo and cruise vessels, we do not expect a significant impact on these businesses.  There is also a possibility the proposed regulation will result in a positive impact on business creation due to additional sales of marine fuels in California beginning in 2010, when the 0.1 percent sulfur fuel requirement becomes effective (subject to a feasibility review).  This is because California is expected to have 0.1 percent sulfur fuel available, whereas it is uncertain whether other ports worldwide will have this fuel available.

## H.    Potential Impact on Business Competitiveness

The proposed regulation could potentially affect the ability of California ports and California based vessel operators to compete with ports and vessel operators outside California due to the slight increase in operating costs.  However, we do not believe that the added costs of the proposed regulation are high enough for vessel operators to consider alternative ports outside California.

There are several reasons for this.  First, many vessel operators utilize California ports because there is already a local market for their goods within California, or because California exporters choose to utilize California ports to vessel their goods overseas. Second, other vessel operators find that the overall cost of transporting goods to their final destination beyond California is lowest by using California ports because of the ports' existing and well established infrastructure, including road and rail access.   Third, in some cases, vessel operators would have to factor in the added costs of fuel and other costs of traveling greater distances to non-California ports, which may negate the cost savings in not purchasing the lower sulfur fuel.  Finally, as stated previously, the added costs resulting from the proposed regulation are a small fraction of the overall operating costs of these vessels, and these costs are not expected to result in a significant adverse impact on the profitability of typical companies.

Most of the affected businesses that operate vessels are large businesses and can either absorb or pass-through the increased costs associated with the proposed regulation with no significant impact on their ability to compete with non-California businesses.  Based on these reasons, we do not believe the relatively low costs of this proposed regulation are high enough to significantly affect the competitiveness of those businesses that are integrally linked to the movement of goods through California ports.

## I.    Potential Impact on Employment, Business Creation, Elimination or Expansion

The proposed regulation is not expected to have a noticeable impact on employment, or business creation, elimination, or expansion. As stated above, the added costs of the

proposed regulation are a small percentage of the overall operating costs for both cargo and cruise vessels.  In addition, an analysis of the impact of the proposed regulation on the profitability of typical businesses indicated no significant adverse impacts.

There is also a possibility the proposed regulation will result in a positive impact on business creation due to additional sales of marine fuels in California beginning in 2010, when the 0.1 percent sulfur fuel requirement becomes effective (subject to a feasibility review).  This is because California is expected to have 0.1 percent sulfur fuel available, whereas it is uncertain whether other ports worldwide will have this fuel available.

## J.    Potential Costs to Local, State, and Federal Agencies

Local Agencies

We do not expect any significant fiscal impacts on local agencies.  We are not aware of any local government agency that operates an ocean-going vessel as defined in the proposed regulation.  However, some minor impacts are possible on ports, which in California are established by state government and are operated by entities such as port authorities and departments of municipal governments.

The proposed regulation will increase costs for vessels visiting California ports.  As such, some vessel operators could potentially choose to utilize alternative ports outside of California.  However, as discussed in detail in section G above, we do not believe that this will occur to any significant degree.

We do not expect significant fiscal impacts on local air pollution control agencies due to the proposed regulation because ARB intends to enforce the provisions of the proposal statewide.

State Agencies

We do not expect any significant fiscal impacts on State agencies.  The ARB will need to expend resources to enforce the proposed regulation.  However, these enforcement activities can be conducted with existing resources in the short term.  Eventually, additional resources will be needed as the implementation of this and other port-related measures occur.

The only other State agency identified by ARB staff that could potentially be impacted is the California Maritime Academy (CMA) in Vallejo.  The CMA operates the "Golden Bear" training vessel on an annual overseas voyage.  This vessel already uses only distillate marine fuel, so it probably already complies with the proposed regulation.  However, when the 0.1 percent sulfur marine gas oil requirement becomes effective in 2010 (subject the required feasibility review), there may be an added cost to operate the vessel.

Federal Agencies

We are not aware of any impacts on federal agencies.  Military vessels are exempted from the requirements of the proposed regulation.

## K.    Cost-Effectiveness

For the purposes of this section, cost-effectiveness is defined as the ratio of the cost of compliance per ton of pollution reduced.  Cost-effectiveness figures allow different regulations to be compared to determine the most economic way to reduce a given amount of emissions.

In this section, we calculate the cost-effectiveness in two ways.  First, we attribute the total annual cost of the proposed regulation to each pollutant individually.  This results in the highest cost-effectiveness values, and may overestimate the overall cost-effectiveness of the proposed regulation.  For example, a regulation that resulted in the same costs and diesel PM emission reductions, but no reductions in other pollutants, would have the same cost-effectiveness in terms of diesel PM as the proposed regulation.  Therefore, as an alternative, we also calculate the cost-effectiveness by attributing half of the costs of the proposed regulation to diesel PM reductions, and the other half to reductions in nitrogen oxides (NOx) and sulfur oxides (SOx).

We also discuss the cost-effectiveness for diesel-electric vessels, which will generally incur greater costs.  Finally, we will analyze the cost-effectiveness of some alternative proposals to the proposed regulation recommended by ARB staff.

Cost-Effectiveness of the Proposed Regulation for All Vessels:  Attributes All Costs to Each Pollutant Individually

The estimate of the cost-effectiveness of the proposed regulation for all vessels is shown in Table VIII-10 below, expressed in 2005 dollars.  The cost-effectiveness is expressed in terms of dollars per ton of NOx, diesel PM, and SOx removed, with the total annual cost attributed to each pollutant individually.

The cost-effectiveness estimates for 2010 and later assumes that the 0.1 percent sulfur marine gas oil requirement becomes effective in 2010.  However, this requirement will be subject to the results of a feasibility analysis as required by the proposed regulation that will analyze the available supply of this fuel, cost, and technical feasibility.

**Table VIII-10: Cost-Effectiveness of the Proposed Regulation for All Vessels:
Attributes All Costs to Each Pollutant Individually**

| Year | Total Annual Cost ($ millions) | Emission Reductions* (tons per year) | | | Cost-Effectiveness $/ton and ($/pound) | | |
|---|---|---|---|---|---|---|---|
| | | NOx | PM | SOx | NOx | PM | SOx |
| 2007-2009 | 38 | 575 | 730 | 5,800 | 66,000 ($33) | 52,000 ($26) | 6,600 ($3.20) |
| 2010-2011 | 42 | 575 | 800 | 7,200 | 73,000 ($37) | 53,000 ($27) | 5,800 ($2.90) |

\* The emission reductions and costs shown are based on the 2004 emissions inventory to
be consistent with other 2004 data used.  The emission reductions in 2007 and 2010 will be
greater than the emission reduction figures shown.

The cost-effectiveness of the proposed regulation for diesel PM (as calculated in
Table VIII-10) is similar to other regulations recently adopted by the Board (see Table
VIII-11 below).  For example, the diesel PM cost-effectiveness of the solid waste
collection vehicle rule was estimated at $56,000 per ton, excluding the benefits of NOx
and hydrocarbon reductions.  (ARB, 2003a)  The cost-effectiveness of the stationary
diesel engine airborne toxic control measure (ATCM) was estimated to range from
$8,000 to $51,000 per ton of diesel PM reduced.  (ARB,2003b)  Finally, the transport
refrigeration unit ATCM was estimated to have a cost-effectiveness of $20,000 to
$40,000 per ton of diesel PM reduced.  (ARB, 2003c)

**Table VIII-11: Diesel PM Cost-Effectiveness of the Proposal and Other
Regulations/Measures (Attributes All Costs to Each Pollutant Individually)**

| Regulation or Airborne Toxic Control Measure | Diesel PM Cost-Effectiveness | |
|---|---|---|
| | Dollars/Ton PM | Dollars/ Pound PM |
| Ship Auxiliary Engine Proposal | $52,000 - $53,000 | $26 – 27 |
| Solid Waste Collection Vehicle Rule | $56,000 | $28 |
| Stationary Diesel Engine ATCM | $8,000 - $51,000 | $4 - $26 |
| Transport Refrigeration Unit ATCM | $20,000 - $40,000 | $10 - $20 |

Cost-Effectiveness of the Proposed Regulation for All Vessels:  Attributes Half the Costs
to Diesel PM and Half to NOx plus SOx

In Table VIII-12 below, we calculate the cost-effectiveness by attributing half of the
costs of the proposed regulation to diesel PM reductions, and the other half to
reductions in nitrogen oxides (NOx) and sulfur oxides (SOx).  This may reflect the
overall cost-effectiveness more accurately in that it accounts for the multiple benefits of
the proposed regulation.

**Table VIII-12: Cost-Effectiveness of the Proposed Regulation for All Vessels: Attributes Half of the Costs to Diesel PM and Half to NOx+SOx**

| Year | Half of Total Annual Cost ($ millions) | Emission Reductions (tons per year) | | Cost-Effectiveness $/ton and ($/pound) | |
|------|------|------|------|------|------|
| | | PM | NOx+SOx | PM | NOx+SOx |
| 2007-2009 | 19 | 730 | 6,300 | $26,000 ($13.00) | $3,000 ($1.50) |
| 2010 - 2011 | 21 | 800 | 7,800 | $27,000 ($14.00) | $2,700 ($1.40) |

Cost-Effectiveness for Diesel-Electric Vessels

As explained in section F, the costs of the proposed regulation are greater for diesel-electric vessels because the large diesel generator sets these vessels use for both propulsion and ship-board electrical uses are covered as "auxiliary engines" under the proposed regulation. However, the emission reductions resulting from the use of distillate fuels will increase proportionally with the cost, so the overall cost-effectiveness of the proposed regulation for these vessels is similar to the other types of vessels. This is shown by comparing the cost-effectiveness results of Table VIII-10, for all vessels, to the results in Table VIII-13 below for diesel-electric vessels only. Similarly, the cost-effectiveness for diesel electric vessels would also be comparable to all vessels using the alternative calculation where half of the proposed regulation costs are attributed to diesel PM and half to NOx plus SOx (as calculated in Table VIII-12).

**Table VIII-13: Cost-Effectiveness of Proposal on Diesel-Electric Vessels**

| Year | Total Annual Cost ($ millions) | Emission Reductions (tons per year) | | | Cost-Effectiveness $/ton and ($/pound) | | |
|------|------|------|------|------|------|------|------|
| | | NOx | PM | SOx | NOx | PM | SOx |
| 2006-2009 | 10.7 to 12.3 | 150 | 215 | 1,700 | $71,000-$82,000 ($36 - $41) | $50,000-$57,000 ($25-$29) | $6,300-$7,200 ($3.20-$3.60) |
| 2010 - 2011 | 11.6 to 13.2 | 150 | 240 | 2,000 | $77,000-$88,000 ($39-$44) | $48,000-$55,000 ($24-$28) | $5,800-$6,600 ($2.90-$3.30) |

* Total industry fuel cost of $10.3 million ($11.2 in 2010), and annualized capital cost of 0.4 to 2 million. Annualized capital costs based on a range in retrofit costs per vessel of $100,000-$500,000 for 17 vessels reported in the ARB Ship Survey, a five year life, and 5% discount rate. Emission reductions estimated using the proportion of heavy fuel oil consumption by cruise ships compared to all vessels (~37%) and applying this ratio to total emission reductions from the proposed regulation.

**L.    Analysis of Alternatives**

In this section, we compare the cost-effectiveness of the proposed regulation to two of the four alternative control options discuss in Chapter V.  We do not discuss the cost-effectiveness of two additional alternatives discussed in Chapter V because ("Do Nothing" and "Rely on U.S. EPA and IMO Regulations") because there are no added costs associated with them.

As described below, the two alternatives analyzed would achieve significantly less emission reductions and associated health benefits.  However, the cost of these alternatives would also be lower, resulting in similar cost-effectiveness to the proposal.

Alternative 1: Use Marine Gas Oil at Dockside Only

Under this alternative, ocean-going vessels visiting California ports would only be required to use marine distillate fuels at dockside.  The emission reductions under this proposed alternative would be reduced by a minimum of 40 percent compared to the proposed regulation because the emissions from auxiliary engines on vessels at sea within the 24 nm boundary during transit would no longer be controlled.  The actual reduction in emission reductions would be greater if auxiliary engines are allowed to transition from one fuel to another at dockside, since such transitions can take an hour or more.  The recurring fuel costs associated with the proposed regulation would be reduced proportionally with the reduction in emissions.

The impact of this alternative on modification costs is difficult to estimate.  There will probably be some reduction in retrofit costs, particularly with the diesel-electric vessels that would benefit most from this alternative.  For example, such vessels may not need an additional tank for storing higher quantities of distillate fuel if the fuel will only be used at dockside.  However, given the variabilities involved, we cannot quantify with certainty the reduction in retrofit costs under this alternative.  Nevertheless, looking at the overall industry costs, the retrofit costs are relatively small compared to the recurring added fuel costs.  Therefore, the overall cost-effectiveness of the alternative is expected to be similar to the proposed regulation.

Alternative 2: Diesel-Electric Vessels

Under this alternative, diesel electric vessels would have three compliance options: (1) use distillate fuels only at dockside as in Alternative 3 above; (2) use 1.5% sulfur heavy fuel oil within the 24 nautical mile boundary and at dockside; or (3) retrofit vessels to use shoreside electrical power and connect at California terminals where the facilities are available.

Under the first option, the same situation applies as in Alternative 3, except that the option only applies to diesel-electric vessels (primarily cruise vessels).  This option

would achieve significantly less emission reductions and the cost would be reduced proportionately.  The cost-effectiveness is expected to be similar to the staff's proposal.

For the option to use 1.5 percent sulfur heavy fuel oil, the estimated PM emission reductions are expected to be significantly less (about 18 percent versus 75 percent for staff's proposal).  SOx emissions would be reduced by about 44 percent versus 80 percent for staff's proposal, and there would be no NOx reductions.   On the other hand, the cost of the 1.5 percent sulfur heavy fuel is currently much less than marine gas oil.  As a result, the cost of this option would be considerably less than the cost associated with staff's proposal.  Overall, we expect that the PM cost-efffectiveness of this option would be in the same range as the proposed regulation.

The third option, utilizing cold ironing where available is difficult to analyze because vessels modified for cold ironing would only plug into shoreside power if it is available.  To date, only a few California port terminals have shoreside power facilities installed.  Additional facilities are anticipated at the Ports of Los Angeles, Long Beach and Oakland.  However, it will be several years before new additional shoreside power facilities are operational.  As a result, we cannot quantify the emissions reductions for this option at this time.

Overall, the emission reductions from any of these options under this alternative would be significantly less than the ARB staff proposal, although the cost-effectiveness would be similar.


**REFERENCES**

(ARB, 2003a) Air Resources Board, *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Proposed Diesel Particulate Matter Control Measure for On-Road Heavy-Duty Residential and Commercial Solid Waste Collection Vehicles*, June, 2003.

(ARB, 2003b) Air Resources Board, *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Airborne Toxic Control Measure for Stationary Compression-Ignition Engines*, September, 2003.

(ARB, 2003c) Air Resources Board, *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Airborne Toxic Control Measure for In-Use Diesel-Fueled Transport Refrigeration Units (TRU) and TRU Generator Sets, and Facilities Where TRUs Operate*, October, 2003.

(ARB, 2005) Air Resources Board, *Air Resources Board Oceangoing Vessel Survey*, January, 2005.

(Beicip Franlab, 2002) *Advice on the Costs to Fuel Producers and Price Premia Likely to Result from a Reduction I the Level of Sulphur in Marine Fuels Marketed in the EU*, Beicip-Franlab, April 2002.

(Bunkerworld, 2005) Bunkerworld Website, Monthly Bunker Prices for March 2005 to September 2005 at Singapore, Fujairah, and Rotterdam.
http://www.bunkerworld.com/markets/prices/sg_sin_monthly_fpr.html (Singapore).
http://www.bunkerworld.com/markets/prices/ae_fjr_monthly_fpr.html (Fujairah).
http://www.bunkerworld.com/markets/prices/nl_rtm_monthly_fpr.html (Rotterdam).
Website locations visited September 14, 2005..

(Carnival, 2005a) Carnival Cruise Lines website, Carnival: The Fun Ships.
http://www.carnival.com/Ship_Detail.aspx?shipCode=PA.  Site visited July 29, 2005..

(Carnival, 2005b) Carnival Cruise Lines website, Carnival: The Fun Ships.
http://www.carnival.com/cms/static_templates/promos/LA_cruises.aspx.  Site visited July 29, 2005>.

(Croner, 2002)  Croner, Per and Gorton, Sara. "*Experience from Operation on MDO and Low Sulphur Fuel on M/S Turando*t," Oslo Bunker Conference, April 25, 2002.

(CSLC, 2005)  California State Lands Commission Ballast Water reporting data for 2003 and 2004 as provided in August 3, 2005 email correspondence to ARB staff.

(EPA, 2002) United States Environmental Protection Agency, *Control of Emissions of Air Pollution from New Marine Compression-Ignition Engines at or Above 30 Liters/Cylinider*, Notice of Proposed Rulemaking, April 30, 2002, Table VI.F-1.

(Entec, 2002) Entec UK Limited.  *Quantification of Emissions from Ships Associated with Ship Movements between Ports in the European Community*, July 2002, p. 87.

(Mercator, 2005) Mercator Transport Group*, Forecast of Container Vessel Specifications and Port Calls Within San Pedro Ba*y, February 10, 2005, Table III-5, p. 109.

(Seafarers, 2005) Seafarers International Union. *Tanker Alaskan Frontier Delivered (8/13)*, http://www.seafarers.org/HeardAtHQ/2004/Q3/afrontrelease.xml.  Site visited August 26, 2005..

## IX.    ADDITIONAL CONSIDERATIONS

In this chapter, we discuss additional technical and policy issues that were addressed in developing the proposed regulation for auxiliary engines on ocean-going vessels. These include the impacts on infrequent visitors to California ports, diesel-electric vessels, the over-water boundary covered by the proposal, and the scope of the Alternative Compliance Plan (ACP) provision.

## A.    Ocean-going Vessels that Require Modifications to Comply

We estimate that a small percentage of vessels will require modifications to comply with the proposed regulation.  For example, we estimate that about 5 percent of non-diesel-electric vessels (which make up nearly 98 percent of the vessels visiting California ports) will require retrofits.  However, for the minority of vessels that require modifications, the proposed regulation may pose additional challenges.  For example, industry representatives have stated that there are a limited number of shipyards available to perform vessel modifications, and it may be difficult to perform the required changes by the January 1, 2007 effective date of the proposed regulation.

In addition, industry representatives have stated that it may be impractical and burdensome to perform vessel modifications on vessels that only occasionally visit California ports.  In fact, based on California State Lands Commission data, roughly half of the nearly 2,000 unique vessels that visited California in 2004 only visited once or twice.  Although only about 5 percent of these vessels may need modifications, these infrequent visitors that require modifications would still constitute a significant percentage of the overall visits to California ports.  Therefore, it is important that these emissions be controlled under the proposed regulation.

To address the above concerns, two options have been included in the Noncompliance Fee Provision as discussed below.  Under the Noncompliance Fee Provision, vessel operators can pay a fee in lieu of complying with the emission standard in the proposed regulation.  The funds collected would be deposited in an account that would provide resources for port and marine related emission reduction projects.  The objective is to reduce equivalent or greater emissions in the same general area more cost-effectively. The fee will be designed to encourage direct compliance with the proposed regulation by ensuring that the use of the provision does not provide an economic advantage relative to the cost of direct compliance with the proposal.

<u>Vessels that Cannot Complete Modifications by January 1, 2007</u>

Under this option, vessel operators may pay a noncompliance fee if they can demonstrate that they cannot complete the necessary modifications prior to the January 1, 2007 effective date of the emission limits in the proposed regulation.  To utilize this option, vessel operators must submit a "Compliance Retrofit Report," signed by the Chief Engineer of the vessel which identifies the modifications needed to comply

with the proposed regulation, demonstrates that the modifications will be made at the earliest possible date, and provides the date when modifications will be completed.

### Infrequent Visitors that Require Modifications

Under this option, a vessel operator could pay the noncompliance fee in lieu of compliance for a vessel requiring modifications up to a maximum of two California port visits per calendar year, and four California port visits over the life of the vessel (starting on January 1, 2007). The vessel operator must demonstrate that vessel modifications are necessary to comply with the proposed regulation and commit to the visitation limits.

## B.    Vessel Noncompliance for Reasons Beyond the Reasonable Control of the Vessel Owner/Operator

In certain limited situations, vessel owners or operators may not be able to comply with the proposed regulation for reasons beyond their reasonable control. Instead of providing an exemption for these situations, staff is proposing to allow use of the "noncompliance fee" provision. The situations where this provision could be utilized include the following:

- the vessel was redirected to a California port and the vessel does not have sufficient quantity of fuel that meets the requirements of the proposal;
- the vessel operator was not able to acquire a sufficient quantity of complying fuel; or
- the fuel was found to be noncompliant in route to a California port.

To utilize this option, vessel operators must demonstrate through adequate documentation that noncompliance resulted from circumstances beyond their reasonable control.

We believe it is important to retain the fee schedule for vessels that do not comply under these circumstances, as opposed to an exemption or variance, to prevent the creation of a loophole in the proposal. In addition, vessel visits occur too quickly to allow for a detailed review of the information necessary to determine whether a variance or exemption is justified.

## C.    Diesel-Electric Vessels

Diesel-electric vessels are vessels that use large diesel engines coupled to generators ("gen-sets") to produce electrical power which propels the vessel and provides ship-board electricity. This is in contrast to typical cargo vessels where a large main engine provides propulsion, and separate smaller diesel gen-sets ("auxiliary engines") provide electrical power for ship-board uses. The large gen-sets on diesel-electric vessels are defined as "auxiliary engines" in the proposed regulation and thus are subject to the requirements of the proposed regulation the same as the smaller gen-sets on cargo vessels.

Industry representatives have stated that it is inappropriate to regulate the large gen-sets on diesel-electric vessels as "auxiliary engines" because they are used for propulsion as well as ship-board electricity and the costs of the proposal are disproportionately high for diesel-electric vessels.  They have also stated that we may inadvertently drive the industry away from cleaner diesel-electric vessels to higher polluting two-stroke direct drive configurations common in most other types of vessels.

Industry representatives have suggested a number of alternative regulatory approaches to address these diesel-electric vessels including the following: (1) limiting the control of these vessels to the portion of power used for ship-board electrical uses (i.e. exempt the portion of power generated for propulsion); (2) limit the requirements of the proposal to dockside operation; and (3) require the use of 1.5 percent sulfur heavy fuel oil instead of the distillate fuels specified in the proposed rulemaking.

Staff believes it is appropriate to control all of the emissions from the large gen-set engines on diesel-electric vessels because the proposal represents a technically feasible and cost-effective means of controlling their emissions.  These large gen-set engines are mechanically similar to the smaller auxiliary engines.  Specifically, both engines are four-stroke, medium speed engines, and both are used in generator set applications.  We are not addressing the main engines in other types of vessels because they are predominantly two-stroke engines that are mechanically very different, and because the use of marine distillate fuels in these engines introduces additional challenges compared to four-stroke medium speed engines.  We plan to address main propulsion engines in future efforts.

We agree that the added cost on the operators of diesel-electric vessels will be significantly higher than for operators of other vessel types.  Specifically, because the gen-sets on diesel-electric vessels are used for propulsion as well as ship-board electrical uses, the amount of fuel used in these engines is much greater and the impact of using the distillate fuels specified in the proposal would be proportionately higher.  However, as explained in Chapter VIII, Economic Impacts, the impacts on operators of these vessels are not expected to result significant adverse impacts on their profitability, and the control of these vessels is equally cost-effective compared to other vessels because the emission reductions increase commensurately with the cost.

We do not believe that the proposal will lead the industry away from diesel-electric vessels.  As mentioned above, we plan to address the emissions from the main engines not covered by the proposed regulation at a later date.  In addition, as discussed in Chapter VIII, the added cost resulting from the proposed regulation is generally a small percentage of vessels' overall operating costs.  Finally, diesel-electric vessels have advantages that were considered in the design of vessel and its intended function.  For example, cruise vessels sometimes operate at less than maximum speed and can run more efficiently by operating some (but not all) of their gen-sets at relatively high loads where they are more fuel-efficient, as opposed to running a single large engine at a less

fuel efficient load.  In addition, diesel-electric vessels generally have several gen-sets which provide for redundancy in the case of an engine failure.

## D.    Scope of the Alternative Compliance Plan

The Alternative Compliance Plan (ACP) was included in the proposed regulation to allow vessel owner/operators with the flexibility to implement alternative emission control strategies that achieve equivalent or greater emission reductions than the fuel requirements specified in the proposal.  Alternative emission control strategies may include the use of shore-side electrical power, engine modifications, exhaust treatment devices such as diesel oxidation catalysts, the use of alternative fuels or fuel additives, and operational controls such as limits on idling time.

As proposed, the ACP allows a company with a fleet of vessels to average its auxiliary engine emissions over all the vessels in the fleet such that the total emission reduction achieved is equivalent to or greater than the emission reductions that would have occurred if all these vessels complied with the fuel provisions in the proposal.  For example, a company with a vessel that frequently visits California ports could achieve greater emission reductions than required on that vessel to offset higher emissions from one or more other vessels.  However, the ACP does not allow inter-fleet averaging (i.e. averaging among the fleets of two different companies).  The ACP provision also does not allow emission reductions from main engines, or other sources not classified as vessel auxiliary engines.  We believe this limitation is necessary to ensure that the complexity of the program will not adversely affect the ability of ARB staff to ensure ongoing compliance under an ACP.  In addition, limiting the provision to auxiliary engines will ensure that emission reductions achieved farther offshore are not traded for fewer reductions close to shore, where diesel PM emission reductions are most critical to reducing the potential cancer risk.

## E.    Enforcement of the Proposed Regulation

Enforcement of this regulation will be achieved through random inspections of records and fuel sampling/testing.  Specifically, records will be inspected to determine when vessels were traveling within "Regulated California Waters" and what fuel was used during this time.  Records on quantity of fuel purchased, the fuel type, and the sulfur content of the fuel will be reviewed to determine compliance.  As appropriate, fuel sampling will be conducted during the vessel inspection.  Fuel samples will be analyzed to ensure that they meet the ISO specifications for the fuel type and do not exceed the sulfur content limits under ISO or the regulation.

Given the large number of vessels and relatively lengthy inspection time per vessel, we envision using vessel visit data to prioritize inspection resources.  One approach will be to focus on the vessels that are the most frequent visitors to California ports.  Inspection priority could also be directed to vessels that are complying using an alternative compliance plan.

As a long term goal, ARB staff would like to transition from compliance data being recorded in logs maintained on the vessel, to automated electronic data devices that can store and transmit data needed to assess compliance.  We are aware of technology that potentially would allow continuous monitoring of key parameters such as fuel flow and vessel positions.  This information could be recorded in a data logger.  Such information could be accessed during an inspection or transmitted to a shore-based receptor.

 ARB staff plans to work with vessel owners and equipment suppliers to develop and field test data recording and submittal systems that can provide compliance data on a real-time basis.