1   Kurt R. Wiese, District Counsel, SBN 127251
    Barbara B. Baird, Principal Deputy Counsel, SBN 81507
2   Michael R. Harris, Sr. Deputy District Counsel, SBN 179544
    SOUTH COAST AIR QUALITY
3      MANAGEMENT DISTRICT
    21865 Copley Drive
4   Diamond Bar, CA 91765-0940
    Telephone: (909) 396-3535
5   Facsimile: (909) 396-2961
    Email: bbaird@aqmd.gov, mharris@aqmd.gov
6
    Attorneys for Intervenor
7   South Coast Air Quality Management District

8

9                  UNITED STATES DISTRICT COURT

10         EASTERN DISTRICT OF CALIFORNIA -- SACRAMENTO

11  PACIFIC MERCHANT SHIPPING          )   Case No.  2:06-CV-02791-WBS-KJM
    ASSOCIATION, a California Mutual Benefit )
12  Corporation,                       )   **DECLARATION OF BARBARA BAIRD IN**
                                       )   **SUPPORT OF THE SOUTH COAST AIR**
13                Plaintiff,           )   **QUALITY MANAGEMENT DISTRICT'S**
                                       )   **OPPOSITION TO PLAINTIFF PACIFIC**
14        v.                           )   **MERCHANT ASSOCIATION'S MOTION**
                                       )   **FOR SUMMARY JUDGMENT AND**
15  CATHERINE E. WITHERSPOON, in her   )   **PARTIAL SUMMARY JUDGMENT;**
16  official capacity as Executive Officer of the )   **EXHIBITS A-E THERETO**
    California Air Resources Board,     )
17                                     )
               Defendant,              )   Date:      July 9, 2007
18                                     )   Time:      2:00 p.m.
    NATURAL RESOURCES DEFENSE          )   Judge:     Hon. William B. Shubb
19  COUNCIL, INC., COALITION FOR CLEAN )   Courtroom: 5
    AIR, INC., SOUTH COAST AIR QUALITY )
20  MANAGEMENT DISTRICT, and CITY OF   )
    LONG BEACH,                        )
21                                     )
                                       )
22         Defendants-Intervenors.     )
                                       )
23  _____

24

25        I, Barbara Baird, declare as follows:

26        1.      I am one of the counsel of record for Defendant-Intervenor South Coast Air Quality

27  Management District ("District").  I make this Declaration of my own personal knowledge and, if

28  called as a witness, could and would testify competently thereto.

                                    -1-

1      2.      Attached hereto as Exhibit A is a true and correct copy of materials obtained from

2    Plaintiff PMSA's website on June 12, 2007.

3      3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from Plaintiff

4    PMSA's Response to Interrogatories Propounded by Defendant Witherspoon.

5      4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from Plaintiff

6    PMSA's Response to Request for Admission Propounded by Defendant Witherspoon.

7      5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the

8    California Air Resources Board (CARB) Staff Report: Initial Statement of Reasons (ISOR) for the

9    proposed rulemaking that are cited in South Coast Air Quality Management District's Opposition to

10   PMSA's Motion for Summary Judgment.

11     6.      Attached hereto as Exhibit E is a true and correct copy of excerpts from the CARB

12   Final Statement of Reasons for the Proposed Rulemaking (FSOR) that are cited in South Coast Air

13   Quality Management District's Opposition to PMSA's Motion for Summary Judgment.

14     I declare under penalty of perjury under the law of the United States of America that the

15   foregoing is true and correct.

16     Executed at Diamond Bar, California, on June 13, 2007.

17

18                                   _Barbara B. Baird_

19                                   Barbara B. Baird

20

21

22

23

24

25

26

27

28

# EXHIBIT A

### PMSA Website
### "Global Green"

Exhibit A, Pg. 1





# Global Green

## Cleaner Engines and Cleaner Burning Fuels

PMSA member companies are already proactively working to reduce emissions by exploring the use of a wide variety of cleaner fuels, engines, and retrofit technologies that exceed any existing requirements. These strategies are constantly evolving as new fuels and technologies become available and include clean burning biofuels; employing new "clean diesel" engine and retrofit technologies; experimenting with new technologies, such as propane and natural gas fueled terminal equipment; and taking other innovative steps to improve west coast air quality.

- Many PMSA members are using low or ultra-low sulfur diesel. Other members are exploring the use of ethanol blended diesel, emulsified diesel, biodiesel, propane and LNG-powered terminal equipment. Electric cranes and retrofitting engines are other ways many PMSA members are lowering emissions.

- Using diesel oxidation catalysts and emulsified diesel in terminal yard equipment at the Ports of Los Angeles and Long Beach has led to major reductions in NOx and diesel particulates.
- The Port of Seattle and its tenants have teamed up for a voluntary initiative to reduce cargo handling equipment diesel emissions by retrofitting vehicles and equipment, installing diesel oxidation catalysts, and encouraging the use of low-sulfur diesel and biodiesel. Terminals in California have already taken these steps to reduce emissions.
- All on-terminal operations at the Port of Tacoma now run on ultra-low sulfur diesel, a biodiesel-low sulfur diesel blend or clean burning propane. The port is also experimenting with gasoline-electric hybrid and fully electric vehicles. In 2005, the port invested in diesel oxidation catalysts to further lower equipment emissions, with an Environmental Protection Agency grant.
- All PMSA members are in compliance with new California Air Resources Board (CARB) regulations requiring the use of low-sulfur diesel fuel in vessels in California waters. Voluntary participation in the Southern California vessel speed reduction program began in May 2001. This program has been responsible for reducing NOx emissions at the Ports of Long Beach and Los Angeles by more than 440 tons per year

Exhibit A, Pg. 2

- Many PMSA members calling at the Port of Seattle have committed to using lower sulfur fuel in their engines while at dock.  In 2006, 50 percent of all ships entering and leaving the Port of Tacoma have committed to using low-emission fuel in their auxiliary engines, and 25 percent have committed to using low-sulfur fuel while in the Puget Sound airshed.
- PMSA members in California are working with CARB to accelerate the turnover of cargo handling equipment at marine terminals to newer, cleaner engine technologies; offering pollution reductions of over 90 percent.
- PMSA recently conducted emissions testing in conjunction with CARB, terminal operators and the University of California at Riverside to provide more data on the comparative benefits of LNG and clean diesel in powering yard tractors.
- Our industry has also partnered with CARB, US EPA, the Ports of Los Angeles and Long Beach and other state and local regulators to test innovative fuel emulsification technology that could reduce emissions of nitrogen oxides from vessels by as much as 20 percent.
- PMSA members are using Selective Catalytic Reduction, technology proven to treat exhaust from ships, reducing 65 tons of nitrogen oxide and carbon monoxide per ship per year.

**Puget Sound Maritime Air Emissions Inventory**

The Puget Sound Maritime Air Emissions Inventory (EI) establishes a detailed baseline of emissions from maritime-related diesel equipment operating within the greater Puget Sound region. It was conducted voluntarily and in advance of any regulatory directive to provide a strong technical foundation to support future policy decisions. The inventory is not a policy document and does not include policy recommendations.

PMSA participated in this effort as a funding partner and steering committee member.  The EI is a tool to adjust ongoing mitigation efforts for an area still in attainment with federal standards. PMSA members are leading the way through a number of pilot projects and voluntary efforts to reduce emissions.

The overview and executive summary of the EI are available at: http://www.maritimeairforum.org/emissions.shtml

Exhibit A, Pg. _3_

# EXHIBIT B

### PMSA Response
### to CARB Interrogatories

Exhibit B, Pg. _4_

1  Erich P. Wise/State Bar No. 63219
   Nicholas S. Politis/State Bar No. 92978
2  Aleksandrs E. Drumalds/State Bar No. 237101
   FLYNN, DELICH & WISE LLP
3  One World Trade Center, Suite 1800
   Long Beach, California 90831-1800
4  Telephone: (562) 435-2626
   Facsimile:  (562) 437-7555

5  James B. Nebel/State Bar No. 69626
   Conte C. Cicala/State Bar No. 173554
6  FLYNN, DELICH & WISE LLP
   One California Street, Suite 350
7  San Francisco, California
   Telephone:  (415) 693-5566
8  Facsimile:   (415) 693-0410

9

10 Attorneys for Plaintiff
   PACIFIC MERCHANT SHIPPING ASSOCIATION,
11 a California Mutual Benefit Corporation

12              UNITED STATES DISTRICT COURT

13       EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO

14

15 PACIFIC MERCHANT SHIPPING        )  CASE NO.: 2:06-CV-02791-WBS-KJM
   ASSOCIATION, a California Mutual  )
16 Benefit Corporation,             )  PLAINTIFF'S RESPONSE TO FIRST
                                    )  SET OF INTERROGATORIES
17            Plaintiff,            )  PROPOUNDED BY DEFENDANT
                                    )  CATHERINE E. WITHERSPOON
18      vs.                         )
                                    )
19 CATHERINE E. WITHERSPOON, in     )
   her official capacity as Executive )
20 Officer of the California Air    )
   Resources Board,                 )
21                                  )
             Defendant,             )
22                                  )
   NATURAL RESOURCES                )
23 DEFENSE COUNCIL, INC.,           )
   COALITION FOR CLEAN AIR,         )
24 INC., SOUTH COAST AIR            )
   QUALITY MANAGEMENT               )
25 DISTRICT, and CITY OF LONG       )
   BEACH,                           )
26                                  )
         Defendants-Intervenors     )

27

28                              - 1 -

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

PROPOUNDING PARTY:        Defendant CATHERINE E. WITHERSPOON

RESPONDING PARTY:         Plaintiff PACIFIC MERCHANT SHIPPING

                          ASSOCIATION

SET NUMBER:               One


**INTERROGATORIES**

**Interrogatory No. 1:**

    For each PMSA VESSEL, identify whether it has or will comply with

CARB'S REGULATIONS by using one of CARB'S SPECIALIZED FUELS, or by

some other method.  If some other method, please state what that method is.

**Response:**

    To the extent that this interrogatory requests a vessel-by-vessel inventory of

the method of compliance, PMSA objects on the grounds that this interrogatory is

overly broad and burdensome.  Without waiving such objections, as far as PMSA

knows, all of its members are complying by use of the fuels listed in subsection

(e)(1)(A) of the regulations and/or cold ironing for some vessels at the dock.  With

respect to the standards applicable commencing January 1, 2010, the method or

methods of compliance that will be employed are unknown.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

- 2 -

# EXHIBIT C

**PMSA Response to CARB
Request for Admissions**

*Exhibit C, Pg.* 7

Erich P. Wise/State Bar No. 63219
Nicholas S. Politis/State Bar No. 92978
Aleksandrs E. Drumalds/State Bar No. 237101
FLYNN, DELICH & WISE LLP
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
Telephone: (562) 435-2626
Facsimile: (562) 437-7555

James B. Nebel/State Bar No. 69626
Conte C. Cicala/State Bar No. 173554
FLYNN, DELICH & WISE LLP
One California Street, Suite 350
San Francisco, California
Telephone: (415) 693-5566
Facsimile: (415) 693-0410

Attorneys for Plaintiff
PACIFIC MERCHANT SHIPPING ASSOCIATION,
a California Mutual Benefit Corporation

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO

| | |
|---|---|
| PACIFIC MERCHANT SHIPPING ASSOCIATION, a California Mutual Benefit Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CATHERINE E. WITHERSPOON, in her official capacity as Executive Officer of the California Air Resources Board, <br><br> Defendant, <br><br> NATURAL RESOURCES DEFENSE COUNCIL, INC., COALITION FOR CLEAN AIR, INC., SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, and CITY OF LONG BEACH, <br><br> Defendants-Intervenors | CASE NO.: 2:06-CV-02791-WBS-KJM <br><br> PLAINTIFF'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT CATHERINE E. WITHERSPOON |

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

1

**Request for Admission No. 5:**

Some of the NOx emitted from AUXILIARY ENGINES on PMSA

VESSELS while the vessels are transiting within three nautical miles of California's

shore is transported by wind to land within California.

**Response to Request for Admission No. 5:**

Admitted.

**Request for Admission No. 6:**

Some of the NOx emitted from AUXILIARY ENGINES on PMSA

VESSELS while the vessels are transiting between three and twenty-four nautical

miles of California's shore is transported by wind to land within California.

**Response to Request for Admission No. 6:**

Admitted.

**Request for Admission No. 7:**

Some of the SOx emitted from AUXILIARY ENGINES on PMSA

VESSELS while the vessels are transiting within three nautical miles of California's

shore is transported by wind to land within California.

**Response to Request for Admission No. 7:**

Admitted.

FLYNN, DELICH & WISE LLP
ATTORNEYS AT LAW
One World Trade Center, Suite 1800
Long Beach, California 90831-1800
(562) 435-2626

PLAINTIFF'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION
PROPOUNDED BY DEFENDANT CATHERINE E. WITHERSPOON
Exhibit C, Pg. 9

# EXHIBIT D


**CARB Staff Report**

**Initial Statement of Reasons
"ISOR"**



*California Environmental Protection Agency*

# AIR RESOURCES BOARD

## STAFF REPORT: INITIAL STATEMENT OF REASONS FOR PROPOSED RULEMAKING



## PROPOSED REGULATION FOR AUXILIARY DIESEL ENGINES AND DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES OF THE CALIFORNIA BASELINE

**Stationary Source Division
Emissions Assessment Branch
October 2005**

**EXECUTIVE SUMMARY**

Air pollution from maritime port activities is a significant and growing concern in California. Diesel-powered vehicles and engines at the ports emit soot, or diesel particulate matter (PM), and other air pollutants than can increase health risks to nearby residents. Port operations are also a significant source of oxides of nitrogen (NOx) which can contribute to the formation of regional smog, or ozone, and fine particulate matter.

Living in any area impacted by air pollution is harmful, particularly for children, the elderly, and those with compromised health. The communities closest to port operations face even greater impacts and have a greater localized risk due to exposures to high levels of diesel PM. This pollutant poses a lung cancer hazard for humans, and causes non-cancer respiratory and cardiovascular effects that increase the risk of premature death. In addition, in many cases, the populations nearby ports are economically disadvantaged and less able to obtain quality health care to address air pollution-related illnesses.

Unless substantial additional control measures are implemented, port-related emissions are expected to significantly increase as trade grows over the next 15 to 20 years. While the movement of goods through California ports is a vital component of the State's overall economy and provides a key link to international trade, it is essential that aggressive steps be taken to counter the projected emissions increases and ensure that the port-related emissions are reduced to health protective levels.

As one of several steps being taken to reduce emissions from port activities, the Air Resources Board (ARB) staff is proposing a regulation to reduce emissions from ocean-going vessel auxiliary engines. Implementation of this regulation will be an important and necessary step in the effort to improve the public health in communities near ports. A recent ARB study has shown that diesel PM emissions from hotelling (auxiliary engine emissions while vessels are moored) are the largest contributor of toxic pollutants to neighboring communities. The proposed regulation would reduce the emissions of diesel PM, NOx, sulfur oxides (SOx), and "secondarily" formed PM (PM formed in the atmosphere from NOx and SOx). The proposed regulation will reduce emissions from ocean-going vessel auxiliary engines through the use of cleaner marine distillate fuels, or equally effective alternative controls. This would result in immediate, substantial reductions in emissions upon implementation in 2007. Specifically, for the nearly 80 percent of vessels currently using heavy fuel oil in their auxiliary engines, compliance with the proposed regulation will result in an estimated 75 percent reduction in diesel PM, 80 percent reduction in SOx, and 6 percent reduction in NOx.

This proposed regulation is one of several measures currently under consideration that will continue progress in meeting the air quality goals defined in the Diesel Risk Reduction Plan and the State Implementation Plan and that will help offset the projected emissions increases in port-related emissions. Other regulations being proposed include measures to reduce emissions from cargo handling equipment, commercial

ISOR

ES-1

Exhibit D, Pg. 12



**Figure ES-1:  Ocean-going Vessel Auxiliary Engine Diesel PM Emissions Estimates Projected to Year 2020**

8.    **What are the exposures and potential heath risks from ocean-going vessel auxiliary engine emissions?**

The majority of California's ports are in urban areas and, in most cases, are located near where people live, work, and go to school.  This results in substantial exposures to diesel PM emissions from the operation of vessel auxiliary engines California. Exposures to these emissions can result in increased cancer risk and non-cancer health impacts, such as premature death, irritation to the eyes and lungs, allergic reactions in the lungs, and asthma exacerbation.

Because analytical tools to distinguish between ambient diesel PM emissions from vessel auxiliary engines and that from other sources of diesel PM do not exist, we cannot measure the actual exposures to emissions from auxiliary engines.  However, modeling tools can be used to estimate potential exposures.  To investigate the potential risks from exposures to the emissions from auxiliary engines, ARB staff used dispersion modeling to estimate the ambient concentration of diesel PM that results from the operation of ocean-going vessel auxiliary engines that visit the Port of Los Angeles (POLA) and the Port of Long Beach (POLB).  The study area was a 20-mile by 20-mile grid centered on POLA and POLB.

The activities of vessel auxiliary engines resulted in significant cancer risk and other PM related health impacts on the nearby residential areas.  Figure ES-2 shows the estimated cancer risk isopleths for diesel PM emissions from vessel auxiliary engines (during transiting, maneuvering, and hotelling) at the Ports of Los Angeles and Long Beach superimposed on a map that covers the ports and the nearby communities.

*1 SOR*

ES-6

Exhibit D, Pg. 13

ARB estimated the area in which the cancer risks are predicted to exceed 100 in a million to be about 13,500 acres with an exposed population of about 225,000.  For the cancer risk level over 200 in a million, the impacted area is estimated to be about 2,260 acres, with an exposed population of about 48,000 people.  Overall, about 99.5 percent of the study area (excluding port property and the surrounding ocean area) has an estimated cancer risk level of over 10 in a million due to auxiliary engine emissions.  We estimate that about 2 million people live in the study area.  ARB staff believes that the results from this analysis provide quantitative results for exposures around the Ports of Los Angeles and Long Beach and indicate that elevated risks also occur at other ports in California.

**Figure ES-2: Estimated Diesel PM Cancer Risk from Vessel Auxiliary Engine Activity at POLA and POLB (Wilmington Met Data, Urban Dispersion Coefficients, 80th Percentile Breathing Rate, Emission = 405 TPY, Modeling Receptor Domain = 20 mi x 20 mi, Resolution = 200 m x 200 m)**



ISoR

ES-7

Exhibit D, Pg. 14

ARB staff also estimated the potential non-cancer impacts associated with exposure to diesel PM from ocean-going vessel auxiliary engines. The non-cancer health effects evaluated include premature death, asthma attacks, work loss days, and minor restricted activity days due to diesel PM emissions from auxiliary engines. Based on the analysis, staff estimates that the average number of cases statewide per year that would be expected from exposure to the 2004 ocean-going vessel diesel PM emission levels are as follows:

- 31 premature deaths (for ages 30 and older), 16 to 48 deaths as 95% confidence interval (CI);
- 830 asthma attacks, 202 to 1,457 as 95% CI;
- 7,258 days of work loss (for ages 18-65), 6,143 to 8,370 as 95% CI;
- 38,526 minor restricted activity days (for ages 18-65), 31,403 to 45,642 as 95% CI.

9.    **What does the proposed regulation require?**

Under the proposed regulation, vessel operators are required to reduce diesel PM, NOx and SOx emissions to levels equivalent to the emissions levels that would occur if cleaner-burning distillate fuels were used. To meet this requirement, we expect that most vessel operators will elect to use the distillate fuels specified in the proposal. However, some may decide to implement an alternative emission control strategy that would achieve equivalent or greater emission reductions. Specifically, under the proposal, starting on January 1, 2007, vessel operators can comply by using one of the following distillate fuels when operating their auxiliary engines within 24 nm of the California Coastline: (1) marine gas oil (MGO); or (2) marine diesel oil (MDO) with less than or equal to 0.5 percent by weight sulfur. A 0.5 percent sulfur limit is specified for MDO because it tends to have a higher sulfur level than MGO. MGO is expected to average at or below 0.5 percent sulfur in California based on the results of a survey sent to vessel operators in 2005.

Starting on January 1, 2010, marine gas oil meeting a 0.1 percent sulfur limit is specified under the proposed regulation. This lower sulfur fuel will result in additional emission reductions of PM and SOx, compared to the January 1, 2007 requirement. This standard is consistent with a recently adopted European Union regulation. However, a feasibility analysis is required under the proposed regulation prior to implementation of this fuel requirement to investigate the supply, cost, and technical feasibility of using this fuel. Based on the results of this evaluation, modifications to this requirement could be proposed to the Board.

While ARB has the authority to regulate ocean-going vessel emissions, we recognize that uniform national or international regulation of vessel emissions would be preferable to most vessel operators. As such, we have included a provision in the staff's proposal that requires the Executive Officer to propose terminating or modifying the requirements of this proposal to the Board if the United States Environmental Protection Agency

ISOR

ES-8

Exhibit D, Pg. 15

(U.S. EPA) or the International Maritime Organization adopts regulations that will achieve equivalent or greater emission reductions from vessels.

The proposed regulation does not address emissions from main engines (except for diesel-electric vessels), boilers, gas or steam turbine engines, or auxiliary engines on military vessels, which are exempted from the requirements of the proposed regulation. ARB staff plan to address main engines and other sources not regulated in this proposed rulemaking *in the next couple of years.*

### 10.    How far offshore are ocean-going vessels required to comply with the proposed regulation?

Under the proposed regulation, vessel emissions would be regulated up to 24 nm off the California coastline. ARB has the authority to require emission reductions out to the California Coastal Water (CCW) boundary. This is the region within which emissions are likely to be transported onshore, and it extends beyond the 24 nm boundary. However, the 24 nm boundary which is shown as the gray area in Figure ES-3 was proposed because it significantly lowers the cost of the regulation while still providing the vast majority of the potential on-shore benefits in terms of reduced exposure to diesel PM. Specifically, about 75 percent of the auxiliary engine diesel PM emissions within 100 nm of the California coastline is emitted within the 24 nm boundary. The 24 nm boundary is also easily defined for vessel operators. The boundary is aligned in Central and Northern California with the outer boundary of the Contiguous Zone, an internationally recognized boundary which extends 24 nm offshore and is noted on most nautical charts. In Southern California, the boundary consists of straight line segments approximately 24 nm offshore of the coastline. This approximation is used because the outer edge of the Contiguous Zone extends around the Channel Islands, bringing the boundary well beyond 24 nm, and in some cases beyond the California Coastal Waters boundary.

**Figure ES-3:  Offshore 24 Nautical Mile Boundary for Proposed Regulation**



ISOR

ES-9

**Exhibit D, Pg. 16**

noncompliance fees would be very limited, and whatever fees that are generated would be used to achieve emission reduction around the ports.

**Table ES-2:  Estimated Emission Reductions from
Implementation of the Proposed Regulation**

| Year | Auxiliary Engine Emission Reductions (Tons per Day) | | |
|---|---|---|---|
| | PM | NOx | SOx |
| 2007 | 2.7 | 1.9 | 22 |
| 2010 | 3.7 | 2.3 | 32 |
| 2015 | 5.0 | 3.2 | 43 |
| 2020 | 7.0 | 4.4 | 61 |

The emission reductions shown for 2007 reflect the initial implementation of the fuel specifications in the proposal, assuming that the average sulfur content of the fuel will be 0.5 percent.  The 2010 and later reductions reflect the use of 0.1 percent sulfur marine gas oil, which is scheduled to be implemented in 2010 subject to the results of a feasibility evaluation required under the proposed regulation.   Figure ES-4 provides a graphical depiction of the change in diesel PM emissions expected with implementation of the regulation.

**Figure ES-4:  Estimated Diesel PM Emissions in 24 nm Zone With and
Without the Implementation of the Proposed Regulation**



Significant air quality benefits are expected from the proposed regulation.  The reductions in diesel PM, NOx and SOx will help improve regional ambient air quality levels of PM and ozone.  We also anticipate significant health benefits due to reduced

ISOR

ES-14

Exhibit D, Pg. 17

percentage of organic material, elemental carbon, and ash are similar among the various fuels. The percent of sulfates and sulfate bound water is higher as the sulfur content of the fuel increases. As a result of the nearly identical combustion process, we would expect that the major combustion products of an engine burning HFO will be similar in chemical nature to an engine using diesel fuel.

- The general classes of PM exhaust components from a marine diesel engine using HFO are similar to a diesel engine using diesel fuel

The PM components emitted from vessel auxiliary engines using heavy fuel oil are the same as those emitted from a typical diesel engine: elemental carbon, ash, soluble organic compounds, and a sulfate fraction (Man B&W, 2004). However, the overall levels of PM will be significantly higher, and a greater proportion of the PM will be from sulfate. Specifically, as discussed in Chapter IV, we estimate that a typical vessel auxiliary engine running on 2.5 percent sulfur heavy fuel oil will emit about 1.5 g of PM per kW-hr. This compares to an emission factor of about 0.3 g/kw-hr for the same engine running on marine gas oil with a sulfur content of about 0.25 percent. Much of this difference is due to the sulfur content of the fuel, since sulfate PM is estimated to be directly related to fuel sulfur. The higher ash content and density of heavy fuel oil is also expected to play a role in the higher emissions from engines using heavy fuel oil (EPA 2002).

- The particle size distribution of the exhaust emissions from a marine diesel engine using HFO is similar to the particle size distribution from a diesel engine using diesel fuel

Preliminary results from testing performed in 2005 by the University of California, Riverside, CE-CERT, in association with Maersk and CARB, indicate that over 85 percent of the particulate matter emissions from a marine diesel engines burning HFO are less than 2.5 microns in size. These results are similar to results for diesel engines using diesel fuel where 95 percent of the particulate were found to be less than 2.5 microns in size. (ARB, 1998) These very small particles are more likely to be inhaled deep into the lung and, as a result, may pose more of a health issue than larger particles.

## D.    Health and Environmental Benefits from the Proposed Regulation

Reducing diesel PM emissions from vessel auxiliary engines will have both public health and environmental benefits. The proposed regulation will reduce localized health risks associated with the operation of vessel auxiliary engines that are near receptors and will contribute to the reduction of the general exposure to diesel PM that occurs on a region-wide basis due to collective emissions from diesel-fueled engines. Additional benefits associated with the proposed regulation include further progress in meeting the ambient air quality standards for $PM_{10}$, $PM_{2.5}$, and ozone, and enhancing visibility.

ISOR

II-7

Exhibit D, Pg. 18

stations spanning over wide distances. From these studies we can infer that pollutants emitted from offshore vessels can be transported to onshore areas and be available to participate in onshore atmospheric processes, influencing onshore air quality.

The onshore impacts of offshore emissions have also been investigated using air quality modeling. A modeling study conducted by the Department of Defense has concluded that the emissions released within 60 nautical miles offshore in the southern California coastal region could transport to the coast (ARB, 2000). Another modeling study conducted by the U. S. Navy using 10 years of hourly surface wind data to estimate the probability that offshore emissions would impact land from specified distances has shown that for California, the probabilities of offshore emissions being transported to the coast within 96 hours were greater than 80 percent from 50 nautical miles offshore (Eddington, 1997).

The U.S. EPA has set a 175 nautical mile boundary off from the United States coasts for development of vessel NOx emission inventory (Eddington, 2003; EPA, 2003). The 175-mile area is based on the estimate of the distance a NOx molecule could travel in one day (assuming a 10 mile per hour wind traveling toward a coast, NOx molecules emitted 12 miles from the coast could reach the coast in just over one hour. NOx molecules emitted 175 nautical miles (200 miles) could reach the coast in less than a day). ARB has also conducted studies on the onshore impact of offshore emissions. ARB's studies have demonstrated that pollutants released off California's coast can be transported to inland areas due to the meteorological conditions off the coast (Chen, 2005; ARB, 1982; ARB, 1983; ARB, 1984).

There has been very little actual in-transit measurement of the pollutant emissions from ships to better understand various aspects of vessel plume chemistry and reconcile differences between measurements and model predictions. However, a recent study conducted by Chen et al (Chen, 2005), in which measurements of chemical species in vessel plumes were taken from aircraft transecting a vessel plume, indicates that the NOx half-life within a vessel's plume may be much shorter than predicted by photochemical models. The study demonstrated a NOx lifetime of about 1.8 hours inside the vessel plume at noontime as compared to about 6.5 hours in the background marine boundary layer of the experiment. Additional studies investigating vessel plume chemistry will help us better understand vessel plume chemistry and improve the photochemical models used to investigate the impacts of vessels on air quality.

The analysis of meteorological data can also be used to demonstrate that emissions released offshore can reach onshore airsheds. In 1983, the ARB established the California Coastal Waters (CCW) boundary, based on coastal meteorology, within which pollutants released offshore would be transported onshore. The development of the boundary was based on over 500,000 island, ship-board, and coastal observations from a variety of records, including those from the U.S. Weather Bureau, U.S. Coast Guard, Navy, Air Force, Marine Corps, and Army Air Force (ARB, 1982). The CCW boundary ranges from about 25 miles off the coast at the narrowest to just over 100 miles at the widest.

**Table VI-2: Current Sulfur Properties of Marine Fuel**

| Fuel Specification | Average Fuel Sulfur Content (wt. %) | |
| --- | --- | --- |
| | ARB Survey (CA Vessels) | DNV (Worldwide) |
| DMA | 0.5% | 0.38% |
| DMB | (survey asked for marine distillate sulfur content) | 0.65% |
| Residual | 2.5% | - |

The ARB Oceangoing Ship Survey (ARB Survey) was sent out in January 2005 to 158 vessel operators and agents. The survey requested information about ocean-going vessels that visited California ports in 2004. To date, we have received information on 327 vessels that visit California ports. This represents about 17 percent of the total number of vessels that visited California in 2004 (ARB Survey, 2004).

From the survey responses, staff estimates that the average sulfur content of marine distillate fuels used in auxiliary engines is about 0.5 percent. (Note: Separate sulfur content estimates for DMA and DMB were not requested in the survey). The average sulfur content of residual fuel was reported to be about 2.5 percent. Both are well below the maximum specifications listed in Table VI-1, which are 1.5 to 2.0 percent for marine distillates and 5.0 percent for residual fuel.

DNV performs a service to the marine industry by sampling and testing marine fuels from many suppliers in ports throughout the world and claims to be responsible for testing 70 percent of the marine fuel tested worldwide. DNV collected samples of marine distillates from ocean-going vessels in 2003. (DNV, 2003) The average sulfur content of samples of DMA taken worldwide was 0.38 percent sulfur by weight – well below the 1.5 percent standard. For DMB, the average sulfur content from the samples was 0.65 percent sulfur by weight – well below the 2.0 percent standard. Among the different areas of the world, averages are calculated from the samples taken at each port. The minimum and maximum average sulfur content samples of DMA taken from any one area of the world were 0.05 percent (Mexico) to 0.97 percent sulfur (Saudi Arabia). The minimum and maximum average sulfur content samples of DMB taken from any one location in the world were 0.05 percent (Mexico) to 1.30 percent sulfur (Germany).

Table VI-3 lists the average marine distillate sulfur contents for those areas of the world where ocean-going vessels that operate in the Pacific Rim have historically refueled. As shown in Table 3, the sulfur content of marine distillates varies widely. Figure VI-1

*ISOR*

VI-4

**Exhibit D, Pg. 20**

As noted previously, we believe the safety of fuel transitions is amply demonstrated by the many vessels that routinely perform them. There are no problems reported for the vast majority of these fuel switches. However, there is a slight risk that temporary engine failure may occur if the vessel operator does not correctly follow procedures, possibly resulting in some loss of electrical power to the vessel. In these cases, a vessels' emergency backup generators, which run solely on marine distillate fuel, would become operational.

For diesel-electric vessels, which generally have several large diesel generator sets that provide power for both propulsion and onboard electrical power, a temporary failure in one or more engines could compromise vessel maneuverability to some degree. However, we do not believe fuel switching on diesel-electric vessels raises a significant problem for a number of reasons. First, the proposed regulation permits, but does not require, vessel operators to switch to the lower-sulfur distillate fuels. As we discussed previously, vessel operators can choose to comply with the regulation's emission limits with one of several options, only one of which is switching to the low sulfur fuels. Those vessel operators who believe fuel switching may cause problems that raise safety concerns have other options with which to comply. Second, as mentioned above under "existing practice," many diesel-electric cruise vessels currently switch to cleaner distillate fuels near California ports on a routine basis. Third, because there are generally several engines on diesel-electric vessels, it is likely that some engines would remain operational, providing the necessary power to the ship's systems. Fourth, the U.S. Coast Guard and shipping associations have recommended in some cases that fuel transitions in propulsion engines be performed away from confined areas. (PSSOA, 1999) The proposed regulation is entirely consistent with these recommendations because the 24 nautical mile boundary in the regulation would generally result in fuel transitions being performed in open water, for those operators that choose to switch fuels. Arguably, switching fuels at or prior to entering the 24 nm, should provide a greater margin for safety than conducting the switch much closer to the ports, which is the practice for some vessels.

<u>Technical and Safety Considerations</u>

ARB staff contacted the major manufacturers of auxiliary engines used on ocean-going vessels to determine whether these engines could operate on marine distillate fuel (marine gas oil or marine diesel oil). Based on our requests for information, engine manufacturers uniformly reported that their auxiliary engines designed for use with heavy fuel oil can also use distillate fuels. (Wartsila, 2004; Caterpillar, 2005; MAN B&W, 2005; Yanmar, 2005; Pielstick, 2004) However, they noted that certain technical and safety considerations need to be observed with the use of distillate fuels and during the transition from one fuel to another.

Given this, we believe that vessel operators already can and do safely use distillate fuels when they follow the engine manufacturers' recommendations. In some cases, modifications may need to be made to the fuel supply and processing equipment on the vessel. Each of these technical considerations is discussed below.

ISOR

VI-14

Exhibit D, Pg. 21

### C. Estimating the Health Benefits Associated with the Reductions of Diesel PM Emissions

<u>Reduced Ambient Particulate Matter Levels</u>

A substantial number of epidemiologic studies have found a strong association between exposure to ambient particulate matter (PM) and adverse health effects. (ARB, 2002) For this report, ARB staff evaluated the impacts the proposed regulation would have on potential cancer risks and conducted a quantitative analysis of four potential non-cancer health impacts associated with exposures to ambient levels of directly emitted diesel PM.

<u>Reduction in Potential Cancer Risks</u>

The reductions in diesel PM emissions that will result from implementation of the proposed regulation will reduce the publics exposures to diesel PM emissions and the potential cancer risks associated with those exposures. The ARB staff used the air dispersion model and model inputs developed for the POLA and POLB health risk assessment to estimate the reductions in potential cancer risk that would result in the area surrounding the ports of POLA and POLB from implementation of the proposed regulation. The ARB staff believes that the results from this analysis provide quantitative results for exposures around the Ports of Los Angeles and Long Beach and are generally applicable to other ports in California, providing a qualitative estimate for those areas.

To investigate the reductions in potential risks that will result as emissions from ocean-going vessel auxiliary engines decline, ARB staff used dispersion modeling and the projected 2008 and 2015 controlled and uncontrolled emissions inventories to estimate the ambient concentration of diesel PM emissions that result from the operation of cargo handling equipment at the Ports of Los Angeles and Long Beach in 2008 and 2015. The potential cancer risks from exposures to the projected controlled and uncontrolled 2008 and 2015 emissions were then estimated to determine how the potential risks will change. As shown in Figures VII-2 and VII-3, we expect a significant decline in the number of people exposed to high risk levels from cargo handling equipment emissions and the acres impacted as the proposed regulation is implemented.[5] Based on our analysis, which is summarized in Appendix K, we estimate that, in 2008, there will be a 70 percent reduction in the population-weighted average risk relative to uncontrolled risk levels in from ocean-going vessel auxiliary engine emissions and approximately a 78 percent reduction in 2015.

---

[5] Because the isopleths for risk levels at 10 in a million were outside the modeling domain, we are not able to quantify the expected regulatory impact on this risk level. However, we believe that the risk levels greater than 10 in a million are also significantly reduced.

*ISOR*

VII - 5

**Exhibit D, Pg. 22**

# EXHIBIT E

**CARB Final Statement of Reasons
"FSOR"**

California Environmental Protection Agency

# Air Resources Board

# Final Statement of Reasons for Rulemaking
## Including Summary of Comments and Agency Responses

**PUBLIC HEARING TO CONSIDER THE ADOPTION OF REGULATIONS
TO REDUCE EMISSIONS FROM AUXILIARY DIESEL ENGINES AND
DIESEL-ELECTRIC ENGINES OPERATED ON OCEAN-GOING
VESSELS WITHIN CALIFORNIA WATERS AND 24 NAUTICAL MILES
OF THE CALIFORNIA BASELINE**

Public Hearing Date: December 8, 2005
Agenda Item No.: 05-12-5

Exhibit E, Pg. 24

**Response:** We disagree. The ACE requirements under subsection (g)(G)(5), "Use of Shore-Side Power," are reasonable. Under these provisions, a vessel that stops at a California port and utilizes shore-side power, is not required to meet the emission limit in the regulations (e.g. use distillate fuels·such as MDO, etc.) during the trip to and from this port while in "Regulated California Waters." However, if the vessel visits a second California port where shore-side power is not used, then the "exemption" from the emission limit ends at that point and the vessel must use distillate fuels or otherwise comply with the emission limit in the regulations from that point forward.

On the other hand, when a vessel makes a California port visit utilizing shore-power, then leaves port and makes a mooring stop (e.g., anchors off Catalina Island), the exemption from the emission limit continues while the vessel is underway as if no mooring stop occurred, but the vessel must meet the emission limit while it is anchored. This is reasonable because the vessel will be relatively close to shore while at anchor to facilitate the transport of passengers to land. It is also less restrictive than considering the mooring stop a "port visit," which would terminate the vessel's exemption from the emission limit for subsequent travel.

Regarding the commenter's suggestion to allow for compliance via a barge-mounted diesel engine burning cleaner fuel, this would be allowable under the general ACE provisions (but not the special ACE provisions under "Use of Shore-Side Power"), provided the overall emission reductions are equivalent to or greater than direct compliance with the regulations.

17.    **Comment:** The ACP should be removed from the regulations because it will inadvertently reduce demand for low sulfur fuel. (CE 1)

**Response:** We disagree. It is important to include the ACE in the regulations because it provides the industry with the flexibility to achieve the required emission reductions in the most economical way. We do not expect the ACE to have a significant impact on the demand for low sulfur fuel because we expect most ship operators to comply with the regulations by using the specified low-sulfur distillate fuels. In addition, the amount of low sulfur distillate fuels to be used in Regulated California Waters under the regulations is small compared to the global usage of fuel by oceangoing vessels. Because the amount of low sulfur fuel to be used under an ACE will be even less than the total amount for the entire regulation, we expect whatever impacts the ACE may have on demand for low sulfur fuel to be small if not negligible.

18.    **Comment:** The ACP should be removed from the regulations because it will put the ARB in a position that no longer allows them to move forward with additional and much needed regulations that would further reduce harmful emissions at California's ports. The Business, Transportation & Housing/Cal-EPA Goods Movement Plan, and the Port of Los Angeles No

FSOR

52

**Exhibit E, Pg. 25**

also be required.  No similar requirements are imposed on vessels by the U.S. EPA or in California on cars and trucks that enter state lines. (MATSON)

**Response:**  Contrary to the commenter's statement, the regulations do not require the installation of California-only tanks or any other type of equipment.  In fact, most vessels will not have to install additional tanks to comply with the proposed regulations.  Based on the ARB Oceangoing Ship Survey, ARB staff estimates that less than ten percent of ships visiting California ports will require modifications (such as the installation of a new fuel tank) to comply with the proposed regulations.  The costs and impacts of these modifications are estimated in the Staff Report in Chapter VIII.  As we noted in Response to Comment F.5, it is neither appropriate nor necessary to include in the cost analysis for this rulemaking the hypothetical costs of potential future regulations by other regulatory entities.

Regarding the commenter's observation that similar requirements (to those imposed on vessels) are not imposed on on-road vehicles, we note that cars and trucks have been subject to increasingly stringent exhaust emissions standards that are dramatically lower than ocean-going vessels.  We would also point out that on-road and off-road diesel vehicles and equipment, beginning in September 2006, will have to use very low sulfur (0.0015% or 15 ppm) diesel fuel.  Finally, we note that most ocean-going vessels already have the tankage and ability to switch fuels, while on-road vehicles do not.

**M.    Miscellaneous**

1.    **Comment:** Expanding the rule's applicability beyond an owner and/or operator is excessive and problematic.  Those who charter, rent, or lease do not assume operation or control of the vessel.  CARB should remove this expanded applicability or clarify and state at a minimum that only the vessel owner or operator is responsible for meeting the requirements in subsections (e) and (g). (WSPA 1)

**Response:**  We disagree.  Based on our experiences with ARB's other air pollution control programs, we anticipate situations occurring when parties beyond the ship owner or operator may be wholly or partially responsible for a violation.  Therefore, it is appropriate to make other parties involved with vessels that visit California ports potentially liable for such violations.  By making other parties "upstream" and "downstream" of the vessel operator or owner potentially liable for violations, we help ensure that all parties involved in vessel operations coordinate their compliance efforts, thereby improving the overall effectiveness of the regulations.

2.    **Comment:** The proposed regulation would require that records be submitted to the ARB within 24 hours of a request by the agency.  This is an unusually short time frame and should be extended to a minimum of two weeks. (WSPA 1)

FSOR

Exhibit E, Pg. 26