UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

PACIFIC MERCHANT SHIPPING
ASSOCIATION, a California mutual
benefit corporation,

                         NO. CIV. S-06-2791 WBS KJM

       Plaintiff,

  v.

                        ORDER RE: MOTION FOR SUMMARY
TOM CACKETTE, in his official      JUDGMENT
capacity as Executive Officer
of the California Air Resources
Board,

       Defendant,

and

NATIONAL RESOURCES DEFENSE
COUNCIL, INC.; COALITION FOR
CLEAN AIR, INC.; SOUTH COAST
AIR QUALITY MANAGEMENT
DISTRICT; CITY OF LONG BEACH,

       Defendant-Intervenors.

----oo0oo----

       Plaintiff Pacific Merchant Shipping Association

1

1  ("PMSA") brought this action against defendant Tom Cackette[1] to

2  enjoin the adoption and enforcement of 13 C.C.R. § 2299.1 and 17

3  C.C.R. § 93118, and obtain a declaration that the regulations are

4  preempted by federal law and/or unconstitutional.  Currently

5  before the court is plaintiff's motion for summary judgment, or

6  in the alternative, partial summary judgement, on the claims that

7  the California regulations are preempted by Title II of the Clean

8  Air Act, 42 U.S.C. §§ 7521 et seq., and the Submerged Lands Act,

9  43 U.S.C. §§ 1301 et seq.

10  I.   Factual and Procedural Background

11       A.   The Parties

12            PMSA is a mutual benefit corporation, organized and

13  existing under the laws of California, and its members include

14  companies that own or operate foreign and United States-flagged

15  ocean-going vessels. (Def.'s Resp. to Pl.'s Statement of

16  Undisputed Facts (Docket No. 65; Attachment 1) ## 1-3.)   The

17  vessels of PMSA's members use auxiliary or diesel electric

18  engines during navigation and when alongside a dock.  (Id. # 4.)

19            Defendant Tom Cackette, the Chief Deputy Executive

20  Officer and Acting Executive Officer of the California Air

21  Resources Board ("CARB"), is charged with enforcement of

22  regulations adopted by CARB.  Cal. Health & Safety Code §§ 39515,

23  39516.  Natural Resources Defense Council, Inc. ("NRDC"),

24

25

26  _____

27       [1]   Plaintiff's originally filed this action against
     Catherine E. Witherspoon, who has since resigned.  Cackette is
28  automatically substituted, pursuant to Federal Rule of Civil
     Procedure 25(d).

Coalition for Clean Air, Inc. ("CCA")[2], South Coast Air Quality Management District ("SCAQMD"), and the City of Long Beach ("Long Beach") intervened as defendants, pursuant to this court's order of April 3, 2007.  (April 3, 2007 Order.)

B.   The Regulations

On October 20, 2006, CARB certified and transmitted two regulations, 13 C.C.R. § 2299.1 and 17 C.C.R. § 93118[3] (the "regulations"), to the California Office of Administrative Law ("OAL") for filing with the California Secretary of State.  On December 6, 2006, the OAL approved the regulations and filed them with the California Secretary of State.  CARB began enforcement of the regulations on January 1, 2007, by inspecting PMSA vessels upon arrival at California ports.  (Def.'s Resp. to Pl.'s Statement of Undisputed Facts ## 5-7.)  CARB did not obtain authorization from the United States Environmental Protection Agency ("EPA") for either of the regulations before it adopted or began enforcing the regulations.  (Id. # 8.)

Both regulations establish limitations for emissions of diesel particulate matter ("PM"), sulfur oxides ("SOx"), and nitrogen oxides ("NOx") from the use of auxiliary diesel engines and diesel-electric engines on ocean-going vessels.  13 C.C.R. §

---

[2]   The NRDC and CCA intervened and filed their papers jointly, and will therefore be referred to jointly as NRDC/CCA.

[3]   The text of the two regulations is the same, although § 2299.1 is described as "emission limits and requirements" under a chapter addressing "standards for fuels for nonvehicular sources," while § 93118 is described as an "airborne toxic control measure."  13 C.C.R. § 2299.1; 17 C.C.R. § 93118. Accordingly, where necessary, the court will cite to 13 C.C.R. § 2299.1, with the understanding that identical, parallel provisions exist in 17 C.C.R. § 93118.

2299.1(a).  The regulations prohibit any ship with an auxiliary diesel engine (including any diesel electric engine) with emission rates above those specified from operating within twenty-four miles of a large portion of the California coast.  13 C.C.R. § 2299.1(d)(2), (d)(26)(F), (e)(1).  In addition, vessel owners are required to keep detailed records of the type of fuel used in each engine operated within the regulated water, as well as the date, time, and location of each vessel whenever entering or exiting the regulated areas, or engaging in a fuel switching procedure.  13 C.C.R. § 2299.1(e)(2).  These rules apply to all commercial vessels registered in, flagged in, or operating under the authority of the United States or any other country, and violations may be punished by injunctive relief, civil and criminal fines, misdemeanor prosecution, and imprisonment.  13 C.C.R. § 2299.1(b), (f)(1).

  C. <u>The Clean Air Act</u>

    First enacted in 1955 as the Air Pollution Control-Research and Technical Assistance Act of 1955, the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA"), Pub. L. No. 84-159, 69 Stat. 322, "is one of the most comprehensive pieces of legislation in our nation's history."  <u>Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation</u>, 17 F.3d 521, 524 (2d Cir. 1994) ("<u>MVMA</u>").  The CAA makes "the States and the Federal Government partners in the struggle against air pollution."  <u>Gen. Motors Corp. v. U.S.</u>, 496 U.S. 530, 532 (1990).  This partnership has not significantly changed since it was established by the Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485 ("1967 Act"), and the Clean Air Amendments of 1970,

Pub. L. No. 91-604, 84 Stat. 1676 ("1970 amendments").  Engine Mfrs. Ass'n, ex rel. Certain of its Members v. EPA, 88 F.3d 1075, 1078 (D.C. Cir. 1996) ("EMA") (further citations omitted).  The 1967 Act required the states to set ambient air quality standards.  Id.  The 1970 amendments transferred authority to set the ambient air quality standards, now known as national ambient air quality standards ("NAAQS"), from the states to the EPA.  CAA § 109, 42 U.S.C. § 7409.  To achieve and maintain these NAAQS by regulating sources of air pollution, each state is required to submit a state implementation plan ("SIP") to the EPA for approval.  CAA § 110, 42 U.S.C. § 7410(a)(1).

The statutory scheme contemplates that "the states would carry out their responsibility chiefly by regulating stationary sources, such as factories and power plants."  EMA, 88 F.3d at 1078-79.  Indeed, many of the statutory requirements for SIPs related to the regulation of stationary sources and penalties for failing to attain air quality standards focused on stationary sources.  Id. at 1079 (analyzing the 1970 and 1977 amendments).[4]

Unlike regulation of pollution from stationary sources, regulation of motor vehicles has been primarily a federal project.  See, e.g., EMA, 1078-1082; MVMA, 17 F.3d at 524-27; Motor & Equip. Mfrs. Ass'n, Inc. v. EPA, 627 F.2d 1095, 1101-03, 1108-11, (D.C. Cir. 1979) ("MEMA"), cert. denied, 446 U.S. 952 (1980).  A reason for the regulatory difference was the

---

[4]   1977 amendments, § 108(a)(1) (CAA, § 110(a)(2)(I)), 91 Stat. at 694.  See also Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 848-51 (1984); Citizens Against the Refinery's Effects Inc. v. EPA, 643 F.2d 183 (4th Cir. 1981).

difficulty of subjecting motor vehicles, which can easily move from one state to another, to control by individual states.  EMA, 88 F.3d at 1079.  Additionally, the possibility of different state regulatory regimes created the "spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers."  MEMA, 627 F.2d at 1109.  In 1967, just two years after Congress first authorized federal emissions regulations, Congress preempted states from adopting emission standards for motor vehicles.[5]  EMA, 88 F.3d at 1079.  The Second Circuit considers Congress' continued express preemption of state regulations of automobile emissions as "the cornerstone of Title II."  MVMA, 17 F.3d at 526.

However, there is an exception to the broad preemption of federal motor vehicle regulation.  Because California was the "lead[er] in the establishment of standards for regulation of automotive pollutant emissions," Congress granted California an exemption from CAA § 209(a) preemption in CAA § 209(b)(1)

---

[5]   Section 209(a) provides:
No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part [CAA Title II, Part A]. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
42 U.S.C. § 7543(a).

provided that the EPA approved California's standards.[6]  MEMA,

627 F.2d at 1109 n.26 (quoting S. Rep. No. 192, 89th Cong., 1st

Sess. 5 (1965)).  Accordingly, motor vehicles must be either

"federal cars" designed to meet the EPA's standards or

"California cars" designed to meet CARB's approved standards.

MVMA, 17 F.3d at 526-27.  Congress allowed other states to

"piggyback" onto California's preemption exception by adopting

the California standards.  Id. at 527.  However, to protect

manufacturers and ensure that manufacturers would only need to

cope with two regulatory regimes rather than 51, Congress

required that "(1) an opt-in state must adopt standards that are

identical to California's; (2) California must receive a waiver

from the EPA for the standards; and (3) both California and the

opt-in state must adopt the standards at least two years before

the beginning of the automobile model year to which they apply."

---

[6]     Section 209(b)(1) provides:
The Administrator shall, after notice and opportunity
for public hearing, waive application of this section
to any State which has adopted standards (other than
crankcase emission standards) for the control of
emissions from new motor vehicles or new motor vehicle
engines prior to March 30, 1966, if the State
determines that the State standards will be, in the
aggregate, at least as protective of public health and
welfare as applicable Federal standards. No such waiver
shall be granted if the Administrator finds that--
        (A) the determination of the State is arbitrary
        and capricious,
        (B) such State does not need such State standards
        to meet compelling and extraordinary conditions,
        or
        (C) such State standards and accompanying
        enforcement procedures are not consistent with
        section 7521(a) of this title [CAA § 202(a)].
42 U.S.C. § 7543(b)(1) (1994). California is the only state that
qualifies for the waiver, because it was the only state that had
adopted emission control standards prior to March 30, 1966. EMA,
88 F.3d at 1079.

1  Id. (citing CAA § 177, 42 U.S.C. § 7507).

2          Prior to 1990, nonroad vehicle emissions, the subject

3  of this action, were not specifically mentioned.  However, some

4  states started to regulate some nonroad sources in their attempts

5  to meet the NAAQSs.  EMA, 88 F.3d at 1080.  In 1990, Congress

6  amended the CAA to define and regulate nonroad sources.  Pub. L.

7  No. 101-549, § 222(b), 104 Stat. at 2502 (codified at CAA §

8  209(e), 42 U.S.C. 7543(e)).

9          D.   PMSA's Pending Motion

10          Plaintiff seeks injunctive relief preventing the

11  enforcement of the regulations, as well a declaration that the

12  regulations are unconstitutional and contrary to federal law.

13  (Id. at ¶¶ 20-21.)  Plaintiff's complaint contained four claims

14  for relief: 1) preemption by Title II of the CAA, 42 U.S.C. §§

15  7521 et seq.; 2) preemption by the Submerged Lands Act, 43 U.S.C.

16  §§ 1301 et seq.; 3) preemption by the Ports and Waterways Safety

17  Act, 46 U.S.C. §§ 3701 et seq.; and 4) violation of the Commerce

18  Clause of the United States Constitution, Article I, Section 8,

19  clause 3.  (Compl.)

20          On May 7, 2007, plaintiff filed this motion for summary

21  judgment on its first and second claims for relief.  On June 4,

22  2007, the parties stipulated to the filing of plaintiff's first

23  amended complaint ("FAC").  (Stipulation Order (Docket No. 54)

24  4.)  The FAC contains only two claims for relief:  1) preemption

25  by Title II of the CAA and 2) preemption by the Submerged Lands

26  Act.  (FAC.)  Plaintiff moves for summary judgment on both of

27  these claims.  Because, for the reasons discussed in detail

28  below, the court finds that the challenged regulations are

8

1  preempted by Title II of the CAA, the court need not decide the

2  question of whether the Federal Submerged Lands Act also preempts

3  California from enforcing the regulations beyond three nautical

4  miles from the baseline.[7]

5  II.  Discussion

6      A.  Legal Standards

7          1.  Summary Judgment Standard

8          Summary judgment is proper "if the pleadings,

9  depositions, answers to interrogatories, and admissions on file,

10  together with the affidavits, if any, show that there is no

11  genuine issue as to any material fact and that the moving party

12  is entitled to judgment as a matter of law."  Fed. R. Civ. P.

13  56(c).  A material fact is one that could affect the outcome of

14

15      [7]    In 1953, Congress passed the Submerged Lands Act to
abrogate the Supreme Court's ruling in United States v.
California, 332 U.S. 19 (1947), opinion supplemented by United
16  States v. California, 332 U.S. 804 (1947) ("California I"), which
held that California had no title or property interest to lands
17  in the Pacific Ocean.  United States v. California, 436 U.S. 32,
37 (1977) ("California II").  The Act provided that:
18      (1) title to and ownership of the lands beneath
        navigable waters within the boundaries of the
19      respective States, and the natural resources within
        such lands and waters, and (2) the right and power to
20      manage, administer, lease, develop and use the said
        lands and natural resources all in accordance with
21      applicable State law . . . are hereby[] vested in and
        assigned to the respective States . . . .
22  43 U.S.C. § 1311(a).  The Act also provided that "nothing in this
subchapter . . . shall affect the use, development, improvement,
23  or control by . . . the United States of said . . . waters for
the purposes of navigation . . . ." 43 U.S.C. § 1311(d).
24      In 1947, the generally accepted international practice
was for the adjacent nation to claim a three-mile belt of
25  sovereignty from the baselines over the marginal sea.  California
I, 332 U.S. at 32-36.  In 1988, President Reagan extended the
26  territorial limits of the United States to 12 nautical miles from
the baselines.  Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27,
27  1988).  In 1994, President Clinton extended the "contiguous zone"
of the United States to 24 nautical miles from the baselines.
28  Proclamation No. 7219, 64 Fed. Reg. 48701 (Aug. 2, 1999).

the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial.   <u>Id.</u>

Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Id.</u> at 324 (quoting Fed. R. Civ. P. 56(e)).  The non-movant "may not rest upon . . . mere allegations or denials of the adverse party's pleading . . . ."  Fed. R. Civ. P. 56(e); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).  However, any inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Additionally, the court must not engage in credibility determinations or weigh the evidence, for these are jury functions.  <u>Anderson</u>, 477 U.S. at 255.

The plaintiff movant "must establish beyond peradventure <u>all</u> of the essential elements of the claim or

defense to warrant judgment in his favor." <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); <u>see</u> <u>also</u> <u>Arnett v. Myers</u>, 281 F.3d 552, 561 (6th Cir. 2002) ("a substantially higher hurdle must be surpassed, particularly where . . . the moving party bears the ultimate burden of persuasion . . . at trial").

> ### 2. <u>Preemption</u>

Under the Supremacy Clause of the Constitution, Congress has the power to pass legislation that preempts state law. <u>See</u> U.S. Const. art. VI, cl. 2; <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law."). Preemption may be either express or implied. Express preemption may be found where Congress has explicitly stated "the extent to which its enactments preempt state law." <u>English v. Gen. Elec. Co.</u>, 496 U.S. 72, 79 (1990) ("Pre-emption is fundamentally a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.") (internal citation omitted)). State law is impliedly preempted where obligations imposed by federal statute "reveal a purpose to preclude state authority." <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947).

In determining the scope of an express preemption provision, the court is guided by two presumptions. <u>Medtronic v. Lohr</u>, 518 U.S. 470, 485 (1996). First, the court presumes that "'the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and

11

1    manifest purpose of Congress.'" Id. (quoting Rice, 331 U.S. at

2    230).  Second, "'[t]he purpose of Congress is the ultimate

3    touchstone' in every preemption case." Id. (quoting Retail

4    Clerks v. Schermerhorn, 375 U.S. 96, 103 (1963)).  Congressional

5    intent is "primarily discerned from the language of the pre-

6    emption statute and the 'statutory framework' surrounding it."

7    Id. (citation omitted).

8         In the case of implied preemption, state law is also

9    preempted when it "stands as an obstacle to the accomplishment

10   and execution of the full purposes and objectives of Congress."

11   Int'l Paper Co. v. Ouellette, 479 U.S. 481, 492 (1987).  To the

12   extent a state law interferes with the manner in which Congress

13   intended the federal law to operate, the state law is preempted

14   even where the state and federal laws share common goals.  Gade

15   v. Nat'l Solid Wastes Mgmt. Ass'n., 505 U.S. 88, 103 (1992).

16        B.   Preemption under CAA Title II

17             1.   Scope of Nonroad Source Preemption

18        Plaintiff argues, in its first claim for relief, that

19   the regulations are preempted by Title II of the CAA.  CAA §

20   209(e)(2)(A) provides:

21        In the case of any nonroad vehicles or engines other
          than those referred to in subparagraph (A) or (B) of
22        paragraph (1), the Administrator shall, after notice
          and opportunity for public hearing, authorize
23        California to adopt and enforce standards and other
          requirements relating to the control of emissions from
24        such vehicles or engines if California determines that
          California standards will be, in the aggregate, at
25        least as protective of public health and welfare as
          applicable Federal standards. No such authorization
26        shall be granted if the Administrator finds that--
            (i) the determination of California is arbitrary
27            and capricious,
            (ii) California does not need such California
28            standards to meet compelling and extraordinary

                                  12

conditions, or
(iii) California standards and accompanying
enforcement procedures are not consistent with
this section.

42 U.S.C. § 7543(e)(2)(A).  The parties agree that auxiliary diesel and diesel electric engines of ocean-going vessels are nonroad engines not governed by CAA § 209(e)(1).[8]

Unlike CAA § 209(e)(1), CAA § 209(e)(2) does not expressly preempt any state regulation.  EMA, 88 F.3d at 1087. However, in the leading case addressing this issue, the D.C. Circuit held that CAA § 209(e)(2) implies preemption.  EMA, 88 F.3d at 1087.  In a well reasoned, 2-1 decision, the EMA court determined that the scope of this implied preemption provision applied to both new and non-new equipment and vehicles.  Id. at 1087-93.  Thus, according to the majority, the implied preemption under CAA § 209(e)(2) for nonroad vehicles and engines is broader than the express preemption of road vehicles and engines under CAA § 209(a)--the latter applying only to new sources.  See CAA § 209(a); 42 U.S.C. § 7543(a).

The EMA court divided solely over whether the implied preemption provision in CAA § 209(e)(2) applied to non-new

_____

[8]    CAA § 209(e)(1) provides:
No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this Act--
(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.
(B) New locomotives or new engines used in locomotives.
Subsection (b) shall not apply for purposes of this paragraph.
42 U.S.C. § 7543(e)(1).

13

nonroad sources.[9]  EMA, 88 F.3d 1087-93; Id. at 1099-1105 (Tatel,
J., dissenting).  The EPA originally interpreted CAA §
209(e)(2)'s implied preemption to not reach non-new nonroad
sources at all, so that the states retained their historic
authority to set emission standards for these sources.  59 Fed.
Reg. 36,969, 36,973-74 (1994).[10]

        The EMA majority overturned the EPA's interpretation
and held that the implied preemption of CAA § 209(e)(2) covers
both new and non-new nonroad vehicles and engines for several
reasons.  EMA, 88 F.3d 1087-93.  First, the EPA's review of
proposed California emission standards under CAA § 209(e)(2) is
not rendered nugatory by the fact that there is no federal
emission standard with which to compare it because CAA §
209(e)(2)(A) also requires that the EPA review proposed
California emission standards to ascertain whether California

---

[9]     If the implied preemption of § 209(e)(2) applied only
to new nonroad sources, plaintiff's preemption argument would
fail since the engines of PMSA's members' vessels are non-new
nonroad sources under the relevant statute.  NRDC argues that the
court should apply the rationale of Judge Tatel's dissent in EMA.
(NRDC Opp'n 6 n.9.)  Generally, courts in one circuit are not
bound by rulings in another circuit.  See, e.g., Hart v.
Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001); Newton v.
Thomason, 22 F.3d 1455, 1460 (9th Cir. 1994).  The court would be
within its discretion to apply either the EMA majority's or
dissent's legal rule.

[10]     Judge Tatel disagreed with the majority's approach to
ascertaining Congressional intent under Chevron step one--the
weighing of the plain meaning of the statute--because "virtually
all other evidence" in the statutory record points to the
opposite conclusion.  EMA, 88 F.3d at 1100 (Tatel, J.,
dissenting) (citing Chevron, 467 U.S. at 837).  Judge Tatel
concluded that Congress made a drafting error in CAA § 209(e)(2)
by inadvertently leaving out the word "new" in the phrase "any
nonroad vehicles or engines" and that the EPA's original
interpretation so finding should not have been disturbed.  Id. at
1105.

needs to adopt the regulation to meet compelling and
extraordinary conditions.  _EMA_, 88 F.3d at 1089-90.  Second, the
"regulatory gap" cited by Judge Tatel in dissent is "illusory"
because each state can still adopt its own in-use regulations.
_Id._ at 1090-91.  The _EMA_ court unanimously upheld the EPA's
interpretation that in-use regulations are neither standards nor
other requirements relating to the control of emissions so that
CAA § 209(e) did not preempt states from adopting them.  _Id._ at
1093-94.  Third, the _EMA_ majority found that the absence of
legislative explanation cut against the EPA and Judge Tatel's
position: "[e]ven if the final product might strike us as
unexpected given the versions passed by each House, the court
could not make the leap from such an impression to the certainty
that such a result was unintentional."  _Id._ at 1091.  Indeed, the
competing interests inherent in such a complicated piece of
legislation "are simply too complex and multifarious to rule out
the possibility that the conference settled on the result
described by the statutory text."  _Id._

          This court adopts the _EMA_ majority and finds that CAA §
209(e)(2) preemption covers both new and non-new nonroad vehicles
and engines.  This court's conclusion is bolstered by the passage
of time since the _EMA_ decision without Congressional action.  The
D.C. Circuit decided _EMA_ over ten years ago.  Had the _EMA_ court
incorrectly gauged Congressional intent, Congress has had more
than enough opportunity to amend the CAA.  Accordingly,
California cannot promulgate any "standards or other requirements
relating to emissions" for nonroad engines unless approved by the
EPA.  CAA § 209(e)(2)(A); 42 U.S.C. § 7543(e)(2)(A).

1          2.   Classification of the Regulations as Emission

2               Standards or In-Use Requirements

3          Plaintiff argues that the California regulations

4    establish emission standards.  Defendants contend that the

5    regulations are not emission standards but rather are in-use

6    requirements, which the CAA did not intend to preempt.  The

7    question turns on the meaning of the phrase "standard relating to

8    the control of emissions" in CAA § 209(e)(2).

9                    a.   Definitions

10                        i.   Standards

11         "Statutory construction must begin with the language

12   employed by Congress and the assumption that the ordinary meaning

13   of that language accurately expresses the legislative purpose."

14   Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194

15   (1985).  In Engine Manufacturers Association v. South Coast Air

16   Quality Management District, 541 U.S. 246 (2004) ("SCAQMD"), the

17   Supreme Court interpreted the meaning of the phrase "standard

18   relating to the control of emissions" in CAA § 209(a), which is

19   the preemption provision for motor vehicles and engines.  CAA §

20   209(e)(2) contains this exact phrase.  The SCAQMD court partially

21   invalidated SCAQMD's Fleet Rules, which extensively regulated the

22   types of vehicles that fleet operators must purchase or lease

23   when adding or replacing fleet vehicles.  SCAQMD, 541 U.S. at

24   258-59.

25         The district court, which the Ninth Circuit summarily

26   affirmed, 309 F.3d 550 (9th Cir. 2002), had upheld SCAQMD's Fleet

27   Rules in their entirety because they regulated only the purchase

28   of vehicles that were otherwise certified for sale in California

                              16

and thus were not standards within the meaning of CAA § 209(a).
158 F. Supp. 2d 1107, 1118-19 (C.D. Cal. 2001) ("Where a state
regulation does not compel manufacturers to meet a new emissions
limit, but rather affects the purchase of vehicles, as the Fleet
Rules do, that regulation is not a standard." Id. at 1118.)

The Supreme Court reversed, declining to read the
purchase/sale distinction into CAA § 209(a), because "[a]
command, accompanied by sanctions, that certain purchasers may
buy only vehicles with particular emission characteristics is as
much an 'attempt to enforce' a 'standard' as a command,
accompanied by sanctions, that a certain percentage of a
manufacturer's sales volume must consist of such vehicles."
SCAQMD, 541 U.S. at 255. Thus, the SCAQMD court defined
"standard" as that which "'is established by authority, custom,
or general consent, as a model or example; criterion; test." Id.
at 252-53 (quoting Webster's Second New International Dictionary
2455 (1945)). The SCAQMD court found that the purchase criteria
of SCAQMD's Fleet rules were "standards" because "[t]o meet them
the vehicle or engine must not emit more than a certain amount of
a given pollutant, must be equipped with a certain type of
pollution-control device, or must have some other design feature
related to the control of emissions." Id. at 253.

The SCAQMD court further noted that this interpretation
conformed to the use of "standard" throughout CAA Title II "to
denote requirements such as numerical emission levels with which
vehicles or engines must comply, e.g., 42 U.S.C. §
7521(a)(3)(B)(ii), or emission-control technology with which they
must be equipped, e.g., § 7521(a)(6)." Id. In MEMA, the D.C.

17

Circuit also interpreted "standard" in the CAA § 209(a) context to mean quantitative levels of emissions.  627 F.2d at 1112-13 ("The Senate Report on the Air Quality Act of 1967, discussing the preemption provision, mentions 'standards' for hydrocarbons, nitrogen oxides, and carbon monoxide in obvious reference to the numerical limitations on those pollutants." (citing S. Rep. No. 403, 90th Cong., 1st Sess. 32 (1967)).

### ii.   In-use Requirements

The EMA court upheld the EPA's interpretation that a state could regulate the "use, operation, or movement of registered or licensed vehicles" under CAA § 209(e)(2), thus extending CAA § 209(d) to nonroad sources.[11]  EMA, 88 F.3d at 1093-94.  Although the EMA court found neither the EPA's nor the EMA's proposed statutory interpretation entirely convincing, the EMA court deferred to the EPA since it "could reasonably conclude that CAA § 213(d) incorporated § 209(d) into the nonroad engine regime, in which case the specific command of § 209(d) would limit the general [but broadly preemptive] language of § 209(e)."  EMA, 88 F.3d at 1094.  Examples of in-use regulations permissible under CAA § 209(d) include carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles, which are expressly intended to control emissions.  Id.

_____

[11]   CAA § 209(d) provides:
Control, regulation, or restrictions on registered or licensed motor vehicles. Nothing in this part [CAA Title II] shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.
42 U.S.C. § 7543(d).

1  (citing CAA § 108(f), 42 U.S.C. § 7408(f) (requiring

2  administrator to make available to state and local authorities

3  information relating to such strategies)).

4          This court follows the EMA court and defers to the

5  EPA's interpretation pursuant to Chevron.  Chevron, 467 U.S. 837,

6  844 (1984) ("We have long recognized that considerable weight

7  should be accorded to an executive department's construction of a

8  statutory scheme it is entrusted to administer, and the principle

9  of deference to administrative interpretations.").

10             b.   Application to the Challenged Regulations

11         The court must decide the difficult question of whether

12 the challenged regulations are in-use requirements or standards.

13 For the reasons discussed below, the court concludes that the

14 regulations are not in-use requirements, but are standards

15 relating to the control of emissions.  The court also concludes

16 that the presumption against preemption is not applicable to this

17 situation nor would the presumption's applicability affect the

18 court's conclusion.

19                  i.   The Regulations are Not In-Use

20                       Requirements

21         Defendants argue that the challenged regulations are

22 in-use requirements, specifically fuel quality specifications.

23 The EMA majority cited with approval Allway Taxi, Inc. v. City of

24 New York, 340 F. Supp. 1120 (S.D.N.Y. 1972), aff'd, 468 F.2d 624

25 (2d Cir. 1972).  Id. at 1089-90.  In Allway Taxi, city

26 regulations that only minimally interfered with interstate

27 commerce were not preempted since they were "directed primarily

28 to intrastate activities and the burden of compliance would be on

                                   19

individual owners and not on manufacturers and distributors."
340 F. Supp. at 1124.

In contrast, the challenged regulations directly affect
international commerce, a position confirmed by the EPA.
Specifically, the EPA's regulation of ocean going vessels
coincided with similar action of the International Marine
Organization (IMO).  <u>Bluewater Network v. EPA</u>, 372 F.3d 404, 407
(D.C. Cir. 2004).  In 1997, the IMO formally adopted Annex VI to
the International Convention on the Prevention of Pollution from
Ships, 1973, as Modified by the Protocol of 1978 Relating Thereto
(MARPOL), which prescribes a NOx emissions limit for certain
diesel engines.  <u>Id.</u>  Annex VI has recently been ratified by the
requisite number of IMO member countries and has taken affect.
<u>Id.</u>  The EPA set its regulations at same level as Annex VI.  In
light of the fact that the regulations do not require the use of
low sulfur fuels, 12 C.C.R. § 2299.1(g)(1)(A), the significant
international ramifications of the regulations make it difficult
for the court to conclude that they are permissible local in-use
requirements.  Accordingly, the court concludes that the
regulations are not in-use requirements.

ii.   <u>The Regulations are Standards</u>

The court's conclusion that the regulations are not in-
use requirements does not automatically require the court to
conclude that the regulations are standards.  As discussed above,
standards include "requirements such as numerical emission levels
with which vehicles or engines must comply, e.g., 42 U.S.C. §
7521(a)(3)(B)(ii)."  <u>SCAQMD</u>, 541 U.S. at 253.

1        The California regulations provide:

2   [N]o person subject to this section shall operate any
    auxiliary diesel engine, while the vessel is operating
3   in any of the Regulated California Waters, which emits
    levels of diesel PM, NOx, or SOx in exceedance of the
4   emission rates of those pollutants that would result
    had the engine used the following fuels:
5        (A) Beginning January 1, 2007:
             1. marine gas oil, as defined in subsection
6            (d); or
             2. marine diesel oil, as defined in
7            subsection (d), with a sulfur content of no
             more than 0.5 percent by weight;
8        (B) Beginning January 1, 2010: marine gas oil with
         a sulfur content of no more than 0.1 percent by
9        weight.

10  13 C.C.R. § 2299.1(e).  These regulations require that engines

11  emit no more pollutants than if the engines had used specified

12  fuels.  Because marine gas oil normally contains less than 5,000

13  ppm (the equivalent of 0.5 percent by weight) the regulations do

14  not specify its sulfur level.  (Milkey Decl. ¶ 21.)  However,

15  since marine diesel oil may contain more than 5,000 ppm of

16  sulfur, the regulations specify that emissions must not exceed

17  the amount that would occur if the vessel used marine diesel with

18  a sulfur content of 5,000 ppm.

19       CARB drafted the regulations such that a vehicle is

20  presumed to be in compliance if it is using the specified fuels.

21  12 C.C.R. § 2299.1(e)(1)(C).  Subsection (g) provides that:

22       alternative emission control strategies can be
         implemented in lieu of meeting the requirements of
23       subsection (e)(1), provided the alternative strategies
         result in emissions of diesel PM, NOx, and SOx from the
24       auxiliary diesel engines that are no greater than the
         emissions that would have occurred under subsection
25       (e)(1), over the applicable compliance period.

26  12 C.C.R. § 2299.1(g)(1)(A).  However, the regulations do not

27  require the use of these fuels.  Subsection (g) of the

28  regulations specifically allows alternative compliance plans.

21

1    Thus, the regulations require a limitation on emissions in

2    accordance with 13 C.C.R. § 2299.1(e), but give vessel owners

3    various mechanisms to comply with the emissions limitation.

4    Accordingly, the regulations, on their face, impose standards

5    relating to the control of emissions, and thus are preempted by

6    CAA § 209(e)(2).  Defendants, individually and collectively,

7    raise several arguments why the court should not classify the

8    regulations as standards--none of which the court finds

9    convincing.

10        Regulations that merely govern fuel quality

11   characteristics are permissible under CAA § 211, which allows

12   California to regulate motor vehicle fuels without an EPA waiver.

13   42 U.S.C. § 7545(c)(4)(B).  However, regardless of the

14   applicability of this provision to nonroad sources, defendants'

15   contentions that almost every affected vessel has switched to

16   marine gas oil or qualified marine diesel oil so that the

17   regulations would be allowed under CAA § 211 confuses standards

18   with the means of complying with those standards.  See Adamo

19   Wrecking Co. v. United States, 434 U.S. 275 (1978) (asbestos

20   regulation that specified procedures to be followed in connection

21   with building demolitions did not by its terms limit emissions;

22   consequentially, it was not an emission standard but a work

23   practice standard).  Any emissions standard imposed is separate

24   and apart from means of compliance and requires EPA authorization

25   regardless of how vessel owners choose to comply.  Since the

26   challenged regulations impose emission standards, CAA § 211 does

27   not save them from preemption.

28        It is not necessary for regulations to set "numerical

22

1  emission levels" to be preempted.  Cackette argues that because
2  different vessel engines may be in compliance even though those
3  engines emit different levels of pollutants, the regulations do
4  not set "numerical emission levels."  (Cackette's Opp'n 18.)
5  However, this reading of SCAQMD elides the "such as" language
6  from the SCAQMD court's opinion in which they wrote that standard
7  was used throughout Title II of the CAA "to denote requirements
8  such as numerical emissions levels with which vehicles or engines
9  must comply."  SCAQMD, 541 U.S. at 253.  Indeed, the SCAQMD court
10 cited the dictionary definition of standard, which included
11 "criteria."  Id. at 252-53.  To meet the criteria referred to in
12 CAA § 209(a), "the vehicle or engine must not emit more than a
13 certain amount of a given pollutant."  Id. at 253.  Justice
14 Scalia, for the SCAQMD majority, wrote "[t]hat a standard is a
15 standard even when not enforced through manufacturer-directed
16 regulation can be seen in Congress's use of the term in another
17 portion of the CAA."  Id. at 254 (discussing the fact that CAA §
18 246 specifically required state-adopted and federal-approved
19 restrictions on the purchase of fleet vehicles to meet clean-air
20 standards) (further citations omitted).  The court agrees with
21 plaintiff that standards do not require a strict, identical
22 numerical test, but that numerical reductions required of
23 specific engines set "standards" for that particular engine.

24      Nor is the court convinced by Cackette's argument that
25 the mere fact that the regulations require a numerical reduction
26 in emissions does not mean that they are emission standards.
27 (Cackette Opp'n 20-22.)  In 2001, the EPA found the Texas ground
28 support equipment ("GSE") rule requiring the reduction of NOx

23

1  emission by ninety percent was not a preempted emissions

2  standard.  66 Fed. Reg. 16,432, 16,433 (Mar. 26, 2001) ("The fact

3  that the level of required reductions is quantified and is

4  calculated based on the level of emissions generated by the GSE

5  fleet in-use in a prior year does not change the conclusion that

6  assigning a general emissions reductions obligation to a fleet

7  operator does not amount to an emissions standard on non-road

8  equipment.")  However, unlike the Texas GSE's generalized

9  criteria, which are unrelated to the emissions rates or

10 characteristics of particular engines, the challenged regulations

11 adopt quantifiable maximum levels of emissions for each engine

12 based on the emission rates and characteristics of each

13 individual engine.[12]  The court does not find this argument

14 persuasive.

15       It is not a prerequisite for classification as a

16 standard that nonroad regulations affect manufacturers.  NRDC

17 argues that classifying the regulations as standards ignores the

18 crucial distinction between preempted standards that place

19 burdens on manufacturers and legally permissible requirements

20 imposed on the operators of nonroad vehicles.  (NRDC Opp'n 13.)

21

22       [12]  Cackette notes that the EPA also declined to preempt
the Texas GSE regulations because the fleet operator had several
alternatives to show compliance with the reductions requirement.

23 "The alternative to obtain reductions from the GSE fleet itself
does not mandate a specific emissions level that the equipment

24 must achieve but instead provides the fleet operators flexibility
in how they obtain the reductions, including allowing

25 restrictions on use and operation of the equipment."  66 Fed.
Reg. 16,432, 16,433 (Mar. 26, 2001).  The challenged regulations

26 again are different in that they relate to each individual
engine.  Further, the Texas GSE requirements conform to Allway

27 Taxi's requirement that they affect primarily intrastate
commerce, which is facially different from the challenged

28 regulations.  See Allway Taxi, 340 F. Supp. at 1124.

1   Plaintiff does not demonstrate that the regulations would have
2   any effect on the manufacturers, which was of great importance to
3   the SCAQMD court.  SCAQMD, 241 U.S. at 255-56.  However, the
4   SCAQMD court's analysis that regulations must affect
5   manufacturers to be standards is inapplicable here in light of
6   the court's determination that CAA § 209(e)(2) preempts both new
7   and non-new nonroad vehicles and engines.  SCAQMD interprets CAA
8   § 209(a), which while very similar in its language, only preempts
9   new road vehicles and engines.  EMA, 88 F.3d at 1079.  The SCAQMD
10  court's concern that regulations have effects on manufacturers in
11  order to be preempted is understandable given the more limited
12  preemptive effect of CAA § 209(a).  Since CAA § 209(e)(2)
13  preempts both new and non-new nonroad vehicles and engines,
14  regulations need not have direct effects on manufacturers to be
15  preempted standards.

16          Nor does the EMA decision dictate a different result.
17  The EMA court does suggest that to be classified as standards,
18  regulations must relate-back to manufacturers.  EMA, 88 F.3d
19  1089-90.  However, the EMA court's discussion was in the context
20  of CAA § 209(e)(1).  Id.  CAA § 209(e)(1), like CAA § 209(a),
21  only preempts standards of specified new sources (engines used in
22  construction or farm equipment or vehicles smaller than 175
23  horsepower and locomotive engines).  42 U.S.C. § 7543(e)(1).
24  Again, CAA § 209(e)(2) preempts California from setting emission
25  standards without EPA approval for both new and non-new nonroad
26  sources.  42 U.S.C. § 7543(e)(2).  Accordingly, the regulations
27  do not need to "relate back" to the manufacturers or
28  significantly affect them to be considered emission standards.

25

1              iii. <u>Presumption Against Preemption Does Not</u>

2                   <u>Apply</u>

3          The presumption against preemption does not change the

4    court's conclusion that the challenged regulations are standards

5    relating to the control of emissions.  "[B]ecause the States are

6    independent sovereigns in our federal system, we have long

7    presumed that Congress does not cavalierly pre-empt state-law

8    causes of action."  <u>Medtronic</u>, 518 U.S. at 485.  In preemption

9    cases, and particularly in those in which Congress has

10   "legislated . . . in a field which the States have traditionally

11   occupied," the Supreme Court counsels that courts should "start

12   with the assumption that the historic police powers of the States

13   were not to be superseded by the Federal Act unless that was the

14   clear and manifest purpose of Congress."  <u>Rice</u>, 331 U.S. at 230.

15         Defendants cite <u>Huron Portland Cement Company v. City</u>

16   <u>of Detroit</u>, 362 U.S. 440, 442 (1960), for the proposition that

17   because emissions control is a historic police power and the CAA

18   gives primary responsibility for reducing air pollution to the

19   states, the presumption should apply.  However, in 1967, just two

20   years after Congress first authorized federal emission

21   regulations, and subsequent to the Supreme Court's decision in

22   <u>Huron Portland Cement</u>, Congress preempted states from adopting

23   emission standards on road sources.  <u>EMA</u>, 88 F.3d at 1079.

24   Additionally, the regulation of motor sources has been primarily

25   a federal project, unlike regulation of pollution from stationary

26   sources.  <u>See</u>, <u>e.g.</u>, <u>EMA</u>, 1078-1082; <u>MVMA</u>, 17 F.3d at 524-27;

27   <u>MEMA</u>, 627 F.2d at 1101-03, 1108-11.  More importantly, the

28   challenged regulations affect the field of international maritime

commerce, which has historically been within the purview of the federal rather than the state government.  United States V. Locke, 529 U.S. 89, 108 (2000).  In Locke, the Supreme Court observed that maritime commerce is "an area where the federal interest has been manifest since the beginning of our Republic and is now well established."  529 U.S. at 99.  Indeed, during the debates on the ratification of the Constitution, the Federalist Papers touted the authority of Congress to regulate interstate navigation without intervention from separate states that would result in difficulties conducing foreign affairs, as a primary reason for adopting the Constitution.  See Federalist Nos. 4, 6, and 22.

The presumption does not apply where "there has been a history of significant federal presence."  Id.  Even so, this question is immaterial given the court's conclusion that CAA § 209(e)(2)(A) preempts any non-EPA approved state standards controlling emissions from auxiliary diesel engines.  See SCAQMD, 541 U.S. at 257-58 (presumption against preemption not addressed in determining certain state fleet rules were preempted by CAA § 209(a) and criticizing dissent; dissent began analysis with the presumption against preemption).

III. Conclusion

For the foregoing reasons, the regulations are standards and are therefore preempted by CAA § 209(e)(2).  The regulations are not in-use requirements.  Because the regulations set numerical requirements for the reduction of emissions relating to particular emissions rather than a fleet as a whole, the regulations are "standards relating to the control of

27

emissions."  Unlike CAA § 209(a) or CAA § 209(e)(1), standards in
CAA § 209(e)(2) do not have to "relate back" to manufacturers.
Finally, the presumption against preemption does not save
California's regulations.  Accordingly, the court will grant
plaintiff's motion for summary judgment on their first claim for
relief and enjoin defendants from enforcing the regulations.

IT IS THEREFORE ORDERED that:

(1) plaintiff's motion for summary judgment on its
first claim for relief be, and the same hereby is, GRANTED; and

(2) defendants be, and they hereby are, PERMANENTLY
ENJOINED from enforcing 13 C.C.R. § 2299.1 and 17 C.C.R. § 93118.
Should defendants receive authorization from the EPA, pursuant to
CAA § 209(e)(2)(A), they may move this court to dissolve this
injunction.

DATED:  August 30, 2007

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE